ORIGINAL

**FILED**

JAN - 7 2009

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

1   GORDON P. ERSPAMER (CA SBN 83364)
    GErspamer@mofo.com
2   TIMOTHY W. BLAKELY (CA SBN 242178)
    TBlakely@mofo.com
3   ADRIANO HRVATIN (CA SBN 220909)
    AHrvatin@mofo.com
4   KIMBERLY L. TAYLOR (CA SBN 240483)
    KTaylor@mofo.com
5   STACEY M. SPRENKEL (CA SBN 241689)
    SSprenkel@mofo.com
6   MORRISON & FOERSTER LLP
    425 Market Street
7   San Francisco, California 94105-2482
    Telephone: 415.268.7000
8   Facsimile: 415.268.7522

**E-filing**

9   Attorneys for Plaintiffs
    Vietnam Veterans of America; Bruce Price; Franklin D.
10  Rochelle; Larry Meirow; Eric P. Muth; David C. Dufrane; and
    Wray C. Forrest

**CW**

11

12              UNITED STATES DISTRICT COURT

        NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION
13

**CV 09        0037**

14  VIETNAM VETERANS OF AMERICA, a Non-Profit       Case No.
    Corporation; BRUCE PRICE; FRANKLIN D.
15  ROCHELLE; LARRY MEIROW; ERIC P. MUTH;           **COMPLAINT FOR**
    DAVID C. DUFRANE; and WRAY C. FORREST,          **DECLARATORY AND**
16  Individuals,                                    **INJUNCTIVE RELIEF UNDER**
                                                    **UNITED STATES**
17                  Plaintiffs,                     **CONSTITUTION**

18          v.

19  CENTRAL INTELLIGENCE AGENCY; GENERAL
    MICHAEL V. HAYDEN, USAF, Director of the
20  Central Intelligence Agency; UNITED STATES
    DEPARTMENT OF DEFENSE; DR. ROBERT M.
21  GATES, Secretary of Defense; UNITED STATES
    DEPARTMENT OF THE ARMY; PETE GEREN,
22  United States Secretary of the Army; UNITED
    STATES OF AMERICA; and MICHAEL B.
23  MUKASEY, Attorney General of the United States,

24                  Defendants.

25

26

27

28

## I.   INTRODUCTION

"When we assumed the soldier, we did not lay aside the citizen." — George Washington.

### A.   The Plight of the "Volunteers"

1.   This action chronicles a chilling tale of human experimentation, covert military operations, and heretofore unchecked abuses of power by our own government. Ironically, one of the main facilitating events for this debacle was action by a court. In 1950, during the height of the Cold War, the U.S. Supreme Court issued its decision in the *Feres* case, which in effect ruled that the government is immune from damages claims brought by Armed Forces personnel arising from DEFENDANTS' own torts. The Supreme Court's decision to absolve DEFENDANTS of legal responsibility for damages caused by the tortious acts committed by the government upon our nation's military personnel quickly led DEFENDANTS to undertake an expansive, multi-faceted program of secret experimentation on human subjects, diverting our own troops from military assignments for use as test subjects. In virtually all cases, troops served in the same capacity as laboratory rats or guinea pigs. DEFENDANTS were able to capitalize on the inherently coercive relationship of a soldier's commanding officers to their soldiers, as military orders can be enforced by a strong set of formal and informal sanctions.

2.   In 1942, the War Department — the present day Department of Defense ("DOD") — authorized the first experiment on military personnel, and beginning in the early 1950s, the Central Intelligence Agency ("CIA") and United States Army planned, organized and executed an extensive series of chemical and biological experiments. The CIA also sponsored human drug experimentation by the Federal Bureau of Narcotics ("FBN"), now the Drug Enforcement Administration ("DEA"). This vast program of human experimentation — shrouded in secrecy — was centered at the Army's compounds at Edgewood Arsenal and Fort Detrick, Maryland. The human experimentation was conducted without the informed consent of its subjects and in direct contravention of applicable legal standards and principles of international law. Representatives of DEFENDANTS had also, on many occasions, promised the test participants ("volunteers") that they would receive medals for volunteering, as well as health care, but they instead abandoned Plaintiffs and the other participants, hiding behind the insulating

walls of government bureaucracies and security classifications. Indeed, DEFENDANTS actively concealed the existence of the human experimentation tests and the test results from the outside world, and destroyed most of the documentation of the tests once their existence began to leak. As a result, Plaintiffs and the other service personnel, many of whom are debilitated, have been left to fight their demons alone for decades without health monitoring, follow-up, or medical treatment from DEFENDANTS. Instead, DEFENDANTS' tactic and strategy have been to ignore the victims and delay action with the expectation that their problems will disappear as the victim population ages and dies.

3.     DEFENDANTS' human experimentation program was far-ranging and had many purposes, including by way of example the following:

a.     To develop non-lethal but incapacitating agents that could be disseminated by airplanes in all environments;

b.     To explore what levels of various chemicals would produce casualties (the so-called "man-break" tests);

c.     To research techniques to impose control over the will of an individual, including neuron-surgery, electric shock, drugs, and hypnosis;

d.     To design and test septal electrodes that would enable DEFENDANTS directly to control human behavior;

e.     To produce a "knockout" pill that could surreptitiously be dropped into drinks or added into food;

f.     To develop a substance that could produce "pure euphoria" with no subsequent let-down;

g.     To derive an undetectable substance that would lower the ambition and general working efficiency of humans;

h.     To develop a substance that would cause mental confusion and make it more difficult to fabricate answers under questioning;

i.     To create a substance that would alter personality structure and induce dependency on another person;

1            j.      To develop a substance that would promote weakness or temporarily

2 compromise hearing or eyesight;

3            k.      To perfect a substance that could be administered surreptitiously, which

4 would prevent someone from performing any physical activity;

5            l.      To identify a substance that would promote illogical thinking or

6 impulsiveness;

7            m.      To develop a substance that would increase, prevent or counteract the

8 intoxicating effects of alcohol;

9            n.      To create materials that would facilitate the induction of hypnosis or

10 enhance its usefulness;

11            o.      To identify substances that would enhance an individual's ability to

12 withstand torture, privation, interrogation or brain-washing;

13            p.      To derive substances that would produce physical disablement, paralysis,

14 or acute anemia; and

15            q.      To find a substance capable of producing extended periods of shock, mania

16 and stress, and confusion or amnesia.

17 In short, under this program of human experimentation, the roles of military doctors were

18 reversed from healing to purposely exposing their patients to harm.

19        4.      DEFENDANTS used at least 7,800 armed services personnel in the

20 experimentation program at the Edgewood Arsenal alone, the vast majority of which were troops

21 from the Army, although troops from the Air Force and Marines also were used. DEFENDANTS

22 used code names to refer to the substances administered to soldiers, and the true identities and

23 properties of at least 250, but as many as 400 chemical and biological agents administered to

24 soldiers at the Edgewood Arsenal, or to other "volunteers" under contract to the Edgewood

25 Arsenal, were not disclosed. In 1970, Defendants provided Congress with an alphabetical list

26 showing that they had tested 145 drugs during Projects Bluebird, Artichoke, MKULTRA and

27 MKDELTA. Among the broader group of substances or agents tested were the following:

28         •   **amphetamines;**

- **anticholinesterase chemicals** such as the "reversible" inhibitors physostigmine (eserine), tacrine, and mylaxen; and more lethal nerve agents such as VX (Edgewood Arsenal designation EA 1701) (a V-series agent developed in England in the early 1950s that is one of the most deadly chemicals known to man) and sarin (military designation GB; EA 1208), tabun (GA; EA 1205) and soman (GD; EA 1210) (G-series nerve agents, all of which were developed in Germany in the 1930s and 1940s), and other lethal compounds such as cyanide;

- **anticholinergic drugs** such as atropine, scopolamine and nonlethal, though potentially harmful, incapacitating agents such as BZ (EA 2277), CAR302,688, and other glycolate compounds such as EA 3580;

- **barbiturates** such as secobarbitol;

- **biochemicals** such as thiols, hydrogenated quinolines, and indole alkaloids;

- **cholinesterase reactivators**, such as the pralidoxime chloride (2-PAM or EA 2170) and its methyl methanesulfonate derivate P2S, toxogonin (EA 3475) and TMB-4 (EA 1814) (all of which are oximes);

- **Irritants** such as chloropicrin (PS), the riot control agents brombenzyl cyanide (CA), o-chlorobenzylidene malononitrile (CS or EA 1779), chloroacetophenone (CN or Mace), nonanoyl morpholide (EA 1778) and disphenylaminochlorasine (DM, an arsenic, or Adamsite); and vesicants (blister agents) such as mustard gas (H) and mustard agents, and Lewisite;

- **narcotic antagonists** such as N-Allil Murmorphine and other drugs to counteract the effects of morphine, methadone, and other narcotics;

- **nettle agents** such as phosgene, also known as dichloroformoxime or CX, a highly toxic, irritating, and corrosive gas that was first used as a chemical weapon during World War I;

- **psychochemicals** such as LSD and its analogues, phencyclidine (SNA or Sernyl, also known as PCP) (commonly referred to using the code name "L-Fields" or "K-Agents"), THC and synthetic analogs of cannabis (about 50 times the then street strength of marijuana) such as dimethylheptylpran (DMHP or EA 1476) and its acetate form EA 2233; and mescaline and mescaline derivatives; and

- **tranquilizers** such as valium, trilafon, and thorazine.

1     5.     DEFENDANTS videotaped many of the experiments involving "volunteers" at

2    Edgewood, as evidenced by releases signed by many of the "volunteers."

3     6.     Varying doses of each substance were administered to the "volunteers," typically

4    through multiple pathways, including through intravenous, inhalation, oral and percutaneous.

5    Placebos were used in only some, but not all of the studies, in an effort to defray costs.

6     7.     The Edgewood experiments were one of the key beneficiaries of the recruitment of

7    over 1,500 Nazi scientists and technicians in "Project Paperclip," some of whom played a pivotal

8    role in, *e.g.*, the testing of psychochemicals and development of a new truth serum. Over half of

9    these Nazi recruits had been members of the SS or Nazi Party. The "Paperclip" name was chosen

10    because so many of the employment applications were clipped to immigration papers.

11     8.     In addition to the human experimentation using military personnel that took place

12    at Edgewood Arsenal and Fort Detrick, DEFENDANTS also contracted with outside researchers

13    at hospitals, universities, consultants, and prisons to conduct additional human tests of chemical

14    and biological substances. DEFENDANTS obtained materials from major pharmaceutical

15    companies, which included drugs found to be commercially non-viable due to hazards and

16    undesirable side effects (the so-called "rejects"), such as phenylbenzeacetic acid or "brown acid."

17    Other test substances included amphetamines, anticholinergic drugs, including glycolate types of

18    anticholinergic compounds, dimethyltryptamine (a drug similar to LSD), glycolate compounds

19    such as EA 3580 (the prefix "EA" indicating an Edgewood Arsenal substance), mescaline and

20    mescaline derivatives, oximes such as pralidosime chloride, phosgene, secobarbitol, and many

21    others. These experiments also used civilian "volunteers" such as college students, who were

22    paid small sums to participate, or prisoners.

23     9.     The doses of these chemicals administered to the service members were at times

24    several multiples above the known toxic threshold, causing excruciating pain, blackouts, memory

25    loss, hallucinations, flashbacks, trauma, psychotic disorders, and other lasting health problems.

26    Indeed, a 2007 study found that PTSD rates amongst veterans exposed to chemicals in research

27    projects were higher than those of combat veterans. In some instances, the "volunteers" suffered

28    grand mal seizures, epileptic seizures or acute paranoia. In at least a few instances, the victims

1  died. Initially, the research program was limited to "defensive" purposes such as the testing of

2  gas masks or development of antidotes, but it quickly was expanded to offensive uses with no

3  practical limits and blatant disregard of required procedures.

4      10.    Not only did DEFENDANTS repeatedly violate principles of ethics and human

5  decency, as established by international law and convention through, among other

6  pronouncements, the Nuremberg Code and the Declaration of Helsinki, but they also violated

7  their own regulations and the U.S. Constitution.

8      11.    The expansive scope of DEFENDANTS' undertakings resulted in *ad hoc* leaks of

9  bits of information about their nefarious activities. Eventually, Congress convened hearings in

10  1975 to 1977 in an attempt to shed some light on the top-secret Edgewood and other experiments.

11  During these hearings, the "pass the buck" strategy began. Admiral Stansfield Turner, the CIA

12  Director, promised to locate participants in the tests and compensate those whose conditions or

13  diseases were linked to their exposures during the programs of human experimentation. Turner

14  assured a joint Congressional Committee that the CIA was working with both the Attorney

15  General and the Secretary of Health, Education and Welfare "to determine whether it is

16  practicable . . . to attempt to identify any of the persons to whom drugs may have been

17  administered unwittingly," and was "working to determine if there are adequate clues to lead to

18  their identification, and if so, how to go about fulfilling the Government's responsibilities in the

19  matter." (*Project MKULTRA, The CIA's Program of Research in Behavioral Modification: Joint*

20  *Hearing Before the S. Select Comm. on Intelligence and the Subcomm. on Health and Scientific*

21  *Research of the S. Comm. on Human Resources*, 95th Cong. (1977) at 8.) Thereafter, the

22  Attorney General assumed responsibility for the governmental effort to locate "volunteers," with

23  the other DEFENDANTS providing a supporting role. On January 10, 1979, Director Turner

24  passed off responsibility for finding and compensating the victims of certain MK-related

25  programs to the Department of the Army.

26      12.    On July 17, 1978, in response to an opinion request from the CIA, the Department

27  of Justice issued a twenty-five page opinion (the "DOJ Opinion") that concluded:

28

1

[T]he **CIA may well be held to have a legal duty to notify those**
**MKULTRA drug-testing subjects whose health the CIA has**
**reason to believe may still be adversely affected by their prior**
**involvement in the MKULTRA drug-testing program** [and] that
an effort should thus be made to notify these subjects . . . .

2

3

4   (Emphasis added.)  A true copy of the DOJ Opinion is attached as Exhibit A hereto, and

5   incorporated by this reference.  (*See* Exh. A at A-006.)  However, CIA General Counsel Anthony

6   Lapham reinterpreted the DOJ Opinion in a July 24, 1978 memorandum to CIA Director Turner,

7   which undermined the recommendations and conclusions in the DOJ Opinion.  Turner approved

8   the recommendations in Lapham's memorandum on July 26, 1978.

9        13.    DEFENDANTS' promise in the 1970s to locate the victims of their human

10  experimentation program, and to provide compensation and health care, proved to be hollow.

11  DEFENDANTS never made a sincere effort to locate the survivors.  Rather, DEFENDANTS

12  quickly adopted a variety of artificial means to limit the number and scope of the population

13  entitled to notice, including eliminating "witting" participants (conveniently defined to include

14  anyone who had signed a general consent form); requiring that it first be established that the CIA

15  should bear "primary responsibility" for the conduct of the tests (taking advantage of the fact that

16  the CIA funded and controlled, but did not actually conduct most of the tests); eliminating tests of

17  substances that arguably did not qualify as "drugs," and eliminating drugs that at the time of the

18  test were considered "not likely to produce long-term aftereffects."  On July 6, 2004, Admiral

19  Stansfield Turner confirmed in private correspondence that the CIA effort to locate the victims of

20  human experimentation did not yield any results other than confirming the death of one

21  individual.  Yet, despite the CIA's repeated representations over multiple decades that they could

22  not find any living persons who participated in Edgewood experiments and others, the CIA had in

23  fact secretly obtained a "large data base" from Edgewood Arsenal in 1974.  Currently, at a point

24  in time 35 years later, the DOD claims to be still working to compile a registry of participants and

25  does not expect to complete work until 2011.  "DoD plans to complete its active investigation of

26  potential exposures by 2011." (*See* http://fhp.osd.mil/CBexposures/.)

27

28

14. As a result, DEFENDANTS failed timely to locate or notify test subjects, and refused to provide compensation or medical screening or treatment to those participants who contacted DEFENDANTS.

15. Similarly, Congressional efforts to locate the "volunteers" and to require medical follow-up achieved only limited success. In 2005, two United States Congressmen acquired and sent a list of "volunteers" to the Department of Veterans Affairs to facilitate delivery of the much-needed, and long-denied, follow-up care. Although the VA offered follow-up medical *examinations* to some, ongoing medical *care* was not provided. Repeated pleas by soldiers to petition for medal awards or recognition were similarly dismissed, ignored or denied. In fact, neither the Plaintiffs nor other victims of DEFENDANTS' human experimentation program have received so much as an apology. DEFENDANTS once again had failed to fulfill the promise to provide the "volunteers" with the medals and commendations that they deserve, and the health care that they so desperately need.

16. Recently, DEFENDANTS began to give some of the "volunteers" access to portions of their available Edgewood files, although the records were not available, incomplete, or heavily redacted in many cases. In addition to the redaction of entire paragraphs or pages, DEFENDANTS redacted the names of virtually all the perpetrators from documents prior to release. Some participants learned for the first time that they had been exposed to chemical agents, including hallucinogenic and psychotropic drugs. These files provided the first hints regarding a possible relationship between patients' ailments and the chemical and biological exposures from Edgewood Arsenal. Other "volunteers" have never been notified at all.

17. Plaintiffs have repeatedly petitioned Congress and DEFENDANTS to honor the promises made to them, but DEFENDANTS have done nothing and have renounced any duty to Plaintiffs, thereby depriving Plaintiffs of their lives and health, their property, and their honor. Although wary of government retaliation, and believing that their health has been compromised by DEFENDANTS' actions, Plaintiffs, all of whom were victims of the Edgewood tests, have now come forward to challenge DEFENDANTS for needlessly exposing them to known toxins and failing to fulfill their obligations and promises to make amends. Plaintiffs ask the Court to

1  use its equitable powers to check flagrant abuses of government power, and seek to avail

2  themselves of the Court's truth-seeking function so that they can finally discover and expose the

3  embarrassing and painful history of America's human experimentation on its own.  This is their

4  story.

5          **B.    Summary of Action**

6          18.    This is a lawsuit for declaratory and injunctive relief in which Plaintiffs seek the

7  following equitable relief:

8                  a.      A declaration that any consent forms signed by Plaintiffs or similar forms

9  signed by other "volunteers" are not valid or enforceable; that Plaintiffs are released from any

10  further obligations under their secrecy oaths; that DEFENDANTS are obligated to notify

11  Plaintiffs and other test participants of all available information concerning the nature of the

12  substances, experimental procedures used, doses, health effects, and other information; that

13  DEFENDANTS have violated the rights of Plaintiffs under the due process clause of the Fifth

14  Amendment; the DEFENDANTS' testing program violated the applicable DOD directives and

15  international law; that the Court must draw adverse inferences from DEFENDANTS' document

16  destruction, redactions, spoliations, and other wrongful acts described herein; and, finally, that

17  DEFENDANTS are obligated to provide the medical care, medals, and other things promised to

18  Plaintiffs when they induced them to "volunteer" for the tests.

19                  b.      Injunctive relief enjoining DEFENDANTS, and anyone in concert with

20  them, from failing and refusing promptly to notify and provide medical care to Plaintiffs and

21  other participants in MKULTRA and other experiments on human subjects, and various other

22  forms of injunctive relief, as prayed for below.

23          **C.    Jurisdiction and Venue**

24          19.    The Court has jurisdiction over the subject matter of this action pursuant to

25  28 U.S.C. § 1331, and 5 U.S.C. § 702.  The action arises out of the Constitution of the United

26  States, and Plaintiffs seek to redress violations of the First and Fifth Amendments to the United

27  States Constitution and other constitutional provisions recited herein.  Plaintiffs also seek a

28

1    declaratory judgment pursuant to 28 U.S.C. § 2201, and seek to compel agency action unlawfully

2    withheld or unreasonably delayed pursuant to 5 U.S.C. § 706.

3        20.    Venue is proper under 28 U.S.C. §§ 1402(a) and 1391(e).

4    **D.    The Organizational Plaintiff**

5        21.    Plaintiff VIETNAM VETERANS OF AMERICA ("VVA"), founded in 1978, is a

6    national non-profit organization primarily dedicated to the interests of Vietnam era veterans and

7    their families. The VVA's founding principle is "Never again shall one generation of veterans

8    abandon another." VVA has over 50,000 members, 46 state councils and 630 local chapters.

9    VVA's principal goals are to promote veterans' access to quality health care, to insure that

10   veterans receive mandated compensation for diseases or conditions that they have incurred during

11   or as a result of military service, to support the next generation of America's veterans, including

12   Operation Iraqi Freedom and Operation Enduring Freedom ("OIF/OEF") veterans, and to hold

13   government agencies accountable for their legal, ethical, and moral obligations to its veterans.

14       22.    The purposes of the VVA, its State Councils, and its Chapters are:

15   A. To help foster, encourage, and promote the improvement of the condition of the Vietnam-era veteran.

16

17   B. To promote physical and cultural improvement, growth and development, self-respect, self-confidence, and usefulness of Vietnam-era veterans and others.

18

19   C. To eliminate discrimination suffered by Vietnam-era veterans and to develop channels of communication which will assist Vietnam-era veterans to maximize self-realization and enrichment

20   of their lives and enhance life-fulfillment.

21   D. To study, on a non-partisan basis, proposed legislation, rules, or regulations introduced in any Federal, State, or local legislative or

22   administrative body which may affect the social, economic, educational, or physical welfare of the Vietnam-era veteran or

23   others; and to develop public policy proposals designed to improve the quality of life of the Vietnam-era veteran and others, especially

24   in the areas of employment, education, training, and health.

25   E. To conduct and publish research, on a non-partisan basis, pertaining to the relationship between Vietnam-era veterans and the

26   American society, the Vietnam War experience, the role of the United States in securing peaceful co-existence for the world

27   community, and other matters which affect the social, economic, educational, or physical welfare of the Vietnam-era veteran or

28   others.

Case No. _____
COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
sf-2564536

10

F. To assist disabled and needy military veterans including, but not limited to, Vietnam-era veterans and their dependents, and the widows and orphans of deceased veterans.

23.     Among VVA's members are former members of our armed services who participated in DEFENDANTS' programs of human experimentation into drugs, chemicals, and other substances, and have suffered or continue to suffer from the after-effects of such experiments, as described in this Complaint. Several of the Individual Plaintiffs are VVA members.

**E.     The Individual Plaintiffs**

<u>**Bruce Price**</u>

24.     Plaintiff BRUCE PRICE joined the U.S. Army in May 1965. Bruce was assigned to duty at Edgewood Arsenal for approximately two months in 1966 — from February 27, 1966, to April 28, 1966. Before being assigned to Edgewood Arsenal, Bruce was stationed at Ft. George G. Meade and that was where he returned until he was discharged in May 1967. Bruce was trained as a helicopter crew chief, and also had other assignments, such as a door gunner.

25.     Bruce first went through a battery of physical and mental evaluations at Edgewood before being used as a test subject. Bruce and three other volunteers were taken into a room where four doctors were present. Two of the doctors were dressed in civilian garb and two were military doctors, including a colonel. The colonel, who seemed to be in charge, described the program and in substance said: "We know you have heard rumors we use drugs here. Well I am here to tell you that is true. We cannot tell you what they are. We do not know if the drugs will have any harmful effects on you. But we have the finest medical facilities. Now, we can't force you to take these drugs, but if you do not, you will be sent back to your home unit with a bad recommendation and it will be put in your DD Form 201 file and follow you for the rest of your life."

26.     At some point, Bruce was asked to sign a general consent form that did not state any information about the drugs to be given. When he started to read the forms, Bruce was berated and told to hurry up and sign them. Bruce never received a Volunteer Booklet explaining the details of the Edgewood assignment.

27.    Bruce participated in several different experiments involving unknown substances. Many decades later, he heard that some of the substances he was administered included BZ, LSD, sarin, and ethanol. He is still not sure what he was given or in what doses. One of the drugs that was administered to Bruce was given on a Monday, and Bruce did not begin to recover from the drug's effect until Friday. He thought it was still Monday.

28.    At one point, Bruce was ordered to visit a building with a chain link fence that housed test animals, including dogs, cats, guinea pigs and monkeys. After reporting, Bruce was strapped across his chest, his wrists, and his ankles to a gurney. Bruce occasionally would regain consciousness for brief moments. On one such instance, he remembers being covered with a great deal of blood, and assumed it was his own, but did not really know the source. Also portions of his arms and the backs of his hand were blue. His wrist and ankles were bruised and sore at the points where he had been strapped to the gurney. Bruce believes that this is the time period during which a septal implant was placed in his brain.

29.    DEFENDANTS placed some sort of an implant in Bruce's right ethmoid sinus near the frontal lobe of his brain. The implant appears on CT scans as a "foreign body" of undetermined composition (perhaps plastic or some composite material) in Bruce's right ethmoid, as confirmed in a radiology report dated June 30, 2004.

30.    Upon leaving Edgewood Arsenal, Bruce was debriefed by government personnel. Bruce was told to never talk about his experiences at Edgewood, and to forget about everything that he ever did, said or heard at Edgewood.

31.    Within days or weeks of returning to Ft. George G. Meade, Bruce began to have trouble with his memory. For example, things as simple as filling out a maintenance report on his chopper and how to spell certain words suddenly became troublesome.

32.    After being discharged from the service with an honorable discharge, Bruce returned home to rural Tennessee. Within a few days Bruce suddenly left for the mountains with a gun with intentions of killing himself. Bruce's brother finally found him, and talked Bruce into returning home.

33.     Before Bruce revealed his experiences at Edgewood Arsenal, his family did not know why he acted so strangely at certain times. Bruce finally told his wife about Edgewood, and the fact that he would have flashbacks or visions where the road suddenly changed colors and how he would get lost while trying to go to work. Bruce disclosed to his wife that he gets lost easily, and did not remember places he had been to hundreds of times previously. Bruce's wife suggested that he avoid being close to radio waves, and when he did so, his symptoms seemed to improve. Bruce's wife also helped him to find out more about what was going on at Edgewood Arsenal. A VA medical diagnostics test ruled out the possibility of Alzheimer's Disease and dementia.

34.     In addition to memory problems, Bruce also suffers from PTSD, and at times is suicidal. He has experienced uncontrolled fits of anger and loss of control, as well as flashbacks. Although Bruce worked intermittently after Edgewood Arsenal, his entire life has been ruined.

35.     Bruce has been completely disabled for many years, and now receives social security disability payments, and has been rated by the VA as 100% service-connected for PTSD related to his service at Edgewood since 2005. He depends on his wife for much of his day-to-day care, and his social security and VA compensation are his only means of financial support.

36.     The account in this Complaint is pieced together from fragments of Bruce's own recollection, things he has told his wife in the past, and the results of his wife's research, which includes reviewing portions of Bruce's military records. To this day, Bruce continues to be haunted by nightmares and dreams about the doctors and what they did to him at Edgewood.

### Eric Muth

37.     Plaintiff ERIC MUTH was 17 years old when he enlisted in the United States Army on September 15, 1957. He was based in Missouri after completing his training and some service, and was promoted to Specialist Fourth Class. In 1959, he entered the Army Reserves. In 1960, Eric joined the National Guard where he remained until 1969 as Staff Sergeant with top-secret clearance.

38.     Early in his Army Career, Eric saw a notice on a bulletin board asking volunteers to help the Army test protective equipment and to test riot gas. Eric signed up for the tour and in

1    May 1958 attended an orientation at Edgewood Arsenal. At this orientation, an officer spoke to

2    the enlisted soldiers, again telling them that they would be testing military gear and riot gas.

3    There was no mention of any possible medical or health risks, and the soldiers were promised

4    medical care and either the Soldier's Medal or a special Congressional Medal, which was then

5    under consideration by Congress.

6         39.     Following the orientation speech, the soldiers were given various forms to sign.

7    Included in these forms were a participation agreement and a security non-disclosure form. Eric

8    was warned that his Edgewood tour was top-secret and that he would be punished if he ever

9    discussed or disclosed any part of it to anyone. It is the mark of a good soldier to follow the

10    orders and instructions of officers without question or hesitation. Seventeen-year-old Eric,

11    wanting to show courage and to help his country, signed the forms without a second thought.

12    However, he never received a Volunteer Booklet that was supposed to be distributed to

13    participants.

14         40.     The pre-experimentation physicals, x-rays, blood work, and psychological medical

15    tests run by the Army at the time indicated that Eric had heart problems, was paranoid and manic.

16    There were concerns about his mental condition and stability, making him an unsuitable

17    candidate for human experimentation according to DEFENDANTS' own guidelines. This,

18    however, did not stop the Army from enrolling Eric as a human guinea pig in its tests. (In fact,

19    Edgewood had no psychiatrist until 1961, when James S. Ketchum, M.D., assumed that position.)

20         41.     Eric became Medical Volunteer Number 781. From May to June 1958, Eric was

21    exposed at least to seven different rounds of chemical agents. He would enter a chamber with

22    several other "volunteers" all of whom wore chemical masks — the equipment Eric believed he

23    was testing — and the chamber would suddenly fill with gas. The so-called "protective gear" was

24    always entirely inadequate, and Eric felt searing pain before losing consciousness. Eric and the

25    other soldiers were unaware that the masks were a charade of deception: they were designed to

26    fail so that the subject soldiers would inhale the highly dangerous and toxic chemicals. The

27    undisclosed purpose of the tests was to determine the impact of these biological and chemical

28    agents upon human beings.

42. Eric "volunteered" for a second tour at Edgewood, which occurred from November to December 1958, during which period Eric was exposed to three or four rounds of chemical agents. Although doing his best to be brave, Eric had no idea of what they were doing, and he did experience some fear and knee buckling. One such test was conducted by injecting a chemical substance intravenously in one arm while simultaneously withdrawing blood from the other arm. Exposure to DM ("Adamsite," an arsenic compound) caused him to fall to the floor vomiting.

43. In another test, Eric was given an unidentified pill to swallow. After being exposed to what he much later learned was EA 1476, he remembers being delirious, arms and legs flailing, unable to stand or walk and crawling to the water fountain to drink, falling, and being ordered to void in jars. As a result of another exposure, Eric lost consciousness for approximately three days, had an extremely low blood pressure, and suffered severe hallucinations. His exposures record contains lines doctored by a magic marker so that they cannot be read. He also has a reoccurring dream with an "out of body experience."

44. Eric never received the Soldier's Medal or a special Congressional medal. In 1996 he petitioned the Army Board for Correction of Military Records for an Army Commendation Medal for his Edgewood service, and he also applied to the Army Awards branch. Each time, his application was denied. Although Eric received a letter of commendation for his Edgewood service, he never received the medal that he was promised.

45. To this day, Eric continues to have flashbacks of his nightmares, and received a dual diagnosis of both PTSD and bipolar disorder. He is anxious and high strung. At times, he has been suicidal. Being confined in small spaces, such as an elevator, terrifies him because it reminds him of a gas chamber, and he finds himself planning escape routes for any building, store, or space he frequents. He is fixated on keeping doorways within view. Eric's list of physical ailments is long: he has heart problems; post-surgery for aneurisms in both legs; allergies; sinus issues; emphysema; gastro-intestinal disorders; hearing loss; tinnitus; vestibular dysfunction; brain ischemia; and spinal degeneration. Notwithstanding these problems, Eric pursued a successful career as an optician.

46.     Due to the security non-disclosure, the warnings that his Edgewood experience was top-secret, and the threats of punishment for telling his tale, Eric did not seek medical attention for many of his ailments until around 1997, when he sought care from VA doctors. Even then, he kept secret the details of his Edgewood past.  More recently, Eric's physicians were able to link certain of his ailments and problems to the agents to which he was unwittingly exposed at Edgewood.  The Social Security Administration has found Eric to be disabled, and the VA also found that Eric was 100% disabled based upon the VA's rating schedule, a portion of which was attributable to his service at Edgewood.

47.     In 2002, Eric underwent an occupational and environmental medicine health and safety exam offered by the VA.  The VA told him that his exposures at Edgewood did not produce any long-term health impacts.  In 2006, Eric received a letter from the VA offering him the opportunity to undertake another health examination as a follow-up to his Edgewood service. Eric took a copy of the letter to his local VA eligibility office in West Haven, Connecticut. However, the VA Eligibility Technician told Eric that they knew nothing about any such offer.

### Frank Rochelle

48.     Plaintiff FRANK ROCHELLE was raised in rural North Carolina.  In 1968, at the age of 20, he was drafted into the Army.  He attended boot camp at Fort Bragg, North Carolina, and was then based at Fort Lee, Virginia.

49.     While at Fort Lee, Frank saw posted notices asking for servicemen to test military equipment, clothing, and gas masks.  The opportunity appealed to Frank in part because the signs promised no guard duty, no KP ("Kitchen Police") duty, and the freedom to wear civilian clothes instead of his uniform.  Frank submitted his name for the assignment.

50.     Upon arriving at Edgewood Arsenal, Frank attended an orientation meeting where he was told that some servicemen might be given the opportunity to test therapeutic drugs currently under development.  The servicemen selected for this would be given Fridays off and would receive special recognition in the form of a medal.  The presenters assured Frank and the attendees that they would not be harmed, that the tests were risk free, and that the drugs given would not be above normal doses.  Frank never was told what he would be testing, nor was Frank

1  warned of any hazards. Frank signed up for the program. He was given a number of tasks and

2  quizzes to test his competency. He also was asked to sign various forms, including a release

3  form. A self-described "country boy" who had never been exposed to street drugs, let alone

4  heard of chemical and other hazardous substances used by the Army, Frank had no clue of what

5  he was in for. He simply signed the form handed to him. Frank was never given a Volunteer

6  Booklet.

7      51.    Frank was stationed at Edgewood Arsenal for a 60-day tour from September 1,

8  1968, to the end of October 1968. Although he does not remember ever signing a security non-

9  disclosure form, he was instructed to never talk about any of his tests. As his first test, he was

10  given an injection that had no discernable effect on him, possibly because it may have been a

11  placebo.

12      52.    The second experiment on Frank, however, proved to be an entirely different story.

13  Frank was taken into a chamber by two individuals in white coats. He was placed in front of a

14  face mask and told to breathe normally. Frank did so, at which point he heard a valve click and

15  smelled some gas. Within one breath, Frank began to lose consciousness. He struggled to

16  breathe and had difficulty seeing. He felt dizzy, drunk, nauseous, and had the acute sensation that

17  his legs were falling through the floor. He vaguely recalls being carried out of the chamber by

18  two men in white coats. Over the next two to three days, Frank was hallucinating and high: he

19  thought he was three feet tall, saw animals on the walls, thought he was being pursued by a 6-foot

20  tall white rabbit, heard people calling his name, thought that all his freckles were bugs under his

21  skin, and used a razor to try to cut these bugs out. No one from the clinical staff intervened on his

22  behalf even though he was told that the test subjects would be under constant supervision.

23  However, when questioned afterwards about the source of the blood, Frank told them that he

24  dropped his razor while shaving. He was too embarrassed to tell them the truth about what had

25  happened. Frank's records show that on that day he was given the glycolate, CAR 302668, an

26  anticholinergic with properties identical to atropine, at a dose above the calculated incapacitating

27  amount.

28

53.     Frank's available records from Edgewood indicate that he participated in a third round of testing during his tenure at Edgewood. To this day, he is unable to recall a single detail from this period of time. However, Frank's records suggest that the substances he received were code-named EA 2233-1 and EA 2233-2. Frank knows nothing about these substances, but internet research has revealed that EA 2233 is a non-lethal incapacitating agent that is actually DMHP, and is related in structure to THC. It has eight stereoisomers, which differ markedly in potency, and the most potent stereoisomer was EA 2233-2. DHMP produces sedation and hallucinogenic effects similar to THC, but also is known to cause hypotension (low blood pressure), severe dizziness, fainting, ataxia and muscle weakness.

54.     When he was released from Edgewood, Frank was promised follow-up medical care. However, the Army never checked in or followed up with Frank. Instead, they sent Frank to fight in Vietnam.

55.     Today, Frank suffers from memory loss, anxiety, vision problems, difficulty breathing, and sleep apnea. He still has nightmares about his time at Edgewood, has a short temper, and is highly distrustful of authority figures. Because he believed that his Edgewood service was top-secret and because he feared punishment for disclosure, Frank did not even tell his own doctor what he had been through until around 2006. He currently receives 80% VA disability compensation for obstructive lung defect, anxiety disorder, hearing loss and tinnitus.

56.     During his assignment to Edgewood, Frank received $1.50 per day in pay for travel and a certificate saying that he was an Edgewood participant. He never received any award or medal. Further, Frank did not receive any follow-up check-ups, care or treatment.

57.     Recently, Frank's medical problems have worsened and his health has deteriorated. As a result, Frank may lose his job in the near future, and become totally disabled.

**Larry Meirow**

58.     Plaintiff LARRY MEIROW was called up to the United States Army in the last draft call of the Vietnam Era. He was 19 when he entered the Army as a Private in June 1972. Larry served on active duty until March 1974 when he joined the National Guard. He returned to active duty in 1975 for 45 days to fulfill his military commitment.

1    59.    After being called up in the draft, Larry entered basic training which he completed

2    in August 1972. Shortly thereafter, in October 1972, his Company Commander came out to the

3    morning formation and asked for volunteers to go to Edgewood. The members of the company

4    were told that they would be testing military equipment and would be given 3-day weekends and

5    extra pay of $2.00 per day. Still standing in morning formation, the soldiers were asked to raise

6    their hands if they were interested. Larry raised his hand.

7    60.    When morning formation was dismissed, Larry asked the officer for more details

8    about Edgewood. Larry was told that those who were selected would learn more once at

9    Edgewood. Larry soon received orders to report to Edgewood by November 3, 1972.

10    61.    Upon reporting to Edgewood, Larry was given paperwork to sign, but was not

11    given the advance opportunity to read or review the contents. He was not given a Volunteer

12    Booklet. Instead, he was berated and ordered to hurry up and complete the forms. Larry was also

13    given psychological and medical exams and was examined by a psychiatrist.

14    62.    During a group presentation, the soldiers were promised a commendation medal

15    and health care should anything go wrong. They also were ordered to never disclose any details

16    of their Edgewood experience and were told that if they disobeyed they would be imprisoned.

17    After this orientation, the soldiers were released to the camp where they would go into the day

18    room to play ping pong and wait for their names to be called up.

19    63.    Sometime around November 11, 1972, Larry was called out of the day room and

20    driven to another building. He was ordered to put on a hospital gown and told to lie down on a

21    table. The people in charge attached leg and arm straps to buckle him down and hold him in

22    place. He was told that he was going to be injected with a harmless substance.

23    64.    Instead, they injected Larry with a substance that caused a burning sensation

24    through his veins and made his head feel like it was going to explode. Larry felt like he was on

25    fire and blacked out from the pain. He cannot recall what happened next, but only remembers

26    regaining consciousness in a bunk bed in a recovery area. While in the recovery area, he was

27    given urine tests every 24 hours. He was told that he would have to continue to have frequent

28

urine tests even after returning to his permanent base and that he should continue to have them done even after he had been discharged.

65. For over 30 years since Edgewood, Larry has had ongoing symptoms of fibromyalgia, joint pain, tremors, and numbness. He has suffered from a splitting headache on the right side of his head, with blurred vision and difficulty swallowing. His head often feels numb and at times he has uncontrollable drooling. He has hearing loss in both ears and wears a hearing aid in one ear. He has almost completely lost his short-term memory, and some loss of his long-term memory. He has been worked up by multiple specialists and diagnosed with cysts on both kidneys, and pre-cancerous polyps of the colon. His EMG tests were positive for polyneuropathies and pathology in both upper and lower extremities, and he has demonstrated persistent problems with balance and fine motor skills. He has severe stomach aches and his gallbladder had to be removed. He has fatty tissue surrounding his liver. He has been unable to sleep a full night for over three decades. He has had periods where sobriety became an issue, has been arrested several times, and has had difficulty holding down jobs for long periods of time. Larry was so fearful of disobeying the confidentiality order and so traumatized by recalling the events that he did not tell his spouse of 37 years or his doctors what he had been through until approximately 2003.

66. When he was 49 years old, Larry had to quit working due to his health condition, and he has been receiving Social Security disability payments since 2004. On Larry's behalf, the VA requested his medical papers from Edgewood. However, Edgewood Arsenal sent a letter to the VA dated May 24, 2005 confirming that Larry had been assigned to serve at Edgewood, but denying that Larry had actually participated in any of their experiments. Larry has never received the health care or medal of commendation that he was promised.

### David Dufrane

67. The day after Plaintiff DAVID DUFRANE graduated from high school in June 1964, he enlisted in the United States Army as a Private E1. David was 17 years old. He served in the Army until June 1967. He served in both Thailand and Edgewood.

68.     In March 1965, while based at Fort Knox, Kentucky, David saw a flyer looking for volunteers to test clothing and equipment. David asked his Platoon Sergeant what the Edgewood program was about. David's Platoon Sergeant responded that he did not know, but that since it was located near some testing grounds, the volunteers might be testing military equipment. David decided to go to an informational meeting.

69.     At the informational meeting, David was told that volunteers would be testing clothing and military equipment. David was also told that they would not have guard duty, would not have KP, would be granted increased amounts of vacation, and would receive a special commendation. Following the information session, David was given a battery of physical and written tests. Like the others, he did not receive the Volunteer Booklet.

70.     Shortly thereafter, David received orders to report to Edgewood in April 1965. He reported for duty at Edgewood on April 4, 1965. After completing a questionnaire regarding routine medical data, David waited for his name to be called.

71.     In all, David was used as a human test subject in at least eight experiments. He is able to remember only four of them. Gas was sprayed directly onto his face, causing extreme burning and blindness that lasted for eight hours. Chemicals were sprayed on his body that, when exposed to black light, turned his body purple. While held in padded rooms, David was injected with substances that made him hallucinate for days. He believed that he was eating entire cities and vomited from the taste of the concrete in his mouth. He also was forced to drink liquids that made him think objects that he held in his hand had disappeared or were invisible.

72.     David was held at Edgewood from early April to the end of May 1965. He spent most of that time entirely incapacitated. As soon as he was finished with one test — and sometimes when he was still under the influence of unknown chemical substances — he would be assigned to participate in another test. He cannot remember much of what happened during that time.

73.     David was later told by the Army that he had signed releases for every test in which he had participated. However, he does not remember ever seeing or signing any release. Edgewood provided him with three examples of his supposed releases. One of these releases was

Case No. _____
COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
sf-2564536

21

1  dated in June 1964, *prior to his entry into the armed services* and at a time when he was still in

2  high school. Another was dated in 1969, *after he had already left the Army*. None of these

3  supposed releases contain any specific information or details as to what he was allegedly agreeing

4  to do.

5      74.    At his exit interview in 1965, David was told that his service at Edgewood was top

6  secret. He was directed to sign a confidentiality agreement, which he complied with. He also

7  was told that he should not speak with either a private doctor or the VA about his Edgewood

8  experience, and that the Army or Edgewood would provide him with any follow-up care he might

9  need.

10     75.    David suffers from frequent flashbacks. His arms and legs are numb and tingle

11 almost all of the time. He has a chronic headache on the left side of his head, and has broken all

12 of the teeth on the left side of his jaw due to grinding from the always-present pain. He has

13 severe breathing and lung problems and almost always hears a hissing noise in his ears.

14     76.    David tried to get medical care in 1986. When he approached his VA for

15 assistance, he was told that he was hallucinating and making things up — he was told that

16 Edgewood never happened and that he had never served there. For the next 6 years, David did

17 not seek medical care, fearful that no one would believe him and unable to back up his claims.

18 After his daughter discovered his Edgewood release papers in the attic, David was able to return

19 to the VA with proof of his Edgewood service. Doctors have since linked his ailments to his

20 chemical exposure while at Edgewood. However, he has never been given the follow-up medical

21 care or medal of commendation that he was promised. David recently was awarded the Vietnam

22 Service Medal with two Bronze Service Stars for the Vietnam Defense Campaign and the

23 Vietnam Counter-Offensive Campaign. David currently receives 60% VA disability

24 compensation for post-traumatic stress disorder.

**Wray Forrest**

26     77.    Plaintiff WRAY FORREST was 17 years old when he enlisted in the United States

27 Air Force. He served in the Air Force from 1967 to 1969 and then, at the age of 19 in January

28

Case No. _____
COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
sf-2564536

22

1969, enlisted in the Army. He served in the Army for 14 years and was honorably discharged in 1982 at the grade of E-7 (Sgt. First Class). He was discharged for alleged personality disorders.

78.     While posted at Fort Stewart, Georgia, Wray saw flyers announcing tours of duty at Edgewood. A meeting was being held at the local post theater. Out of curiosity, Wray attended. At the meeting representatives from Edgewood announced that they were looking for soldiers to test Army equipment, vehicles, military combat equipment, and the like. The representatives said that soldiers selected to participate would have a 4-day work week, with a guaranteed 3-day pass, and would receive a Commendation Medal for their service. There was no mention of testing drugs, nor was there any disclosure of hazards or potential risks.

79.     Soldiers interested in the opportunity to serve at Edgewood were invited to remain at the post theater to participate in a number of screening interviews. Wray was asked to sign forms saying that he was interested in serving at Edgewood and was then given written and psychiatric tests. Eight to ten weeks later, Wray received notification to report to personnel to pick up his Temporary Duty Orders. He was one of two people from his post ordered to Edgewood Arsenal.

80.     After Wray arrived at Edgewood in 1973, he remembers signing some sort of form consenting to test aircraft equipment. He was ordered to report for testing early Monday morning. It was only at this point — after he had been ordered to serve at Edgewood, after he had reported for duty at Edgewood, after he had signed the consent forms to perform tests on aircraft, and after he showed up on Monday morning for testing — that he was verbally informed that he would be used to test drugs. He never received a Volunteer Booklet. He was issued a special identification card to present in the event that he were ever arrested for drug use based upon the track marks that would soon appear on his arms. At that point, because he was a soldier following the orders of his officers, he felt that he did not have any real opportunity to back out or return to his post. Wray became Medical Volunteer Number 6692.

81.     Wray was a human subject in at least five Edgewood tests. The tests were conducted in various places: the ward, an aircraft, a dark room with no light, and a classroom

1  setting. He was injected with various substances, and was then asked to describe his side effects,

2  which included dizziness, blurred vision, difficulty speaking, and a rapid heart rate.

3       82.    Following his service at Edgewood, Wray has suffered traumatic stress disorder

4  and pulmonary and cardiac problems that has led to a 100% Social Security Disability rating. He

5  never received the Commendation Medal he was promised, nor recognition of any other kind.

6  Although still an active service member when the Army was requested to provide the names of all

7  soldier subjects during the Congressional Hearings in 1977, the Army never notified or contacted

8  Wray. In fact, the only time Wray has been contacted regarding his Edgewood service was by a

9  Department of Veterans Affairs ("DVA") outreach survey in 2007, three decades after he

10  completed his tour at Edgewood.

11  **Common Issues Among Individual Plaintiffs**

12       83.    None of the activities of Plaintiffs described herein constituted participation in

13  military activities or implicated questions of military discipline. Unless expressly stated to the

14  contrary, DEFENDANTS have not compensated Plaintiffs for any of the damages suffered as the

15  proximate result of DEFENDANTS' actions or reimbursed Plaintiffs for the private medical care

16  and treatment they have received. In contrast, the British government in January 2008 provided

17  full compensation to the participants in a parallel set of human experiments on troops assigned to

18  serve at Porton Down, near Salisbury, England. Similarly, in 2004, the Canadian government

19  adopted a payment program to recognize the service of Canadian veterans who participated in

20  chemical warfare experiments at Suffield, Alberta, and Chemical Warfare Laboratories, Ottawa,

21  from 1941 through the mid-1970s. The vast majority of Edgewood participants have never

22  received any notice from DEFENDANTS and at most a small handful have ever received any

23  health care or compensation from DEFENDANTS associated with their participation in the

24  MKULTRA experiments.

25       84.    DEFENDANTS acquired esoteric and unique knowledge and information, most of

26  which was never made public, concerning the properties, doses, and health effects, both

27  immediate and latent, of the substances they tested. Most private physicians lack the background

28  and experience properly to treat many of the health effects of such substances, some of which

Case No. _____
COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
sf-2564536

24

1    DEFENDANTS have never identified. As a result, the ability of the "volunteers" to obtain

2    suitable medical care has in many instances been, and continues to be, adversely impacted or

3    compromised.

4         85.    Nothing herein is intended or should be construed as an attempt to obtain review

5    of any decision relating to benefits sought by any veteran or to challenge any benefits decisions

6    made by the Secretary of the VA. Likewise, nothing herein is intended or should be construed as

7    a request for money damages.

8         86.    Plaintiffs reserve the right to amend this Complaint to seek class action

9    certification.

10   **F.**    **DEFENDANTS**

11        87.    Defendant CENTRAL INTELLIGENCE AGENCY ("CIA") was created in 1947

12   by the National Security Act, which also established the Department of Defense and the National

13   Security Council ("NSC"). CIA was modeled largely after the Office of Strategic Services,

14   which served as the principal U.S. intelligence organization during World War II. The newly

15   created agency was authorized to engage in foreign intelligence collection (*i.e.*, espionage),

16   analysis, and covert actions. It was, however, prohibited from engaging in domestic police or

17   internal security functions. The CIA has publicly stated that no U.S. citizens should be the object

18   of CIA operations. Nonetheless, CIA engaged in a surreptitious, illegal program of domestic

19   human experimentation from the 1950s at least well into the 1970s.

20        88.    Defendant GENERAL MICHAEL V. HAYDEN, USAF, is the Director of the

21   CIA, and is named solely in his official capacity. The Director of the CIA serves as the head of

22   the CIA and reports to the Director of National Intelligence. (The Intelligence Reform and

23   Terrorism Prevention Act of 2004 amended the National Security Act to provide for a Director of

24   National Intelligence who would assume some of the roles formerly fulfilled by the Director of

25   Central Intelligence ("DCI"), with a separate Director of the CIA.) The CIA Director's

26   responsibilities include: (a) collecting intelligence through human sources and by other

27   appropriate means, except that he shall have no police, subpoena, or law enforcement powers or

28   internal security functions; (b) correlating and evaluating intelligence related to the national

1  security and providing appropriate dissemination of such intelligence; (c) providing overall

2  direction for and coordination of the collection of national intelligence outside the United States

3  through human sources by elements of the intelligence community authorized to undertake such

4  collection and, in coordination with other departments, agencies, or elements of the United States

5  Government that are authorized to undertake such collection, ensuring that the most effective use

6  is made of resources and that appropriate account is taken of the risks to the United States and

7  those involved in such collection; and (d) performing such other functions and duties related to

8  intelligence affecting the national security as the President or the Director of National Intelligence

9  may direct.

10      89.    Defendant the DEPARTMENT OF DEFENSE ("DOD" or "DoD") is the federal

11  department charged with coordinating and supervising all agencies and functions of the

12  government relating directly to national security and the military.  The organization and functions

13  of the DOD are set forth in Title 10 of the United States Code.  The DOD is the major tenant of

14  The Pentagon building near Washington, D.C., and has three major components — the

15  Department of the Army, the Department of the Navy, and the Department of the Air Force.

16  Among the many DOD agencies are the Missile Defense Agency, the Defense Advanced

17  Research Projects Agency ("DARPA"), the Pentagon Force Protection Agency ("PFPA"), the

18  Defense Intelligence Agency ("DIA"), the National Geospatial-Intelligence Agency ("NGA"),

19  and the National Security Agency ("NSA").  The department also operates several joint service

20  schools, including the National War College.

21      90.    Defendant DR. ROBERT M. GATES is the Secretary of Defense, and is named

22  solely in his official capacity.  The Secretary of Defense is the principal defense policy advisor to

23  the President and is responsible for the formulation of general defense policy and policy related to

24  all matters of direct concern to the DOD, and for the execution of approved policy.  Under the

25  direction of the President, the Secretary of Defense exercises authority, direction and control over

26  the DOD.  The Secretary of Defense is a member of the President's Cabinet and of the National

27  Security Council.  In 1964, the DOD took primary responsibility for the human experimentation

28  "volunteers."  In 1993, the DOD promised to supply VA with information to help "volunteers"

1  with claims; however, the DOD did not fulfill that promise. On December 2, 2002, Congress

2  passed the Bob Stump National Defense Authorization Act for Fiscal Year 2003. In that Act,

3  Congress directed the Secretary of Defense to "work with veterans and veterans service

4  organizations" to identify "projects or tests conducted by the Department of Defense that may

5  have exposed members of the Armed Forces to chemical or biological agents." In February 2008,

6  the U.S. Government Accountability Office reported to Congress that the DOD had not met this

7  duty, and that the DOD "has not kept Congress and veterans service organizations fully informed

8  about its efforts." Indeed, for decades the DOD resisted release of the names of the "volunteers"

9  to the VA, as well as other available information.

10      91.    Defendant UNITED STATES DEPARTMENT OF THE ARMY (the "Department

11  of the Army") is one of three service departments of the Department of Defense. It has

12  responsibility for the administration of, control, and operation of the United States Army (the

13  "Army"), a military organization whose primary responsibility is for land-based military

14  operations. The civilian head of the Department of the Army is the Secretary of the Army, and

15  the highest ranking military officer in the department is the Chief of Staff, unless the Chairman of

16  the Joint Chiefs of Staff or Vice Chairman of the Joint Chiefs of Staff is an Army officer. The

17  Army is made up of three components: the active component, the Regular Army, and two reserve

18  components, the Army National Guard and the Army Reserve. As of October 31, 2008, the

19  Regular Army reported just under 546,000 soldiers. The Army National Guard (the "ARNG")

20  reported 350,000 personnel and the United States Army Reserve (the "USAR") reported 189,000

21  personnel, putting the approximate combined total at 1,085,000 personnel.

22      92.    Defendant PETE GEREN is the United States Secretary of the Army, and is

23  named solely in his official capacity. Secretary GEREN has statutory responsibility for all

24  matters relating to the United States Army: manpower, personnel, reserve affairs, installations,

25  environmental issues, weapons systems and equipment acquisition, communications, and

26  financial management. Additionally, Secretary GEREN is responsible for the Department of the

27  Army's annual budget and supplemental budget of $170 billion. He leads a work force of over

28

Case No. _____
COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
sf-2564536

27

1    one million active duty, Army National Guard, and Army Reserve soldiers, 230,000 Department

2    of the Army civilian employees and 280,000 contracted service personnel.

3        93.    Defendant MICHAEL B. MUKASEY is the Attorney General of the UNITED

4    STATES OF AMERICA, and is named solely in his official capacity.

5        94.    The inclusion of each defendant named herein is necessary to afford complete

6    relief, and to avoid a multiplicity of actions and the possibility of inconsistent results.

7   **II.   THE HISTORY OF THE GOVERNMENT'S USE OF CITIZENS
           AS TEST SUBJECTS IN EXPERIMENTS INVOLVING**
8        **RADIOACTIVE ISOTOPES, CHEMICALS AND BIOLOGICAL AGENTS**

9        **A.   DEFENDANTS' Use of Soldiers to Test Toxic Chemical and Biological
              Warfare Agents**
10
             **1.    Overview of Testing at Edgewood Arsenal**
11

12       95.    Edgewood Arsenal was originally established on October 20, 1917, six months

13   after the United States entered World War I, and one of its responsibilities was to conduct

14   chemical weapons research, development and testing. Edgewood also provided chemical

15   production and artillery shell filling facilities to respond to the chemical weapons that were being

16   used in the fighting in Europe. The main chemicals produced were phosgene, chloropicrin and

17   mustard. Edgewood offered a military facility where design and testing of ordnance material

18   could be carried out in close proximity to the nation's industrial and shipping centers. The

19   installation comprises two principal areas, separated by the Bush River. The Northern area was

20   known as the Aberdeen Proving Ground area. The southern sector, Edgewood Arsenal —

21   formerly called the U.S. Army Chemical Warfare Center — was located northeast of Baltimore,

22   Maryland, in the Northern Chesapeake Bay along a neck of land between the Gunpowder and

23   Bush rivers. The two areas were administratively combined in 1971.

24       96.    During the 1930s, Edgewood Arsenal served as the center of the military's

25   Chemical Warfare Service activities. Workers developed gas masks and protective clothing,

26   tested chemical agent dispersal methods, and trained Army and Navy personnel. During World

27   War II, Edgewood Arsenal continued to produce chemical agents and plans for countermeasures

28   in case it became necessary to use them. Workers at Edgewood also tested and developed flame

1 | thrower weapons and smoke screens. The Army Chemical and Biological Defense Command

2 | ("CBDCOM") is home to the Army's non-medical chemical and biological defense activities,

3 | including research, development, acquisition, and remediation issues associated with chemical

4 | and biological defense.

5 | 97. By the end of World War II, the U.S. had produced more than 87,000 tons of

6 | sulfur mustard, 20,000 tons of Lewisite, and 100 tons of nitrogen mustard at Edgewood Arsenal

7 | and three other military facilities. In addition to producing chemical materials, Edgewood

8 | became the first American military installation to test lethal agents on humans.

9 | 98. In 1942, DEFENDANTS for the first time sought formal authority to recruit and

10 | use human subjects in a chemical warfare experiment involving mustard agents. (Office of the

11 | Inspector General and Auditor General, U.S. Dep't of Army, Use of Volunteers in Chemical

12 | Agent Research, Report DAIG-IN 21-75 (1976) (hereinafter "1976 Army IG Report") at 29-30.)

13 | The Acting Secretary of War authorized in principle the use of enlisted men as subjects for testing

14 | of mustard agent on soldiers. Initially, volunteer investigators at Edgewood Arsenal were used to

15 | test mustard, phosgene, and other known chemical agents. DEFENDANTS continued to rely

16 | upon this same mustard gas authorization to conduct human experimentation into the 1950s at

17 | Camp Siebert, Alabama, Bushnell, Florida, Dugway Proving Ground, Utah, and off the coast of

18 | Panama near the Panama Canal Zone. (1976 Army IG Report at 30.)

19 | 99. On or about January 21, 1944, DEFENDANTS carried out a mission to test the

20 | effects of mustard gas bombs on American prisoners who had volunteered for the assignment on

21 | the understanding that they would be released from prison after it was concluded. These

22 | volunteers were placed in underground fortified bunkers on an island off the coast of Australia.

23 | In an effort to cover their tracks, DEFENDANTS used Australian pilots in American Air Force

24 | planes to conduct an air strike on the fortified bunkers, hoping to gain information to plan the

25 | invasion of Pacific Islands held by Japan. The secret mission was headed by Lt. Col. Jess

26 | Crowther of the 5th U.S. Air Force. The prisoners were killed in the bombing, and

27 | DEFENDANTS suppressed or destroyed information concerning the mission and its results.

28 |

100. DEFENDANTS and other government agencies have reported conflicting estimates regarding the total number of armed services members exposed at Edgewood Arsenal and other locations. DVA has reported that, between 1950 and 1975, approximately 6,720 soldiers were used as human guinea pigs for experiments involving exposure to at least 254 toxic biological and chemical warfare agents at the U.S. Army's laboratories at Edgewood Arsenal. These tests were conducted jointly by the U.S. Army Intelligence Board and the Chemical Warfare Laboratories at Edgewood Arsenal's research facility.

101. One of the principal objectives of activities at Edgewood and Fort Detrick was to research and test drugs that could be used for "psychological warfare." In accordance with this policy, the United States government began human testing of newer chemical agents, including LSD, PCP, and synthetic cannabis analogs.

102. DEFENDANTS also tested mustard agents on soldiers at Edgewood. From 1958 to 1974, the government conducted tests of the riot control agent CS on at least 1,366 human subjects at Edgewood, including skin applications, aerosol exposures, and direct application to the individuals' eyes.

103. The CIA, which referred to Edgewood as EARL (Edgewood Arsenal Research Labs), Department of Defense, and Special Operations Division of the U.S. Army were actively involved in human experimentation, which used soldiers as test subjects. The CIA's involvement violated its Charter, which restricts or forbids domestic CIA activities. *See* 50 U.S.C. § 403-3(d)(1).

### 2. The CIA and Other DEFENDANTS Hatch Project MKULTRA

104. The U.S. Supreme Court's decision in *Feres v. United States*, 340 U.S. 135 (1950), emboldened DEFENDANTS dramatically to expand the use of military personnel as test subjects, confident that they would be insulated from liability. In April 1953, Richard Helms, the CIA's Acting Deputy Director of Plans, proposed that the CIA institute a program for the "covert use of biological and chemical materials" on an ultra-sensitive basis, meaning that knowledge of its existence would be limited to senior CIA officers and that its activities and budget would be exempt from normal budget, accounting, and legislative oversight requirements. (Memorandum

from Richard Helms, Acting Deputy Dir. of Plans, to Allen Dulles, Dir. of Cent. Intelligence

(Apr. 3, 1953) (copy attached at Tab A to a 1963 Report of Inspection of MKULTRA by CIA

Inspector General J.S. Earman ( the "1963 CIA IG Report," a true copy of which is attached as

Exhibit B hereto)); *see* Exh. B at B-029-B-042.) (Helms was later convicted of lying to Congress

regarding the CIA's role in the attempted overthrow of President Salvador Allende in Chile.)

105.    On or around April 13, 1953, CIA Director Allen Dulles approved Helms's

proposal and a covert CIA mind-control and chemical interrogation research program known as

"MKULTRA" was created. (Memorandum from Allen Dulles, Dir. of Cent. Intelligence, to

Deputy Dir. of Admin. (Apr. 13, 1953); *see* Exh. B at B-038-B-039; *see also* Exh. B at B-040.)

"Through the course of MKULTRA, CIA sponsored numerous experiments on unwitting

humans." (The Advisory Committee on Human Radiation Experiments (ACHRE), Interim

Report of ACHRE (Oct. 21, 1994) at App. E.) MKULTRA testing was conducted at Edgewood

Arsenal together with other sites such as Fort McClellan, Alabama, Fort Benning, Georgia, and

Fort Bragg, North Carolina. The CIA also contracted with Fort Detrick, which conducted a series

of experiments using human subjects, one of which was known as "Project White Coat."

106.    The MKULTRA projects were under the control of the Chemical Division, within

the Technical Services Division of the CIA. The Chemical Division was headed from 1951 to

1956 by Dr. Sidney Gottlieb. During testimony he gave to Congress in 1977, Dr. Gottlieb

claimed that the creation of MKULTRA was inspired by reports of mind-control work in the

Soviet Union and China. He stated that the mission was "to investigate whether and how it was

possible to modify an individual's behavior by covert means." (*Human Drug Testing by the CIA,

1977: Hearings on S. 1893 Before the Subcomm. on Health and Scientific Research of the S.

Comm. on Human Resources*, 95th Cong. (1977) at 169.)

107.    A secret arrangement devoted a percentage of the CIA budget to MKULTRA. For

instance, in 1953, the MKULTRA Director, Dr. Sidney Gottlieb, was granted six percent of the

Technical Services Section's research and development budget without any meaningful oversight

or accounting. (Exh. B at B-030, B-034.) MKULTRA, the "funding vehicle," soon established

over 149 subprojects that involved experiments using drugs on human behavior, lie detectors,

1   hypnosis, and electric shock. The CIA also enlisted the cooperation of over 44 colleges and

2   universities, 15 research foundations, 12 clinics or hospitals, and 3 prisons. The CIA established

3   front organizations to channel funds to institutions conducting or assisting in the experiments

4   using benign, descriptive names such as the "Society for the Investigation of Human Ecology."

5       108.    The calculating mindset behind MKULTRA was revealed in a national security

6   assessment prepared for President Eisenhower in 1954 entitled "Report on the Covert Activities

7   of the Central Intelligence Agency," which urged:

> If the United States is to survive, long-standing American concepts
> of "fair play" must be reconsidered. We must . . . learn to subvert,
> sabotage, and destroy our enemies by more clever, more
> sophisticated, and more effective methods than those used against
> us. It may become necessary that the American people will be
> acquainted with, understand and support this fundamentally
> repugnant philosophy.

12  (James H. Doolittle, et al., Report on the Covert Activities of the Central Intelligence Agency

13  (Sept. 30, 1954) at 2-3.)

14      109.    On February 26, 1953 — during the same year that MKULTRA began — the CIA

15  and DOD prepared and issued a directive that purported to bring the U.S. government in

16  compliance with the 1947 Nuremberg Code on medical research (the "1953 Wilson Directive").

17  The 1953 Wilson Directive, a true copy of which is attached as Exhibit C hereto, initially was

18  classified as "top secret" and provided in relevant part that:

19      a.    "The voluntary consent of the human subject is absolutely essential," and

20  that "the person involved should have legal capacity to give consent; should be so situated as to

21  be able to exercise free power of choice, without the intervention of any element of force, fraud,

22  deceit, duress, over-reaching, or other ulterior forms of constraint or coercion; and should have

23  sufficient knowledge and comprehension of the elements of the subject matter involved as to

24  enable him to make an understanding and enlightened decision," [which requires that he know]

25  "the nature, duration, and purpose of the experiment; the method and means by which it is to be

26  conducted; all inconvenience and hazards reasonably to be expected; and the effects upon his

27  health or person which may possibly come from his participation in the experiment" (Exh. C at

28  C-001-C-002);

1          b.      "The number of volunteers used shall be kept to a minimum . . ." (Exh. C

2   at C-002);

3          c.      "The experiment should be so designed and based on the results of animal

4   experimentation and a knowledge of the natural history of the disease or other problem under

5   study . . ." (Exh. C at C-002);

6          d.      "The experiment should be so conducted as to avoid all unnecessary

7   physical and mental suffering and injury" (Exh. C at C-002);

8          e.      "The experiment should be conducted only by scientifically qualified

9   persons. The highest degree of skill and care should be required through all stages of the

10  experiment . . ." (Exh. C at C-003);

11         f.      "During the course of the experiment the human subject should be at

12  liberty to bring the experiment to an end if he has reached the physical or mental state where

13  continuation of the experiment seems to him to be impossible," and "the scientist in charge must

14  be prepared to terminate the experiment at any stage . . ." (Exh. C at C-003); and

15         g.      "In each instance in which an experiment is proposed . . ., the nature and

16  purpose of the proposed experiment and the name of the person who will be in charge of such

17  experiment shall be submitted for approval to the Secretary of the military department in which

18  the proposed experiment is to be conducted," and no experiment "shall be undertaken until such

19  Secretary has approved in writing the experiment proposed . . ." (Exh. C at C-003).

20         110.    The classification of the 1953 Wilson Directive as "Top Secret" and later "Secret"

21  rendered it unknown to Plaintiffs, other "volunteers," and the vast majority of the managers of the

22  human experimentation program. In fact, the existence of the 1953 Wilson Directive was kept

23  secret from researchers, subjects and policymakers for over two decades, and the implementing

24  instructions to the field for the 1953 Wilson Directive were delayed, and monitoring and

25  enforcement of the directive were almost non-existent.

26         111.    Following a series of revelations concerning MKULTRA and other unethical CIA

27  practices, President Gerald Ford issued Executive Order 11905 on Foreign Intelligence Activities

28  in February 1976, which prohibited "experimentation with drugs on human subjects, except with

the informed consent, in writing and witnessed by a disinterested third party." (Exec. Order 11905 §5(d).)

112. On or about April 19, 1979, the National Commission for the Protection of Human Subjects of Biomedical and Behavioral Research, Department of Health, Education and Welfare published a report pursuant to the National Research Act, which set forth basic ethical principles and guidelines for the protection of human subjects in biomedical and behavioral research (the "Belmont Report").

113. On or about December 4, 1981, President Reagan issued Executive Order 12333, which governed the conduct of U.S. intelligence activities. Section 2.10 of which, entitled "Human Experimentation," provided:

> No agency within the Intelligence Community shall sponsor, contract for or conduct research on human subjects except in accordance with guidelines issued by the Department of Health and Human Services. The subject's informed consent shall be documented as required by those guidelines.

114. On or about January 7, 1983, DEFENDANT DOD issued Directive No. 3216.2 regarding the Protection of Human Subjects in DOD-Supported Research, which extended basic procedures of the 1953 Wilson Directive and applied to all DOD-supported research, development, tests, evaluations, and clinical investigations by DOD and DOD contractors.

115. On June 30, 1953, the Department of the Army Office of the Chief of Staff issued a CONFIDENTIAL Memorandum, numbered Item 3247, concerning Use of Volunteers in Research. This Memorandum echoed the Wilson Directive and set forth opinions of the Judge Advocate General that furnished "specific guidance for all participants in research in atomic, biological and/or chemical warfare defense using volunteers." Among other things, the guidelines established in this Memorandum provided that:

a. Agents used in research must have several "limiting characteristics," including "[n]o serious chronicity anticipated," "[e]ffective therapy available," and an "[a]dequate background of animal experimentation."

b. "As added protection for the volunteers, the following safeguards *will be provided*: . . . . Medical treatment and hospitalization *will be provided* for all casualties of the experiments as required." (Emphasis added.)

116. In June 1991, the same basic principles contained in the 1953 Wilson Memorandum were propounded in regulations issued by DEFENDANT DOD. *See* 32 C.F.R. Part 219. This set of regulations is generally referred to as the "Common Rule," a denomination that is also used in this Complaint.

117. DEFENDANT DOD issued a series of directives adopting or certifying the Common Rule in Directives 3216.02 ("Protection of Human Subjects and Adherence to Ethical Standards in DOD-Supported Research," March 25, 2002) and 6200.2 ("Use of Investigational New Drugs for Force Health Protection," August 1, 2000). The directives, regulations and other governmental actions regarding the Common Rule, the Belmont Report and the 1953 Wilson Memorandum are sometimes referred to collectively as the "Official Directives." Throughout the period of time encompassed by this Complaint, the basic ethical principles memorialized in the Official Directives did not change. However, what did markedly change is the willingness of government officials to ignore or depart from ethical norms or circumvent procedures or mechanisms to patrol or monitor compliance with such norms.

118. The rationale for DEFENDANTS' policy of secrecy regarding its human experimentation program was summarized by Atomic Energy Commission's Colonel O. G. Haywood: "It is desired that no document be released which refers to experiments with humans and might have adverse effect upon on public opinion or result in legal suits. Documents covering such work field should be classified 'secret.'" (Memorandum from Col. O.G. Haywood, Jr., U.S. Army Corps of Eng'rs, U.S. Atomic Energy Comm'n, to U.S. Atomic Energy Comm'n (Apr. 17, 1947).)

119. The links between the Army's Edgewood Arsenal and the CIA were close. Many scientists who worked at Edgewood, such as Dr. Ray Treichler, or under Edgewood contracts were on the CIA's payroll. Importantly, the CIA funded Edgewood research for over 20 years. The CIA financed, directed, and used the information derived from the tests at Edgewood for

1   their own purposes.  At least three CIA officers were members of DOD's Committee on Medical

2   Sciences ("CMS") from 1948 until 1953.  Reputedly, many of the Army officers running the

3   Edgewood experiments were actually CIA agents.  DEFENDANTS did not comply with the

4   protocols established in the 1953 Wilson Directive or the Official Directives in their conduct of

5   the human experimentation program.  Rather, DEFENDANTS continued to flagrantly, repeatedly

6   and deliberately flout the safeguards in the Official Directives and international law, depending

7   on secrecy to operate with impunity.

8       120.   The 1963 CIA IG Report by J.S. Earman (*see supra* ¶ 104) listed the following

9   activities as having been "appropriate [for] investigation" under the MKULTRA charter:

10  radiation, electro-shock, various fields of psychology, psychiatry, sociology, anthropology,

11  graphology, harassment substances, and paramilitary devices and materials.  (Exh. B at B-006.)

12  Ongoing activities as of 1963 included "projects in offensive/defensive [categories] BW, CW

13  [biological and chemical weapons] and radiation," "petroleum sabotage," "defoliants," and

14  "devices for remote measurement of physiological processes."  (Exh. B at B-024.)  The 1963 CIA

15  IG Report noted that "original charter documents specified that TSD [Technical Services

16  Division] maintain exacting control of MKULTRA activities," but that "redefinition of the scope

17  of MKULTRA is now appropriate."  (Exh. B at B-006.)

18      121.   Major program elements of MKULTRA and its progeny have never been publicly

19  revealed.  For example, key parts of the 1963 CIA IG Report were redacted, including all

20  information concerning one of the two major MKULTRA programs.  (Exh. B at B-003, B-005,

21  B-030, and B-033.)

22      122.   The 1963 CIA IG Report found that DEFENDANTS had pursued a policy of

23  "minimum documentation," which "precluded use of routine inspection procedures."  (Exh. B at

24  B-007.)  Only two individuals in TSD had "full substantive knowledge of the program, and most

25  of that knowledge is unrecorded."  (Exh. B at B-008.)

26      123.   The managers of MKULTRA concluded in 1955 that the "testing of materials

27  under accepted scientific procedures" would "fail[] to disclose the full pattern of reactions and

28  attributions that may occur in operational situations."  Therefore, DEFENDANTS initiated a

Case No. _____
COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
sf-2564536

36

1  "program for covert testing of materials on unwitting U.S. Citizens" in 1955. (Exh. B at B-008-
2  B-009.)

3      124.   By the early 1960s MKULTRA had evolved into a "highly elaborated and
4  stabilized . . . structure" (Exh. B at B-009), which was divided into the following key parts:

5         a.   Securing new materials through "standing arrangements with specialists in
6  universities, pharmaceutical houses, hospitals, state and federal institutions, and private research
7  organizations." (Exh. B at B-009.) For example, using Dr. Charles F. Geschickter as a cover
8  under Subproject 35, the CIA secretly arranged for the financing and construction of a wing of the
9  Georgetown University Hospital in 1950 to provide a secure locale for clinical testing of
10 biological, radiological and chemical substances on human beings. (Advisory Committee on
11 Human Radiation Experiments (ACHRE), Interim Report of ACHRE (Oct. 21, 1994) at App. E.)
12 The so-called "Geschickter Fund for Medical Research" served as the "principal 'cut-out source'
13 for CIA's secret funding of numerous MKULTRA human experiment projects" (*id.* at FN 6), and
14 insured that the "Agency's [CIA's] sponsorship of sensitive research projects would be
15 completely deniable since no connection would exist between the University and Agency."
16 (Memorandum from Chief, Deputy Dir., Plans, Technical Servs. Section, CIA, to Dir. of Cent.
17 Intelligence (Allen Dulles) (Nov. 15, 1954) at Tab A (Subproject 35 - Project MKULTRA, T.S.
18 101077A).) A "cut-out" is a straw man or cover mechanism designed to hide the true ownership
19 or financing of an operation, project or activity. This arrangement became necessary when
20 researchers complained that existing cover mechanisms exposed scientists and other researchers
21 to "unnecessary and highly undesirable personal risk[s]" as their connection to the projects
22 "might seriously jeopardize their professional reputations." (*Id.*)

23        b.   The CIA also financed studies by Dr. D. Ewen Cameron at the Department
24 of Psychiatry, McGill University, in the 1950s, which explored methods to erase memory and
25 rewrite the psyche, using patients being treated for conditions such as post-partum depression,
26 marital problems, and anxiety. Dr. Cameron used a combination of intense electro-shocks,
27 sensory deprivation, isolation, drugs such as LSD and insulin (to induce extended sleep).
28 Eventually, the subjects regressed to a vegetative, pre-verbal or infantile state. Once this

Case No. _____
COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
sf-2564536

37

1   "depatterning" had occurred, Dr. Cameron forced patients to listen to repetitive pre-recorded

2   messages that contained principles intended to guide future behavior such as, "You are a good

3   mother," which he referred to as "psychic driving." Most of Dr. Cameron's patients emerged

4   from his therapies with more serious symptoms and problems, including memory loss,

5   hallucinations, intense anxiety, and loss of touch with reality.

6           c.      Grants of funds were made "under ostensible research foundation auspices

7   to the specialists located in the public or quasi-public institutions," therefore "conceal[ing] from

8   the institution the interest of [the] CIA." (Exh. B at B-009.) "The system in effect 'buys a piece'

9   of the specialist in order to enlist his aid in pursuing the intelligence implications of his research,"

10  including "systematic search of the scientific literature, procurement of materials, their

11  propagation, and the application of test dosages to animals and under some circumstances to

12  volunteer human subjects." (Exh. B at B-010.) This "funding of sensitive MKULTRA projects

13  by sterile grants in aid . . . [was] one of the principal controversial aspects of this program."

14  (Exh. B at B-010.) In addition to the CIA, the Department of Health, Education and Welfare, and

15  the Law Enforcement Assistance Administration provided funding for experiments involving

16  behavior modification and mind control.

17          d.      The intensive testing of substances on human subjects by "physicians,

18  toxicologists, and other specialists in mental, narcotics and general hospitals and in prisons, who

19  are provided the products and findings of the basic research projects . . . . Where health permits,

20  test subjects are voluntary participants in the program." (Exh. B at B-011-B-012.). One series of

21  experiments on prisoners took place at the California Medical Facility at Vacaville, where

22  psychiatrists administered anectine, a strong muscle relaxant which deprives the victim of all

23  muscular control and arrests breathing, and induces strong sensations of suffocation and

24  drowning.

25          e.      The "final phase of testing of MKULTRA materials involves their

26  application to unwitting subjects in normal life settings." (Exh. B at B-012.) To accomplish this,

27  the CIA entered into an "informal arrangement" with individuals in the Bureau of Narcotics

28  ("FBN" - ("DEA")) in 1955 with the understanding that the FBN would "disclaim all knowledge

1    and responsibility in the event of a compromise." (Exh. B at B-013.)  FBN operated safehouses

2    in both San Francisco and New York where they secretly administered experimental substances to

3    the patrons of prostitutes. (Exh. B at B-013-B-014; *see also Project MKULTRA, The CIA's*

4    *Program of Research in Behavioral Modification*, 95th Cong. (1977) at 57 (J. Gittinger), 115 (R.

5    Lashbrook, M.D.), and 184 (S. Gottlieb, M.D.).)  The FBN maintained "close working relations

6    with local police authorities which could be utilized to protect the activity in critical situations."

7    (Exh. B at B-015.)  The brothel experiments were code-named "Operation Midnight Climax."

8            f.      The final step in the "research and development sequence" was to

9    "deliver[] MKULTRA materials into the MKDELTA control system governing their employment

10   in clandestine operations." (Exh. B at B-015.)  "The final stage of covert testing of materials on

11   unwitting subjects is clearly the most sensitive aspect of MKULTRA." (Exh. B at B-016.)

12   "Present practice is to maintain no records of the planning and approval of test programs."

13   (Exh. B at B-016.)

14       125.    Ironically, the operational returns of MKULTRA were scanty.  The products were

15   rarely used in field operations, and had limited success where used. (Exh. B at B-018-B-019; *see*

16   *also Project MKULTRA, The CIA's Program of Research in Behavioral Modification*, 95th Cong.

17   (1977) at 43.)  "There is an extremely low rate of operational use of the controlled materials."

18   (Exh. B at B-023.)  One of the reasons for nonuse was that "some case officers have basic moral

19   objections to the concept of MKDELTA and therefore refuse to use the materials." (Exh. B at

20   B-021-B-022.)

21       126.    Under MKULTRA and its progeny, at least 1,000 "volunteers" were given up to

22   20 doses of LSD to test the drug as an interrogation weapon, even though the tests were known by

23   Edgewood scientists to result in serious physical and psychological problems.  Dr. Van Sim, a

24   physician responsible for the human subjects used at Edgewood, previously worked at the British

25   Chemical Defense Establishment at Porton Down, where similar experiments had been conducted

26   on humans.  After returning to the United States, Dr. Van Sim warned that the British

27   experiments had shown that "during acute LSD intoxication the subject is a potential danger to

28

1 himself and to others; in some instances a delayed and exceptionally severe response may take

2 place and be followed by serious after effects lasting several days."

3     127. Despite this knowledge, test subjects at Edgewood were given LSD and other

4 drugs and then sometimes subjected to hostile questioning. Moreover, the test subjects were not

5 given any specific information about the nature of the drugs they were receiving, which

6 exacerbated the state of the victims' anxiety while on mind-altering agents.

7     128. Some of the experiments at Edgewood were designed to replicate some of those

8 that were conducted by Nazi doctors in concentration camps. American psychiatrist Paul Hoch's

9 experiments on mental patients in New York, where he was working on Edgewood projects

10 supervised by DEFENDANTS and as a CIA consultant, killed one patient with a mescaline

11 injection (Harold Blauer) and seriously injured another. As the federal judge concluded in a case

12 brought by Mr. Blauer's daughter, "the real reason Blauer died was not medical incompetence in

13 the administration of a therapeutic or diagnostic drug, but the fact that he was used as a human

14 guinea pig." *Barrett v. United States*, 660 F. Supp. 1291, 1308 (S.D.N.Y. 1987). MKULTRA's

15 experiments also resulted in the death of Frank Olson, an Army scientist who mysteriously fell

16 out of a hotel window after members of the CIA secretly slipped LSD into his drink. A 1994

17 GAO publication also notes that during the course of the extensive radiological, chemical, and

18 biological research programs conducted or sponsored by DEFENDANTS, some participants died.

19 (Frank C. Conahan, Assistant Comptroller Gen., U.S. Gen. Accounting Office, Human

20 Experimentation: An Overview on Cold War Era Programs, Testimony Before The Legis. and

21 National Security Subcomm. of the H. Comm. on Government Operations, GAO/T-NSIAD-94-

22 266 (Sept. 28, 1994) at 1.)

23     129. Sporadic information regarding DEFENDANTS' activities began to circulate and

24 the 1963 CIA IG Report recommended termination of unwitting testing. However, the CIA's

25 Deputy Director for Research, Richard Helms, who later became the CIA Director, surreptitiously

26 continued the program under a new name in 1964: MKSEARCH. The MKSEARCH project

27 attempted, among other things, to produce a perfect truth serum for use in interrogating suspected

28 Soviet spies during the Cold War, and generally to explore any other possibilities of mind control.

130.    DEFENDANTS adopted a policy to create only "sparse documentation" of the projects, with a preference that results of experiments be "conveyed verbally."  Nor did defendants prepare adequate documentation of the medical records of test participants or follow-up to determine long-term health effects.  "Present [CIA] practice is to maintain no records of the planning and approval of test programs."  (Exh. B at B-016.)  Medical records regarding the exposure of hundreds of "volunteers" that were maintained by the Medical Research Laboratory mysteriously disappeared in the 1960s.  And, shortly before he left office in 1973, CIA Director Richard Helms authorized the destruction of the CIA's files regarding human experimentation and Dr. Gottlieb's drug files, the intent of which was to prevent discovery of the embarrassing and indefensible details of their crimes.  As a result, most of the records documenting the human experimentation program are not available.

131.    DEFENDANTS also developed a protocol to classify any documents that referred to the human experimentation program based upon concerns that they might have "an adverse effect on public opinion or result in legal suits."  (*See* 1947 Haywood memo, *supra* ¶ 118.) DEFENDANTS also ordered that:

> Precautions must be taken not only to protect operations from exposure to enemy forces but also to conceal these activities from the American public in general.  The knowledge that the Agency [CIA] is engaging in unethical and illicit activities would have serious repercussions in political and diplomatic circles and would be detrimental to the accomplishment of its mission.

(CIA Inspector General's Survey of Technical Servs. Div., 1957, as cited in S. Rep. No. 94-755 ("Church Committee Report"), Book 1, §XVII (1976) at 394; *see Project MKULTRA, The CIA's Program of Research in Behavioral Modifications*, 95th Cong. (1977) at 74.)  A July 26, 1963 Memorandum to the CIA Director also concluded that "[t]he concepts involved in manipulating human behavior are found by many people both within and outside the Agency [CIA] to be distasteful and unethical."  (Memorandum from J.S. Earman, Inspector General, CIA, to Dir. of Cent. Intelligence (July 26, 1963) (attaching the 1963 CIA IG Report); *see* Exh. B at B-002.)

132.    Documents from the CIA's "Family Jewels" declassified file establish that drugs that had been rejected by private manufacturers were tested on soldiers at Edgewood.

1    Specifically, as explained in the CIA's own documents: "the reported [behavioral] drug was part

2    of a larger program in which the Agency had relations with commercial drug manufacturers,

3    whereby they passed on drugs rejected because of unfavorable side effects. The drugs were

4    screened with the use of ADP equipment, and those selected for experimentation were tested at

5    [redacted] using monkeys and mice. Materials of having [sic] further interest, as demonstrated by

6    this testing, were then tested at Edgewood, using volunteer members of the Armed Forces."

7    (Memorandum from WVB to Executive Sec'y, CIA Mgmt. Comm. (undated), "CIA Family

8    Jewels" at 00413.)

9        133.    In the decades following the 1953 Wilson Directive, DEFENDANTS' human

10   experimentation program continued and rapidly expanded under a shifting series of secret code

11   names, changes that usually were adopted to facilitate statements by DEFENDANTS denying that

12   recent or earlier programs such as MKULTRA were ongoing, including the following:

13            a.      DEFENDANTS changed the program name from MKULTRA to

14   MKSEARCH after release of the CIA IG's 1963 Report, which was highly critical of

15   MKULTRA;

16            b.      the OFTEN and CHICKWIT projects, jointly conducted by the Army and

17   CIA at the Edgewood Arsenal, but also funded by the CIA, which involved the collection of

18   information about foreign pharmaceuticals and experiments with human subjects;

19            c.      the BLUEBIRD and ARTICHOKE projects, where DEFENDANTS

20   researched hypnosis, drugs such as sodium pentothal, the stimulant Desoxyn (methamphetamine),

21   and bulbocapnine (an alkaloid), which facilitate recovery of information under hypnosis, and

22   other substances that might aid in the interrogation of prisoners of war and defectors;

23            d.      the MKDELTA project, a mind control research and development program

24   devised by DEFENDANTS that concentrated upon the use of biochemicals in clandestine

25   operations;

26            e.      the MKNAOMI project, a successor to MKDELTA, which focused on the

27   research, testing, manufacture and means of diffusion or distribution of lethal and non-lethal

28   biological agents and materials;

1    　　　　　f.　　　the CHATTER project, which focused on the development and use of truth

2    serum and other interrogation drugs such as anabasis, aphylla, scopolamine, and mescaline; and

3    　　　　　g.　　　a series of related or follow-on projects with code names including

4    "PANDORA," "SPELLBINDER," "MONARCH," "SLEEPING BEAUTY," as well as others.

5    　　　134.　　　The MKULTRA and MKSEARCH project sponsors operated "safe houses" in

6    New York City and San Francisco, where drugs were surreptitiously administered to human

7    subjects lured to the site by prostitutes, and the effects were witnessed and/or recorded on film.

8    Experiments also were conducted on aged veterans in VA domiciliaries. DEFENDANTS often

9    used surrogates in the private sector to perform many of these experiments.

10    　　　135.　　　DEFENDANTS formally launched Sub-Project 119 in 1960, the purpose of which

11    was to research, study, and interpret "bioelectric signals from the human organism, and activation

12    of human behavior by remote means." (Memorandum for the Record re MKLUTRA Subproject

13    119 from Technical Servs. Div., Research Branch, CIA (Aug. 17, 1960).) This Sub-Project

14    involved the installation of "permanent septal electrodes . . . to determine the locus in which

15    stimulations will produce specific reactions," first in animals and later in humans. (Proposal

16    Materials re MKULTRA Subproject 106, CIA (Jan. 1961) at 106-1.) The Army's own report of

17    the health effects of LSD experiments concluded in 1980 that: "Early experimental studies by

18    Monroe and Heath and associates using electrodes implanted deeply in the brains of human

19    subjects demonstrated the occurrence of spiking (epileptiform) activity in portions of the limbic

20    system (hippocampus, amygadala [sic] and septal area) in response to LSD administration."

21    (U.S. Army Med. Dep't, LSD Follow-Up Study Report (Oct. 1980) at 34-35.) DEFENDANTS'

22    research program continued under various other code names, including Subproject 106 (in 1962),

23    and others, and DEFENDANTS used an unidentified "cut-out and cover" to run the program and

24    to camouflage their role. DEFENDANTS classified this work as "Agency Top Secret," and

25    DEFENDANTS have either destroyed or classified the results of the Sub-Project 119 and 106

26    studies, as well as their progeny.

27    　　　136.　　　Dr. Jose Delgado began to research the use of pain and pleasure for mind control

28    during WWII. Later, as Director of Neuropsychiatry at Yale University Medical School, he

1  refined the design of his "transdermal stimulator," a computer controlled, remote neurologic

2  transceiver and aversion stimulator. Dr. Delgado was especially interested in Electronic

3  Stimulation of the Brain. Dr. Delgado discovered that he could wield enormous power over his

4  subject by implanting a small probe into the brain. Using a device he called the "stimoceiver,"

5  which operated by FM radio waves, he was able to electrically orchestrate a wide range of human

6  emotions, including rage, pleasant sensations, elation, deep thoughtful concentration, odd

7  feelings, super relaxation (an essential precursor for deep hypnosis), colored visions or

8  hallucinations, lust, fatigue and various other responses. Dr. Delgado researched and perfected

9  many of his devices under the auspices of MKULTRA Sub-Project 95, in which he was joined by

10 Dr. Louis Jolyon West, who had mastered a technology called "RHIC-EDOM." RHIC means

11 "Radio Hypnotic Intracerebral Control," and EDOM means "Electronic Dissolution of Memory."

12 These implants could be stimulated to induce a post-hypnotic state. EDOM involves the creation

13 of "Missing Time" or the loss of memory.

14      137.    Dr. Delgado ominously wrote: "*The individual may think that the most important*

15 *reality is his own existence, but this is only his personal point of view. . . . This self-*

16 *importance . . . lacks historical perspective. [The notion that man has] **the right to develop his***

17 ***own mind** . . . . [is a] kind of liberal orientation [that] has great appeal, but . . . its assumptions*

18 *are not supported . . . by . . . studies.*" (Jose M.R. Delgado, M.D., *Physical Control of the Mind,*

19 *Toward a Psychocivilized Society* (1969) at 236, 239 (emphasis added).)

20      138.    Additional studies, conducted by Dr. Ewen Cameron and funded by the CIA, were

21 directed towards erasing memory and imposing new personalities on unwilling patients.

22 Cameron discovered that electroshock treatment caused amnesia. He set about a program that he

23 called "de-patterning," which had the effect of erasing the memory of selected patients. Further

24 work revealed that subjects could be transformed into a virtual blank machine (Tabula Rasa) and

25 then be re-programmed with a technique which he termed "psychic driving."

26      139.    From 1965 through to 1970, Defense Advanced Projects Research Agency

27 (DARPA), with up to 70-80% funding provided by the military, set in motion operation

28 PANDORA to study the health and psychological effects of low intensity microwaves with regard

1    to the so-called "Moscow signal." This project appears to have been quite extensive and included

2    (under U.S. Navy funding) studies demonstrating how to induce heart seizures, create leaks in the

3    blood/brain barrier and production of auditory hallucinations. Despite attempts to render the

4    Pandora program invisible to scrutiny, FOIA filings revealed memoranda of Richard Cesaro,

5    Director of DARPA, which confirmed that the program's initial goal was to discover whether a

6    carefully controlled microwave signal could control the mind. Cesaro urged that these studies be

7    made for potential weapons applications.

8           140.    Notwithstanding the international standards identified above, DEFENDANTS'

9    experiments on human subjects were conducted shrouded in secrecy, and have been characterized

10   by stealth, evasion, treachery, and deceit. Most of the subjects have been collected under

11   programs that operate under the umbrella of "non-lethal" or "less than lethal" weapons, and

12   include a wide assortment of different technologies based upon electro-magnetic radiation,

13   microwaves, lasers, infrasound, acoustic and polysound generators, and others.

14          **3.    Secrecy Oaths**

15          141.    "Volunteers" in the Edgewood experiments were in most instances required to sign

16   a statement agreeing that they would:

17                  not divulge or make available any information related to U.S. Army
                    Intelligence Center interest or participation in the [volunteer
18                  program] to any individual, nation, organization, business,
                    association, or other group or entity, not officially authorized to
19                  receive such information. I understand that any action contrary to
                    the promises of this statement will render me liable to punishment
20                  under the provisions of the Uniform Code of Military Justice.

21   The "volunteers," including many or all of the Individual Plaintiffs, were also generally forced to

22   sign forms consenting to the videotaping of the experiments.

23          142.    In fact, DEFENDANTS' form misled the "volunteers" by implying that the

24   Uniform Code of Military Justice applied to civilians.

25          143.    The existence of their secrecy oaths not only interfered with participants' ability to

26   obtain health care, but to seek redress or assert claims. In 2003, the DVA concluded that "most of

27   the volunteer subjects of these experiments conducted by the U.S. Military were told at the time

28

1   that they should never reveal the nature of the experiments, and apparently, almost to a man, they

2   kept this secret for the next 40 or more years."

3        144.   In approximately September 2006, some, but not all, Edgewood recipients,

4   received form letters from the DVA advising them that notwithstanding their secrecy oaths, the

5   DOD had authorized them to discuss exposure information with their health care providers, but

6   warning them not to "discuss anything that relates to operational information that might reveal

7   chemical or biological warfare vulnerabilities or capabilities."

8              **4.    Purported "Consent" by Human Test Subjects**

9        145.   Many "volunteers" used as test subjects at Edgewood and elsewhere were duped

10   into volunteering to test chemical warfare clothing and gas masks and instead were secretly given

11   nerve gas, psychochemicals, incapacitating agents, and hundreds of other dangerous drugs. The

12   "volunteers" were given no information about the chemicals used on them in the experiments, no

13   warning as to the potential health risks, and no or inadequate follow-up health care to determine

14   the effects (and resulting injuries) caused by the tests — despite the government's knowledge and

15   conclusion that informed, voluntary consent was necessary.

16        146.   Indeed, informed consent was precluded by DEFENDANTS' own plan, which

17   noted that "[c]are should be exercised not to mention to the prospect the exact properties of the

18   material that lends itself to intelligence application." Moreover, DEFENDANTS withheld

19   information from the "volunteers" concerning health problems that they had discovered from

20   examinations and tests at Edgewood, and Edgewood medical records for participants were

21   separated from the participants' service medical files, and kept under lock and key.

22        147.   The Medical Volunteer Handbook of the U.S. Army purportedly given to test

23   participants in the late 1950s and 1960s falsely represented that the tests involved "non-hazardous

24   exposure to compounds as well as the evaluation of methods, procedures and equipment utilized

25   by the soldier in the field." (U.S. Army Chemical Warfare Labs., U.S. Army Chemical Center,

26   MD, The Medical Research Volunteer Program (U), CWL Special Pub. 2-13 (June 1958) at 1.)

27   DEFENDANTS' policy toward uncooperative "volunteers" was reflected in a publication

28

Case No. _____
COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
sf-2564536

distributed to the "volunteers" entitled "What is Expected of a Volunteer," the 1972 edition of which stated:

> It is essential that you show up on time for admission to the wards and for testing . . . . As for the testing, this of course is what you are here for . . . . Failure to show up on time for admission or the test will usually result in your being returned to your permanent duty station.

148.    The Army's Inspector General concluded that although there was evidence that some form of the informed consent policy was eventually made known to commanders and investigators working with human subjects, often in practice "consent was relegated to a simple, all-purpose statement to be signed by the volunteer." (1976 Army IG Report at 78.)  Further, even in instances where a more detailed form was used, "the intent of the informed consent policy did not appear to have been fulfilled, since the revised form did not require disclosure of the chemical agent to be used or the full effects of the drug, nor did the publication appended to the volunteer agreement form contain that information." (*Id.* at 80.)

149.    The Inspector General noted that although, with few exceptions, human subjects who were used for chemical testing had technically "volunteered," the issue was "not whether the subjects volunteered, but whether they were provided sufficient information to permit an enlightened decision." (*Id.* at 82.)  On this point, the Inspector General's report concluded: "volunteers were not fully informed, as required, prior to their participation; and the methods for procuring their services, in many cases, appeared not to have been in accord with the intent of the Department of the Army policies governing the use of volunteers in research." (*Id.* at 87.) Indeed, "in spite of the clear guidelines concerning the necessity for 'informed consent,' there was a willingness to dilute and in some cases negate the intent of the policy." (*Id.* at 40.)  The consents signed by "volunteers" included the words "I certify that . . . I [am] completely aware of all hazards." Yet, DEFENDANTS have admitted that even they were not aware of such hazards.

150.    Further, the Army Inspector General's findings regarding consent at Edgewood were even more troubling.  The report noted that "in most cases the [participation] agreement was signed prior to arrival at Edgewood Arsenal, or on the first day after arrival.  In either case, it was

1  usually signed before the subject was selected for a specific agent test. Therefore, it was not

2  likely that meaningful information regarding all hazards to his health were provided the volunteer

3  prior to his signing the participation agreement." (*Id.* at 84.) Indeed, one of the purposes of the

4  experimentation was to learn about health effects on humans, in areas which were previously

5  unknown.

6       151. Indeed, in designing their LSD studies in 1956, the Army attempted to avoid the

7  impact of "suggestion" or "placebo" effect on the observed effects by insuring that at least one

8  control group administered LSD-25 be neither given a training lecture nor provided any

9  information on the drug being administered.

10       152. Another problem with the purported "consent" by volunteers was that

11  "inducements were offered to persuade the soldier[s] to volunteer." (*Id.* at 85.) The Inspector

12  General identified examples of such inducements, including: a promise of a 3-day pass each

13  weekend; better living and recreational accommodations than normally available; a guaranteed

14  letter of commendation that would be placed in the volunteer's official personnel file; and a sense

15  of patriotic contribution to the nation's national security. (*Id.* at 85.) The report noted that such

16  inducements "represented substantial rewards" in the 1950s and 1960s. (*Id.* at 85.) These

17  inducements were used to influence the prospective subject's decision by offering special

18  privileges or rewards and thus, were contrary to the guidelines, which stated that informed

19  consent should be given without influence over the volunteer's free choice.

20       153. A 1993 GAO Report acknowledged that "[m]ilitary procedures have long required

21  that the volunteers be fully informed of the nature of the studies in which they participate and the

22  foreseeable risks. However, prior to 1975, these procedures were not always followed." (U.S.

23  Gen. Accounting Office, Veterans Disability: Information from the Military May help VA Assess

24  Claims Related to Secret Tests, GAO/NSIAD-93-89 (Feb. 1993) at 2; *see also* Frank C. Conahan,

25  Assistant Comptroller Gen., U.S. Gen. Accounting Office, Human Experimentation: An

26  Overview on Cold War Era Programs, Testimony Before The Legis. and National Security

27  Subcomm. of the H. Comm. on Government Operations, GAO/T-NSIAD-94-266 (Sept. 28, 1994)

28  at 2, 10.)

1      154.   In 2003, the DVA admitted that "[i]t would be naive to assume that there will be

2      no lapses in compliance with human subjects protections in future studies involving human

3      subjects."

4      155.   DEFENDANTS have admitted that a number of their research projects were

5      conducted "without knowledge of the host system or on unwitting subjects." (Memorandum for

6      the Record from William V. Broe, Inspector General, CIA, to Dir. of Cent. Intelligence (May 23,

7      1973), "CIA Family Jewels" at 00402.)

8      156.   The consents purportedly signed by "volunteer" soldiers were ineffective for

9      multiple reasons including fraud in the inducement, lack of disclosure of the substances involved

10     in the experiments, lack of specificity, and others. These purported "volunteer" test subjects were

11     not told which drugs they were given, and were never fully informed of the extreme physical and

12     psychological effects these drugs would have on them.

13     157.   DEFENDANTS have failed and refused to supply all available information to the

14     Department of Veterans Affairs ("DVA") concerning the exposures of "volunteers" who have

15     filed or whose survivors have filed claims for service-connected death or disability compensation,

16     thereby thwarting or compromising the success of many claims.

17                          **FIRST CLAIM FOR RELIEF**
                                 **(Declaratory Relief)**
18

19     158.   Plaintiffs reallege and incorporate herein by reference as though fully set forth,

20     each and every allegation contained in Paragraphs 1 through 157 of this Complaint.

21     159.   Plaintiffs seek a declaration that the consent forms signed by Plaintiffs are not

22     valid or enforceable; that Plaintiffs are released from any obligations or penalties under their

23     secrecy oaths; that DEFENDANTS are obligated to notify Plaintiffs and other test participants

24     and provide all available documents and evidence concerning their exposures and known health

25     effects; that DEFENDANTS have violated the rights of Plaintiffs under the due process clause of

26     the Fifth Amendment; that the Court must draw adverse inferences from DEFENDANTS'

27     document destruction, redactions, spoliations, and other wrongful acts described herein; and,

28

1    finally, that DEFENDANTS are obligated to confer the medical care, medals, and other things

2    promised to Plaintiffs, and the other relief prayed for above.

3        160.    A present controversy exists between Plaintiffs and DEFENDANTS concerning

4    the foregoing, and Plaintiffs contend and DEFENDANTS deny that:

5            a.    DEFENDANTS have unconstitutionally infringed on Plaintiffs' life,

6    property and liberty rights protected by the Due Process Clause of the Fifth Amendment to the

7    United States Constitution, which provides that "No person shall . . . be deprived of life, liberty or

8    property without due process of law," and upon Plaintiffs' right to privacy;

9            b.    The programs of human experimentation on military subjects and civilians

10   failed to comply with the 1953 Wilson Directive, the Official Directives, and international law;

11           c.    The "consents," if any, obtained from Plaintiffs and other test subjects were

12   invalid or not enforceable;

13           d.    Plaintiffs are not bound by the secrecy oaths they took, and that such oaths

14   are invalid;

15           e.    Adverse inferences should be drawn against DEFENDANTS based upon

16   their destruction of evidence and other wrongful acts recited above; and

17           f.    DEFENDANTS must fully comply with their duty to locate and warn all

18   test participants.

19       161.    A present controversy exists between Plaintiffs and DEFENDANTS in that

20   Plaintiffs contend and DEFENDANTS deny that DEFENDANTS violated Plaintiffs' right to

21   privacy under the First, Fourth, Fifth and Ninth Amendments by DEFENDANTS' surreptitiously

22   administering the noxious agents described above and committing the other wrongful acts alleged

23   herein.

24       162.    A present controversy exists between Plaintiffs and DEFENDANTS in that

25   Plaintiffs contend and DEFENDANTS deny that DEFENDANTS violated Plaintiffs' property

26   and liberty rights protected by the Due Process Clause of the Fifth Amendment to the United

27   States Constitution by concealing (and continuing to conceal) the extent and nature of the tests

28   conducted on Plaintiffs and the known or suspected effects of such experiments, and failing to

1 provide adequate medical treatment to Plaintiffs after Plaintiffs were discharged from the

2 military.

3     163.    The Court should issue a declaration stating that DEFENDANTS must fully

4 disclose to Plaintiffs complete medical information concerning all tests conducted on Plaintiffs

5 (including any results thereof), as well as the other relief prayed for above, and stating that

6 DEFENDANTS' duty to provide Plaintiffs with all necessary medical treatment on an ongoing

7 basis is mandatory.

8 **SECOND CLAIM FOR RELIEF**<br>**(Injunctive Relief)**

9

10     164.    Plaintiffs reallege and incorporate herein by reference as though fully set forth,

11 each and every allegation contained in Paragraphs 1 through 163 of this Complaint.

12     165.    Plaintiffs seek injunctive relief enjoining DEFENDANTS, and anyone in concert

13 with them, from failing and refusing to do the following:

14     a.    Notify Plaintiffs and all "volunteers" of the details of their participation in

15 human experimentation programs and provide them with full documentation of the experiments

16 done on them and all known or suspected health effects;

17     b.    Conduct a thorough search of all available document repositories and

18 archives, and other sources, and provide victims with all available documentation concerning the

19 details and conduct of the human experimentation program and known or suspected health

20 effects;

21     c.    Provide examinations and medical care and treatment to all participants in

22 the MKULTRA, Edgewood, and other human experiments with respect to any disease or

23 condition that may be linked to their exposures;

24     d.    Give the participants in the Edgewood experiments the medals,

25 commendations, and other things that were promised to them;

26     e.    Supply all available information to the VA with respect to any past,

27 existing or future claims for service-connected death or disability compensation based on

28 DEFENDANTS' human experimentation programs; and

1    f.    To the extent violations have continued, from continuing to commit any

2    violations of the Official Directives or international law.

3    **PRAYER FOR RELIEF**

4    WHEREFORE, Plaintiffs pray for judgment against DEFENDANTS as follows:

5    166.    On the First Claim for Declaratory Relief, for declaratory relief as prayed for

6    above.

7    167.    On the Second Claim for Injunctive Relief, for a preliminary and permanent

8    injunction as prayed for above.

9    168.    On all causes of action, for Plaintiffs' reasonable attorneys' fees and costs incurred

10   herein pursuant to 28 U.S.C. § 2412 and any other applicable law.

11   169.    For such other relief as the Court deems just and proper.

12   Dated:   January 7, 2009                  GORDON P. ERSPAMER
                                               TIMOTHY W. BLAKELY
13                                             ADRIANO HRVATIN
                                               KIMBERLY L. TAYLOR
14                                             STACEY M. SPRENKEL
                                               MORRISON & FOERSTER LLP
15

16

17                                             By: _____
                                               Gordon P. Erspamer
18                                             [GErspamer@mofo.com]

19                                             Attorneys for Plaintiffs
                                               Vietnam Veterans of America; Bruce
20                                             Price; Franklin D. Rochelle; Larry
                                               Meirow; Eric P. Muth; David C.
21                                             Dufrane; and Wray C. Forrest

22

23

24

25

26

27

28

Case No. _____
COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
sf-2564536

52