1  GORDON P. ERSPAMER (CA SBN 83364)
   GErspamer@mofo.com
2  TIMOTHY W. BLAKELY (CA SBN 242178)
   TBlakely@mofo.com
3  STACEY M. SPRENKEL (CA SBN 241689)
   SSprenkel@mofo.com
4  DANIEL J. VECCHIO (CA SBN 253122)
   DVecchio@mofo.com
5  DIANA LUO (CA SBN 233712)
   DLuo@mofo.com
6  MORRISON & FOERSTER LLP
   425 Market Street
7  San Francisco, California  94105-2482
   Telephone: 415.268.7000
8  Facsimile: 415.268.7522

9  Attorneys for Plaintiffs
   Vietnam Veterans of America; Swords to Plowshares: Veterans
10 Rights Organization; Bruce Price; Franklin D. Rochelle; Larry
   Meirow; Eric P. Muth; David C. Dufrane; Tim Michael Josephs;
11 and William Blazinski

12                    UNITED STATES DISTRICT COURT

13                   NORTHERN DISTRICT OF CALIFORNIA

14                          OAKLAND DIVISION

15
   VIETNAM VETERANS OF AMERICA, a Non-Profit        Case No.   CV 09-0037-CW
16 Corporation; SWORDS TO PLOWSHARES:
   VETERANS RIGHTS ORGANIZATION, a California
17 Non-Profit Corporation; BRUCE PRICE; FRANKLIN     **THIRD AMENDED**
   D. ROCHELLE; LARRY MEIROW; ERIC P. MUTH;          **COMPLAINT FOR**
18 DAVID C. DUFRANE; TIM MICHAEL JOSEPHS;            **DECLARATORY AND**
   and WILLIAM BLAZINSKI, individually, on behalf of **INJUNCTIVE RELIEF**
19 themselves and all others similarly situated,     **UNDER UNITED STATES**
                                                     **CONSTITUTION AND**
20                   Plaintiffs,                     **FEDERAL STATUTES AND**
                                                     **REGULATIONS**
21          v.

22 CENTRAL INTELLIGENCE AGENCY; LEON                 (Class Action)
   PANETTA, Director of the Central Intelligence
23 Agency; UNITED STATES DEPARTMENT OF
   DEFENSE; DR. ROBERT M. GATES, Secretary of
24 Defense; UNITED STATES DEPARTMENT OF THE
   ARMY; PETE GEREN, United States Secretary of the
25 Army; UNITED STATES OF AMERICA; ERIC H.
   HOLDER, JR., Attorney General of the United States;

26          **CAPTION CONTINUES ON NEXT PAGE**

27

28

1  UNITED STATES DEPARTMENT OF VETERANS
   AFFAIRS; and ERIC K. SHINSEKI, UNITED
2  STATES SECRETARY OF VETERANS AFFAIRS,

3              Defendants.

I.      **INTRODUCTION**[1]

"When we assumed the soldier, we did not lay aside the citizen." — George Washington.

A.      **The Plight of the "Volunteers"**

1.      This action chronicles a chilling tale of human experimentation, covert military operations, and heretofore unchecked abuses of power by our own government.  Ironically, one of the main facilitating events for this debacle was action by a court.  In 1950, during the height of the Cold War, the U.S. Supreme Court issued its decision in *Feres v. United States*, 340 U.S. 135 (1950) (hereafter, "*Feres*"), which in effect ruled that the government is immune from damages claims brought by Armed Forces personnel arising from DEFENDANTS' own torts.  The Supreme Court's decision to absolve DEFENDANTS of legal responsibility for damages caused by the tortious acts committed by the government upon our nation's military personnel quickly led DEFENDANTS to undertake an expansive, multi-faceted program of secret experimentation on human subjects, diverting our own troops from military assignments for use as test subjects. In virtually all cases, troops served in the same capacity as laboratory rats or guinea pigs. DEFENDANTS were able to capitalize on the inherently coercive relationship of a soldier's commanding officers to their soldiers, as military orders can be enforced by a strong set of formal and informal sanctions or punishment.

2.      In 1942, the War Department — the present day Department of Defense ("DOD") — authorized the first experiment on military personnel which used mustard gas, and various additional experiments were conducted during and following World War II.  Beginning in the early 1950s, the human experiment program was greatly expanded, as the Central Intelligence Agency ("CIA") and United States Army planned, organized and executed an extensive series of experiments involving potential chemical and biological weapons.  The CIA also sponsored

---

[1] On January 19, 2010, the Court dismissed with prejudice the "organization Plaintiffs' claim for declaratory relief that the *Feres* doctrine is unconstitutional" and "Plaintiffs' claim for declaratory relief on the lawfulness of the testing program."  (*See* Docket No. 59 at 19-20.) Plaintiffs do not intend to reassert those dismissed claims as part of this pleading and do not expect Defendants to respond to or answer any claim that the Court has dismissed.  Plaintiffs reserve their appellate rights with respect to those dismissed claims.

1  human drug experimentation by the Federal Bureau of Narcotics ("FBN"), now the Drug

2  Enforcement Administration ("DEA").  This vast program of human experimentation —

3  shrouded in secrecy — was centered at the Army's compounds at Edgewood Arsenal and Fort

4  Detrick, Maryland.  The human experimentation was conducted without the informed consent of

5  its subjects and in direct contravention of applicable legal standards and principles of

6  international law.  Representatives of DEFENDANTS had also, on many occasions, promised the

7  test participants ("volunteers") that they would receive medals for volunteering, as well as health

8  care, but they instead abandoned Plaintiffs and the other participants, hiding behind the insulating

9  walls of government bureaucracies and security classifications.  Indeed, DEFENDANTS actively

10  concealed the existence of the human experimentation tests and the test results from the outside

11  world, and destroyed most of the documentation of the tests once their existence began to leak.

12  As a result, Plaintiffs and the other service personnel, many of whom are debilitated, have been

13  left to fight their demons alone for decades without health monitoring, follow-up, or medical

14  treatment from DEFENDANTS.  Instead, DEFENDANTS' tactic and strategy have been to

15  ignore the victims and delay action with the expectation that their problems will disappear as the

16  victim population ages and dies.

17        3.     DEFENDANTS' human experimentation program was far-ranging and had many

18  purposes, including by way of example the following:

19          a.     To develop non-lethal but incapacitating agents that could be disseminated

20  by airplanes in all environments;

21          b.     To explore what levels of various chemicals would produce casualties (the

22  so-called "man-break" tests);

23          c.     To research techniques to impose control over the will of an individual,

24  including neuron-surgery, electric shock, drugs, and hypnosis;

25          d.     To design and test septal electrodes that would enable DEFENDANTS

26  directly to control human behavior;

27          e.     To produce a "knockout" pill that could surreptitiously be dropped into

28  drinks or added into food;

THIRD AMENDED COMPLAINT
CASE NO. CV 09-0037-CW
sf- 2922333

2

1          f.      To develop a substance that could produce "pure euphoria" with no

2  subsequent let-down;

3          g.      To derive an undetectable substance that would lower the ambition and

4  general working efficiency of humans;

5          h.      To develop a substance that would cause mental confusion and make it

6  more difficult to fabricate answers under questioning;

7          i.      To create a substance that would alter personality structure and induce

8  dependency on another person;

9          j.      To develop a substance that would promote weakness or temporarily

10  compromise hearing or eyesight;

11          k.      To perfect a substance that could be administered surreptitiously, which

12  would prevent someone from performing any physical activity;

13          l.      To identify a substance that would promote illogical thinking or

14  impulsiveness;

15          m.      To develop a substance that would increase, prevent or counteract the

16  intoxicating effects of alcohol;

17          n.      To create materials that would facilitate the induction of hypnosis or

18  enhance its usefulness;

19          o.      To identify substances that would enhance an individual's ability to

20  withstand torture, privation, interrogation or brain-washing;

21          p.      To derive substances that would produce physical disablement, paralysis,

22  or acute anemia; and

23          q.      To find a substance capable of producing extended periods of shock, mania

24  and stress, and confusion or amnesia.

25  In short, under this program of human experimentation, the roles of military doctors were

26  reversed from healing to purposely exposing their patients to harm in violation of their

27  Hippocratic oaths.

28

1      4.    In the early stages of DEFENDANTS' experimentation program at Edgewood

2    Arsenal, DEFENDANTS recruited armed services personnel from relatively close military

3    facilities such as Fort Knox, Kentucky, Fort Meade, Maryland, and Fort Monmouth, New Jersey.

4    By late 1956, however, DEFENDANTS' psychochemical compound experiments had begun and

5    DEFENDANTS were unable to procure enough "volunteers" from nearby military facilities.  In

6    April 1957, the Department of the Army directed Army commanders to assist in the recruitment

7    of "volunteers" from military facilities from across the nation.  (*See* Office of the Inspector

8    General and Auditor General, U.S. Dep't of Army, Use of Volunteers in Chemical Agent

9    Research, Report DAIG-IN 21-75 (1976) (hereinafter "1976 Army IG Report") at 68-70.)  Each

10    of the commanders of the six armies was required to provide a minimum of thirty "volunteers"

11    per month on a rotating basis, with each commander responsible for providing "volunteers" for

12    two months each year.  For example, the Sixth U.S. Army, headquartered at the Presidio in

13    San Francisco, California, was responsible for providing "volunteers" in the months of June and

14    December of each year.  The Army commanders were directed to the June 30, 1953

15    Memorandum setting forth Army policy on the Use of Volunteers in Research (*see*

16    paragraph 125), were instructed that "the voluntary consent of the human subject is absolutely

17    essential," and were assured that all human test subjects would be "thoroughly informed about all

18    procedures, and what can be expected during each test."  (*See* Memorandum from Army Office of

19    the Adjutant General to Commanding Generals ZI Armies, Subject:  "Use of Volunteers in

20    Research" (Apr. 18, 1957).)

21      5.    DEFENDANTS used at least 7,800 armed services personnel in the

22    experimentation program at the Edgewood Arsenal alone, the vast majority of which were troops

23    from the Army, although troops from the Air Force and Marines also were used.  DEFENDANTS

24    used code names to refer to the substances administered to soldiers, and the true identities, doses,

25    and properties of at least 250, but as many as 400, chemical and biological agents administered to

26    soldiers at the Edgewood Arsenal, or to other "volunteers" under contract to the Edgewood

27    Arsenal, were not disclosed.  For example, in 1970, DEFENDANTS provided Congress with an

28    alphabetical list showing that they had tested 145 drugs during Projects Bluebird, Artichoke,

MKULTRA and MKDELTA.  Among the broader group of substances or agents tested were the following:

- **amphetamines**;

- **anticholinesterase chemicals** such as the "reversible" inhibitors physostigmine (eserine), tacrine, and mylaxen; and more lethal nerve agents such as VX (Edgewood Arsenal designation EA 1701) (a V-series agent developed in England in the early 1950s that is one of the most deadly chemicals known to man) and sarin (military designation GB; EA 1208), tabun (GA; EA 1205) and soman (GD; EA 1210) (G-series nerve agents, all of which were developed in Germany in the 1930s and 1940s), and other lethal compounds such as cyanide;

- **anticholinergic drugs** such as atropine, scopolamine and nonlethal, though potentially harmful, incapacitating agents such as BZ (EA 2277), CAR302,688, and other glycolate compounds such as EA 3580;

- **barbiturates** such as secobarbitol;

- **biochemicals** such as thiols, hydrogenated quinolines, and indole alkaloids;

- **cholinesterase reactivators**, such as the pralidoxime chloride (2-PAM or EA 2170) and its methyl methanesulfonate derivate P2S, toxogonin (EA 3475) and TMB-4 (EA 1814) (all of which are oximes);

- **irritants** such as chloropicrin (PS), the riot control agents brombenzyl cyanide (CA), o-chlorobenzylidene malononitrile (CS or EA 1779), chloroacetophenone (CN or Mace), nonanoyl morpholide (EA 1778) and disphenylaminochlorasine (DM, an arsenic, or Adamsite) and vesicants (blister agents) such as mustard gas (H) and mustard agents, and Lewisite;

- **narcotic antagonists** such as N-Allil Murmorphine and other drugs to counteract the effects of morphine, methadone, and other narcotics;

- **nettle agents** such as phosgene, also known as dichloroformoxime or CX, a highly toxic, irritating, and corrosive gas that was first used as a chemical weapon during World War I;

- **psychochemicals** such as LSD and its analogues, phencyclidine (SNA or Sernyl, also known as PCP) (commonly referred to using the code name "L-Fields" or "K-Agents"), THC and synthetic analogs of cannabis (about 50 times the then street strength of marijuana) such as

1    dimethylheptylpran (DMHP or EA 1476) and its acetate form EA 2233; and mescaline and

2    mescaline derivatives; and

3         • **tranquilizers** such as valium, trilafon, and thorazine.

4         6.      DEFENDANTS videotaped many of the experiments involving "volunteers" at

5    Edgewood, as evidenced by releases signed by many of the "volunteers."

6         7.      Varying doses of each substance were administered to the "volunteers," typically

7    through multiple pathways, including through intravenous, inhalation, oral and percutaneous.

8    Placebos were used in only some, but not all of the studies, in an effort to defray costs.

9         8.      The experiments involving human subjects were one of the key beneficiaries of the

10   recruitment of over 1,500 scientists and technicians from Nazi Germany in "Project Paperclip,"

11   some of whom played a pivotal role in, *e.g.*, the testing of psychochemicals and development of a

12   new truth serum.  Over half of these recruits had been members of the SS or Nazi Party.  The

13   "Paperclip" name was chosen because so many of the employment applications were clipped to

14   immigration papers.

15        9.      In addition to the human experimentation using military personnel that took place

16   at Edgewood Arsenal and Fort Detrick, DEFENDANTS also contracted with outside researchers

17   at hospitals, universities, consultants, and prisons to conduct additional human tests of chemical

18   and biological substances.  The Army Inspector General reported that such contracts were an

19   "important and integral" part of DEFENDANTS' human experimentation program and typically

20   included provisions requiring the contractors to observe basic army policies for Use of Volunteers

21   in Research as set forth in the June 30, 1953 policy Memorandum described in paragraph 125

22   below.  In 1975, the Commander at Edgewood Arsenal reported to the Army Inspector General

23   the results of a study designed to identify and quantify Army expenditures related to the

24   development of chemical incapacitating agents.  That study identified numerous contracts from

25   1958 to 1965 between DEFENDANTS and outside research institutions, including multiple

26   contracts (for tens of thousands of dollars) with the University of California, the Regents of the

27   University of California, and with Stanford Research Institute, which was founded in 1946 by the

28   trustees of Stanford University in Palo Alto, California.  In a follow up study completed in 1976,

THIRD AMENDED COMPLAINT
CASE NO. CV 09-0037-CW                                                                          6
sf- 2922333

1   the Comptroller at Edgewood Arsenal identified additional contracts worth more than $2 million

2   with Stanford Research Institute between 1964 and 1968 related to DEFENDANTS'

3   experimentation program.  (*See* 1976 Army IG Report, Chapter X "Contracts with Civilian

4   Institutions," Chapter XI "Incapacitating Agents Cost Review," & Section III "Contract Costs.")

5       10.    DEFENDANTS obtained materials from major pharmaceutical companies, which

6   included drugs found to be commercially non-viable due to hazards and undesirable side effects

7   (the so-called "rejects"), such as phenylbenzeacetic acid or "brown acid."  Other test substances

8   included amphetamines, anticholinergic drugs, including glycolate types of anticholinergic

9   compounds, dimethyltryptamine (a drug similar to LSD), glycolate compounds such as EA 3580

10  (the prefix "EA" indicating an Edgewood Arsenal substance), mescaline and mescaline

11  derivatives, oximes such as pralidoxime chloride, phosgene, secobarbitol, and many others.

12  These experiments also used civilian "volunteers" such as college students, who were paid small

13  sums to participate, or prisoners.

14      11.    The doses of these chemicals administered to the service members were at times

15  several multiples above the known toxic threshold, causing excruciating pain, blackouts, memory

16  loss, hallucinations, flashbacks, trauma, psychotic disorders, and other lasting health problems.

17  Indeed, a 2007 study found that PTSD rates amongst veterans exposed to chemicals in research

18  projects were higher than those of combat veterans.  In some instances, the "volunteers" suffered

19  grand mal seizures, epileptic seizures or acute paranoia.  In at least a few instances, the victims

20  died.  Initially, the research program was limited to "defensive" purposes such as the testing of

21  gas masks or development of antidotes, but it quickly was expanded to offensive uses with no

22  practical limits and blatant disregard of required procedures.

23      12.    Not only did DEFENDANTS repeatedly violate principles of ethics and human

24  decency, as established by international law and convention through, among other

25  pronouncements, the Nuremberg Code and the Declaration of Helsinki, but they also violated

26  their own regulations and the U.S. Constitution.

27      13.    The expansive scope of DEFENDANTS' undertakings resulted in *ad hoc* leaks of

28  bits of information about their nefarious activities.  Eventually, Congress convened hearings in

1975 to 1977 in an attempt to shed some light on the top-secret Edgewood and other experiments. During these hearings, the "pass the buck" strategy began.  Admiral Stansfield Turner, the CIA Director, promised to locate participants in the tests and compensate those whose conditions or diseases were linked to their exposures during the programs of human experimentation.  Turner assured a joint Congressional Committee that the CIA was working with both the Attorney General and the Secretary of Health, Education and Welfare "to determine whether it is practicable . . . to attempt to identify any of the persons to whom drugs may have been administered unwittingly," and was "working to determine if there are adequate clues to lead to their identification, and if so, how to go about fulfilling the Government's responsibilities in the matter."  (*Project MKULTRA, The CIA's Program of Research in Behavioral Modification:  Joint Hearing Before the S. Select Comm. on Intelligence and the Subcomm. on Health and Scientific Research of the S. Comm. on Human Resources*, 95th Cong. (1977) at 8.)  Thereafter, the Attorney General assumed responsibility for the overall governmental effort to locate "volunteers," with the other DEFENDANTS providing a supporting role.  On January 10, 1979, Director Turner passed off responsibility for finding and compensating the victims of certain MK-related programs to the Department of the Army.

14.     On July 17, 1978, in response to an opinion request from the CIA, the Department of Justice issued a twenty-five page opinion (the "DOJ Opinion") that concluded:

> [T]he **CIA may well be held to have a legal duty to notify those MKULTRA drug-testing subjects whose health the CIA has reason to believe may still be adversely affected by their prior involvement in the MKULTRA drug-testing program** [and] that an effort should thus be made to notify these subjects . . . .

(Emphasis added.)  A true copy of the DOJ Opinion is attached as Exhibit A hereto, and incorporated by this reference.  (*See* Exh. A at A-006.)  However, CIA General Counsel Anthony Lapham reinterpreted the DOJ Opinion in a July 24, 1978 memorandum to CIA Director Turner, which undermined the recommendations and conclusions in the DOJ Opinion.  Turner approved the recommendations in Lapham's memorandum on July 26, 1978.

15.     DEFENDANTS' promise in the 1970s to locate the victims of their human experimentation program, and to provide compensation and health care, proved to be hollow.

1    DEFENDANTS never made a sincere effort to locate the survivors.  Rather, DEFENDANTS

2    quickly adopted a variety of artificial means to limit the number and scope of the population

3    entitled to notice, including eliminating "witting" participants (conveniently defined to include

4    anyone who had signed a general consent form); requiring that it first be established that the CIA

5    should bear "primary responsibility" for the conduct of the tests (taking advantage of the fact that

6    the CIA funded and controlled, but did not actually conduct most of the tests); eliminating tests of

7    substances that arguably did not qualify as "drugs," and eliminating drugs that at the time of the

8    test were considered "not likely to produce long-term aftereffects."  On July 6, 2004, Admiral

9    Stansfield Turner confirmed in private correspondence that the CIA effort to locate the victims of

10    human experimentation did not yield any results other than confirming the death of one

11    individual.  Yet, despite the CIA's repeated representations over multiple decades that they could

12    not find any living persons who participated in Edgewood experiments and others, the CIA had in

13    fact secretly obtained a "large data base" from Edgewood Arsenal in 1974, which contained the

14    names and personal information of all the "volunteers."  Currently, at a point in time 35 years

15    later, the DOD claims to be still working to compile a registry of participants and does not expect

16    to complete work until 2011.  "DoD plans to complete its active investigation of potential

17    exposures by 2011."  (*See* http://fhp.osd.mil/CBexposures/.)

18        16.    As a result, DEFENDANTS failed timely to locate or notify test subjects, and

19    refused to provide compensation or medical screening or treatment to those participants who

20    contacted DEFENDANTS.

21        17.    On or about January 25, 1990, DEFENDANT United States Department of the

22    Army issued updated regulations formally acknowledging its "Duty to Warn" research subject

23    volunteers.  Those regulations provide:

24            *Duty to warn*.  Commanders **have an obligation** to ensure that research
            volunteers are adequately informed concerning the risks involved with

25            their participation in research, and **to provide them with any newly
            acquired information that may affect their well-being** when that

26            information becomes available.  **The duty to warn exists even after the
            individual volunteer has completed his or her participation** in research.

27

28

1   *See* Army Regulation 70-25, *Use of Volunteers as Subjects of Research*, Chapter 3-2(h) (Jan. 25,

2   1990) (emphasis added).  DEFENDANTS' failure to timely locate or notify test subjects about

3   information that has come into DEFENDANTS' possession concerning the human

4   experimentation program flies in the face of this clear mandate.

5       18.   Congressional efforts to locate the "volunteers" and to require medical follow-up

6   achieved only limited success.  In 2005, two United States Congressmen acquired and sent a list

7   of "volunteers" to the Department of Veterans Affairs ("VA") to facilitate delivery of the much-

8   needed, and long-denied, follow-up care.  Although the VA offered follow-up medical

9   *examinations* to some, ongoing medical *care* was not provided.  DEFENDANTS' failure and

10  refusal to fulfill their promise and duty to provide the "volunteers" with the information and

11  health care that many of them so desperately need continued.

12      19.   Beginning at a time unknown to Plaintiffs, DEFENDANTS began to give some of

13  the "volunteers" access to portions of their available Edgewood files, although the records were

14  not available, incomplete, or heavily redacted in many cases.  In addition to the redaction of entire

15  paragraphs or pages, DEFENDANTS redacted the names of virtually all the perpetrators from

16  documents prior to release.  Some participants learned for the first time that they had been

17  exposed to chemical agents, including hallucinogenic and psychotropic drugs.  These files

18  provided the first hints regarding a possible relationship between patients' ailments and the

19  chemical and biological exposures from Edgewood Arsenal.  Other "volunteers" have never been

20  notified at all.

21      20.   Plaintiffs have repeatedly petitioned Congress and DEFENDANTS to honor the

22  promises made to them, but DEFENDANTS have done nothing and have renounced any duty to

23  Plaintiffs, thereby depriving Plaintiffs of their lives and health, their property, and their honor.

24  Although wary of government retaliation, and believing that their health has been compromised

25  by DEFENDANTS' actions, Plaintiffs, all of whom were victims of the Edgewood tests, have

26  now come forward to challenge DEFENDANTS for needlessly exposing them to known toxins

27  and failing to fulfill their obligations and promises to make amends.  Plaintiffs ask the Court to

28  use its equitable powers to check flagrant abuses of government power, and seek to avail

1   themselves of the Court's truth-seeking function so that they can finally discover and expose the

2   embarrassing and painful history of America's human experimentation on its own.  This is their

3   story.

4       **B.**     **Summary of Action**

5       21.     This is a lawsuit for declaratory and injunctive relief in which Plaintiffs seek the

6   following equitable relief:

7           a.     A declaration that any consent forms signed by Plaintiffs and members of

8   the class are not valid or enforceable; that Plaintiffs and the class members are released from any

9   further obligations under their secrecy oaths; that DEFENDANTS are obligated to notify

10  Plaintiffs and class members of all available information concerning the nature of the substances,

11  experimental procedures used, doses, health effects, and other available information; that

12  DEFENDANTS have violated the rights of Plaintiffs under the due process clause of the Fifth

13  Amendment; that DEFENDANTS' human testing program violated the applicable government

14  directives; and other declaratory relief, as prayed for below; and

15          b.     Injunctive relief enjoining DEFENDANTS, and anyone in concert with

16  them, from failing and refusing promptly to notify and provide medical care to Plaintiffs and class

17  members, and various other forms of injunctive relief, as prayed for below.

18      **C.**     **Jurisdiction and Venue**

19      22.     The Court has jurisdiction over the subject matter of this action pursuant to

20  28 U.S.C. § 1331, and 5 U.S.C. § 702.  The action arises out of the Constitution of the United

21  States, and Plaintiffs seek to redress violations of the First and Fifth Amendments to the United

22  States Constitution and other constitutional provisions recited herein.  Plaintiffs also seek a

23  declaratory judgment pursuant to 28 U.S.C. § 2201, and seek to compel agency action unlawfully

24  withheld or unreasonably delayed pursuant to 5 U.S.C. § 706.

25      23.     Venue is proper under 28 U.S.C. §§ 1402(a) and 1391(e), based on plaintiff

26  Swords to Plowshares: Veterans Rights Organization's presence in this District, and because a

27  substantial part of the relevant events giving rise to Plaintiffs' claims took place in this District, as

28  alleged herein, including in paragraphs 4, 9, 105-107, 111, 112, 137(e), 148, 154, and 168.

1   Plaintiffs believe that discovery will confirm that additional relevant events or omissions giving

2   rise to Plaintiffs' claims took place in this District as well.

3           **D.      The Organizational Plaintiffs**

4           24.      Plaintiff VIETNAM VETERANS OF AMERICA ("VVA"), founded in 1978, is a

5   national non-profit organization primarily dedicated to the interests of Vietnam era veterans and

6   their families.  The VVA's founding principle is "Never again shall one generation of veterans

7   abandon another."  VVA has over 50,000 members, 46 state councils and 630 local chapters.

8   VVA's principal goals are to promote veterans' access to quality health care, to insure that

9   veterans receive mandated compensation for diseases or conditions that they have incurred during

10  or as a result of military service, to support the next generation of America's veterans, including

11  Operation Iraqi Freedom and Operation Enduring Freedom ("OIF/OEF") veterans, and to hold

12  government agencies accountable for their legal, ethical, and moral obligations to its veterans.

13          25.      The purposes of the VVA, its State Councils, and its Chapters are:

14               A.  To help foster, encourage, and promote the improvement of the
                 condition of the Vietnam-era veteran.
15

16               B.  To promote physical and cultural improvement, growth and
                 development, self-respect, self-confidence, and usefulness of
17               Vietnam-era veterans and others.

18               C.  To eliminate discrimination suffered by Vietnam-era veterans
                 and to develop channels of communication which will assist
19               Vietnam-era veterans to maximize self-realization and enrichment
                 of their lives and enhance life-fulfillment.
20
                 D.  To study, on a non-partisan basis, proposed legislation, rules, or
21               regulations introduced in any Federal, State, or local legislative or
                 administrative body which may affect the social, economic,
22               educational, or physical welfare of the Vietnam-era veteran or
                 others; and to develop public policy proposals designed to improve
23               the quality of life of the Vietnam-era veteran and others, especially
                 in the areas of employment, education, training, and health.
24
                 E.  To conduct and publish research, on a non-partisan basis,
25               pertaining to the relationship between Vietnam-era veterans and the
                 American society, the Vietnam War experience, the role of the
26               United States in securing peaceful co-existence for the world
                 community, and other matters which affect the social, economic,
27               educational, or physical welfare of the Vietnam-era veteran or
                 others.
28

THIRD AMENDED COMPLAINT
CASE NO. CV 09-0037-CW                                                                              12
sf- 2922333

F.  To assist disabled and needy military veterans including, but not limited to, Vietnam-era veterans and their dependents, and the widows and orphans of deceased veterans.

26.     Among VVA's members are former members of our armed services who participated in DEFENDANTS' programs of human experimentation into drugs, chemicals, and other substances, and have suffered or continue to suffer from the after-effects of such experiments, as described in this Complaint, and have been barred from asserting or deterred from asserting damages claims.  Several of the Individual Plaintiffs are VVA members.

27.     Plaintiff SWORDS TO PLOWSHARES:  VETERANS RIGHTS ORGANIZATION ("Swords" or "Swords to Plowshares"), is a California non-profit service organization whose principal administrative office is in the South of Market District in San Francisco.  Swords also operates veterans housing projects at the Presidio and on Treasure Island.  Founded in 1974, Swords is a community-based, not-for-profit organization that provides counseling and case management, employment and training, housing, and advocacy/legal assistance to more than 1500 homeless and low-income veterans annually in the San Francisco Bay Area and beyond.  Swords promotes and protects the rights of veterans through advocacy, public education, and partnerships with local, state, and national entities.  For example, Swords' Executive Director was appointed to the VA's Advisory Committee on Homeless Veterans in 2002, and Swords advocates for veterans by, among other things, providing assistance with VA disability claims and discharge upgrades, and through legislative comments and analysis.

28.     Swords' mission of service to veterans includes the sub-population of veterans who served as guinea pigs in the testing of biological and chemical weapons.  As a direct result of DEFENDANTS' actions and failures to act in connection with their human testing programs as alleged herein, Swords has diverted and devoted, and expects to continue to divert and devote, already scarce resources to provide additional services to veterans harmed by DEFENDANTS' actions and failures to act.  For example, Swords provided referral services to a U.S. Army Vietnam veteran who reported that while in the military he had been "used as a guinea-pig in Canada for chemical warfare testing new gas masks."  In addition, as part of its advocacy program, Swords has provided initial counseling services during telephone counseling hours to

1    multiple Vietnam-era veterans who were not willing to disclose information related to potential

2    VA claims due to perceived secrecy obligations.  As of December 2009, Swords is providing

3    legal services to a U.S. Army veteran located in Hanford, California, who was a test subject in

4    DEFENDANTS' human experimentation program at Edgewood Arsenal.  Swords believes that it

5    has in the past provided services to additional veterans who participated in DEFENDANTS'

6    chemical and biological weapons testing programs and Swords expects to continue providing

7    services to such veterans into the future.

8             **E.**      **The Individual Plaintiffs**

9                              **Bruce Price**

10        29.     Plaintiff BRUCE PRICE ("Bruce") joined the U.S. Army in May 1965.  Bruce was

11    assigned to duty at Edgewood Arsenal for approximately two months in 1966 — from

12    February 27, 1966, to April 28, 1966.  Before being assigned to Edgewood Arsenal, Bruce was

13    stationed at Ft. George G. Meade and that was where he returned until he was discharged in May

14    1967.  Bruce was trained as a helicopter crew chief, and also had other assignments, such as a

15    door gunner.

16        30.     Bruce first went through a battery of physical and mental evaluations at Edgewood

17    before being used as a test subject.  Bruce and three other volunteers were taken into a room

18    where four doctors were present.  Two of the doctors were dressed in civilian garb and two were

19    military doctors, including a colonel.  The colonel, who seemed to be in charge, described the

20    program and in substance said:  "We know you have heard rumors we use drugs here.  Well I am

21    here to tell you that is true.  We cannot tell you what they are.  We do not know if the drugs will

22    have any harmful effects on you.  But we have the finest medical facilities.  Now, we can't force

23    you to take these drugs, but if you do not, you will be sent back to your home unit with a bad

24    recommendation and it will be put in your DD Form 201 file and follow you for the rest of your

25    life."

26        31.     At some point, Bruce was asked to sign a general consent form that did not state

27    any information about the drugs to be given.  When he started to read the forms, Bruce was

28

1    berated and told to hurry up and sign them.  Bruce never received a Volunteer Booklet explaining

2    the details of the Edgewood assignment.

3          32.     Bruce participated in several different experiments involving unknown substances.

4    Many decades later, he heard that some of the substances he was administered included BZ, LSD,

5    sarin, and ethanol.  He is still not sure what he was given or in what doses.  One of the drugs that

6    was administered to Bruce was given on a Monday, and Bruce did not begin to recover from the

7    drug's effect until Friday.  He thought it was still Monday.

8          33.     At one point, Bruce was ordered to visit a building with a chain link fence that

9    housed test animals, including dogs, cats, guinea pigs and monkeys.  After reporting, Bruce was

10   strapped across his chest, his wrists, and his ankles to a gurney.  Bruce occasionally would regain

11   consciousness for brief moments.  On one such instance, he remembers being covered with a

12   great deal of blood, and assumed it was his own, but did not really know the source.  Also

13   portions of his arms and the backs of his hand were blue.  His wrist and ankles were bruised and

14   sore at the points where he had been strapped to the gurney.  Bruce believes that this is the time

15   period during which a septal implant was placed in his brain.

16         34.     DEFENDANTS placed some sort of an implant in Bruce's right ethmoid sinus

17   near the frontal lobe of his brain.  The implant appears on CT scans as a "foreign body" of

18   undetermined composition (perhaps plastic or some composite material) in Bruce's right ethmoid,

19   as confirmed in a radiology report dated June 30, 2004.

20         35.     Upon leaving Edgewood Arsenal, Bruce was debriefed by government personnel.

21   Bruce was told to never talk about his experiences at Edgewood, and to forget about everything

22   that he ever did, said or heard at Edgewood.

23         36.     Within days or weeks of returning to Ft. George G. Meade, Bruce began to have

24   trouble with his memory.  For example, things as simple as filling out a maintenance report on his

25   chopper and how to spell certain words suddenly became troublesome.

26         37.     After being discharged from the service with an honorable discharge, Bruce

27   returned home to rural Tennessee.  Within a few days Bruce suddenly left for the mountains with

28

a gun with intentions of killing himself.  Bruce's brother finally found him, and talked Bruce into returning home.

38.     Before Bruce revealed his experiences at Edgewood Arsenal, his family did not know why he acted so strangely at certain times.  Bruce finally told his wife about Edgewood, and the fact that he would have flashbacks or visions where the road suddenly changed colors and how he would get lost while trying to go to work.  Bruce disclosed to his wife that he gets lost easily, and did not remember places he had been to hundreds of times previously.  Bruce's wife suggested that he avoid being close to radio waves, and when he did so, his symptoms seemed to improve.  Bruce's wife also helped him to find out more about what was going on at Edgewood Arsenal.  A VA medical diagnostics test ruled out the possibility of Alzheimer's Disease and dementia.

39.     In addition to memory problems, Bruce also suffers from PTSD, and at times is suicidal.  He has experienced uncontrolled fits of anger and loss of control, as well as flashbacks.  Although Bruce worked intermittently after Edgewood Arsenal, his entire life has been ruined.

40.     Bruce has been completely disabled for many years, and received social security disability payments from the age of 62 until he turned 66 in June, 2009, when he qualified for full social security benefits.  Bruce has been rated by the VA as 100% service-connected for PTSD related to his service at Edgewood since 2005.  He depends on his wife for much of his day-to-day care, and his social security and VA compensation are his only means of financial support.

41.     The account in this Complaint is pieced together from fragments of Bruce's own recollection, things he has told his wife in the past, and the results of his wife's research, which includes reviewing portions of Bruce's military records.  To this day, Bruce continues to be haunted by nightmares and dreams about the doctors and what they did to him at Edgewood.

### Eric P. Muth

42.     Plaintiff ERIC P. MUTH ("Eric") was 17 years old when he enlisted in the United States Army on September 15, 1957.  He was based in Missouri after completing his training and some service, and was promoted to Specialist Fourth Class.  In 1959, he entered the Army

1   Reserves.  In 1960, Eric joined the National Guard where he remained until 1969 as Staff

2   Sergeant with top-secret clearance.

3         43.     Early in his Army Career, Eric saw a notice on a bulletin board asking volunteers

4   to help the Army test protective equipment and to test riot gas.  Eric signed up for the tour and in

5   May 1958 attended an orientation at Edgewood Arsenal.  At this orientation, an officer spoke to

6   the enlisted soldiers, telling them that they would be testing military gear and riot gas.  There was

7   no mention of any possible medical or health risks, and the soldiers were promised medical care

8   and either the Soldier's Medal or a special Congressional Medal, which was then under

9   consideration by Congress.

10        44.     Following the orientation speech, the soldiers were given various forms to sign.

11  Included in these forms were a participation agreement and a security non-disclosure form.  Eric

12  was warned that his Edgewood tour was top-secret and that he would be punished if he ever

13  discussed or disclosed any part of it to anyone.  It is the mark of a good soldier to follow the

14  orders and instructions of officers without question or hesitation.  Seventeen-year-old Eric,

15  wanting to show courage and to help his country, signed the forms without a second thought.

16  However, he never received a Volunteer Booklet that was supposed to be distributed to

17  participants.

18        45.     The pre-experimentation physicals, x-rays, blood work, and psychological medical

19  tests run by the Army at the time indicated that Eric had heart problems, was paranoid and manic.

20  There were concerns about his mental condition and stability, making him an unsuitable

21  candidate for human experimentation according to DEFENDANTS' own guidelines.  This,

22  however, did not stop the Army from enrolling Eric as a human guinea pig in its tests.  (In fact,

23  Edgewood had no psychiatrist until 1961, when James S. Ketchum, M.D., assumed that position.)

24        46.     Eric became Medical Volunteer Number 781.  From May to June 1958, Eric was

25  exposed at least to seven different rounds of chemical agents.  He would enter a chamber with

26  several other "volunteers" all of whom wore chemical masks — the equipment Eric believed he

27  was testing — and the chamber would suddenly fill with gas.  The so-called "protective gear" was

28  always entirely inadequate, and Eric felt searing pain before losing consciousness.  Eric and the

THIRD AMENDED COMPLAINT
CASE NO. CV 09-0037-CW
sf- 2922333

17

1    other soldiers were unaware that the masks were a charade of deception: they were designed to

2    fail so that the subject soldiers would inhale the highly dangerous and toxic chemicals. The

3    undisclosed purpose of the tests was to determine the impact of these biological and chemical

4    agents upon human beings.

5          47.    Eric "volunteered" for a second tour at Edgewood, which occurred from

6    November to December 1958, during which period Eric was exposed to three or four rounds of

7    chemical agents. Although doing his best to be brave, Eric had no idea of what they were doing,

8    and he did experience some fear and knee buckling. One such test was conducted by injecting a

9    chemical substance intravenously in one arm while simultaneously withdrawing blood from the

10    other arm. Exposure to DM ("Adamsite," an arsenic compound) caused him to fall to the floor

11    vomiting.

12          48.    In another test, Eric was given an unidentified pill to swallow. After being

13    exposed to what he much later learned was EA 1476, he remembers being delirious, arms and

14    legs flailing, unable to stand or walk and crawling to the water fountain to drink, falling, and

15    being ordered to void in jars. As a result of another exposure, Eric lost consciousness for

16    approximately three days, had an extremely low blood pressure, and suffered severe

17    hallucinations. His exposures record contains lines doctored by a magic marker so that they

18    cannot be read. He also has a reoccurring dream with an "out of body experience."

19          49.    To this day, Eric continues to have flashbacks of his nightmares, and received a

20    dual diagnosis of both PTSD and bipolar disorder. He is anxious and high strung. At times, he

21    has been suicidal. Being confined in small spaces, such as an elevator, terrifies him because it

22    reminds him of a gas chamber, and he finds himself planning escape routes for any building,

23    store, or space he frequents. He is fixated on keeping doorways within view. Eric's list of

24    physical ailments is long: he has heart problems; post-surgery for aneurisms in both legs;

25    allergies; sinus issues; emphysema; gastro-intestinal disorders; hearing loss; tinnitus; vestibular

26    dysfunction; brain ischemia; and spinal degeneration. Notwithstanding these problems, Eric

27    pursued a successful career as an optician.

28

50.     Due to the security non-disclosure, the warnings that his Edgewood experience was top-secret, and the threats of punishment for telling his tale, Eric did not seek medical attention for many of his ailments until around 1997, when he sought care from VA doctors. Even then, he kept secret the details of his Edgewood past.  More recently, Eric's physicians were able to link certain of his ailments and problems to the agents to which he was unwittingly exposed at Edgewood.  The Social Security Administration has found Eric to be disabled, and the VA also found that Eric was 100% disabled based upon the VA's rating schedule, a portion of which was attributable to his service at Edgewood.

51.     In 2002, Eric underwent an occupational and environmental medicine health and safety exam offered by the VA.  The VA told him that his exposures at Edgewood did not produce any long-term health impacts, but also stated that the agents he had been exposed to had not been well studied or remained classified, and that this precluded further assessment.  In 2006, Eric received a letter from the VA offering him the opportunity to undertake another health examination as a follow-up to his Edgewood service.  Eric took a copy of the letter to his local VA eligibility office in West Haven, Connecticut.  However, the VA Eligibility Technician told Eric that they knew nothing about any such offer.

**Franklin D. Rochelle**

52.     Plaintiff FRANKLIN D. ROCHELLE ("Frank") was raised in rural North Carolina.  In 1968, at the age of 20, he was drafted into the Army.  He attended boot camp at Fort Bragg, North Carolina, and was then based at Fort Lee, Virginia.

53.     While at Fort Lee, Frank saw posted notices asking for servicemen to test military equipment, clothing, and gas masks.  The opportunity appealed to Frank in part because the signs promised no guard duty, no KP ("Kitchen Police") duty, and the freedom to wear civilian clothes instead of his uniform.  Frank submitted his name for the assignment.

54.     Upon arriving at Edgewood Arsenal, Frank attended an orientation meeting where he was told that some servicemen might be given the opportunity to test therapeutic drugs currently under development.  The servicemen selected for this would be given Fridays off and would receive special recognition in the form of a medal.  The presenters assured Frank and the

1    attendees that they would not be harmed, that the tests were risk free, and that the drugs given

2    would not be above normal doses.  Frank never was told what he would be testing, nor was Frank

3    warned of any hazards.  Frank signed up for the program.  He was given a number of tasks and

4    quizzes to test his competency.  He also was asked to sign various forms, including a release

5    form.  A self-described "country boy" who had never been exposed to street drugs, let alone

6    heard of chemical and other hazardous substances used by the Army, Frank had no clue of what

7    he was in for.  He simply signed the form handed to him.  Frank was never given a Volunteer

8    Booklet.

9         55.    Frank was stationed at Edgewood Arsenal for a 60-day tour from September 1,

10   1968, to the end of October 1968.  Although he does not remember ever signing a security non-

11   disclosure form, he was instructed to never talk about any of his tests.  As his first test, he was

12   given an injection that had no discernable effect on him, possibly because it may have been a

13   placebo.

14        56.    The second experiment on Frank, however, proved to be an entirely different story.

15   Frank was taken into a chamber by two individuals in white coats.  He was placed in front of a

16   face mask and told to breathe normally.  Frank did so, at which point he heard a valve click and

17   smelled some gas.  Within one breath, Frank began to lose consciousness.  He struggled to

18   breathe and had difficulty seeing.  He felt dizzy, drunk, nauseous, and had the acute sensation that

19   his legs were falling through the floor.  He vaguely recalls being carried out of the chamber by

20   two men in white coats.  Over the next two to three days, Frank was hallucinating and high:  he

21   thought he was three feet tall, saw animals on the walls, thought he was being pursued by a 6-foot

22   tall white rabbit, heard people calling his name, thought that all his freckles were bugs under his

23   skin, and used a razor to try to cut these bugs out.  No one from the clinical staff intervened on his

24   behalf even though he was told that the test subjects would be under constant supervision.

25   However, when questioned afterwards about the source of the blood, Frank told them that he

26   dropped his razor while shaving.  He was too embarrassed to tell them the truth about what had

27   happened.  Frank's records show that on that day he was given the glycolate, CAR 302668, an

28

1    anticholinergic with properties identical to atropine, at a dose above the calculated incapacitating

2    amount.

3         57.     Frank's available records from Edgewood indicate that he participated in a third

4    round of testing during his tenure at Edgewood.  To this day, he is unable to recall a single detail

5    from this period of time.  However, Frank's records suggest that the substances he received were

6    code-named EA 2233-1 and EA 2233-2.  Frank knows nothing about these substances, but

7    internet research has revealed that EA 2233 is a non-lethal incapacitating agent that is actually

8    DMHP, and is related in structure to THC.  It has eight stereoisomers, which differ markedly in

9    potency, and the most potent stereoisomer was EA 2233-2.  DHMP produces sedation and

10   hallucinogenic effects similar to THC, but also is known to cause hypotension (low blood

11   pressure), severe dizziness, fainting, ataxia and muscle weakness.

12        58.     When he was released from Edgewood, Frank was promised follow-up medical

13   care.  However, the Army never checked in or followed up with Frank.  Instead, they sent Frank

14   to fight in Vietnam.

15        59.     Today, Frank suffers from memory loss, anxiety, vision problems, difficulty

16   breathing, and sleep apnea.  He still has nightmares about his time at Edgewood, has a short

17   temper, and is highly distrustful of authority figures.  Because he believed that his Edgewood

18   service was top-secret and because he feared punishment for disclosure, Frank did not even tell

19   his own doctor what he had been through until around 2006.  He currently receives 80% VA

20   disability compensation for obstructive lung defect, anxiety disorder, hearing loss and tinnitus.

21        60.     During his assignment to Edgewood, Frank received $1.50 per day in pay for

22   travel and a certificate saying that he was an Edgewood participant.  He never received any award

23   or medal.  Further, Frank did not receive any follow-up check-ups, care or treatment.

24        61.     Recently, Frank's medical problems have worsened and his health has

25   deteriorated.  As a result, Frank is no longer able to work the job that he held for over 28 years.

26                              **Larry Meirow**

27        62.     Plaintiff LARRY MEIROW ("Larry") was called up to the United States Army in

28   the last draft call of the Vietnam Era.  He was 19 when he entered the Army as a Private in

1  June 1972.  Larry served on active duty until March 1974 when he joined the National Guard.  He

2  returned to active duty in 1975 for 45 days to fulfill his military commitment.

3      63.    After being called up in the draft, Larry entered basic training which he completed

4  in August 1972.  Shortly thereafter, in October 1972, his Company Commander came out to the

5  morning formation and asked for volunteers to go to Edgewood.  The members of the company

6  were told that they would be testing military equipment and would be given 3-day weekends and

7  extra pay of $2.00 per day.  Still standing in morning formation, the soldiers were asked to raise

8  their hands if they were interested.  Larry raised his hand.

9      64.    When morning formation was dismissed, Larry asked the officer for more details

10  about Edgewood.  Larry was told that those who were selected would learn more once at

11  Edgewood.  Larry soon received orders to report to Edgewood by November 3, 1972.

12      65.    Upon reporting to Edgewood, Larry was given paperwork to sign, but was not

13  given the advance opportunity to read or review the contents.  He was not given a Volunteer

14  Booklet.  Instead, he was berated and ordered to hurry up and complete the forms.  Larry was also

15  given psychological and medical exams and was examined by a psychiatrist.

16      66.    During a group presentation, the soldiers were promised a commendation medal

17  and health care should anything go wrong.  They also were ordered to never disclose any details

18  of their Edgewood experience and were told that if they disobeyed they would be imprisoned.

19  After this orientation, the soldiers were released to the camp where they would go into the day

20  room to play ping pong and wait for their names to be called up.

21      67.    Sometime around November 11, 1972, Larry was called out of the day room and

22  driven to another building.  He was ordered to put on a hospital gown and told to lie down on a

23  table.  The people in charge attached leg and arm straps to buckle him down and hold him in

24  place.  He was told that he was going to be injected with a harmless substance.

25      68.    Instead, they injected Larry with a substance that caused a burning sensation

26  through his veins and made his head feel like it was going to explode.  Larry felt like he was on

27  fire and blacked out from the pain.  He cannot recall what happened next, but only remembers

28  regaining consciousness in a bunk bed in a recovery area.  While in the recovery area, he was

given urine tests every 24 hours.  He was told that he would have to continue to have frequent urine tests even after returning to his permanent base and that he should continue to have them done even after he had been discharged.

69.     For over 30 years since Edgewood, Larry has had ongoing symptoms of fibromyalgia, joint pain, tremors, and numbness.  He has suffered from a splitting headache on the right side of his head, with blurred vision and difficulty swallowing.  His head often feels numb and at times he has uncontrollable drooling.  He has hearing loss in both ears and wears a hearing aid in one ear.  He has almost completely lost his short-term memory, and some loss of his long-term memory.  He has been worked up by multiple specialists and diagnosed with cysts on both kidneys, and pre-cancerous polyps of the colon.  His EMG tests were positive for polyneuropathies and pathology in both upper and lower extremities, and he has demonstrated persistent problems with balance and fine motor skills.  He has severe stomach aches and his gallbladder had to be removed.  He has fatty tissue surrounding his liver.  He has been unable to sleep a full night for over three decades.  He has had periods where sobriety became an issue, has been arrested several times, and has had difficulty holding down jobs for long periods of time.  Larry was so fearful of disobeying the confidentiality order and so traumatized by recalling the events that he did not tell his spouse of 37 years or his doctors what he had been through until approximately 2003.

70.     When he was 49 years old, Larry had to quit working due to his health condition, and he has been receiving Social Security disability payments since 2004.  On Larry's behalf, the VA requested his medical papers from Edgewood.  However, Edgewood Arsenal sent a letter to the VA dated May 24, 2005 confirming that Larry had been assigned to serve at Edgewood, but denying that Larry had actually participated in any of their experiments.  Larry has never received the health care or medal of commendation that he was promised.

**David C. Dufrane**

71.     The day after Plaintiff DAVID C. DUFRANE ("David") graduated from high school in June 1964, he enlisted in the United States Army as a Private E1.  David was 17 years old.  He served in the Army until June 1967.  He served in both Thailand and Edgewood.

1   72.   In March 1965, while based at Fort Knox, Kentucky, David saw a flyer looking for

2   volunteers to test clothing and equipment.  David asked his Platoon Sergeant what the Edgewood

3   program was about.  David's Platoon Sergeant responded that he did not know, but that since it

4   was located near some testing grounds, the volunteers might be testing military equipment.

5   David decided to go to an informational meeting.

6   73.   At the informational meeting, David was told that volunteers would be testing

7   clothing and military equipment.  David was also told that they would not have guard duty, would

8   not have KP, would be granted increased amounts of vacation, and would receive a special

9   commendation.  Following the information session, David was given a battery of physical and

10  written tests.  Like the others, he did not receive the Volunteer Booklet.

11  74.   Shortly thereafter, David received orders to report to Edgewood in April 1965.  He

12  reported for duty at Edgewood on April 4, 1965.  After completing a questionnaire regarding

13  routine medical data, David waited for his name to be called.

14  75.   In all, David was used as a human test subject in at least eight experiments.  He is

15  able to remember only four of them.  Gas was sprayed directly onto his face, causing extreme

16  burning and blindness that lasted for eight hours.  Chemicals were sprayed on his body that, when

17  exposed to black light, turned his body purple.  While held in padded rooms, David was injected

18  with substances that made him hallucinate for days.  He believed that he was eating entire cities

19  and vomited from the taste of the concrete in his mouth.  He also was forced to drink liquids that

20  made him think objects that he held in his hand had disappeared or were invisible.

21  76.   David was held at Edgewood from early April to the end of May 1965.  He spent

22  most of that time entirely incapacitated.  As soon as he was finished with one test — and

23  sometimes when he was still under the influence of unknown chemical substances — he would be

24  assigned to participate in another test.  He cannot remember much of what happened during that

25  time.

26  77.   David was later told by the Army that he had signed releases for every test in

27  which he had participated.  However, he does not remember ever seeing or signing any release.

28  Edgewood provided him with three examples of his supposed releases.  One of these releases was

dated in June 1964, *prior to his entry into the armed services* and at a time when he was still in high school.  Another was dated in 1969, *after he had already left the Army*.  None of these supposed releases contain any specific information or details as to what he was allegedly agreeing to do.

78.     At his exit interview in 1965, David was told that his service at Edgewood was top secret.  He was directed to sign a confidentiality agreement, which he complied with.  He also was told that he should not speak with either a private doctor or the VA about his Edgewood experience, and that the Army or Edgewood would provide him with any follow-up care he might need.

79.     David suffers from frequent flashbacks.  His arms and legs are numb and tingle almost all of the time.  He has a chronic headache on the left side of his head, and has broken all of the teeth on the left side of his jaw due to grinding from the always-present pain.  He has severe breathing and lung problems and almost always hears a hissing noise in his ears.

80.     David tried to get medical care in 1986.  When he approached his VA for assistance, he was told that he was hallucinating and making things up — he was told that Edgewood never happened and that he had never served there.  For the next 6 years, David did not seek medical care, fearful that no one would believe him and unable to back up his claims.  After his daughter discovered his Edgewood release papers in the attic, David was able to return to the VA with proof of his Edgewood service.  Doctors have since linked his ailments to his chemical exposure while at Edgewood.  However, he has never been given the follow-up medical care or medal of commendation that he was promised.  David recently was awarded the Vietnam Service Medal with two Bronze Service Stars for the Vietnam Defense Campaign and the Vietnam Counter-Offensive Campaign.  David currently receives 60% VA disability compensation for post-traumatic stress disorder.

### Former Individual Plaintiff Wray C. Forrest

81.     Former Plaintiff WRAY C. FORREST ("Wray") was 17 years old when he enlisted in the United States Air Force.  He served in the Air Force from 1967 to 1969 and then, at the age of 19 in January 1969, enlisted in the Army.  He served in the Army for 14 years and

1  was honorably discharged in 1982 at the grade of E-7 (Sgt. First Class).  He was discharged for

2  alleged personality disorders.

3       82.     While posted at Fort Stewart, Georgia, Wray saw flyers announcing tours of duty

4  at Edgewood.  A meeting was being held at the local post theater.  Out of curiosity, Wray

5  attended.  At the meeting representatives from Edgewood announced that they were looking for

6  soldiers to test Army equipment, vehicles, military combat equipment, and the like.  The

7  representatives said that soldiers selected to participate would have a 4-day work week, with a

8  guaranteed 3-day pass, and would receive a Commendation Medal for their service.  There was

9  no mention of testing drugs, nor was there any disclosure of hazards or potential risks.

10       83.     Soldiers interested in the opportunity to serve at Edgewood were invited to remain

11  at the post theater to participate in a number of screening interviews.  Wray was asked to sign

12  forms saying that he was interested in serving at Edgewood and was then given written and

13  psychiatric tests.  Eight to ten weeks later, Wray received notification to report to personnel to

14  pick up his Temporary Duty Orders.  He was one of two people from his post ordered to

15  Edgewood Arsenal.

16       84.     After Wray arrived at Edgewood in 1973, he remembers signing some sort of form

17  consenting to test aircraft equipment.  He was ordered to report for testing early Monday

18  morning.  It was only at this point — after he had been ordered to serve at Edgewood, after he

19  had reported for duty at Edgewood, after he had signed the consent forms to perform tests on

20  aircraft, and after he showed up on Monday morning for testing — that he was verbally informed

21  that he would be used to test drugs.  He never received a Volunteer Booklet.  He was issued a

22  special identification card to present in the event that he were ever arrested for drug use based

23  upon the track marks that would soon appear on his arms.  At that point, because he was a soldier

24  following the orders of his officers, he felt that he did not have any real opportunity to back out or

25  return to his post.  Wray became Medical Volunteer Number 6692.

26       85.     Wray was a human subject in at least five Edgewood tests.  The tests were

27  conducted in various places:  the ward, an aircraft, a dark room with no light, and a classroom

28

1   setting.  He was injected with various substances, and was then asked to describe his side effects,

2   which included dizziness, blurred vision, difficulty speaking, and a rapid heart rate.

3        86.     Following his service at Edgewood, Wray has suffered traumatic stress disorder

4   and pulmonary and cardiac problems that has led to a 100% Social Security Disability rating.  He

5   never received the Commendation Medal he was promised, nor recognition of any other kind.

6   Although still an active service member when the Army was requested to provide the names of all

7   soldier subjects during the Congressional Hearings in 1977, the Army never notified or contacted

8   Wray.  In fact, the only time Wray has been contacted regarding his Edgewood service was by a

9   VA outreach survey in 2007, three decades after he completed his tour at Edgewood.

10        87.     On August 31, 2010, after suffering with terminal lung, throat and lymphatic

11   cancer, Wray passed away.

12   <div align="center">**Common Issues Among Individual Plaintiffs**</div>

13        88.     None of the activities of Plaintiffs described herein constituted participation in

14   what can properly be considered to be military activities or implicated questions of military

15   discipline.  None of the Plaintiffs or members of the proposed class are currently active members

16   of the military.

17        89.     Except for a handful of veterans compensated by the passage of private bills,

18   DEFENDANTS have not compensated Plaintiffs or any class members for any of the damages

19   suffered as the proximate result of DEFENDANTS' actions or reimbursed Plaintiffs or class

20   members for the private medical care and treatment they have received.  In contrast, the British

21   government in January 2008 provided full compensation to the participants in a parallel set of

22   human experiments on troops assigned to serve at Porton Down, near Salisbury, England.

23   Similarly, in 2004, the Canadian government adopted a payment program to recognize the service

24   of Canadian veterans who participated in chemical warfare experiments at Suffield, Alberta, and

25   Chemical Warfare Laboratories, Ottawa, from 1941 through the mid-1970s.  The vast majority of

26   Edgewood participants have never received any notice from DEFENDANTS and at most a small

27   handful have ever received any health care or compensation from DEFENDANTS associated

28   with their participation in the MKULTRA experiments.

THIRD AMENDED COMPLAINT
CASE NO. CV 09-0037-CW
sf- 2922333

27

90.     DEFENDANTS acquired esoteric and unique knowledge and information, most of which was never made public, concerning the properties, doses, and health effects, both immediate and latent, of the substances they tested.  Most private physicians lack the background and experience properly to treat many of the health effects of such substances, some of which DEFENDANTS have never identified.  As a result, the ability of the "volunteers" to obtain suitable medical care has in many instances been, and continues to be, adversely impacted or compromised.

91.     Nothing herein is intended or should be construed as an attempt to obtain review of any decision relating to benefits sought by any veteran or to challenge any benefits decisions made by the Secretary of the VA.  Likewise, nothing herein is intended or should be construed as a request for money damages.

**F.     DEFENDANTS**

92.     Defendant CENTRAL INTELLIGENCE AGENCY ("CIA") was created in 1947 by the National Security Act, which also established the Department of Defense and the National Security Council ("NSC").  CIA was modeled largely after the Office of Strategic Services, which served as the principal U.S. intelligence organization during World War II.  The newly created agency was authorized to engage in foreign intelligence collection (*i.e.*, espionage), analysis, and covert actions.  It was, however, prohibited from engaging in domestic police or internal security functions.  The CIA has publicly stated that no U.S. citizens should be the object of CIA operations.  Nonetheless, CIA engaged in a surreptitious, illegal program of domestic human experimentation from the 1950s at least well into the 1970s.

93.     Defendant LEON PANETTA, is the current Director of the CIA, and is named solely in his official capacity.  The Director of the CIA serves as the head of the CIA and reports to the Director of National Intelligence.  (The Intelligence Reform and Terrorism Prevention Act of 2004 amended the National Security Act to provide for a Director of National Intelligence who would assume some of the roles formerly fulfilled by the Director of Central Intelligence ("DCI"), with a separate Director of the CIA.)  The CIA Director's responsibilities include:

(a) collecting intelligence through human sources and by other appropriate means, except that he

1   shall have no police, subpoena, or law enforcement powers or internal security functions;

2   (b) correlating and evaluating intelligence related to the national security and providing

3   appropriate dissemination of such intelligence; (c) providing overall direction for and

4   coordination of the collection of national intelligence outside the United States through human

5   sources by elements of the intelligence community authorized to undertake such collection and, in

6   coordination with other departments, agencies, or elements of the United States Government that

7   are authorized to undertake such collection, ensuring that the most effective use is made of

8   resources and that appropriate account is taken of the risks to the United States and those

9   involved in such collection; and (d) performing such other functions and duties related to

10  intelligence affecting the national security as the President or the Director of National Intelligence

11  may direct.

12          94.     Defendant the DEPARTMENT OF DEFENSE ("DOD" or "DoD") is the federal

13  department charged with coordinating and supervising all agencies and functions of the

14  government relating directly to national security and the military.  The organization and functions

15  of the DOD are set forth in Title 10 of the United States Code.  The DOD is the major tenant of

16  the Pentagon building near Washington, D.C., and has three major components — the

17  Department of the Army, the Department of the Navy, and the Department of the Air Force.

18  Among the many DOD agencies are the Missile Defense Agency, the Defense Advanced

19  Research Projects Agency ("DARPA"), the Pentagon Force Protection Agency ("PFPA"), the

20  Defense Intelligence Agency ("DIA"), the National Geospatial-Intelligence Agency ("NGA"),

21  and the National Security Agency ("NSA").  The department also operates several joint service

22  schools, including the National War College.

23          95.     Defendant DR. ROBERT M. GATES is the current Secretary of Defense, and is

24  named solely in his official capacity.  The Secretary of Defense is the principal defense policy

25  advisor to the President and is responsible for the formulation of general defense policy and

26  policy related to all matters of direct concern to the DOD, and for the execution of approved

27  policy.  Under the direction of the President, the Secretary of Defense exercises authority,

28  direction and control over the DOD.  The Secretary of Defense is a member of the President's

1   Cabinet and of the National Security Council.  In 1964, the DOD took primary responsibility for

2   the human experimentation "volunteers."  In 1993, the DOD promised to supply VA with

3   information to help "volunteers" with claims; however, the DOD did not fulfill that promise.  On

4   December 2, 2002, Congress passed the Bob Stump National Defense Authorization Act for

5   Fiscal Year 2003.  In that Act, Congress directed the Secretary of Defense to "work with veterans

6   and veterans service organizations" to identify "projects or tests conducted by the Department of

7   Defense that may have exposed members of the Armed Forces to chemical or biological agents."

8   In February 2008, the U.S. Government Accountability Office reported to Congress that the DOD

9   had not met this duty, and that the DOD "has not kept Congress and veterans service

10   organizations fully informed about its efforts."  Indeed, for decades the DOD resisted release of

11   the names of the "volunteers" to the VA, as well as other available information.

12       96.     Defendant UNITED STATES DEPARTMENT OF THE ARMY (the "Department

13   of the Army") is one of three service departments of the Department of Defense.  It has

14   responsibility for the administration of, control, and operation of the United States Army (the

15   "Army"), a military organization whose primary responsibility is for land-based military

16   operations.  The civilian head of the Department of the Army is the Secretary of the Army, and

17   the highest ranking military officer in the department is the Chief of Staff, unless the Chairman of

18   the Joint Chiefs of Staff or Vice Chairman of the Joint Chiefs of Staff is an Army officer.  The

19   Army is made up of three components:  the active component, the Regular Army, and two reserve

20   components, the Army National Guard and the Army Reserve.  As of October 31, 2008, the

21   Regular Army reported just under 546,000 soldiers.  The Army National Guard (the "ARNG")

22   reported 350,000 personnel and the United States Army Reserve (the "USAR") reported 189,000

23   personnel, putting the approximate combined total at 1,085,000 personnel.

24       97.     Defendant PETE GEREN is the current United States Secretary of the Army, and

25   is named solely in his official capacity.  Secretary GEREN has statutory responsibility for all

26   matters relating to the United States Army:  manpower, personnel, reserve affairs, installations,

27   environmental issues, weapons systems and equipment acquisition, communications, and

28   financial management.  Additionally, Secretary GEREN is responsible for the Department of the

Army's annual budget and supplemental budget of $170 billion.  He leads a work force of over one million active duty, Army National Guard, and Army Reserve soldiers, 230,000 Department of the Army civilian employees and 280,000 contracted service personnel.

98.     Defendant ERIC H. HOLDER, JR. is the current Attorney General of the UNITED STATES OF AMERICA, and is named solely in his official capacity, and in connection with the Attorney General's assumption of responsibility to notify the victims of biological and chemical weapons tests.

99.     The inclusion of each defendant named herein is necessary to afford complete relief, and to avoid a multiplicity of actions and the possibility of inconsistent results.

## II.      THE HISTORY OF THE GOVERNMENT'S USE OF CITIZENS AS TEST SUBJECTS IN EXPERIMENTS INVOLVING RADIOACTIVE ISOTOPES, CHEMICALS AND BIOLOGICAL AGENTS

### A.      DEFENDANTS' Use of Soldiers to Test Toxic Chemical and Biological Warfare Agents

#### 1.      Overview of Testing Programs

100.     Edgewood Arsenal was originally established on October 20, 1917, six months after the United States entered World War I, and one of its responsibilities was to conduct chemical weapons research, development and testing.  Edgewood also provided chemical production and artillery shell filling facilities to respond to the chemical weapons that were being used in the fighting in Europe.  The main chemicals produced were phosgene, chloropicrin and mustard.  Edgewood offered a military facility where design and testing of ordnance material could be carried out in close proximity to the nation's industrial and shipping centers.  The installation comprises two principal areas, separated by the Bush River.  The Northern area was known as the Aberdeen Proving Ground area.  The southern sector, Edgewood Arsenal — formerly called the U.S. Army Chemical Warfare Center — was located northeast of Baltimore, Maryland, in the Northern Chesapeake Bay along a neck of land between the Gunpowder and Bush rivers.  The two areas were administratively combined in 1971.

101.     During the 1930s, Edgewood Arsenal served as the center of the military's Chemical Warfare Service activities.  Workers developed gas masks and protective clothing,

tested chemical agent dispersal methods, and trained Army and Navy personnel.  During World War II, Edgewood Arsenal continued to produce chemical agents and plans for countermeasures in case it became necessary to use them.  Workers at Edgewood also tested and developed flame thrower weapons and smoke screens.  The Army Chemical and Biological Defense Command ("CBDCOM") is home to the Army's non-medical chemical and biological defense activities, including research, development, acquisition, and remediation issues associated with chemical and biological defense.

102.    By the end of World War II, the U.S. had produced more than 87,000 tons of sulfur mustard, 20,000 tons of Lewisite, and 100 tons of nitrogen mustard at Edgewood Arsenal and three other military facilities.  In addition to producing chemical materials, Edgewood became the first American military installation to test lethal agents on humans.

103.    In 1942, DEFENDANTS for the first time sought formal authority to recruit and use human subjects in a chemical warfare experiment involving mustard agents.  (1976 Army IG Report at 29-30.)  The Acting Secretary of War authorized in principle the use of enlisted men as subjects for testing of mustard agent on soldiers.  Initially, volunteer investigators at Edgewood Arsenal were used to test mustard, phosgene, and other known chemical agents.  DEFENDANTS continued to rely upon this same mustard gas authorization to conduct human experimentation into the 1950s at Camp Siebert, Alabama, Bushnell, Florida, Dugway Proving Ground, Utah, and off the coast of Panama near the Panama Canal Zone.  (1976 Army IG Report at 30.)

104.    On or about January 21, 1944, DEFENDANTS carried out a mission to test the effects of mustard gas bombs on American prisoners who had volunteered for the assignment on the understanding that they would be released from prison after it was concluded.  These volunteers were placed in underground fortified bunkers on an island off the coast of Australia.  In an effort to cover their tracks, DEFENDANTS used Australian pilots in American Air Force planes to conduct an air strike on the fortified bunkers, hoping to gain information to plan the invasion of Pacific Islands held by Japan.  The secret mission was headed by Lt. Col. Jess Crowther of the 5th U.S. Air Force.  The prisoners were killed in the bombing, and DEFENDANTS suppressed or destroyed information concerning the mission and its results.

105.    From approximately 1949 to 1968, DEFENDANTS conducted open air field tests of anti-personnel biological stimulants in numerous U.S. cities.  For example, in 1950, DEFENDANTS exposed the city of San Francisco to an aerosolized live bacteria called *serratia marcescens*.  On information and belief, this field test exposed military personnel and civilians alike to *serratia marcescens*.  *See, e.g.*, *Nevin v. United States*, 696 F.2d 1229 (9th Cir. 1983). The bacterium *bacillus globigii* also was used in the 1950 San Francisco test.  Additional anti-personnel field testing of *bacillus globigii* took place at Edgewood Arsenal in 1959.  (*See, e.g.*, U.S. Army Activity In the U.S. Biological Warfare Programs, Volume 2, Annex E, Appendix III & Annex F (Feb. 24, 1977), included in *Biological Testing Involving Human Subjects by the Department of Defense:  Hearing Before the Subcomm. on Health and Scientific Research of the S. Comm. on Human Resources*, 95th Cong. (1977).)  DEFENDANTS also entered into numerous Biological Warfare Research, Development, Test, & Evaluation ("RDTE") Contracts with private research institutions through Fort Detrick, including more than 20 contracts from 1950 to 1966 with the State of California, the University of California, Stanford University, and Stanford Research Institute.  (*See id.* at 80-100.)

106.    In early 1952, the CIA effected an agreement with the Army Chemical Corps for the performance of certain chemical and biological warfare research and development work by the Army Chemical Corps at the Army's laboratory facilities at Fort Detrick.  CIA funding for this program continued until the 1970s.  Fort Detrick was the parent research and pilot plant center for DEFENDANTS' biological warfare programs, and became heavily involved in cancer research after President Nixon declared a war on cancer in 1971.  The National Cancer Institute ("NCI") spearheaded that effort.  The Naval Biosciences Laboratory ("NBL"), in Oakland, California, collaborated in open-air tests of biological warfare stimulants in the San Francisco Bay Area in the 1950s, including by supplying personnel, lab facilities, and equipment for the secret biological warfare stimulant exercise in San Francisco.  The University of California ("UC") helped manage the NBL — earlier called the Naval Biological Laboratory.  From approximately 1953 to 1968, UC, while involved with the NBL, also had biological warfare contracts with the U.S. Army.  After U.S. treaty obligations prohibited open research on mass

1   production of dangerous viruses as a result of the Biological Weapons Convention (1972), this

2   program, at least officially, shifted its focus to defensive measures.  A focus of the Fort Detrick

3   facility after the ban on offensive viruses was the large scale production of oncogenic (cancer-

4   causing) and suspected oncogenic viruses.  Within about a year, DEFENDANTS had produced a

5   stockpile of approximately 60,000 liters of oncogenic and immunosuppressive viruses.  In

6   addition, a research engineer at NBL who was a member of the NCI Biohazards Work Group

7   from the NBL, conducted research concerning the stability, virulence, and biological

8   characteristics of viral aerosols in the early 1970s.

9          107.    Throughout the 1970s, the U.S. "defensive" biological warfare programs

10   increasingly focused on the research and development of viral disease agents.  The seed stocks for

11   virus production came from the Cell Culture Laboratory ("CCL"), which was housed at the NBL.

12   The laboratory was partially funded by the NCI and connected to UC and it became a repository

13   for potentially cancer-causing tissues and tissues that might contain them.  After the ban, the NBL

14   continued experimenting with biological agents, but as "defensive" research.  The NBL contract

15   was concurrent with NBL projects with bubonic plague, Rift Valley and meningitis.  The NBL

16   did additional research for Fort Detrick before the 1972 ban.  The NBL also performed much of

17   the original research into biological warfare during World War II.  During this same period of

18   time, DEFENDANTS began to test the effectiveness of possible vaccines for biological warfare

19   agents on military personnel, using, for example, troops at Army installations such as Fort Dix,

20   N.J., where soldier "volunteers" were used to test a vaccine for meningitis.

21          108.    DEFENDANTS and other government agencies have reported conflicting

22   estimates regarding the total number of armed services members exposed at Edgewood Arsenal

23   and other locations.  The VA has reported that, between 1950 and 1975, approximately 6,720

24   soldiers were used as human guinea pigs for experiments involving exposure to at least 254 toxic

25   biological and chemical warfare agents at the U.S. Army's laboratories at Edgewood Arsenal.

26   These tests were conducted jointly by the U.S. Army Intelligence Board and the Chemical

27   Warfare Laboratories at Edgewood Arsenal's research facility.

28

1   109.    One of the principal objectives of activities at Edgewood and Fort Detrick was to

2   research and test drugs that could be used for "psychological warfare."  In accordance with this

3   policy, the United States government began human testing of newer chemical agents, including

4   LSD, PCP, and synthetic cannabis analogs.

5   110.    DEFENDANTS also tested mustard agents on soldiers at Edgewood.  From 1958

6   to 1974, the government conducted tests of the riot control agent CS on at least 1,366 human

7   subjects at Edgewood, including skin applications, aerosol exposures, and direct application to the

8   individuals' eyes.

9   111.    As part of DEFENDANTS' human experimentation program, DEFENDANTS

10  determined that field tests of psychochemicals were necessary and should be performed to follow

11  up on laboratory experiments.  The former Fort Ord, approximately five miles north of Monterey,

12  California, was suggested as a field test site because the low ground fog was considered "good

13  weather" for such tests.

14  112.    DEFENDANTS conducted field tests at Fort Ord using military personnel.  These

15  field tests included a 1964 test entitled "Road Operations in a Toxic Environment" and a 1975

16  test code named "Grand Plot III," which was concerned with twelve common chemical defense

17  tasks.  One purpose of these tests appears to have been to test nuclear, biological, and chemical

18  protective clothing.  Reports, some classified as SECRET, detailing the results of the Grand

19  Plot III tests contain specific data concerning how much a soldier's performance is degraded

20  while operating in a chemical environment.  (*See, e.g.*, *Biomedical and Behavioral Research,*

21  *1975: Joint Hearings Before the Subcomm. on Health of the S. Comm. on Labor and Public*

22  *Welfare and the Subcomm. on Admin. Practice and Procedure of the S. Comm. on the Judiciary,*

23  *First Session of Human-Use Experimentation Programs of the Department of Defense and*

24  *Central Intelligence Agency*, 94th Cong. (1975) at 621; Office of the Surgeon General, U.S.

25  Army, Medical Aspects of Harsh Environments, Vol. I (2001) at 12).

26  113.    The CIA, which referred to Edgewood as EARL (Edgewood Arsenal Research

27  Labs), Department of Defense, and Special Operations Division of the U.S. Army were actively

28  involved in human experimentation, which used soldiers as test subjects.  The CIA's involvement

1   violated its Charter, which restricts or forbids domestic CIA activities.  *See* 50 U.S.C. § 403-

2   3(d)(1).

3                    **2.     The CIA and Other DEFENDANTS Hatch Project MKULTRA**

4          114.    The U.S. Supreme Court's decision in *Feres* emboldened DEFENDANTS

5   dramatically to expand the use of military personnel as test subjects, confident that they would be

6   insulated from liability.  In April 1953, Richard Helms, the CIA's Acting Deputy Director of

7   Plans, proposed that the CIA institute a program for the "covert use of biological and chemical

8   materials" on an ultra-sensitive basis, meaning that knowledge of its existence would be limited

9   to senior CIA officers and that its activities and budget would be exempt from normal budget,

10  accounting, and legislative oversight requirements.  (Memorandum from Richard Helms, Acting

11  Deputy Dir. of Plans, to Allen Dulles, Dir. of Cent. Intelligence (Apr. 3, 1953) (copy attached at

12  Tab A to a 1963 Report of Inspection of MKULTRA by CIA Inspector General J.S. Earman (the

13  "1963 CIA IG Report," a true copy of which is attached as Exhibit B hereto)); *see* Exh. B at

14  B-029-B-042.)  (Helms was later convicted of lying to Congress regarding the CIA's role in the

15  attempted overthrow of President Salvador Allende in Chile.)

16         115.    On or around April 13, 1953, CIA Director Allen Dulles approved Helms's

17  proposal and a covert CIA mind-control and chemical interrogation research program known as

18  "MKULTRA" was created.  (Memorandum from Allen Dulles, Dir. of Cent. Intelligence, to

19  Deputy Dir. of Admin. (Apr. 13, 1953); *see* Exh. B at B-038-B-039; *see also* Exh. B at B-040.)

20  "Through the course of MKULTRA, CIA sponsored numerous experiments on unwitting

21  humans."  (The Advisory Committee on Human Radiation Experiments (ACHRE), Interim

22  Report of ACHRE (Oct. 21, 1994) at App. E.)  MKULTRA testing was conducted at Edgewood

23  Arsenal together with other sites such as Fort McClellan, Alabama, Fort Benning, Georgia, and

24  Fort Bragg, North Carolina.  The CIA also contracted with Fort Detrick, which conducted a series

25  of experiments using human subjects, one of which was known as "Project White Coat."

26         116.    The MKULTRA projects were under the control of the Chemical Division, within

27  the Technical Services Division of the CIA.  Beginning in 1951, Dr. Sidney Gottlieb became the

28  director of the Chemical Division.  During testimony he gave to Congress in 1977, Dr. Gottlieb

1   claimed that the creation of MKULTRA was inspired by reports of mind-control work in the

2   Soviet Union and China.  He stated that the mission was "to investigate whether and how it was

3   possible to modify an individual's behavior by covert means."  (*Human Drug Testing by the CIA,*

4   *1977:  Hearings on S. 1893 Before the Subcomm. on Health and Scientific Research of the S.*

5   *Comm. on Human Resources*, 95th Cong. (1977) at 169.)

6          117.    A secret arrangement devoted a percentage of the CIA budget to MKULTRA.  For

7   instance, in 1953, the MKULTRA Director, Dr. Sidney Gottlieb, was granted six percent of the

8   Technical Services Section's research and development budget without any meaningful oversight

9   or accounting.  (Exh. B at B-030, B-034.)  MKULTRA, the "funding vehicle," soon established

10  over 149 subprojects that involved experiments using drugs on human behavior, lie detectors,

11  hypnosis, and electric shock.  The CIA also enlisted the cooperation of over 44 colleges and

12  universities, 15 research foundations, 12 clinics or hospitals, and 3 prisons.  The CIA established

13  front organizations to channel funds to institutions conducting or assisting in the experiments

14  using benign, descriptive names such as the "Society for the Investigation of Human Ecology."

15         118.    The calculating mindset behind MKULTRA was revealed in a national security

16  assessment prepared for President Eisenhower in 1954 entitled "Report on the Covert Activities

17  of the Central Intelligence Agency," which urged:

18             If the United States is to survive, long-standing American concepts
               of "fair play" must be reconsidered.  We must . . . learn to subvert,
19             sabotage, and destroy our enemies by more clever, more
               sophisticated, and more effective methods than those used against
20             us.  It may become necessary that the American people will be
               acquainted with, understand and support this fundamentally
21             repugnant philosophy.

22  (James H. Doolittle, et al., Report on the Covert Activities of the Central Intelligence Agency

23  (Sept. 30, 1954) at 2-3.)

24         119.    On February 26, 1953 — during the same year that MKULTRA began — the CIA

25  and DOD prepared and issued a directive that purported to bring the U.S. government into

26  compliance with the 1947 Nuremberg Code on medical research (the "1953 Wilson Directive").

27  The 1953 Wilson Directive, a true copy of which is attached as Exhibit C hereto, initially was

28  classified as "top secret" and provided in relevant part that:

a.      "The voluntary consent of the human subject is absolutely essential," and that "the person involved should have legal capacity to give consent; should be so situated as to be able to exercise free power of choice, without the intervention of any element of force, fraud, deceit, duress, over-reaching, or other ulterior forms of constraint or coercion; and should have sufficient knowledge and comprehension of the elements of the subject matter involved as to enable him to make an understanding and enlightened decision," [which requires that he know] "the nature, duration, and purpose of the experiment; the method and means by which it is to be conducted; all inconvenience and hazards reasonably to be expected; and the effects upon his health or person which may possibly come from his participation in the experiment" (Exh. C at C-001-C-002);

b.      "The number of volunteers used shall be kept to a minimum . . ." (Exh. C at C-002);

c.      "The experiment should be so designed and based on the results of animal experimentation and a knowledge of the natural history of the disease or other problem under study . . ." (Exh. C at C-002);

d.      "The experiment should be so conducted as to avoid all unnecessary physical and mental suffering and injury" (Exh. C at C-002);

e.      "The experiment should be conducted only by scientifically qualified persons.  The highest degree of skill and care should be required through all stages of the experiment . . ." (Exh. C at C-003);

f.      "During the course of the experiment the human subject should be at liberty to bring the experiment to an end if he has reached the physical or mental state where continuation of the experiment seems to him to be impossible," and "the scientist in charge must be prepared to terminate the experiment at any stage . . ." (Exh. C at C-003); and

g.      "In each instance in which an experiment is proposed . . ., the nature and purpose of the proposed experiment and the name of the person who will be in charge of such experiment shall be submitted for approval to the Secretary of the military department in which

1   the proposed experiment is to be conducted," and no experiment "shall be undertaken until such

2   Secretary has approved in writing the experiment proposed . . ." (Exh. C at C-003).

3       120.    The classification of the 1953 Wilson Directive as "Top Secret" and later "Secret"

4   rendered it unknown to Plaintiffs, other "volunteers," and the vast majority of the managers of the

5   human experimentation program.  In fact, the existence of the 1953 Wilson Directive was kept

6   secret from researchers, subjects and policymakers for over two decades, and the implementing

7   instructions to the field for the 1953 Wilson Directive were delayed, and monitoring and

8   enforcement of the directive were almost non-existent.

9       121.    Following a series of revelations concerning MKULTRA and other unethical CIA

10  practices, President Gerald Ford issued Executive Order 11905 on Foreign Intelligence Activities

11  in February 1976, which prohibited "experimentation with drugs on human subjects, except with

12  the informed consent, in writing and witnessed by a disinterested third party."  (Exec. Order

13  11905 §5(d).)

14      122.    On or about April 19, 1979, the National Commission for the Protection of Human

15  Subjects of Biomedical and Behavioral Research, Department of Health, Education and Welfare

16  published a report pursuant to the National Research Act, which set forth basic ethical principles

17  and guidelines for the protection of human subjects in biomedical and behavioral research (the

18  "Belmont Report").

19      123.    On or about December 4, 1981, President Reagan issued Executive Order 12333,

20  which governed the conduct of U.S. intelligence activities.  Section 2.10 of which, entitled

21  "Human Experimentation," provided:

22          No agency within the Intelligence Community shall sponsor,
            contract for or conduct research on human subjects except in
23          accordance with guidelines issued by the Department of Health and
            Human Services.  The subject's informed consent shall be
24          documented as required by those guidelines.

25      124.    On or about January 7, 1983, DEFENDANT DOD issued Directive No. 3216.2

26  regarding the Protection of Human Subjects in DOD-Supported Research, which extended basic

27  procedures of the 1953 Wilson Directive and applied to all DOD-supported research,

28  development, tests, evaluations, and clinical investigations by DOD and DOD contractors.

125.     On June 30, 1953, the Department of the Army Office of the Chief of Staff issued a CONFIDENTIAL Memorandum, numbered Item 3247, concerning Use of Volunteers in Research.  This Memorandum echoed the Wilson Directive and set forth opinions of the Judge Advocate General that furnished "specific guidance for all participants in research in atomic, biological and/or chemical warfare defense using volunteers."  Among other things, the guidelines established in this Memorandum provided that:

a.     Agents used in research must have several "limiting characteristics," including "[n]o serious chronicity anticipated," "[e]ffective therapy available," and an "[a]dequate background of animal experimentation."

b.     "As added protection for the volunteers, the following safeguards *will be provided*:  . . . . Medical treatment and hospitalization *will be provided* for all casualties of the experiments as required."  (Emphasis added.)

126.     On or about March 26, 1962, the Department of the Army issued Army Regulation 70-25, concerning the Use of Volunteers as Subjects in Research ("AR 70-25").  AR 70-25 prescribed policies "governing the use of volunteers as subjects in Department of Army research, including research in nuclear, biological and chemical warfare, wherein human beings are deliberately exposed to unusual or potentially hazardous conditions."  AR 70-25 set forth certain "basic principles" that "must be observed to satisfy moral, ethical, and legal concepts."  The first basic principle listed is that "Voluntary consent i[s] absolutely essential."  In furtherance of that basic principle, AR 70-25 instructs (among other things) that:

a.     the volunteer "must have sufficient understanding of the implications of his participation to enable him to make an informed decision, so far as such knowledge does not compromise the experiment"; and

b.     the volunteer "will be fully informed of the effects upon his health or person which may possibly come from his participation in the experiment."

127.     Another basic principle set forth by AR 70-25 is that volunteers "will have no physical or mental diseases which will make the proposed experiment more hazardous for them than for normal healthy persons."

128.    AR 70-25 also mandates that "[a]s added protection for volunteers, the following safeguards *will be provided*: . . . Required medical treatment and hospitalization *will be provided* for all casualties."  (Emphasis added.)

129.    In June 1991, the same basic principles contained in the 1953 Wilson Memorandum were propounded in regulations issued by DEFENDANT DOD.  *See* 32 C.F.R. Part 219.  This set of regulations is generally referred to as the "Common Rule," a denomination that is also used in this Complaint.

130.    DEFENDANT DOD issued a series of directives adopting or certifying the Common Rule in Directives 3216.02 ("Protection of Human Subjects and Adherence to Ethical Standards in DOD-Supported Research," March 25, 2002) and 6200.2 ("Use of Investigational New Drugs for Force Health Protection," August 1, 2000).  The directives, regulations (including, but not limited to, AR 70-25) and other governmental actions regarding the Common Rule, the Belmont Report and the 1953 Wilson Memorandum are sometimes referred to collectively as the "Official Directives."  Throughout the period of time encompassed by this Complaint, the basic ethical principles memorialized in the Official Directives did not change.  However, what did markedly change is the willingness of government officials to ignore or depart from ethical norms or circumvent procedures or mechanisms to patrol or monitor compliance with such norms.

131.    The rationale for DEFENDANTS' policy of secrecy regarding its human experimentation program was summarized by Atomic Energy Commission's Colonel O. G. Haywood:  "It is desired that no document be released which refers to experiments with humans and might have adverse effect upon on public opinion or result in legal suits.  Documents covering such work field should be classified 'secret.'"  (Memorandum from Col. O.G. Haywood, Jr., U.S. Army Corps of Eng'rs, U.S. Atomic Energy Comm'n, to U.S. Atomic Energy Comm'n (Apr. 17, 1947).)

132.    The links between the Army's Edgewood Arsenal and the CIA were close.  Many scientists who worked at Edgewood, such as Dr. Ray Treichler, or under Edgewood contracts were on the CIA's payroll.  Importantly, the CIA funded Edgewood research for over 20 years.  The CIA financed, directed, and used the information derived from the tests at Edgewood for

1   their own purposes.  At least three CIA officers were members of DOD's Committee on Medical

2   Sciences ("CMS") from 1948 until 1953.  Reputedly, many of the Army officers running the

3   Edgewood experiments were actually CIA agents.  DEFENDANTS did not comply with the

4   protocols established in the 1953 Wilson Directive or the Official Directives in their conduct of

5   the human experimentation program.  Rather, DEFENDANTS continued to flagrantly, repeatedly

6   and deliberately flout the safeguards in the Official Directives and international law, depending

7   on secrecy to operate with impunity.

8          133.    The 1963 CIA IG Report by J.S. Earman (*see supra* ¶ 114) listed the following

9   activities as having been "appropriate [for] investigation" under the MKULTRA charter:

10  radiation, electro-shock, various fields of psychology, psychiatry, sociology, anthropology,

11  graphology, harassment substances, and paramilitary devices and materials.  (Exh. B at B-006.)

12  Ongoing activities as of 1963 included "projects in offensive/defensive [categories] BW, CW

13  [biological and chemical weapons] and radiation," "petroleum sabotage," "defoliants," and

14  "devices for remote measurement of physiological processes."  (Exh. B at B-024.)  The 1963 CIA

15  IG Report noted that "original charter documents specified that TSD [Technical Services

16  Division] maintain exacting control of MKULTRA activities," but that "redefinition of the scope

17  of MKULTRA is now appropriate."  (Exh. B at B-006.)

18         134.    Major program elements of MKULTRA and its progeny have never been publicly

19  revealed.  For example, key parts of the 1963 CIA IG Report were redacted, including all

20  information concerning one of the two major MKULTRA programs.  (Exh. B at B-003, B-005,

21  B-030, and B-033.)

22         135.    The 1963 CIA IG Report found that DEFENDANTS had pursued a policy of

23  "minimum documentation," which "precluded use of routine inspection procedures."  (Exh. B at

24  B-007.)  Only two individuals in TSD had "full substantive knowledge of the program, and most

25  of that knowledge is unrecorded."  (Exh. B at B-008.)

26         136.    The managers of MKULTRA concluded in 1955 that the "testing of materials

27  under accepted scientific procedures" would "fail[] to disclose the full pattern of reactions and

28  attributions that may occur in operational situations."  Therefore, DEFENDANTS initiated a

THIRD AMENDED COMPLAINT
CASE NO. CV 09-0037-CW
sf- 2922333

42

1    "program for covert testing of materials on unwitting U.S. Citizens" in 1955.  (Exh. B at B-008-

2    B-009.)

3         137.    By the early 1960s MKULTRA had evolved into a "highly elaborated and

4    stabilized . . . structure" (Exh. B at B-009), which was divided into the following key parts:

5              a.    Securing new materials through "standing arrangements with specialists in

6    universities, pharmaceutical houses, hospitals, state and federal institutions, and private research

7    organizations."  (Exh. B at B-009.)  For example, using Dr. Charles F. Geschickter as a cover

8    under Subproject 35, the CIA secretly arranged for the financing and construction of a wing of the

9    Georgetown University Hospital in 1950 to provide a secure locale for clinical testing of

10   biological, radiological and chemical substances on human beings.  (Advisory Committee on

11   Human Radiation Experiments (ACHRE), Interim Report of ACHRE (Oct. 21, 1994) at App. E.)

12   The so-called "Geschickter Fund for Medical Research" served as the "principal 'cut-out source'

13   for CIA's secret funding of numerous MKULTRA human experiment projects" (*id.* at FN 6), and

14   insured that the "Agency's [CIA's] sponsorship of sensitive research projects would be

15   completely deniable since no connection would exist between the University and Agency."

16   (Memorandum from Chief, Deputy Dir., Plans, Technical Servs. Section, CIA, to Dir. of Cent.

17   Intelligence (Allen Dulles) (Nov. 15, 1954) at Tab A (Subproject 35 - Project MKULTRA, T.S.

18   101077A).)  A "cut-out" is a straw man or cover mechanism designed to hide the true ownership

19   or financing of an operation, project or activity.  This arrangement became necessary when

20   researchers complained that existing cover mechanisms exposed scientists and other researchers

21   to "unnecessary and highly undesirable personal risk[s]" as their connection to the projects

22   "might seriously jeopardize their professional reputations."  (*Id.*)

23              b.    The CIA also financed studies by Dr. D. Ewen Cameron at the Department

24   of Psychiatry, McGill University, in the 1950s, which explored methods to erase memory and

25   rewrite the psyche, using patients being treated for conditions such as post-partum depression,

26   marital problems, and anxiety.  Dr. Cameron used a combination of intense electro-shocks,

27   sensory deprivation, isolation, drugs such as LSD and insulin (to induce extended sleep).

28   Eventually, the subjects regressed to a vegetative, pre-verbal or infantile state.  Once this

THIRD AMENDED COMPLAINT
CASE NO. CV 09-0037-CW
sf- 2922333

43

1   "depatterning" had occurred, Dr. Cameron forced patients to listen to repetitive pre-recorded

2   messages that contained principles intended to guide future behavior such as, "You are a good

3   mother," which he referred to as "psychic driving."  Most of Dr. Cameron's patients emerged

4   from his therapies with more serious symptoms and problems, including memory loss,

5   hallucinations, intense anxiety, and loss of touch with reality.

6            c.      Grants of funds were made "under ostensible research foundation auspices

7   to the specialists located in the public or quasi-public institutions," therefore "conceal[ing] from

8   the institution the interest of [the] CIA."  (Exh. B at B-009.)  "The system in effect 'buys a piece'

9   of the specialist in order to enlist his aid in pursuing the intelligence implications of his research,"

10  including "systematic search of the scientific literature, procurement of materials, their

11  propagation, and the application of test dosages to animals and under some circumstances to

12  volunteer human subjects."  (Exh. B at B-010.)  This "funding of sensitive MKULTRA projects

13  by sterile grants in aid . . . [was] one of the principal controversial aspects of this program."

14  (Exh. B at B-010.)  In addition to the CIA, the Department of Health, Education and Welfare, and

15  the Law Enforcement Assistance Administration provided funding for experiments involving

16  behavior modification and mind control.

17           d.      The intensive testing of substances on human subjects by "physicians,

18  toxicologists, and other specialists in mental, narcotics and general hospitals and in prisons, who

19  are provided the products and findings of the basic research projects . . . .  Where health permits,

20  test subjects are voluntary participants in the program."  (Exh. B at B-011-B-012.).  One series of

21  experiments on prisoners took place at the California Medical Facility at Vacaville, where

22  psychiatrists administered anectine, a strong muscle relaxant which deprives the victim of all

23  muscular control and arrests breathing, and induces strong sensations of suffocation and

24  drowning.

25           e.      The "final phase of testing of MKULTRA materials involves their

26  application to unwitting subjects in normal life settings."  (Exh. B at B-012.)  To accomplish this,

27  the CIA entered into an "informal arrangement" with individuals in the Bureau of Narcotics

28  ("FBN" - ("DEA")) in 1955 with the understanding that the FBN would "disclaim all knowledge

1    and responsibility in the event of a compromise." (Exh. B at B-013.)  FBN operated safehouses

2    in both San Francisco and New York where they secretly administered experimental substances to

3    the patrons of prostitutes. (Exh. B at B-013-B-014; *see also Project MKULTRA, The CIA's*

4    *Program of Research in Behavioral Modification*, 95th Cong. (1977) at 57 (J. Gittinger), 115 (R.

5    Lashbrook, M.D.), and 184 (S. Gottlieb, M.D.).)  The FBN maintained "close working relations

6    with local police authorities which could be utilized to protect the activity in critical situations."

7    (Exh. B at B-015.)  The brothel experiments were code-named "Operation Midnight Climax."

8             f.       The final step in the "research and development sequence" was to

9    "deliver[] MKULTRA materials into the MKDELTA control system governing their employment

10   in clandestine operations." (Exh. B at B-015.)  "The final stage of covert testing of materials on

11   unwitting subjects is clearly the most sensitive aspect of MKULTRA." (Exh. B at B-016.)

12   "Present practice is to maintain no records of the planning and approval of test programs."

13   (Exh. B at B-016.)

14            138.   Ironically, the operational returns of MKULTRA were scanty.  The products were

15   rarely used in field operations, and had limited success where used. (Exh. B at B-018-B-019; *see*

16   *also Project MKULTRA, The CIA's Program of Research in Behavioral Modification*, 95th Cong.

17   (1977) at 43.)  "There is an extremely low rate of operational use of the controlled materials."

18   (Exh. B at B-023.)  One of the reasons for nonuse was that "some case officers have basic moral

19   objections to the concept of MKDELTA and therefore refuse to use the materials." (Exh. B at

20   B-021-B-022.)

21            139.   Under MKULTRA and its progeny, at least 1,000 "volunteers" were given up to

22   20 doses of LSD to test the drug as an interrogation weapon, even though the tests were known by

23   Edgewood scientists to result in serious physical and psychological problems.  Dr. Van Sim, a

24   physician responsible for the human subjects used at Edgewood, previously worked at the British

25   Chemical Defense Establishment at Porton Down, where similar experiments had been conducted

26   on humans.  After returning to the United States, Dr. Van Sim warned that the British

27   experiments had shown that "during acute LSD intoxication the subject is a potential danger to

28

1    himself and to others; in some instances a delayed and exceptionally severe response may take

2    place and be followed by serious after effects lasting several days."

3        140.    Despite this knowledge, test subjects at Edgewood and elsewhere were given LSD

4    and other drugs and then sometimes subjected to hostile questioning.  Moreover, the test subjects

5    were not given any specific information about the nature of the drugs they were receiving, which

6    exacerbated the state of the victims' anxiety while on mind-altering agents.

7        141.    Some of the experiments at Edgewood and other sites were designed to replicate

8    some of those that were conducted by Nazi doctors in concentration camps.  American

9    psychiatrist Paul Hoch's experiments on mental patients in New York, where he was working on

10   Edgewood projects supervised by DEFENDANTS and as a CIA consultant, killed one patient

11   with a mescaline injection (Harold Blauer) and seriously injured another.  As the federal judge

12   concluded in a case brought by Mr. Blauer's daughter, "the real reason Blauer died was not

13   medical incompetence in the administration of a therapeutic or diagnostic drug, but the fact that

14   he was used as a human guinea pig."  *Barrett v. United States*, 660 F. Supp. 1291, 1308

15   (S.D.N.Y. 1987).  MKULTRA's experiments also resulted in the death of Frank Olson, an Army

16   scientist who mysteriously fell out of a hotel window after members of the CIA secretly slipped

17   LSD into his drink.  A 1994 GAO publication also notes that during the course of the extensive

18   radiological, chemical, and biological research programs conducted or sponsored by

19   DEFENDANTS, some participants died.  (Frank C. Conahan, Assistant Comptroller Gen., U.S.

20   Gen. Accounting Office, Human Experimentation: An Overview on Cold War Era Programs,

21   Testimony Before The Legis. and National Security Subcomm. of the H. Comm. on Government

22   Operations, GAO/T-NSIAD-94-266 (Sept. 28, 1994) at 1.)

23       142.    Sporadic information regarding DEFENDANTS' activities began to circulate and

24   the 1963 CIA IG Report recommended termination of unwitting testing.  However, the CIA's

25   Deputy Director for Research, Richard Helms, who later became the CIA Director, surreptitiously

26   continued the program under a new name in 1964:  MKSEARCH.  The MKSEARCH project

27   attempted, among other things, to produce a perfect truth serum for use in interrogating suspected

28   Soviet spies during the Cold War, and generally to explore any other possibilities of mind control.

THIRD AMENDED COMPLAINT
CASE NO. CV 09-0037-CW                                                                      46
sf- 2922333

143.    DEFENDANTS adopted a policy to create only "sparse documentation" of the projects, with a preference that results of experiments be "conveyed verbally." Nor did DEFENDANTS prepare adequate documentation of the medical records of test participants or follow-up to determine long-term health effects. "Present [CIA] practice is to maintain no records of the planning and approval of test programs." (Exh. B at B-016.) Medical records regarding the exposure of hundreds of "volunteers" that were maintained by the Medical Research Laboratory mysteriously disappeared in the 1960s. And, shortly before he left office in 1973, CIA Director Richard Helms authorized the destruction of the CIA's files regarding human experimentation and Dr. Gottlieb's drug files, the intent of which was to prevent discovery of the embarrassing and indefensible details of their crimes. As a result, most of the records documenting the human experimentation program are not available.

144.    The Court should draw adverse inferences from DEFENDANTS' document destruction, redactions, spoliations, and other wrongful acts described herein.

145.    DEFENDANTS also developed a protocol to classify any documents that referred to the human experimentation program based upon concerns that they might have "an adverse effect on public opinion or result in legal suits." (*See* 1947 Haywood memo, *supra* ¶ 131.) DEFENDANTS also ordered that:

> Precautions must be taken not only to protect operations from exposure to enemy forces but also to conceal these activities from the American public in general. The knowledge that the Agency [CIA] is engaging in unethical and illicit activities would have serious repercussions in political and diplomatic circles and would be detrimental to the accomplishment of its mission.

(CIA Inspector General's Survey of Technical Servs. Div., 1957, as cited in S. Rep. No. 94-755 ("Church Committee Report"), Book 1, §XVII (1976) at 394; *see Project MKULTRA, The CIA's Program of Research in Behavioral Modifications*, 95th Cong. (1977) at 74.) A July 26, 1963 Memorandum to the CIA Director also concluded that "[t]he concepts involved in manipulating human behavior are found by many people both within and outside the Agency [CIA] to be distasteful and unethical." (Memorandum from J.S. Earman, Inspector General, CIA, to Dir. of Cent. Intelligence (July 26, 1963) (attaching the 1963 CIA IG Report); *see* Exh. B at B-002.)

146.   Documents from the CIA's "Family Jewels" declassified file establish that drugs that had been rejected by private manufacturers were tested on soldiers at Edgewood. Specifically, as explained in the CIA's own documents:  "the reported [behavioral] drug was part of a larger program in which the Agency had relations with commercial drug manufacturers, whereby they passed on drugs rejected because of unfavorable side effects.  The drugs were screened with the use of ADP equipment, and those selected for experimentation were tested at [redacted] using monkeys and mice.  Materials of having [sic] further interest, as demonstrated by this testing, were then tested at Edgewood, using volunteer members of the Armed Forces." (Memorandum from WVB to Executive Sec'y, CIA Mgmt. Comm. (undated), "CIA Family Jewels" at 00413.)

147.   In the decades following the 1953 Wilson Directive, DEFENDANTS' human experimentation program continued and rapidly expanded under a shifting series of secret code names, changes that usually were adopted to facilitate statements by DEFENDANTS denying that recent or earlier programs such as MKULTRA were ongoing, including the following:

a.   DEFENDANTS changed the program name from MKULTRA to MKSEARCH after release of the CIA IG's 1963 Report, which was highly critical of MKULTRA;

b.   the OFTEN and CHICKWIT projects, jointly conducted by the Army and CIA at the Edgewood Arsenal, but also funded by the CIA, which involved the collection of information about foreign pharmaceuticals and experiments with human subjects;

c.   the BLUEBIRD and ARTICHOKE projects, where DEFENDANTS researched hypnosis, drugs such as sodium pentothal, the stimulant Desoxyn (methamphetamine), and bulbocapnine (an alkaloid), which facilitate recovery of information under hypnosis, and other substances that might aid in the interrogation of prisoners of war and defectors;

d.   the MKDELTA project, a mind control research and development program devised by DEFENDANTS that concentrated upon the use of biochemicals in clandestine operations;

1     e.  the MKNAOMI project, a successor to MKDELTA, which focused on the

2 research, testing, manufacture and means of diffusion or distribution of lethal and non-lethal

3 biological agents and materials;

4     f.  the CHATTER project, which focused on the development and use of truth

5 serum and other interrogation drugs such as anabasis, aphylla, scopolamine, and mescaline; and

6     g.  a series of related or follow-on projects with code names including

7 "PANDORA," "SPELLBINDER," "MONARCH," "SLEEPING BEAUTY," as well as others.

8 Hereinafter, DEFENDANTS' group of experiments and programs involving human subjects,

9 including DEFENDANTS' human experimentation conducted at Edgewood or under the

10 direction of Edgewood personnel, shall collectively be referred to as the "Human Test Series."

11   148.  The MKULTRA and MKSEARCH project sponsors operated "safe houses" in

12 New York City and San Francisco, where drugs were surreptitiously administered to human

13 subjects lured to the site by prostitutes, and the effects were witnessed and/or recorded on film as

14 part of Subprojects 3, 16, 42, 132, and 149.  Ray Treichler was a CIA Monitor for this operation.

15 On information and belief, DEFENDANTS "were engaged in the involuntary drugging of

16 unwitting suspects in San Francisco" in settings outside of these "safe houses" as well.  *See, e.g.*,

17 *Ritchie v. United States*, No. C 00-03940 MHP, 2004 WL 1161171, at *1-2 (N.D. Cal. May 24,

18 2004).  DEFENDANTS also operated in Mill Valley, California, as part of Subproject 42.

19 Experiments also were conducted on aged veterans in VA domiciliaries.  DEFENDANTS often

20 used surrogates in the private sector to perform many of these experiments.

21   149.  DEFENDANTS formally launched Sub-Project 119 in 1960, the purpose of which

22 was to research, study, and interpret "bioelectric signals from the human organism, and activation

23 of human behavior by remote means."  (Memorandum for the Record re MKLUTRA Subproject

24 119 from Technical Servs. Div., Research Branch, CIA (Aug. 17, 1960).)  This Sub-Project

25 involved the installation of "permanent septal electrodes . . . to determine the locus in which

26 stimulations will produce specific reactions," first in animals and later in humans.  (Proposal

27 Materials re MKULTRA Subproject 106, CIA (Jan. 1961) at 106-1.)  The Army's own report of

28 the health effects of LSD experiments concluded in 1980 that:  "Early experimental studies by

1   Monroe and Heath and associates using electrodes implanted deeply in the brains of human

2   subjects demonstrated the occurrence of spiking (epileptiform) activity in portions of the limbic

3   system (hippocampus, amygadala [sic] and septal area) in response to LSD administration."

4   (U.S. Army Med. Dep't, LSD Follow-Up Study Report (Oct. 1980) at 34-35.)  DEFENDANTS'

5   research program continued under various other code names, including Subproject 106 (in 1962),

6   and others, and DEFENDANTS used an unidentified "cut-out and cover" to run the program and

7   to camouflage their role.  DEFENDANTS classified this work as "Agency Top Secret," and

8   DEFENDANTS have either destroyed or classified the results of the Sub-Project 119 and 106

9   studies, as well as their progeny.

10          150.    Dr. Jose Delgado began to research the use of pain and pleasure for mind control

11   during WWII.  Later, as Director of Neuropsychiatry at Yale University Medical School, he

12   refined the design of his "transdermal stimulator," a computer controlled, remote neurologic

13   transceiver and aversion stimulator.  Dr. Delgado was especially interested in Electronic

14   Stimulation of the Brain.  Dr. Delgado discovered that he could wield enormous power over his

15   subject by implanting a small probe into the brain.  Using a device he called the "stimoceiver,"

16   which operated by FM radio waves, he was able to electrically orchestrate a wide range of human

17   emotions, including rage, pleasant sensations, elation, deep thoughtful concentration, odd

18   feelings, super relaxation (an essential precursor for deep hypnosis), colored visions or

19   hallucinations, lust, fatigue and various other responses.  Dr. Delgado researched and perfected

20   many of his devices under the auspices of MKULTRA Sub-Project 95, in which he was joined by

21   Dr. Louis Jolyon West, who had mastered a technology called "RHIC-EDOM."  RHIC means

22   "Radio Hypnotic Intracerebral Control," and EDOM means "Electronic Dissolution of Memory."

23   These implants could be stimulated to induce a post-hypnotic state.  EDOM involves the creation

24   of "Missing Time" or the loss of memory.

25          151.    Dr. Delgado ominously wrote:  "*The individual may think that the most important*

26   *reality is his own existence, but this is only his personal point of view. . . . This self-*

27   *importance . . . lacks historical perspective.  [The notion that man has] **the right to develop his***

28   ***own mind** . . . . [is a] kind of liberal orientation [that] has great appeal, but . . . its assumptions*

1    *are not supported . . . by . . . studies.*"  (Jose M.R. Delgado, M.D., *Physical Control of the Mind,*

2    *Toward a Psychocivilized Society* (1969) at 236, 239 (emphasis added).)

3         152.    Additional studies, conducted by Dr. Ewen Cameron and funded by the CIA, were

4    directed towards erasing memory and imposing new personalities on unwilling patients.

5    Cameron discovered that electroshock treatment caused amnesia.  He set about a program that he

6    called "de-patterning," which had the effect of erasing the memory of selected patients.  Further

7    work revealed that subjects could be transformed into a virtual blank machine (Tabula Rasa) and

8    then be re-programmed with a technique which he termed "psychic driving."

9         153.    From 1965 through to 1970, Defense Advanced Projects Research Agency

10   (DARPA), with up to 70-80% funding provided by the military, set in motion operation

11   PANDORA to study the health and psychological effects of low intensity microwaves with regard

12   to the so-called "Moscow signal."  This project appears to have been quite extensive and included

13   (under U.S. Navy funding) studies demonstrating how to induce heart seizures, create leaks in the

14   blood/brain barrier and production of auditory hallucinations.  Despite attempts to render the

15   Pandora program invisible to scrutiny, FOIA filings revealed memoranda of Richard Cesaro,

16   Director of DARPA, which confirmed that the program's initial goal was to discover whether a

17   carefully controlled microwave signal could control the mind.  Cesaro urged that these studies be

18   made for potential weapons applications.

19        154.    The CIA financed further studies and subprojects under Project MKULTRA that

20   took place at Stanford University in Palo Alto, California, between 1953 and at least 1962.  These

21   studies included:

22        •   Subproject 2 (1953-1958):  to study the "synergistic action of drugs which may be

23            appropriate for use in abolishing consciousness through animal experimentation"

24            (referred to as the "knockout" problem) and a "survey of methods to enable the

25            administration of drugs to patients without their knowledge."  Animal testing was

26            indicated in Subproject 2 proposals "as a precondition to human testing."

27        •   Subproject 56 (1956-1960):  to study the "effectiveness of sympathominetic drugs

28            in delaying" alcohol absorption.

- Subproject 70 (1957-1961): to develop a "temporary incapacitating drug" and "define mechanisms involved in producing involuntary sleep and related unconscious states" (referred to as the "K problem").  Ray Treichler served as a CIA Monitor for Subproject 70.

- Subproject 71 (1957-1961): to conduct "clinical testing and evaluation of anti-interrogation drugs" and develop a "miniaturized polygraph."

- Subproject 72 (1956-57):  to study "neurophysiologic and pharmacological effects of central nervous system antagonists and synergists."

- Subproject 85 (1958-1959):  to establish and substantiate the "true identity" of individuals through blood groupings.

- Subproject 86 (1958-1959):  to design and build miniature polygraph machines for potential use on unwitting subjects.

- Subproject 91 (1959-1962):  to perform "pre-clinical pharmacological studies required to develop new psychochemicals and to test the promising drugs" on animals.  Ray Treichler was a CIA Monitor for Subproject 91.

The CIA spent more than half a million dollars funding these projects.  On information and belief, additional MKULTRA projects funded by the CIA took place at St. Francis Memorial Hospital in San Francisco (Subprojects 124 and 140) and at Menlo Park Veterans Hospital.

155.     Notwithstanding the international standards identified above, DEFENDANTS' experiments on human subjects were conducted shrouded in secrecy, and have been characterized by stealth, evasion, treachery, and deceit.  Most of the subjects have been collected under programs that operate under the umbrella of "non-lethal" or "less than lethal" weapons, and include a wide assortment of different technologies based upon electro-magnetic radiation, microwaves, lasers, infrasound, acoustic and polysound generators, and others.

### 3.      Secrecy Oaths

156.     "Volunteers" in the Edgewood and other experiments were in most instances required to sign a statement agreeing that they would:

not divulge or make available any information related to U.S. Army
Intelligence Center interest or participation in the [volunteer
program] to any individual, nation, organization, business,
association, or other group or entity, not officially authorized to
receive such information.  I understand that any action contrary to
the promises of this statement will render me liable to punishment
under the provisions of the Uniform Code of Military Justice.

The "volunteers," including many or all of the Individual Plaintiffs, were also generally forced to

sign forms consenting to the videotaping of the experiments.

157.   In fact, DEFENDANTS' form misled the "volunteers" by implying that the

Uniform Code of Military Justice applied to them after their discharge from service.

158.   The existence of their secrecy oaths not only interfered with participants' ability to

obtain health care and other necessary services, but to seek redress or assert claims.  For example,

during telephone counseling hours over the years, Swords has provided initial counseling services

to multiple Vietnam-era veterans who were unwilling to share information relevant to possible

VA claims because of perceived secrecy obligations.  In many cases, these secrecy obligations

hindered Swords' efforts to provide — and in some cases prevented Swords from being able to

provide — comprehensive legal services to these veterans.

159.   In 2003, the VA concluded that "most of the volunteer subjects of these

experiments conducted by the U.S. Military were told at the time that they should never reveal the

nature of the experiments, and apparently, almost to a man, they kept this secret for the next 40 or

more years."

160.   In approximately September 2006, some, but not all, Edgewood recipients,

received form letters from the VA advising them that notwithstanding their secrecy oaths, the

DOD had authorized them to discuss exposure information with their health care providers, but

warning them not to "discuss anything that relates to operational information that might reveal

chemical or biological warfare vulnerabilities or capabilities."  In addition, the DOD has

maintained a web site that contains incomplete and misleading information concerning the human

experimentation program.

#### 4.      Purported "Consent" by Human Test Subjects

161.     Many "volunteers" used as test subjects at Edgewood and elsewhere were duped into volunteering to test chemical warfare clothing and gas masks and instead were secretly given nerve gas, psychochemicals, incapacitating agents, and hundreds of other dangerous drugs.  The "volunteers" were given no information about the chemicals used on them in the experiments, no warning as to the potential health risks, and no or inadequate follow-up health care to determine the effects (and resulting injuries) caused by the tests — despite the government's knowledge and conclusion that informed, voluntary consent was necessary.

162.     Indeed, informed consent was precluded by DEFENDANTS' own plan, which noted that "[c]are should be exercised not to mention to the prospect the exact properties of the material that lends itself to intelligence application."  Moreover, DEFENDANTS withheld information from the "volunteers" concerning health problems that they had discovered from examinations and tests at Edgewood, and Edgewood medical records for participants were separated from the participants' service medical files, and kept under lock and key.

163.     The Medical Volunteer Handbook of the U.S. Army purportedly given to test participants in the late 1950s and 1960s falsely represented that the tests involved "non-hazardous exposure to compounds as well as the evaluation of methods, procedures and equipment utilized by the soldier in the field."  (U.S. Army Chemical Warfare Labs., U.S. Army Chemical Center, MD, The Medical Research Volunteer Program (U), CWL Special Pub. 2-13 (June 1958) at 1.) DEFENDANTS' policy toward uncooperative "volunteers" was reflected in a publication distributed to the "volunteers" entitled "What is Expected of a Volunteer," the 1972 edition of which stated:

> It is essential that you show up on time for admission to the wards and for testing . . . .  As for the testing, this of course is what you are here for . . . .  Failure to show up on time for admission or the test will usually result in your being returned to your permanent duty station.

164.     The Army's Inspector General concluded that although there was evidence that some form of the informed consent policy was eventually made known to commanders and investigators working with human subjects, often in practice "consent was relegated to a simple,

1   all-purpose statement to be signed by the volunteer." (1976 Army IG Report at 78.)  Further,

2   even in instances where a more detailed form was used, "the intent of the informed consent policy

3   did not appear to have been fulfilled, since the revised form did not require disclosure of the

4   chemical agent to be used or the full effects of the drug, nor did the publication appended to the

5   volunteer agreement form contain that information." (*Id.* at 80.)

6       165.   The Inspector General noted that although, with few exceptions, human subjects

7   who were used for chemical testing had technically "volunteered," the issue was "not whether the

8   subjects volunteered, but whether they were provided sufficient information to permit an

9   enlightened decision." (*Id.* at 82.)  On this point, the Inspector General's report concluded:

10  "volunteers were not fully informed, as required, prior to their participation; and the methods for

11  procuring their services, in many cases, appeared not to have been in accord with the intent of the

12  Department of the Army policies governing the use of volunteers in research." (*Id.* at 87.)

13  Indeed, "in spite of the clear guidelines concerning the necessity for 'informed consent,' there

14  was a willingness to dilute and in some cases negate the intent of the policy." (*Id.* at 40.)  The

15  consents signed by "volunteers" included the words "I certify that . . . I [am] completely aware

16  of all hazards."  Yet, DEFENDANTS have admitted that even they were not aware of such

17  hazards.

18      166.   Further, the Army Inspector General's findings regarding consent at Edgewood

19  were even more troubling.  The report noted that "in most cases the [participation] agreement was

20  signed prior to arrival at Edgewood Arsenal, or on the first day after arrival.  In either case, it was

21  usually signed before the subject was selected for a specific agent test.  Therefore, it was not

22  likely that meaningful information regarding all hazards to his health were provided the volunteer

23  prior to his signing the participation agreement." (*Id.* at 84.)  Indeed, one of the purposes of the

24  experimentation was to learn about health effects on humans, in areas which were previously

25  unknown.

26      167.   Indeed, in designing their LSD studies in 1956, the Army attempted to avoid the

27  impact of "suggestion" or "placebo" effect on the observed effects by insuring that at least one

28

1   control group administered LSD-25 be neither given a training lecture nor provided any

2   information on the drug being administered.

3       168.    Another problem with the purported "consent" by volunteers was that

4   "inducements were offered to persuade the soldier[s] to volunteer." (*Id.* at 85.)  The Inspector

5   General identified examples of such inducements, including:  a promise of a 3-day pass each

6   weekend; better living and recreational accommodations than normally available; a guaranteed

7   letter of commendation that would be placed in the volunteer's official personnel file; and a sense

8   of patriotic contribution to the nation's national security.  (*Id.* at 85.)  The report noted that such

9   inducements "represented substantial rewards" in the 1950s and 1960s.  (*Id.* at 85.)  These

10  inducements were used to influence the prospective subject's decision by offering special

11  privileges or rewards and thus, were contrary to the guidelines, which stated that informed

12  consent should be given without influence over the volunteer's free choice.  The "volunteers"

13  were drawn from troops located at Army bases throughout the country.  Plaintiffs believe, and

14  expect that discovery will confirm, that these inducements were offered to — and material

15  misstatements of fact concerning DEFENDANTS' human experimentation program were made

16  to — troops located within this District and that DEFENDANTS drew "volunteers" from this

17  District for their human experimentation programs.  For instance, discovery to-date has revealed

18  that in 2006 the VA sent 135 notification letters to California veterans of DEFENDANTS' human

19  experimentation programs.

20      169.    A 1993 GAO Report acknowledged that "[m]ilitary procedures have long required

21  that the volunteers be fully informed of the nature of the studies in which they participate and the

22  foreseeable risks.  However, prior to 1975, these procedures were not always followed."  (U.S.

23  Gen. Accounting Office, Veterans Disability: Information from the Military May help VA Assess

24  Claims Related to Secret Tests, GAO/NSIAD-93-89 (Feb. 1993) at 2; *see also* Frank C. Conahan,

25  Assistant Comptroller Gen., U.S. Gen. Accounting Office, Human Experimentation: An

26  Overview on Cold War Era Programs, Testimony Before The Legis. and National Security

27  Subcomm. of the H. Comm. on Government Operations, GAO/T-NSIAD-94-266 (Sept. 28, 1994)

28  at 2, 10.)

1    170.    In 2003, the VA admitted that "[i]t would be naive to assume that there will be no

2    lapses in compliance with human subjects protections in future studies involving human

3    subjects."

4    171.    DEFENDANTS have admitted that a number of their research projects were

5    conducted "without knowledge of the host system or on unwitting subjects."  (Memorandum for

6    the Record from William V. Broe, Inspector General, CIA, to Dir. of Cent. Intelligence (May 23,

7    1973), "CIA Family Jewels" at 00402.)

8    172.    The consents purportedly signed by "volunteer" soldiers were ineffective for

9    multiple reasons including fraud in the inducement, lack of disclosure of the substances involved

10   in the experiments, lack of specificity, duress and others.  These purported "volunteer" test

11   subjects were not told which drugs and the drug doses that they were given, what side effects to

12   expect,  and were never fully informed of the extreme physical and psychological effects these

13   drugs would have on them.

14   173.    DEFENDANTS have failed and refused to supply all available information to the

15   VA concerning the exposures of "volunteers" who have filed or whose survivors have filed

16   claims for service-connected death or disability compensation, or advised the VA that relevant

17   records of participation had been destroyed, thereby thwarting or compromising the success of

18   many claims.

19   **III.    CLASS ACTION ALLEGATIONS**

20           **A.    Class Definition**

21   174.    The proposed Plaintiff class for purposes of all claims includes all veterans who

22   were involved in the Human Test Series (hereinafter the "Proposed Class Members").  The

23   proposed class does not include participants in Project 112/SHAD ("Shipboard and Hazard

24   Defense), a separate program directed by the U.S. Army Deseret Test Center.  Project 112/SHAD

25   was conducted on ships and land to test the vulnerability of ships to chemical and biological

26   attacks, and, with respect to tests on land, to determine how biological and chemical weapons

27   would be affected by climate.  Although members of the military were exposed to hazardous

28   biological and chemical substances during Project 112/SHAD, the principal purpose of the

1  program was not to test the effects of biological and chemical weapons upon human subjects, as

2  were the veterans involved in the Human Test Series.

3      175.   The proposed class representatives are Plaintiffs VVA and Swords to Plowshares,

4  the Organizational Plaintiffs in this action.

5      176.   Plaintiffs reserve the right to amend this Complaint to add additional class

6  representatives, either before or after a Motion to Certify the Class, subject to the provisions of

7  Rule 15 of the Federal Rules of Civil Procedure.

8      **B.    Presence of Common Issues of Fact or Law**

9      177.   The members of the Proposed Class are so numerous that joinder of all members is

10  impracticable.

11      178.   There are material questions of law and fact common to the proposed class,

12  including but not limited to the following:

13          a.    The constitutionality of DEFENDANTS' actions and activities recited

14  above;

15          b.    DEFENDANTS' failures to notify and timely provide medical care to the

16  Proposed Class Members;

17          c.    Whether DEFENDANTS have complied with the Official Directives

18  and/or international law;

19          d.    Whether the consent forms signed by the Proposed Class Members

20  respecting the Human Test Series were effective or not;

21          e.    Whether the Proposed Class Members are bound by secrecy oaths;

22          f.    Whether DEFENDANTS are currently conducting human experiments

23  with human subjects in violation of the Official Directives and/or international law, and, to the

24  extent they are, whether injunctive relief should be awarded to Plaintiffs; and,

25          g.    The applicability and effectiveness of certain defenses asserted by

26  DEFENDANTS to the claims raised in this action, including subject matter jurisdiction, standing,

27  sovereign immunity, statute of limitations, and others, and applicability of the doctrine of

28  equitable estoppel and any other arguments advanced by Plaintiffs.

THIRD AMENDED COMPLAINT
CASE NO. CV 09-0037-CW
sf- 2922333

58

179.     The claims of the members of or constituencies served by the Organizational

Plaintiffs are typical of the claims of the Proposed Class Members, and the proposed class

representatives will fairly and adequately protect the interests of the class.

180.     The prosecution of separate actions by various members of the class would create

a risk:

        a.     of inconsistent or varying adjudications with respect to Proposed Class

Members that would establish incompatible standards of conduct for DEFENDANTS; and

        b.     that adjudications with respect to individual Proposed Class Members

would, as a practical matter, be dispositive of the interests of Proposed Class Members who are

not parties to such adjudications or substantially impair or impede their ability to protect their

interests.

181.     DEFENDANTS have acted and/or refused to act on grounds generally applicable

to the Proposed Class Members, thereby making appropriate final injunctive relief and/or

declaratory relief with respect to the Proposed Class Members as a whole.

<div align="center">

**FIRST CLAIM FOR RELIEF**
**(Declaratory Relief as to All Plaintiffs)**

</div>

182.     Plaintiffs reallege and incorporate herein by reference as though fully set forth,

each and every allegation contained in Paragraphs 1 through 181 of this Complaint, subject to this

Court's rulings in its January 19, 2010 Order Granting in Part and Denying in Part Defendants'

Motions to Dismiss and Denying Defendants' Alternative Motion for Summary Judgment

(Docket No. 59).

183.     Plaintiffs seek a declaration that the consent forms signed by Plaintiffs are not

valid or enforceable; that Plaintiffs are released from any obligations or penalties under their

secrecy oaths; that DEFENDANTS are obligated to notify Plaintiffs and other test participants

and provide all available documents and evidence concerning their exposures and known health

effects; and, finally, that DEFENDANTS are obligated to confer the medical care promised to

Plaintiffs, and the other relief prayed for above.

184.     A present controversy exists between Plaintiffs and DEFENDANTS concerning the foregoing, and Plaintiffs contend and DEFENDANTS deny that:

a.     DEFENDANTS have unconstitutionally infringed on Plaintiffs' life, property and liberty rights protected by the Due Process Clause of the Fifth Amendment to the United States Constitution, which provides that "No person shall . . . be deprived of life, liberty or property without due process of law," and upon Plaintiffs' right to privacy;

b.     DEFENDANTS have failed to comply with the 1953 Wilson Directive and the Official Directives;

c.     The "consents," if any, obtained from Plaintiffs and other test subjects were invalid or not enforceable;

d.     Plaintiffs are not bound by the secrecy oaths they took, and that such oaths are invalid; and

e.     DEFENDANTS must fully comply with their duty to locate and warn all test participants.

185.     A present controversy exists between Plaintiffs and DEFENDANTS in that Plaintiffs contend and DEFENDANTS deny that DEFENDANTS violated Plaintiffs' rights under the First, Fourth, Fifth and Ninth Amendments by committing the wrongful acts alleged herein.

186.     A present controversy exists between Plaintiffs and DEFENDANTS in that Plaintiffs contend and DEFENDANTS deny that DEFENDANTS violated Plaintiffs' property and liberty rights protected by the Due Process Clause of the Fifth Amendment to the United States Constitution by concealing (and continuing to conceal) the extent and nature of the tests conducted on Plaintiffs and the known or suspected effects of such experiments, and failing to provide adequate medical treatment to Plaintiffs after Plaintiffs were discharged from the military.

187.     The Court should issue a declaration stating that DEFENDANTS must fully disclose to Plaintiffs complete medical information concerning all tests conducted on Plaintiffs (including any results thereof), as well as the other relief prayed for above, and stating that

1  DEFENDANTS' duty to provide Plaintiffs with all necessary medical treatment on an ongoing

2  basis is mandatory.

3  <center>**SECOND CLAIM FOR RELIEF**
**(Injunctive Relief as to All Plaintiffs)**</center>

4

5      188.    Plaintiffs reallege and incorporate herein by reference as though fully set forth,

6  each and every allegation contained in Paragraphs 1 through 187 of this Complaint, subject to this

7  Court's rulings in its January 19, 2010 Order Granting in Part and Denying in Part Defendants'

8  Motions to Dismiss and Denying Defendants' Alternative Motion for Summary Judgment

9  (Docket No. 59).

10      189.    Plaintiffs seek injunctive relief enjoining DEFENDANTS, and anyone in concert

11  with them, from failing and refusing to do the following:

12          a.      Notify Plaintiffs and all "volunteers" of the details of their participation in

13  human experimentation programs and provide them with full documentation of the experiments

14  done on them and all known or suspected health effects;

15          b.      Conduct a thorough search of all available document repositories and

16  archives, and other sources, and provide victims with all available documentation concerning the

17  details and conduct of the human experimentation program and known or suspected health

18  effects;

19          c.      Provide examinations and medical care and treatment to all participants in

20  the MKULTRA, Edgewood, and other human experiments with respect to any disease or

21  condition that may be linked to their exposures;

22          d.      Supply all available information to the VA with respect to any past,

23  existing or future claims for service-connected death or disability compensation based on

24  DEFENDANTS' human experimentation programs; and

25          e.      To the extent violations have continued, to cease committing any violations

26  of the Official Directives or international law.

27

28

1

## THIRD CLAIM FOR RELIEF BY ADDITIONAL INDIVIDUAL PLAINTIFFS AGAINST ORIGINAL DEFENDANTS
### (Declaratory and Injunctive Relief)

2

3

190.    Plaintiffs reallege and incorporate herein by reference as though fully set forth,

4

each and every allegation contained in Paragraphs 1 through 189 of this Complaint, subject to this

5

Court's rulings in its January 19, 2010 Order Granting in Part and Denying in Part Defendants'

6

Motions to Dismiss and Denying Defendants' Alternative Motion for Summary Judgment

7

(Docket No. 59), and in its November 15, 2010 Order Granting in Part and Denying in Part

8

Plaintiffs' Motion for Leave to File Third Amended Complaint (Docket No. 177).

9

### Wray C. Forrest

10

191.    Former Plaintiff Wray Forrest passed away on August 31, 2010.  By leave of this

11

Court, as set forth in its November 15, 2010 Order, two additional Plaintiffs are being added.

12

### Tim Michael Josephs

13

192.    Plaintiff TIM MICHAEL JOSEPHS ("Mr. Josephs") joined the U.S. Army in

14

January 1967, after graduating from high school.  Mr. Josephs was assigned to duty at Edgewood

15

Arsenal for approximately two months in 1968 — from January 1, 1968, to February 29, 1968.

16

Before being assigned to Edgewood Arsenal, Mr. Josephs went through basic training and

17

advanced infantry training, and then attended Officer Candidate School for a few months.

18

193.    After Officer Candidate School, Mr. Josephs was assigned to a holding company,

19

which is a temporary assignment, at Fort Benning, but he anticipated the likelihood that he would

20

be deployed to Vietnam.

21

194.    In late 1967, Mr. Josephs saw a flyer looking for volunteers to serve at Edgewood.

22

He was told, via an announcement at his morning formation, that volunteers at Edgewood would

23

be testing gas masks, boots, and other clothing, and there were no risks associated with the

24

assignment.  In fact, he was told that service at Edgewood was an "elite" opportunity that he

25

would have to apply for and not necessarily be accepted.  Because Edgewood was relatively close

26

to his hometown of Pittsburgh, Pennsylvania, Mr. Josephs believed that service there would allow

27

him to visit home more often.

28

195.     He was promised weekends off, but does not recall other benefits that might have been promised.  However, he later received a letter of commendation from Dr. Frederick Sidell, presumably upon completion of his assignment at Edgewood.

196.     Once he arrived at Edgewood, Mr. Josephs was asked to sign a participation agreement on January 3, 1968, which is a general consent form that did not state any information about the drugs or substances to be given.  He was also never warned of any potentially detrimental health effects associated with the testing.  Although the agreement references a document entitled "Medical Research Volunteer Program" that was purportedly "annexed" to the agreement, no such document existed.  Mr. Josephs never received any documents explaining the details of the Edgewood assignment.

197.     In fact, the instructions Mr. Josephs did receive were that he would "pay for it" if he ever tried to quit his assignment at Edgewood, and that he was not ever to talk about Edgewood with anyone.

198.     The day after Mr. Josephs signed his agreement, he went through a battery of physical and mental evaluations before being used as a test subject, although he no longer recalls the details surrounding those initial evaluations.

199.     While at Edgewood, Mr. Josephs was subjected to tests approximately once per week.  During some tests, he was injected with substances that were unknown to him at the time. Following the injections, the Edgewood staff personnel typically would observe him for a period of time, often several hours and sometimes it would span multiple days.  Mr. Josephs may have participated in tests that required him to wear gas masks while being exposed to chemicals in gas chambers.

200.     Mr. Josephs was required to carry a special card that provided instructions to call Edgewood if he experienced a medical emergency while off base during weekends.  However, he does not recall what he told his family and friends during his visits to them on the weekends about what he was doing at Edgewood, or why he had to carry a card with instructions regarding potential medical emergencies.

201.     Long after the completion of his assignment at Edgewood, Mr. Josephs first discovered that he received at least the following chemicals and/or derivatives thereof, as indicated in his medical records and/or correspondence from the government: pyridine-2-aldoxime methane sulfate (a derivative of 2-PAM), also known as P2S, scopolamine, Prolixin, Congentin, and Artane.

202.     Moreover, Mr. Josephs' medical files indicated that the experiment in which he was given 9 grams of P2S on February 1, 1968, was to treat "organophosphorous poisoning," which results from exposure to anticholinesterase agents such as nerve gas and pesticides.  This indicates that Mr. Josephs likely received injections of nerve gas such as sarin, and/or pesticides such as dioxin, prior to receiving a high dose of P2S.

203.     During one of the experiments on February 19-21, 1968, after Mr. Josephs was given Prolixin, he had an apparent reaction that produced symptoms akin to those of Parkinson's disease, including tremors.  According to his medical files, the doctor on staff used drugs that were normally used to treat Parkinson's disease (i.e., Congentin and Artane) to treat him, and his symptoms subsided.

204.     Upon leaving Edgewood Arsenal at the end of February 1968, Mr. Josephs was debriefed by government personnel.  Mr. Josephs was warned to never talk about his experiences at Edgewood, and to forget about everything that he ever did, said, or heard at Edgewood.

205.     Mr. Josephs has a copy of a "class picture" from Edgewood, consisting of volunteers who served at Edgewood at or around the same time he did.  He recognizes the volunteer seated next to him in the picture, but does not recall his name.  He also does not remember anyone else in the picture.

206.     A few days after leaving Edgewood, Mr. Josephs returned to Fort Benning.  His medical records show that he required medication for "nerves." He also recalls "not feeling himself," nervous and "shaky" for a while after returning to Fort Benning.

207.     After a short stint at Fort Benning, Mr. Josephs served in Thailand for about one year, prior to being honorably discharged from the service in August of 1969, at which time

1   Mr. Josephs returned home to Pittsburgh.  Based upon his instructions, Mr. Josephs did not tell

2   anyone about what happened at Edgewood.

3       208.    Since being discharged from the military, Mr. Josephs has been contacted by the

4   government representatives on several occasions.  For example, in 1975, he was contacted by the

5   government for the completion of a questionnaire to assess his general health.

6       209.    Mr. Josephs decided to try to find out more about his experiences at Edgewood

7   and what actually happened there, so he drafted a letter to the government to find out what

8   substances he was exposed to while at Edgewood.  On September 17, 1975, Mr. Josephs received

9   a letter from Dr. C. McClure, Director of Biomedical Laboratory, informing him of the names of

10  three of the substances to which he was exposed, none of which he had ever heard of:  pyridine-2-

11  aldoxime methane sulfate, scopolamine, and Prolixin.  As Mr. Josephs was still in good health at

12  the time, he did not follow up with the government further.  Mr. Josephs' records do not show any

13  contacts between the government and him regarding his services at Edgewood between 1976 and

14  2000.

15      210.    However, in 2000 and then 2001, Mr. Josephs received additional surveys from the

16  government which asked questions about his state of health.  It was then Mr. Josephs requested

17  his file relating to the experiments he had undergone at Edgewood, which discussed various other

18  substances (i.e., Congentin and Artane, and possibly also nerve gas and/or pesticides) to which he

19  was exposed during his time at Edgewood.  The government never warned him, at any time,

20  about the possible health effects of his exposures at Edgewood.

21      211.    Mr. Josephs' health has deteriorated rapidly in the last several years, which has

22  made it difficult for him to investigate what happened at Edgewood, and to assess possible links

23  to his health problems.  In 2004, he was diagnosed with Parkinson's disease, which he recently

24  learned has some sort of an association with the chemicals he was exposed to at Edgewood.  He

25  also suffered two "small strokes" (as told by his doctor, Dr. Nicolaas Bohnen), which may have

26  resulted from exposure to the chemicals at Edgewood.  In addition, he currently suffers from

27  hypertension, which may have been caused by his exposure to P2S.  Mr. Josephs' medical records

28  show that he had received a very high dose (9 grams) of P2S while at Edgewood, a dose much

higher than the low doses (of 2 PAM, of which P2S is a derivative) found to cause hypertension in recent studies.

212.    Mr. Josephs sought benefits through the VA in the fall of 2009, but was notified via mail by the VA regional office in Baltimore that he was not eligible because his family income was too high.  However, the substantial out-of-pocket medical expenses, including cost of his treatments and prescription drugs, has been a financial burden to Mr. Josephs and his wife.

213.    The account in this Third Amended Complaint has been compiled from memories and fragments of Mr. Josephs' own recollection, earlier discussions with his wife, the results of his wife's research, as well as portions of his available military records.

**William Blazinski**

214.    Plaintiff WILLIAM BLAZINSKI ("Mr. Blazinski") was drafted into the Army and began service on October 4, 1966, at the age of 19.  He was stationed at Edgewood Arsenal for a 60-day tour from March 1, 1968, to April 30, 1968.  Before being assigned to Edgewood, Mr. Blazinski was stationed at Fort Sill, Oklahoma.  He was trained as an infantryman, but also served in the 85th Missile Detachment.

215.    While stationed at Fort Sill, Mr. Blazinski attended a presentation by personnel from Edgewood, who were recruiting test subjects to test substances and/or equipment.  In exchange for participating, volunteers were promised that they would have three-day weekend passes and no duties (i.e., guard or KP duties) beyond participation in tests.  Mr. Blazinski agreed to participate, believing that he was "doing the right thing" by doing so.

216.    After volunteering, Mr. Blazinski underwent a "mental stability" test and a physical at Fort Sill.  At that time or shortly after arriving at Edgewood, he completed numerous forms, including a "participation agreement."  To his recollection, Mr. Blazinski never received a Volunteer Handbook.  While Mr. Blazinski does not remember signing a security non-disclosure form, he was told repeatedly that the experiments were top-secret and that he could not disclose anything about what happened there to anyone.  He became Volunteer Number 5031.

217.    Mr. Blazinski participated in at least five experiments at Edgewood.  During three of them, he was gassed with types of chlorobenzylidene malononitrile ("CS," commonly known

1    as tear gas).  Mr. Blazinski was told that the gas was being deployed in Vietnam and that, after

2    being dropped in enemy tunnels, "nobody was coming out."  During these gas experiments,

3    Mr. Blazinski and other participants were instructed to remain in a gas chamber for as long as

4    possible while being exposed to CS gas.  During each CS test, he managed to tolerate the

5    exposure for ten minutes as his eyes watered, his nose burned, and he choked before being

6    removed from the chamber.

7           218.   In another experiment, Mr. Blazinski was told that he was testing an agent and its

8    antidote and that he would lose his eyesight temporarily during the test.  Instead, he was placed in

9    a padded room and given scopolamine, an experimental antidote for nerve-agent poisoning that

10   causes harmful side effects, and another drug, physostigmine, to test its ability to reverse

11   scopolamine's effects.  After a short time, he suddenly noticed that the wall was "fluttering" like

12   a flag in the sky, and he began having severe vision problems.  He could not distinguish between

13   his fingers when holding his hand in front of his face; his hand looked "webbed."  He was then

14   taken to another room where he was given math and mechanical tests that he had previously

15   taken.  Mr. Blazinski lacked the focus to perform the math test and the dexterity to perform the

16   mechanical test.  He was given thick glasses to help him see.  Mr. Blazinski was then taken to

17   lunch.  When given a plate of peas, the peas looked like one green mass, and he was unable to

18   feed himself without assistance.

19          219.   During a fifth experiment, described to him at the time as a "communications

20   system" test, electrodes were attached to Mr. Blazinski and electrical charges ran through his

21   body, causing pain like pinpricks.  Years later, Mr. Blazinski would learn that it had actually been

22   a drug experiment and that he may have been part of a control group.

23          220.   Mr. Blazinski returned to Fort Sill to complete his military obligation and was

24   discharged from the Army on October 3, 1968.

25          221.   In 2008, Mr. Blazinski was diagnosed with chronic lymphocytic leukemia and

26   ulcerative colitis.  He never told any doctor about his time at Edgewood until after those

27   diagnoses.  He also suffers from high blood pressure and eczema.  Mr. Blazinski applied for VA

28   disability benefits in 2008, but was denied.

222.   The additional individual Plaintiffs in this Claim for Relief seek the same forms of relief as the original Plaintiffs.  Together with one or more of the original Plaintiffs, Plaintiffs may seek court approval for the Additional Plaintiffs to serve as class representatives.

**FOURTH CLAIM FOR RELIEF BY VVA AND ALL INDIVIDUAL PLAINTIFFS AGAINST DVA AND SECRETARY SHINSEKI**
**(Declaratory and Injunctive Relief)**

223.   Plaintiffs reallege and incorporate herein by reference as though fully set forth, each and every allegation contained in Paragraphs 1 through 222 of this Complaint, subject to this Court's rulings in its January 19, 2010, Order Granting in Part and Denying in Part Defendants' Motions to Dismiss and Denying Defendants' Alternative Motion for Summary Judgment (Docket No. 59).

**Defendant Department of Veterans Affairs**

224.   Defendant DEPARTMENT OF VETERANS AFFAIRS ("DVA") is the federal agency responsible for providing service-connected death and disability compensation ("SCDDC") and free, priority health care for our nation's veterans (and their survivors) who become disabled or die in their service to our country.  The Veterans Benefits Administration ("VBA") is the branch of DVA responsible for the administration of veterans' benefits, including SCDDC, while the Veterans Health Administration ("VHA") is responsible for providing free health care to disabled veterans on a priority basis.  Defendant ERIC K. SHINSEKI is the United States Secretary of Veterans Affairs, and is named herein solely in his official capacity.

225.   Defendants have actively concealed the DVA's actual participation in the chemical and biological weapons program.  Defendants have recently produced documents in discovery that reveal that the Army, DOD, and CIA procured from DVA some of the substances, including samples of drugs and chemicals, that the Army and CIA used to conduct experiments on military personnel or veterans.  The adverse information that made such substances unsuitable for treatment or use were the exact same properties that made them attractive as candidates for use in chemical or biological weapons, yet the DVA either failed to advise the other defendants of the known or suspected risks or failed to ensure that those known or suspected risks were disclosed to

1    the military personnel whom the DVA knew would be tested with the substances.  Defendants

2    never shared any information about known or suspected risks with the subjects of the

3    experiments.  DVA assumed an independent obligation of full disclosure and notification to the

4    military personnel exposed to substances that it provided to Defendants, but DVA has failed to

5    fulfill that obligation.  Plaintiffs have been unable to obtain information from Defendants as to

6    what substances were actually supplied by DVA, and which were used on the Individual Plaintiffs

7    or other class members.

8         226.    Moreover, during the long period of time that the DVA has been involved in

9    deciding whether affected veterans obtain free, priority health care and SCDDC, as well as

10   conducting the outreach activities described above, the DVA has been conducting its own

11   experiments using human subjects (veterans) that involve many of the same chemical and

12   biological weapons that were the subject of the Army and CIA programs, and many of which also

13   failed to comply with the Official Directives.  For example, the DVA has tested LSD-25 on

14   veterans dating back to at least the late 1950s.  The DVA also conducted studies at its own

15   medical facilities in the early 1960s using veterans residing at a VA domiciliary as guinea pigs,

16   which were sponsored by the CIA and used CIA cut-outs for funding; for example MKULTRA

17   Subproject 125, conducted at the VA Center in Martinsburg, West Virginia, involved studies of

18   differential effects of drugs such as meprobamate and dextro-amphetamine on behavior, including

19   the placebo effect, utilized unwitting subjects, and used the Society for the Investigation of

20   Human Ecology as a cover for funding and security purposes.  Based upon recent VHA filings

21   concerning its Research Laboratory Hazardous Agents Control Program, the common

22   chemicals/drugs tested by the DVA and the other Defendants include BZ (3-quinuclidinyl

23   benzilate), Lewisite, LSD, mustard gas, phosgene, sarin, soman (GD), tabun (GA), VX (nerve

24   gas), and others.  Tests conducted in VHA research facilities also include a long litany of

25   biological agents such has botulism, anthrax, ebola virus, brucella, and many others.

26        227.    In approximately 2005-06, the DVA became involved in outreach activities and

27   notification concerning veterans who had participated in the chemical and biological experiments

28   program.  DVA divided the exposed veterans relevant to this action into two groups.  First, based

1    upon information received from DOD, the DVA ultimately identified approximately 4,495

2    veterans who had been exposed to mustard agents and lewisite (mustard gas) ( the "Mustard Gas

3    Group").  Second, DVA received or compiled a database of 10,528 veterans who were exposed to

4    other chemical or biological substances at the Edgewood Arsenal (the "Chemical/Biological

5    Weapons Group").  As known by the DVA, the DOD list received by the DVA omitted the names

6    of all veterans exposed before 1954, which likely numbered in the tens of thousands.

7          228.    Neither the DVA nor other Defendants have made even a semblance of a

8    comprehensive effort to identify or notify veterans exposed to chemical and biological weapons at

9    other locations than the Edgewood Arsenal.  Likewise, the DVA has not compiled any

10    information concerning veterans who were the subject of brain implants or mind control

11    experiments.  Moreover, the DVA has made no effort to contact survivors of dead veterans, who

12    would be eligible for Dependency and Indemnity compensation ("DIC") if the death of the

13    veteran's spouse were service connected.  As a result, Defendants' notification program began

14    with a truncated list of names representing only a small fraction of the veterans exposed to

15    chemical weapons, biological weapons, and mind control experiments and even a smaller fraction

16    of persons potentially eligible for SCDDC, including DIC.

17          229.    Of the 4,495 veterans in the Mustard Gas Group, the DVA concluded that almost

18    half (2,120) were dead; as to them, the notification efforts ceased, despite the survivors' potential

19    eligibility for DIC.  Of the remaining 2,375 veterans in the Mustard Gas Group, the DVA has

20    found addresses of only 371, or 15.6%.  As of September 2009, the DVA had received 1,518

21    SCDDC claims by veterans based upon mustard gas exposure, 142 of which were still pending.

22    The DVA's 2009 report does not reveal how many of the remaining 1,376 mustard gas claims

23    were granted, but a VBA data summary from January 2006 reported that 11 SCDDC claims in the

24    Mustard Gas Group had been granted, or approximately 0.8%.  VBA abandoned any further

25    efforts to notify Mustard Gas Group veterans in 2009, and, as noted above, has never notified

26    survivors of veterans whose deaths were or may have been service connected of their potential

27    eligibility of DIC.

28

1     230.    Of the 10,528 names of veterans that DVA received from DOD concerning the

2     Chemical/Biological Weapons Group, the DVA has notified only 3,218, or 30.6%, and appears to

3     have made no effort to expand the original group of veteran names based upon defects, gaps, or

4     omissions in the original list.  Moreover, it appears that the DVA has made no effort to notify

5     veterans with "possible exposures" or to identify military personnel exposed to toxic agents

6     during "protective suit physicals" at Edgewood unless the soldier had actually sought aid at the

7     "Toxic Aid Exposure Station."  The DVA has received 87 SCDDC claims from veterans in the

8     Chemical/Biological Weapons Group, of which only 2, less than 3%, have been granted.  It is

9     unclear whether the DVA has continued or abandoned efforts to notify veterans whose names are

10    actually listed in the Chemical/Biological Weapons Group.

11    231.    The notification letters sent by the DVA to veterans enclose so-called "Fact

12    Sheets" and Answers to "Frequently Asked Questions".  The notification letters and other

13    materials sent by DVA, together with other information prepared or circulated as part of the DVA

14    outreach efforts, contain a series of misrepresentations of material fact and other information

15    intended and calculated to discourage veterans from applying for SCDDC or seeking health care

16    from the VHA.  Among these misrepresentations and other statements were the following:

17    (a) falsely representing that the chemical and biological weapons tests had begun in the mid-

18    1950s, a misstatement intended to justify the decision not to notify participants tested before 1954

19    and to hide the fact that such tests did not conform to the Nuremburg Law; (b) falsely

20    representing that scientific studies had been conducted showing that exposed veterans did not

21    have any significant adverse health effects and that "available evidence and follow-up" studies

22    had been conducted which "[did] not support significant long-term physical harm among subjects

23    exposed to acutely toxic amounts of [these] agents other than mustard gas and Lewisite;"

24    (c) falsely representing that the doses and safety of the test substances had been pre-confirmed in

25    animal tests and that doses were increased only where there was "a low risk of serious side

26    effects;" (d) falsely representing that the participants in the tests had received low doses;

27    (e) falsely representing that the participants in the tests had voluntarily consented to them and the

28    consent was informed because the Army had "provided study information to each volunteer;"

(f) falsely representing that the tests were defensive in nature and purpose; (g) describing the drugs administered as "common approved pharmaceuticals," and that long-term health effects from psychochemicals were limited to LSD; (h) the omission of known, material information about the adverse physical and mental health effects of the chemicals and biological substances derived from earlier studies or incidents involving humans, past studies of industrial accidents, animals studies, and other sources; (i) falsely representing that the tests were conducted in "great care" and that details were recorded as to the date and type of study, the specific chemicals used, the amount of each chemical, the observed health effects, and any treatment provided, and that all participants had received treatment for all adverse health effects; (j) placing an undue and disproportionate emphasis on the inclusion of placebos and benign substances, particularly given the average number of tests of different chemicals each veteran was exposed to; (k) omitting information concerning DIC claims that could be brought by survivors of veterans who participated in the chemical and biological weapons tests; (l) withholding data concerning the incidence of diseases or conditions experienced by veterans that had been exposed to chemicals and drugs in experiments and the known dangers of interactions between or among different chemicals or substances administered to veterans; and (m) falsely representing that no specific medical tests or evaluations were available for the types of exposures experienced by veterans and emphasizing that medical examinations only were available from the DVA, and that the fact of notification did not suggest eligibility for health care or compensation, when in fact the DVA knew or should have known that some of the veterans receiving notice were eligible for one or both.  The FAQs also represent that the DOD does not conduct any human experimentation involving chemical agents today, although appears to contradict itself in a later sentence where it states that the DOD continues to test agents that protect against chemical weapons, which implies that chemicals are still being administered to service personnel in order to test the protective agents.  Moreover, the DVA has failed to adequately obtain exposure and test information available from the Army and DOD concerning the identity, properties, doses, mode of exposure, and other fundamental information relating to service connection, and to train adjudicators and medical personnel to fairly evaluate and process SCDDC claims based upon exposure to

1  substances used in chemical and biological weapons or the program of mind-control

2  experimentation.

3        232.    The Fifth Amendment due process clause guarantees that decision makers

4  respecting eligibility for health care and SCDDC be neutral and unbiased, and that they lack an

5  interest in the subject matter of their determinations or some undisclosed conflict of interest.  The

6  DVA's decisions described above, including the interminable delays in providing and misleading

7  contents of the notice, the incomplete rosters of veterans selected to receive notice, the small

8  percentage of veterans located, the nature of the information imparted to exposed veterans, and

9  the shockingly low success rate on claims are all reflections, manifestations, or the results of bias

10  and the violations of the due process rights of Plaintiffs and members of the proposed class.

11        233.    Plaintiffs are entitled to a declaration from this Court stating that decisions made

12  by the DVA respecting entitlement to SCDDC and/or eligibility for free and/or medical care

13  based upon service connection are null and void due to violations of the due process clause of the

14  Fifth Amendment to the U.S. Constitution.

15        234.    Plaintiffs are also entitled to a preliminary and permanent injunction forbidding

16  defendants from continuing to use biased decision makers to decide their eligibility for free,

17  priority health care and for SCDDC, including DIC.  Plaintiffs also request that this Court enter

18  an order directing the DVA to propose a plan to remedy denials of affected claims for SCDDC

19  and/or eligibility for medical care based upon service connection and to devise procedures for

20  resolving such claims that comply with the due process clause, which involve, at a minimum, an

21  independent decision maker, all to be submitted to the Court for advance approval.

22                                **PRAYER FOR RELIEF**

23        WHEREFORE, subject to this Court's rulings in its January 19, 2010 Order Granting in

24  Part and Denying in Part Defendants' Motions to Dismiss and Denying Defendants' Alternative

25  Motion for Summary Judgment (Docket No. 59), Plaintiffs pray for judgment against

26  DEFENDANTS as follows:

27        1.      On the First Claim for Relief, for declaratory relief as prayed for above.

28

THIRD AMENDED COMPLAINT
CASE NO. CV 09-0037-CW
sf- 2922333

73

1    2.    On the Second Claim for Relief, for a preliminary and permanent injunction as

2  prayed for above.

3    3.    On the Third Claim for Relief, for declaratory and injunctive relief as prayed for

4  above.

5    4.    On the Fourth Claim for Relief, for declaratory and injunctive relief as prayed for

6  above.

7    5.    On all claims for relief, for Plaintiffs' reasonable attorneys' fees and costs incurred

8  herein pursuant to 28 U.S.C. § 2412 and any other applicable law.

9    6.    For such other relief as the Court deems just and proper.

10

11  Dated: November 18, 2010          GORDON P. ERSPAMER
                                     TIMOTHY W. BLAKELY
12                                   STACEY M. SPRENKEL
                                     DANIEL J. VECCHIO
13                                   DIANA LUO
                                     MORRISON & FOERSTER LLP

14

15                                   By:   /s/ GORDON P. ERSPAMER
                                         Gordon P. Erspamer
16                                       [GErspamer@mofo.com]

17                                   Attorneys for Plaintiffs
                                     Vietnam Veterans of America; Swords to
18                                   Plowshares: Veterans Rights Organization; Bruce
                                     Price; Franklin D. Rochelle; Larry Meirow; Eric
19                                   P. Muth; David C. Dufrane; Tim Michael Josephs;
                                     and William Blazinski
20

21

22

23

24

25

26

27

28