IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| VIETNAM VETERANS OF AMERICA, et al.,<br><br>        Plaintiffs,<br><br>   v.<br><br>CENTRAL INTELLIGENCE AGENCY, et al.,<br><br>        Defendants. | Case No.: 09-cv-0037 CW (JSC)<br><br>**ORDER RE: PLAINTIFFS' MOTION TO COMPEL (Dkt. No. 404)** |

Pending before the Court is Plaintiffs' Motion to Compel seeking to resolve several outstanding discovery matters following the close of fact discovery on December 23, 2011. (Dkt. No. 404). Having considered the parties' filings and having had the benefit of oral argument on April 5, 2012, the Court GRANTS Plaintiffs' Motion to Compel in part.

## BACKGROUND

The present dispute is the latest in a long series of disputes regarding the scope and quantity of discovery produced in this action. Plaintiffs' Motion to Compel seeks the following: 1) production of documents over which the Department of Veterans Affairs ("DVA") and the Department of Defense ("DOD") assert deliberative process privilege; 2) production of the mustard gas mailbox and claim files; 3) production of unredacted versions

of documents from the Central Intelligence Agency ("CIA") MKULTRA Freedom of Information Act ("FOIA") set; 4) the DOD magnetic tapes; and 5) four additional or reopened depositions. The Court has considered all of these same issues before in prior orders. See, e.g., Dkt. Nos. 294, 303, 327, 330.

Discovery in this putative class action is complicated by the various legal claims which exist against the four agency Defendants (collectively "the government"). Plaintiffs' legal claims have unsurprisingly evolved over the course of discovery as they challenge the government's conduct over more than eight decades with respect to chemical and biological weapons testing on service members. Plaintiffs' four remaining legal claims are: 1) whether the DOD and Army failed to provide adequate notice to test participants including notice of chemicals to which they were exposed and any known health effects; 2) whether the DOD and Army failed to provide medical care to test participants for any conditions arising out of participation in testing programs; 3) whether the Army, DOD, and CIA have failed to release participants from secrecy oaths; and 4) whether the Department of Veterans Affairs is an inherently biased decision-maker. (Dkt. Nos. 177, 178, 233, 346).

## DISCUSSION

### A. Documents withheld based on the Deliberative Process Privilege

The Court has discussed the deliberative process privilege at length in prior orders. See, e.g., Dkt. Nos. 294, 327. The deliberative process privilege is a qualified privilege that "permits the government to withhold documents that reflect advisory opinions, recommendations, and deliberations comprising part of a process by which governmental decisions and polices are formulated." Hongsermeier v. Commissioner of Internal Revenue, 621 F.3d 890, 904 (9th Cir. 2010) (internal citations omitted). The privilege may be overcome by a strong showing of relevance and an inability to obtain the information from other sources. See Schwarzer, Tashima & Wagstaffe, Fed. Civ. P. Before Trial § 11:767 (TRG 2010) (citing Sanchez v. City of Santa Ana, 936 F.2d 1027, 1034 (9th Cir. 1990)). Courts consider the following factors in determining substantial need: 1) the relevance of the evidence, 2) the availability of other evidence, 3) the government's role in the litigation, and

4) the extent to which disclosure would hinder frank and independent discussion regarding contemplated policies and decisions. See F.T.C. v. Warner Comms. Inc., 742 F.2d 1156, 1161 (9th Cir. 1984).

### 1) DVA Documents

Plaintiffs previously filed a motion to compel with respect to documents withheld by DVA based on the qualified deliberative process privilege. After an in camera review of the 483 documents over which DVA asserted the privilege, the Court held that DVA's claim of privilege was overcome by Plaintiffs' showing of substantial need with respect to 50 of the documents. (Dkt. No. 327). On January 19, 2012, DVA served an updated privilege log identifying 747 new documents over which it asserts the deliberative process privilege. The log was further updated on February 6, 2012, to add more entries and delete others resulting in a total of 705 new entries.

Plaintiffs contend that DVA's assertion of privilege with respect to these documents is untimely and the privilege is therefore waived. DVA's prior privilege log was served on October 21, 2010 in response to Plaintiffs' July 27, 2009 Rule 45 Subpoena. DVA asserts that given the enormous discovery produced to date, the delay in providing the updated privilege log is not unreasonable. However, that DVA waited until after the close of fact discovery and over four months after the Court ordered DVA to provide the Court with copies of all the previously identified deliberative process documents for in camera review, may well be unreasonable.

The Ninth Circuit set forth the standard for waiver of discovery privileges in Burlington Northern & Santa Fe Ry. Co. v. United States, 408 F.3d 1142 (9th Cir. 2005). Burlington rejected a "per se waiver rule that deems a privilege waived if a privilege log is not produced within Rule 34's 30–day time limit." Id. at 1149. Instead, the Burlington court instructed district courts to apply a "holistic reasonableness analysis" and make a case-by-case determination regarding waiver using the following factors:

(1) the degree to which the objection or assertion of privilege enables the litigant seeking discovery and the court to evaluate whether each of the withheld

3

>    documents is privileged (where providing particulars typically contained in a privilege log is presumptively sufficient and boilerplate objections are presumptively insufficient);
> (2) the timeliness of the objection and accompanying information about the withheld documents (where service within 30 days, as a default guideline, is sufficient);
> (3) the magnitude of the document production; and
> (4) other particular circumstances of the litigation that make responding to discovery unusually easy . . . or unusually hard.

Id. at 1149. In Burlington, the Court upheld the district court's finding that the privilege had been waived based upon Burlington's five month delay in serving a privilege log and the fact that Burlington was a sophisticated corporate litigant. Id.; see also Dominguez v. Schwarzenegger, No. 09-2306, 2010 WL 3341038, at *6 (N.D. Cal. Aug. 25, 2010) (finding waiver of the deliberative process privilege based on deficiencies in the privilege log).

Here, Plaintiffs do not dispute the adequacy of the privilege log; thus, the first factor weighs in DVA's favor. The third, and to some degree, fourth factors also weigh in DVA's favor. Discovery in this action is indisputably voluminous and the magnitude of discovery sought and provided has been discussed at length by the Court in prior orders. Similarly, the broad scope of this action challenging the conduct of four different government agencies over the course of more than eighty years presents unique discovery challenges.

Nonetheless, the documents at issue here over which DVA has asserted the deliberative process privilege represent a considerably more finite body of discovery. It is within this context that the Court considers the second factor, the timeliness of the assertion of privilege, and the fourth factor's consideration of particular circumstances of the litigation which might make responding to the discovery particularly difficult or easy. The vast majority of the documents over which DVA has asserted the deliberative process privilege cover a five year span from 2005-2009 and involve DVA's efforts to provide notice to service members who were subject to chemical and biological testing.[1] In October 2010, DVA identified over 400 documents regarding this subject which it asserted were subject to the

---

[1] Plaintiffs categorize the documents as follows: "the Fact Sheet and FAQ's, the Outreach Letter, outreach efforts, the DVA Information Letter, the DVA Training Letter, legislative proposals, test participant verification, the DOD Database, claims adjudication and tracking, and interactions with Congress and the GAO." (Dkt. No. 404, p. 4).

4

deliberative process privilege. DVA has now identified over 700 additional documents mostly from the *same* time period and covering the *same* subjects over which it asserts deliberative process privilege as well. However, DVA has not provided any specific explanation as to why these documents were not identified the first time around when DVA was searching for responsive discovery and why it took DVA over a year to identify additional documents regarding these subjects on a privilege log. As the record is devoid of an explanation, DVA's untimely assertion of privilege is subject to waiver.

This is particularly true given the prejudice this belated disclosure has caused Plaintiffs. Plaintiffs' ability to conduct discovery, especially to conduct depositions, has been prejudiced by Defendants' belated production. DVA contends that any prejudice was of Plaintiffs' own making because Plaintiffs chose to go ahead with depositions knowing that these documents were outstanding. This argument is not well-taken. Plaintiffs were between a rock and hard place because of Defendants' delayed production. Given the fact discovery deadline of December 23, 2011, Plaintiffs had to take these depositions and could not anticipate the contents of Defendants' document production, which they had been waiting several months to receive.

The Court therefore finds that DVA has waived its claim of deliberative process privilege with respect to the newly identified documents on the February 6, 2012 privilege log which cover the same time period and the same subject matter as those the Court previously reviewed in camera. This ruling does not include documents which do not appear to relate to documents over which DVA previously asserted the deliberative process privilege as discussed below.

First, those 2010 documents concerning the Chao draft manuscript and study and the other studies referenced on page 159 of the privilege log. See Dkt. No. 405, Ex. F (entries marked in blue by Plaintiffs). Because DVA's prior privilege log does not appear to contain any reference to the Chao manuscript or these other studies, the Court declines to find waiver of the deliberative process privilege with respect to these documents. The Court would

review the documents in camera, but Plaintiffs have not requested in camera review of these specific documents. (Dkt. No. 404, n. 1).

The second category of documents generally post-dates the documents within DVA's prior production and largely concerns a draft GAO report from 2007-2009. The Court declines to find waiver of the deliberative process privilege with respect to these documents, but will review the documents in camera to determine whether Plaintiffs have a substantial need for the documents sufficient to overcome DVA's claim of privilege. This includes the following documents: DVA0078 49-51, DVA0078 52-53, DVA0078 54-55, DVA0078 2665-2680, DVA0078 2684-2687, DVA0078 2688-2690, DVA0078 2696-2698, DVA0078 2704-2706, DVA0078 2707-7749, DVA00782750-2765, DVA0078 3132-3147, DVA0078 3148-3150, DVA0078 3151-3157, DVA0078 3158-3159, DVA00783160-3162, DVA0078 3163-3165, DVA0078 3166-3168, DVA0078 3169-3171, DVA0078 3172, DVA0078 3309-3312, DVA0078 3338-3345, DVA0078 3322-3337, DVA0078 3517-3553, DVA0078 3585-3676, DVA0078 3688-3779, DVA0078 3782-3878, DVA0078 3879-3986, DVA0078 3987-4083, DVA0078 4084-4178, DVA0078 4182, DVA0078 4225-4227, DVA0078 4442-4457, DVA0078 4489-4531, DVA0078 4733-4734, DVA0078 5319-5335, DVA0078 5401-5406, DVA0078 5703-5704, DVA0078 5772-5773, DVA0078 5774, DVA0078 5775-5776, DVA0078 5777-5778, DVA0078 5779, DVA0078 5780, DVA0078 5781-5782, DVA0078 5783, DVA0078 5784-5785, DVA0078 5786-5787, DVA0078 5790-579, DVA0078 5795-5798, and DVA0078 5803-5818.

Accordingly, with the exception of the two categories of documents identified above, the Court finds the deliberative process privilege waived for the newly identified documents on the privilege log. The waiver does not include those documents over which DVA also asserts attorney client or work product privilege, or those documents DVA has identified as identical or substantively identical. See Dkt. No. 371, n. 9. On or before April 13, 2012, DVA shall provide the Court with copies of the documents in category two as discussed above for in camera review of the claim of privilege.

**2) DOD/Army Documents**

On January 10 and 30, 2012, the DOD/Army served updated privilege logs asserting deliberative process privilege over 324 documents which Plaintiffs contend are responsive to requests dating back as far as 2009. As with those documents withheld by the DVA, Plaintiffs contend that the privilege log is untimely and that DOD has waived any claim of privilege over the documents.[2]

The documents at issue were identified as a result of DOD's review of the email archives of certain key employees to identify documents responsive to Plaintiffs' discovery requests. In July 2011, Plaintiffs raised the issue of whether DOD had run keyword searches for emails of key employees to identify potentially responsive documents. Plaintiffs briefed this issue in their August 2011 motion to compel, but the parties worked out an agreement while the motion was pending whereby Defendant agreed to produce the emails.[3] On December 16 and 23, 2011, DOD produced numerous emails to Plaintiffs. On January 10 and 30, 2012, DOD provided privilege logs indicating that it had withheld approximately 324 documents from the production on a claim of deliberative process privilege. DOD produced these documents just days before the close of fact discovery, and in the case of the privilege logs, after the close of fact discovery. Plaintiffs thus received the documents in the midst of previously-noticed depositions of the recipients/authors of the emails. Moreover, the privilege logs lists documents which relate to these same deponents.

DOD argues that the log is not untimely because it was provided within 30 days of DOD's production of non-privileged documents relating to the same production. However, the relevant time period under Burlington is not the time between the production of documents and the service of a privilege log, but between the service of a discovery request

---

[2] The DOD previously provided a privilege log on February 11, 2011.

[3] DOD's opposition to Plaintiffs' Motion to Compel production of these very emails, filed September 1, 2011, stated that "DOD is currently conducting searches for relevant emails of pertinent custodians, and will produce all responsive, non-privileged documents that it can reasonably locate and obtain. Accordingly, there is no need for this Court to compel any action by DOD." (Dkt. No. 278, p. 27).

7

and the provision of a privilege log. Plaintiffs argue that these documents are responsive to requests dating back to 2009. Under these circumstances, the log is clearly untimely.

However, unlike DVA's untimely production of its supplemental privilege log, it appears that the parties had different understandings regarding the scope of DOD's discovery responses. Defendant contends that it was not until shortly before November 7, 2011 that the parties discussed protocols for DOD email searches, including agreed-upon search terms and the identification of relevant custodians. (Dkt. No. 371, n. 4). Given the magnitude of the discovery sought from DOD in this case, if the parties did not in fact have a common understanding regarding what sources would be searched to identify responsive documents then DOD's production of a privilege log within 30 days of the production of the non-privilege documents does appear reasonable.

Under these circumstances, the Court declines to find that DOD has waived the deliberative process privilege with respect to these documents. However, there is still the question of whether Plaintiffs have a substantial need for the documents sufficient to overcome the privilege. Because these documents appear to cover the same time period and many of the same subjects as the DVA documents the Court previously reviewed, the documents are likely relevant to Plaintiffs' claims. Accordingly, the Court will review the documents <u>in camera</u> to determine whether the deliberative process privilege applies to these documents, and if so, whether Plaintiffs have demonstrated substantial need sufficient to overcome the privilege. On or before April 13, 2012, DOD shall provide the Court with copies of the documents identified on the January 30, 2012 privilege log which are not subject to another claim of privilege.

### B. Mustard Gas Production

Plaintiffs seek the contents of DVA's Mustard Gas Mailbox and production of the claim files relating to mustard gas claimants. DVA argues that the burden of this production outweighs any relevance because this evidence is not relevant to Plaintiffs' facial basis claims against DVA and that means discovery is being sought from DVA as a third-party, and as a

third-party, it is entitled to greater protection from burdensome discovery. As the Court has previously noted, the Court is less concerned with which agency the discovery request is aimed at because the reality is that all four of the agency parties here are part of the government. As such, the Court is not persuaded by Defendants' argument that one government agency should not be required to produce discovery because it only relates to claims against another government agency. The important question is whether DVA has discovery relevant to Plaintiffs' claims generally and whether the burden of producing the discovery is beyond that envisioned by Federal Rule of Civil Procedure 26.

### 1) Mustard Gas Mailbox

DVA created mailboxes that were used to verify participation of test subjects as part of the Mustard Gas and Edgewood Arsenal notification process. When an individual made a claim, DVA was required to verify their participation in the testing program by sending an email to the respective mailbox. As a result, the mailboxes contain emails and rating decisions regarding claimants' test participation and the adjudication of their claims. At the December 15 hearing, DVA stated that both mailboxes had been encrypted and it did not have the key. The parties were ordered to meet and confer to see if they could figure out a solution. DVA has since successfully decrypted the mailbox contents and has produced the contents of the ChemBio Mailbox, but not the Mustard Gas Mailbox. DVA makes a generalized claim of burden with respect to production of the Mustard Gas Mailbox, but has not submitted any particularized evidence with regard to any burden. The Court therefore finds this argument unpersuasive and directs DVA to produce the contents of the Mustard Gas Mailbox to Plaintiffs.

### 2) Mustard Gas Claim Files

Plaintiffs also seek the claim files for the mustard gas claimants. In contrast to the burden evidence offered in support of Defendants' position regarding the Mustard Gas Mailbox, DVA has offered specific evidence of burden with respect to production of the mustard gas claim files. DVA indicates that it has identified approximately 1,623 potential mustard gas test veterans and estimates that 650 of these actually filed claims relating to

1  mustard gas exposure.  However, DVA cannot determine whether these claims are based on
2  mustard gas exposure without reviewing each claim file and the claim files are located in
3  storage facilities throughout the country.  According to the Declaration of Michael Hogan,
4  DVA estimates that it would cost $115,000 to produce these identified claim files to
5  Plaintiffs.  (Dkt. No. 371-5).  This cost is significant.

6  Plaintiffs contend that the government failed to notify tens of thousands of individuals
7  that they had been exposed to mustard gas and lewisite.  The contents of the claim files of the
8  650 individuals who filed claims based on their exposure will shed little if any light on
9  Plaintiffs' notice claims.  Accordingly, under the proportionality analysis of Rule 26 the
10 Court finds that the burden of producing this discovery outweighs any potential relevance.

### C. Magnetic Tapes

Early in this action, Defendants identified several magnetic tapes which seem to contain data regarding Edgewood Arsenal testing.[4]  (Dkt. No. 291-1).  Plaintiffs believe the tapes contain information regarding the identities of test subjects, the substances and doses administered, and any observed health effects.   In September 2011, Defendants informed Plaintiffs that they were unable to extract any information from the tapes.  (Dkt. No. 291-5).  Plaintiffs have repeatedly raised concerns regarding the magnetic tapes with the Court and the Court has repeatedly encouraged the parties to work together to resolve the issue.

On December 19, 2011, Defendants sent the tapes to the Defense Logistics Agency ("DLA").   DLA has extracted data from two of the tapes which has been sent to DOD for classification review.  DOD has determined that none of these documents are classified and estimates that the documents will be produced to Plaintiffs within a week.  DLA's hardware was not able to recover any information from the remaining four tapes.

---

[4] The tapes were discussed in a 2007 letter from then-CIA Director Michael V. Hayden which stated that the CIA had located "some magnetic tapes associated with Project Often that Agency officers believe are copies of computer databases that the Agency received from Edgewood Arsenal in the early 1970's."  (Dkt. No. 318, p. 25).

Plaintiffs continue to raise numerous concerns regarding the tapes; however, as the Court indicated at oral argument these concerns may be premature. These tapes are from the 1970's and may or may not contain information relevant to Plaintiffs' claims. However, Plaintiffs no longer need to speculate regarding the tapes' relevance as Plaintiffs will shortly have the documents from the first two tapes and can determine for themselves whether the tapes contain relevant information. If they do, Plaintiffs should attempt to meet and confer with Defendants regarding what further steps, if any, can be taken to attempt to access the information on the remaining four tapes. Plaintiffs should also meet and confer with Defendants regarding any dispute as to the number of tapes at issue (after having read the deposition transcript of Patricia Cameresi). If necessary, the parties can present any further disputes regarding this matter to the Court in the form of a joint statement.

### D. **CIA FOIA documents**

Early in this case the CIA provided Plaintiffs with 17,000 pages of documents it had previously produced outside the scope of this litigation in response to FOIA requests (made in the 1970's) regarding the CIA's involvement in human testing programs ("the MKULTRA FOIA documents"). (Dkt. No. 279-26, pp. 29-30). These documents were extensively redacted based on non-specified statutory FOIA privileges.

Plaintiffs complain that the CIA gave them the MKULTRA FOIA documents with the same redactions as in the public version of the documents, and they also complain that the CIA did not provide a privilege log reflecting the basis for the redactions. The CIA responds that only a very small portion of documents in this FOIA set involve testing on service members and those are the Project Often documents. The CIA contends that it has already reproduced these documents with fewer redactions in response to discovery in this case.

This issue was discussed at length at the December 15 hearing. The Court ordered Plaintiffs to review the FOIA set and identify those documents which Plaintiffs alleged were relevant to their claims and had not otherwise been produced. Plaintiffs identified eleven documents from the FOIA set and request that these eleven documents, 56 pages in total, be produced in unredacted form. The CIA objects and claims that the documents are not

relevant and it would be extremely burdensome to review the documents because they were redacted by hand over thirty years ago and the original archived versions currently occupy eighty linear feet of shelf space. Further, the documents themselves are not stored in any particular order; in other words, to locate the 56 pages the CIA will have to review all, or much of, the eighty linear feet of documents. (Dkt. No. 279-26, ¶ 78).

Although Plaintiffs seek eleven total documents, they have only made specific arguments as to the relevance of three of these documents. Plaintiffs contend that two of the documents are relevant because they concern LSD, one of the substances known to have been tested on putative class members. The other document addresses Subproject 125, which involved testing on retired service members at a VA domiciliary. Although these documents do appear to contain information regarding Plaintiffs' claims, the Court must weigh the relevance of this evidence against the burden associated with locating and reviewing these thirty-plus year-old documents in eighty linear feet of storage space.

The CIA asserts that Plaintiffs have already received considerable discovery regarding LSD. Specifically, Plaintiffs (1) received the Army's 1980 "LSD Follow-Up Study," for which the Army attempted to contact every service member exposed to LSD as part of its test programs and which analyzed the potential health effects of LSD usage on test participants; (2) received test files of the service members involved in the Army's chemical test programs, which would include any recorded health effects they experienced at the time of administration; (3) received follow-up studies by the National Research Council that included an analysis of LSD usage during the experiments and also included participant surveys regarding health effects; and (4) deposed Dr. George Aghajanian, a neuropsychologist with extensive research experience related to LSD. (Dkt. No. 372, ¶ 57). Given the large amount of discovery Plaintiffs have already received regarding LSD, the Court finds that the burden associated with locating these additional documents regarding LSD outweighs the documents' potential relevance.

As for the Project 125 document, Plaintiffs contend that the document is relevant to their facial bias claim against DVA because it concerns DVA's involvement in testing

12

1 programs; however, Project 125 did not involve testing on active duty service members (the
2 putative class members here). Furthermore, the Court has reviewed the 1961 document and
3 concludes that the potential relevance of the redacted information (the bulk of which appears
4 to relate to names of particular individuals) is not sufficient to justify the burden associated
5 with locating and producing the document. (Dkt. No. 405, Ex. Y, MORI ID 17383).

6 Accordingly, the Court finds that the burden on Defendant to locate and review the
7 identified documents in the MKULTRA FOIA set exceeds the potential relevance of any of
8 the documents sought.

### E. Further Depositions

10 Based on recently produced documents and additional documents identified on the
11 updated privilege logs, Plaintiffs seek to resume the depositions of Dee Dodson Morris, Joe
12 Salvatore, and David Abbot. They also request leave to depose Dr. Kelley Brix. For the
13 reasons set forth below, the Court finds that Plaintiffs have shown good cause to take the
14 depositions of Mr. Salvatore and Dr. Brix. Depending on the contents of the pending
15 document production relating to Mr. Abbot, Plaintiffs may well have good cause to resume
16 his deposition as well.

#### 1) Dee Dodson Morris (DOD)

18 Ms. Morris was deposed on July 6, 2011. In December 2011, DOD produced Ms.
19 Morris's emails. Plaintiffs contend that these emails shed light on DVA's decision not to
20 send individualized notice to veterans and that they should have the opportunity to question
21 her about this decision-making process. See, e.g., Dkt. No. 405, Ex. M (email from Ms.
22 Morris to Michael Kilpatrick stating that "VA agreed not to include agent/dose in the letters
23 to veterans."). In addition, Plaintiffs allege that they were not aware that Ms. Morris was the
24 ultimate decision-maker regarding verification of participation in testing programs until
25 David Abbot's deposition in January. Defendants oppose this request arguing that: 1)
26 Plaintiffs have already obtained substantial discovery regarding the decision not to send
27 individualized notice; and 2) Plaintiffs knew all along that Ms. Morris was a key decision-
28 maker, and in fact, questioned her about this at her deposition.

1    Plaintiffs' discovery of additional facts regarding Ms. Morris's role through a
2    subsequently noticed deposition is not alone good cause. Plaintiffs made tactical decisions
3    regarding when to take particular depositions – that a subsequent deponent suggested facts
4    Plaintiffs would like to discuss with a prior deponent is not in and of itself good cause to
5    resume a deposition after the close of fact discovery. Further, although documents produced
6    by DVA pursuant to the Court's November 23, 2011 Order involve the decision not to send
7    individual notice, Plaintiffs have not shown that they have good cause to question Ms.
8    Dodson about this matter given that it was covered at her deposition and Plaintiffs have
9    substantial additional information regarding this subject. Accordingly, the Court declines to
10   order Ms. Dodson to appear for an additional deposition.

**2) Joe Salvatore (DVA)**

Plaintiffs deposed Mr. Salvatore June 29, 2011. Plaintiffs seek leave to reopen his deposition for four hours of additional testimony based on the production of the DVA deliberative process documents which indicate that Mr. Salvatore had a central role in the DVA's outreach and notification efforts.

Defendants argue that the production of documents after a deposition is not sufficient reason to reopen a deposition, citing Foster v. Metro, No. 03-2644, 2005 WL 1397512 (N.D. Cal. Jun. 14, 2005). However, Foster is inapposite because it addressed a request for a wholesale reopening of discovery and the plaintiff had not sought any discovery prior to the discovery cut-off. Id. at *1. Defendants' other argument, that Plaintiffs made a tactical decision to depose Mr. Salvatore while the dispute regarding DVA's assertion of deliberative process over certain documents was outstanding, has more force. Defendants also argue that to the extent these documents contain important information, Plaintiffs had the opportunity to question other witnesses who were party to many of the email communications, following the document production.

As with Ms. Dodson's deposition, Plaintiffs made a tactical decision to take Mr. Salvatore's deposition in the summer of 2011; however, Plaintiffs could not have anticipated the contents or volume of discovery outstanding regarding Mr. Salvatore that would be

14

1   produced pursuant to the Court's November 23, 2011 Order.  Accordingly, the Court finds
2   that Plaintiffs have demonstrated sufficient good cause to resume his deposition for up to
3   three hours, but limits the questioning to the evidence produced in response to the Court's
4   November 23 Order and this Order, Section A.1 supra.

### 3) David Abbot (DVA)

Plaintiffs took Mr. Abbot's deposition on January 25, 2012.  On February 29, 2012, Defendants informed Plaintiffs that they had located his user file on an old VA server. Defendants represent that they will produce all responsive, non-privileged documents from this file by May 15.  Plaintiffs seek leave to reopen Mr. Abbot's deposition for up to four hours and request that Defendants pay their travel expenses based on this late disclosure.

Plaintiffs' request is premature.  Following Plaintiffs' review of the documents, the parties should meet and confer regarding any further deposition of Mr. Abbot.  The Court encourages the parties to try and work this issue out without Court intervention as no court order is needed to resume Mr. Abbot's deposition upon agreement of the parties.  If the parties are not able to resolve the matter themselves, they may submit a joint statement.

### 4) Dr. Kelley Brix (DOD)

Plaintiffs request the opportunity to depose Dr. Kelley Brix, a DOD employee who was involved in the 2006 notification efforts, based on an email that was produced as part of the DVA deliberative process documents.  Dr. Brix's July 7, 2006 email to Mark Brown references "recurrent issues with the [notice] letter and attachment" and suggests a "major reorganization of the attachment." (Dkt. No. 405, Ex. K).

Defendants argue that as with the other depositions, Plaintiffs cannot demonstrate good cause because they made a strategic decision not to depose Dr. Brix.  Indeed, Plaintiffs included Dr. Brix in their October 21, 2011 request for additional depositions.  Plaintiffs sought her deposition because she:

> report[ed] to Dr. Kilpatrick (Docket Nos. 259-22 at 48-49; 259-23 at 2), and has criticized the DVA's notification program — making her testimony important for both the notice claims and the bias claim. For example, Mr. Salvatore testified that Dr. Brix

> stated that, "VA had not released a sufficient amount of notification letters." (Docket No. 259-24 at 67-68.)

(Dkt. No. 307, p. 5).

At the time Plaintiffs made the decision not take Dr. Brix's deposition they were not aware of her email suggesting these rewrites and Plaintiffs' efforts to obtain information regarding this email from another deponent (Roy Finno) were apparently unavailing. Given the significance of this issue, Plaintiffs have demonstrated good cause to take her deposition. Plaintiffs may take an up to four hour deposition of Dr. Brix and the deposition shall be limited to the newly produced evidence.

### F. Scheduling

Plaintiffs have filed a partially unopposed motion to extend case deadlines. (Dkt. No. 388). The parties both acknowledge that the current schedule is no longer viable given the volume of discovery outstanding. Accordingly, the parties have agreed to vacate the current expert discovery schedule. The parties are ordered to meet and confer and submit a stipulated schedule to this Court by April 19, 2012. If the parties are unable to agree to a schedule, they may file a joint statement detailing the dispute.

## CONCLUSION

For the reasons set forth above, the Court GRANTS Plaintiffs' Motion to Compel in part as follows: (1) within 21 days DVA shall produce to Plaintiffs all newly indentified documents on its February 6, 2012 privilege log except those protected by another claim of privilege, those which are duplicates, and those which fall in the two excluded categories discussed in Section A.1 supra; (2) on or before April 13, 2012 DVA shall provide the Court with copies of those documents in category two as discussed in Section A.1 supra for in camera review; (3) on or before April 13, 2012 DOD shall provide the Court with copies of the newly identified documents on its January 30, 2012 privilege log which are not subject to another claim of privilege for in camera review; (4) within 21 days DVA shall provide Plaintiffs with the contents of the Mustard Gas Mailbox; (5) on or before April 13, 2012 Defendants shall provide Plaintiffs with the documents contained on magnetic tape numbers

one and two; (6) the parties should meet and confer regarding scheduling the depositions of Joe Salvatore and Dr. Kelly Brix; (7) Defendants shall provide Plaintiffs with the Dave Abbot files by May 15, 2012, and as necessary, the parties should meet and confer regarding and further deposition of Mr. Abbot; and (8) the parties shall meet and confer regarding the case schedule and submit a stipulated schedule to the Court by April 19, 2012.

The Order disposes of Docket Nos. 388 and 404.

**IT IS SO ORDERED.**

Dated:  April 6, 2012

_____
JACQUELINE SCOTT CORLEY
UNITED STATES MAGISTRATE JUDGE