IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| VIETNAM VETERANS OF AMERICA; TIM MICHAEL JOSEPHS; and WILLIAM BLAZINSKI, individually, on behalf of themselves and all others similarly situated; SWORDS TO PLOWSHARES: VETERANS RIGHTS ORGANIZATION; BRUCE PRICE; FRANKLIN D. ROCHELLE; LARRY MEIROW; ERIC P. MUTH; DAVID C. DUFRANE; and KATHRYN MCMILLAN-FORREST,<br><br>          Plaintiffs,<br><br>     v.<br><br>CENTRAL INTELLIGENCE AGENCY; JOHN BRENNAN, Director of the Central Intelligence Agency; UNITED STATES DEPARTMENT OF DEFENSE; CHARLES T. HAGEL, Secretary of Defense; UNITED STATES DEPARTMENT OF THE ARMY; JOHN M. MCHUGH, United States Secretary of the Army; UNITED STATES OF AMERICA; ERIC H. HOLDER, Jr., Attorney General of the United States; UNITED STATES DEPARTMENT OF VETERANS AFFAIRS; and ERIC K. SHINSEKI, United States Secretary of Veterans Affairs,<br><br>          Defendants.<br>═══════════════════════════/ | No. C 09-0037 CW<br><br>ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT (Docket No. 490) AND GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (Docket No. 495) |

Plaintiffs Vietnam Veterans of America, Swords to Plowshares:

Veterans Rights Organization, Bruce Price, Franklin D. Rochelle,

Larry Meirow, Eric P. Muth, David C. Dufrane, Tim Michael Josephs,

William Blazinski and Kathryn McMillan-Forrest move for partial

summary judgment, holding that Defendants U.S. Department of

Defense and its Secretary Charles T. Hagel (collectively, DOD) and

the U.S. Department of the Army and its Secretary John M. McHugh

(collectively, Army) have legal obligations under the Administrative Procedures Act (APA) to provide notice and medical care to test subjects.  Plaintiffs do not seek summary judgment on any of their class or individual claims against the remaining Defendants or on any of their other claims against the DOD and the Army.  Defendants United States of America; U.S. Attorney General Eric Holder; the Central Intelligence Agency and its Director John Brennan (collectively, CIA); the DOD; the Army; and the U.S. Department of Veterans Affairs and its Secretary Eric K. Shinseki (collectively, DVA) oppose Plaintiffs' motion and move for summary judgment on all of Plaintiffs' individual and class claims against them.[1]  Having considered the papers filed by the parties and their arguments at the hearing, the Court GRANTS in part and DENIES in part Plaintiffs' motion and GRANTS in part and DENIES in part Defendants' cross-motion.

BACKGROUND

"Military experiments using service member[s] as subjects have been an integral part of U.S. chemical weapons program, producing tens of thousands of 'soldier volunteers' experimentally exposed to a wide range of chemical agents from World War I to about 1975."  Patterson Decl., Ex. 3, Docket No. 491-3, VET001_015677.  "On June 28, 1918, the President directed the establishment of the Chemical Warfare Service (CWS)."  Gardner Decl., Ex. 1, Docket No. 496-1, PLTF014154.  CWS was originally part of the War Department and became part of the U.S. Army on

---

[1]  Pursuant to Federal Rule of Civil Procedure 25(d), the Court substitutes Director Brennan and Secretary Hagel in place of their predecessors.

July 1, 1920.  Gardner Decl., Ex. 16, Docket No. 496-22, 27-28.
At the end of World War I, CWS was consolidated at the Edgewood
Arsenal in Maryland.  Id.  In about 1922, "the CWS created a
Medical Research Division to conduct research directed at
providing a defense against chemical agents."  Gardner Decl., Ex.
1, Docket No. 496-1, PLTF014154.  Between 1920 and 1936, the
Medical Research Division continued to carry out experiments
regarding chemical warfare agents, including experiments that used
human subjects, mostly drawn from personnel working at Edgewood
Arsenal.  Gardner Decl., Ex. 16, Docket No. 496-22, 28.

"Formal authority to recruit and use volunteer subjects in
[chemical warfare] experiments was initiated in 1942."  Gardner
Decl., Ex. 1, Docket No. 496-1, PLTF014154.  By the end of World
War II, "over 60,000 U.S. servicemen had been used as human
subjects in this chemical defense research program."  Gardner
Decl., Ex. 16, Docket No. 496-22, 1.  "At least 4,000 of these
subjects had participated in tests conducted with high
concentrations of mustard agents or Lewisite in gas chambers or in
field exercises over contaminated ground area."  Id.  Human
subjects were used in these tests to test the effectiveness of
protective clothing, among other things.  Id. at 31.  The most
common tests were patch, or drop, tests, in which a drop of an
agent was put on the arm, to "to assess the efficacy of a
multitude of protective or decontamination ointments, treatments
for mustard agent and Lewisite burns, effects of multiple
exposures on sensitivity, and the effects of physical exercise on
the severity of chemical burns."  Id.

United States District Court
For the Northern District of California

After the conclusion of World War II, the CWS's research programs were scaled down and little research was conducted between 1946 and 1950. "From 1955 to 1975, thousands of U.S. service members were experimentally treated with a wide range of agents, primarily at U.S. Army Laboratories at Edgewood Arsenal, Maryland." Patterson Decl., Ex. 3, Docket No. 491-3, VET001_015677; see also Answer to Fourth Am. Compl. ¶ 5 (admitting "that the DOD used approximately 7,800 armed services personnel in the experimentation program at Edgewood Arsenal"). During this time period, the focus of the human testing was on newer chemical agents that were "perceived to pose greater threats than sulfur mustard or Lewisite," including nerve gases and psychoactive drugs. Gardner Decl., Ex. 16, Docket No. 496-22, 46; see also Answer to Fourth Am. Compl. ¶ 5 (admitting that the "DOD administered 250 to 400 chemical and biological agents during the course of its research at Edgewood Arsenal involving human subjects"). Between 1954 and 1973, about 2,300 individuals, who entered military service as conscientious objectors and ninety percent of whom were Seventh Day Adventists, were used as human subjects in experiments to test biological agents at Fort Detrick in Frederick, Maryland. Gardner Decl., Ex. 12, Docket No. 496-18, 183.

The Department of Defense no longer tests live agents on human subjects. Gardner Decl., Ex. 4 (Depo. of Anthony Lee), Docket No. 496-6, 45:1-46:8. Human testing of chemical compounds at Edgewood Arsenal was suspended on July 28, 1976, although "protective suit tests" continued to take place between 1976 and 1979. Gardner Decl., Ex. 7 (Decl. of Lloyd Roberts), ¶ 4.

4

United States District Court
For the Northern District of California

Various memoranda and regulations were intended to govern these experiments.  In February 1953, the Secretary of Defense issued the Wilson Directive to the Secretaries of the Army, Navy and Air Force.  Patterson Decl., Ex. 4, Docket No. 491-4, C-001. In it, he informed them that "the policy set forth will govern the use of human volunteers by the Department of Defense in experimental research in the fields of atomic, biological and/or chemical warfare."  Id.  The Wilson Directive stated, "The voluntary consent of the human subject is absolutely essential," and provided,

> This means that the person involved should have legal capacity to give consent; should be so situated as to be able to exercise free power of choice, without the intervention of any element of force, fraud, deceit, duress, over-reaching, or other ulterior form of constraint or coercion; and should have sufficient knowledge and comprehension of the elements of the subject matter involved as to enable him to make an understanding and enlightened decision.  This latter element requires that before the acceptance of an affirmative decision by the experiment subject there should be made known to him the nature, duration, and purpose of the experiment; the method and means by which it is to be conducted; all inconveniences and hazards reasonably to be expected; and the effects upon his health or person which may possibly come from his participation in the experiment.

Id. at C-001-02.  It further stated, "Proper preparation should be made and adequate facilities provided to protect the experimental subject against even remote possibilities of injury, disability, or death."  Id. at C-003.  The memorandum provided, "The Secretaries of the Army, Navy and Air Force are authorized to conduct experiments in connection with the development of defense of all types against atomic, biological and/or chemical warfare agents involving the use of human subjects within the limits prescribed above."  Id.  The Secretary of Defense warned that the

addressees "will be responsible for insuring compliance with the provisions of this memorandum within their respective Services." Id.

A June 1953 Department of the Army memorandum, CS: 385, repeated the requirements set forth in the Wilson Directive and further stated, "Medical treatment and hospitalization will be provided for all casualties of the experimentation as required." Patterson Decl., Ex. 5, Docket No. 491-5, VVA 024544.

These requirements were codified in Army Regulation (AR) 70-25, which was promulgated on March 26, 1962 and later reissued in 1974.  See Gardner Decl., Exs. 47, 48, Docket Nos. 496-55, 496-56. Both versions set forth "[c]ertain basic principles" that "must be observed to satisfy moral, ethical, and legal concepts."  Gardner Decl., Ex. 47, Docket No. 496-55, 1; Gardner Decl., Ex. 48, Docket no. 496-56, 1.  Like the earlier memoranda, the regulations provided, "Voluntary consent is absolutely essential," and stated,

> The volunteer will have legal capacity to give consent, and must give consent freely without being subjected to any force or duress.  He must have sufficient understanding of the implications of his participation to enable him to make an informed decision, so far as such knowledge does not compromise the experiment.  He will be told as much of the nature, duration, and purpose of the experiment, the method and means by which it is to be conducted, and the inconveniences and hazards to be expected, as will not invalidate the results.  He will be fully informed of the effects upon his health or person which may possibly come from his participation in the experiment.

Gardner Decl., Ex. 47, Docket No. 496-55, 1; Gardner Decl., Ex. 48, Docket No. 496-56, 1.  The regulations also mandated, "Required medical treatment and hospitalization will be provided for all casualties."  Gardner Decl., Ex. 47, Docket No. 496-55, 2; Gardner Decl., Ex. 48, Docket No. 496-56, 2.

United States District Court
For the Northern District of California

On August 8, 1979, Army General Counsel Jill Wine-Volner issued a memorandum to various high-level Army officials, entitled, "Notification of Participants in Drug or Chemical/Biological Agent Research."  Patterson Decl., Ex. 6, Docket No. 491-6, VET123-084994-95.  In the memorandum, Wine-Vollner asked for input regarding the creation of a program to "notify those individuals who were not fully informed participants and may have suffered injury or be subject to a possible injury." Id. at VET123-084994.  She stated that "the legal necessity for a notification program is not open to dispute" and that the Army may be held to have a legal obligation to notify those who are still adversely affected by their prior involvement in its testing programs.  Id.  In a subsequent memorandum issued on September 24, 1979, Wine-Volner advised the Director of the Army Staff, "If there is reason to believe that any participants in such research programs face the risk of continuing injury, those participants should be notified of their participation and the information known today concerning the substance they received."  Patterson Decl., Ex. 7, Docket No. 491-7, VET017-000279.  This was to take place "regardless of whether the individuals were fully informed volunteers at the time the research was undertaken."  Id.

On October 25, 1979, John R. McGiffert, Director of the Army Staff, issued a memorandum to establish "Army Staff responsibilities for review of past Army research involving possible military applications of drug or chemical/biological agents," with the objective "to identity and notify those research participants who may face the risk of continuing injury." Patterson Decl., Ex. 8, Docket No. 491-8, VET030-022686.  The

United States District Court
For the Northern District of California

memorandum provided, "In the event that long-term hazards of a substance are not known, The Surgeon General (TSG) should continue to monitor research developments, and if at some future time more information makes it necessary to take some action, TSG should recommend appropriate action, including notification." Id. at VET030-022687.  On November 2, 1979, the Army informed Congress of this notification plan and the plan of the Surgeon General to ask the National Academy of Sciences to assist in reviewing the effects of the drugs and agents.  Patterson Decl., Ex. 9, Docket No. 491-9, VET030-022692-93.

On December 11, 1981, the Army published in the Federal Register a proposed amendment to a record keeping system.  46 Fed. Reg. 60,639.  The proposed system, to become effective on January 11, 1982, was called the "Research and Experimental Case Files" and maintained records for individuals who were "[v]olunteers (military members, Federal civilian employees, state prisoners) who participated in Army tests of potential chemical agents and/or antidotes from the early 1950's until the program ended in 1975." Id.  The purpose of the system was for use by "the Department of the Army: (1) to follow up on individuals who voluntarily participated in Army chemical/biological agent research projects for the purpose of assessing risks/hazards to them, and (2) for retrospective medical/scientific evaluation and future scientific and legal significance." Id.

On June 30, 1986, the Army proposed the creation of a new record system entitled the "Medical Research Volunteer Registry." 51 Fed. Reg. 23,576.  Included in the system were "[r]ecords of military members, civilian employees, and non-DOD civilian

volunteers participating in current and future research sponsored by the U.S. Army Medical Research and Development Command." Id. Among the purposes of the system were to "assure that the U.S. Army Medical Research and Development Command (USAMRDC) can contact individuals who participated in research conducted/sponsored by the Command in order to provide them with newly acquired information, which may have an impact on their health," and to "answer inquiries concerning an individual's participation in research sponsored/conducted by USAMRDC." Id. AR 70-25 was not listed among the authorities for the maintenance of the system.

Both record systems were amended several times during the 1980s. On May 10, 1988, the Army published a proposed change, which changed the name of the "Medical Research Volunteer Registry" to "Research Volunteer Registry" and expanded it to encompass research conducted by the U.S. Army Chemical Research, Development and Engineering Center (CRDEC). 53 Fed. Reg. 16,575.

On August 8, 1988, the Army issued an updated version of AR 70-25, which became effective on September 30, 1988.[2] Gardner Reply Decl., Ex. 87, Docket No. 513-13, 1. Among other changes, this version added a provision stating,

> Duty to warn. Commanders have an obligation to ensure that research volunteers are adequately informed concerning the risks involved with their participation

---

[2] Until Defendants filed their reply brief, the parties apparently did not realize that there were versions of AR 70-25 released in 1988 and 1989, and instead focused their analysis on the 1990 version. The parties have represented these versions were "substantively identical for the purposes of the issues in this case." Defs.' Reply, Docket No. 513-1, 8 n.8; see also Hr'g Tr., Docket No. 523, 4:21-5:2.

United States District Court
For the Northern District of California

> in research, and to provide them with any newly acquired
> information that may affect their well-being when that
> information becomes available.  The duty to warn exists
> even after the individual volunteer has completed his or
> her participation in research.  To accomplish this, the
> MACOM [(major Army Commands)] or agency conducting or
> sponsoring research must establish a system which will
> permit the identification of volunteers who have
> participated in research conducted or sponsored by that
> command or agency, and take actions to notify volunteers
> of newly acquired information. (See a above.)

Id. at 5.  Section a, which was referred to in this passage,

requires that MACOM commanders and organization heads "[p]ublish

directives and regulations for . . . [t]he procedures to assure

that the organization can accomplish its 'duty to warn.'"  Id. at

5.  The regulation also required the Army to create and maintain a

"volunteer database" so that it would be able "to readily answer

questions concerning an individual's participation in research"

and "to ensure that the command can exercise its 'duty to warn.'"

Id. at 18.  It mandated, "The data base must contain items of

personal information, for example, name, social security number

(SSN), etc., which subjects it to the provisions of The Privacy

Act of 1974."  Id.  It further provided, "Volunteers are

authorized all necessary medical care for injury or disease that

is a proximate result of their participation in research."  Id. at

4.  The regulation also required that informed consent be given in

accordance with appendix E.  Id. at 6, 20.  Appendix E included,

among other things:

> E-3. Description of the study
>
> A statement that the study involves research.  An
> explanation of the purpose of the study and the expected
> duration of the subject's participation.  A description
> of the procedures to be followed.  An identification of
> any experimental procedures.  A statement giving
> information about prior, similar, or related studies
> that provide the rationale for this study.

10

E-4. Risks

A description of any reasonably foreseeable risks or discomforts to the subject.

E-5. Benefits

A description of the benefits, if any, to the subject or to others that may reasonably be expected from the study.  If there is no benefit to the subject, it should be so stated.

. . .

E-9. Subject's rights

A statement that--

a. Participation is voluntary.

. . .

Id. at 12.  The definition for "human subject" included, with limited exceptions, a "living individual about whom an investigator conducting research obtains data through interaction with the individual, including both physical procedures and manipulations of the subject or the subject's environment."  Id. at 20.

In 1989 and 1990, AR 70-25 was again updated.  Gardner Decl., Ex. 49, Docket No. 496-57, i; Gardner Reply Decl., Ex. 88, Docket No. 513-14, 1.  The 1990 version added a provision stating that the regulation applied to "Research involving deliberate exposure of human subjects to nuclear weapons effect, to chemical warfare agents, or to biological warfare agents."  Gardner Decl., Ex. 49, Docket No. 496-57, 1.

On November 21, 1990, the name of the "Research Volunteer Registry" was changed to the "Medical Research Volunteer Registry."  55 Fed. Reg. 48,671.  At that time, its system identification number was changed to "A0070-25DASG."  Id.

On September 24, 1991, the Army proposed changes to both the "Research and Experimental Case Files" and the "Medical Research Volunteer Registry" record systems.  56 Fed. Reg. 48,179-81, 48,187.  At that time, both were kept materially the same as the earlier versions.

In 1991, the DOD issued regulations addressing the protection of human test subjects.  56 Fed. Reg. 28,003 (codified at 32 C.F.R. §§ 29.101-124).  These regulations adopted some of the basic principles of informed consent set forth in the Wilson Directive.  See 32 C.F.R. § 219.116.

On December 1, 2000, the Army proposed the deletion of the "Research Volunteer Registry," stating that its records "have been incorporated" into a new system of records, the "Medical Scientific Research Data Files."  65 Fed. Reg. 75,249.  This new records system was also given the system identifier of "A0070-25 DASG."  Id.  AR 70-25 was identified among the authorities for the maintenance of that records system.  Id.  The purposes of the new data system included, "To answer inquiries and provide data on health issues of individuals who participated in research conducted or sponsored by U.S. Army Medical Research Institute of Infectious Diseases, U.S. Army Medical Research and Development Command, and U.S. Army Chemical Research, Development, and Engineering Center," and to "provide individual participants with newly acquired information that may impact their health."  Id.  Among the categories of people whose records were included in the new system were "individuals who participate in research sponsored by the U.S. Army Medical Research and Development Command and the U.S. Army Chemical Research, Developments, and Engineering Center;

United States District Court
For the Northern District of California

and individuals at Fort Detrick who have been immunized with a biological product or who fall under the Occupational Health and Safety Act or Radiologic Safety Program." Id. Information in the database "may specifically be disclosed . . . [t]o the Department of Veteran Affairs to assist in making determinations relative to claims for service connected disabilities; and other such benefits." Id.

In 2002, Congress passed section 709 of the National Defense Authorization Act for Fiscal Year 2003 (NDAA), Pub. L. No. 107-314, Div. A, Title VII, Subtitle A, § 709(c), 116 Stat. 2458 (the "Bob Stump Act"), which required the Secretary of Defense to work to identify projects or tests "conducted by the Department of Defense that may have exposed members of the Armed Forces to chemical or biological agents."

The DOD has issued two memoranda releasing veterans in part or in full from secrecy oaths that they may have taken in conjunction with testing.  The first, issued by former Secretary of Defense William Perry in March 1993, releases

> any individuals who participated in testing, production, transportation or storage associated with any chemical weapons research conducted prior to 1968 from any non-disclosure restrictions or written or oral prohibitions (e.g., oaths of secrecy) that may have been placed on them concerning their possible exposure to any chemical weapons agents.

Gardner Decl., Ex. 42, Docket No. 496-50, VVA 025766-67.

The second, issued by the Office of the Deputy Secretary of Defense on January 11, 2011, after the instant litigation began, does not have a date restriction and states,

> In the 1990s, several reviews of military human subject research programs from the World War II and Cold War

United States District Court
For the Northern District of California

eras noted the common practice of research volunteers
signing "secrecy oaths" to preclude disclosure of
research information.  Such oaths or other non-
disclosure requirements have reportedly inhibited
veterans from discussing health concerns with their
doctors or seeking compensation from the Department of
Veterans Affairs for potential service-related
disabilities.

. . .

To assist veterans seeking care for health concerns
related to their military service, chemical or
biological agent research volunteers are hereby released
from non-disclosure restrictions, including secrecy
oaths, which may have been placed on them.  This release
pertains to addressing health concerns and to seeking
benefits from the Department of Veterans Affairs.
Veterans may discuss their involvement in chemical and
biological agent research programs for these purposes.
This release does not affect the sharing of any
technical reports or operational information concerning
research results, which should appropriately remain
classified.

. . .

This memorandum, which is effective immediately, does
not affect classification or control of information,
consistent with applicable authority, relating to other
requirements pertaining to chemical or biological
weapons.

Gardner Decl., Ex. 53, Docket No. 496-61, VET021-000001-02.

The DVA processes service-connected death or disability

compensation (SCDDC) claims of class members.  To establish that a

death or disability is connected to a veteran's participation in

the testing programs for the purposes of SCDDC claims, individuals

seeking survivor or disability benefits must establish that "it is

at least as likely as not that such a relationship exists."

Plaintiffs contend that the DVA participated in some capacity

in some of the other Defendants' testing programs.  Plaintiffs

also argue that the DVA engaged in human testing of similar

substances, including LSD and Thorazine.

14

Defendants have undertaken some efforts to contact and provide notice to participants in the testing programs.  In 1990, the DVA contacted 128 veterans who participated in World War II mustard gas testing; Defendants do not provide evidence of what information these individuals were provided then.  Gardner Decl., Ex. 15, DVA014 001257.  In recent years, the DVA, using databases compiled by DOD and its contractor, Batelle Memorial Institute, sent notice letters to certain individuals who participated in some WWII and Cold War era testing programs.  For the first round of letters related to WWII era testing, which were sent in 2005, DOD identified approximately 6,400 individuals who had been exposed to mustard gas or other agents during WWII and compiled a database with 4,618 entries.  Starting in March 2005, the DVA sent letters to approximately 319 individuals or their survivors for whom DVA could find current contact information.  These letters stated in part,

> You may be concerned about discussing your participation in mustard agent or Lewisite tests with VA or your health care provider.
>
> On March 9, 1993 the Deputy Secretary of Defense released veterans who participated in the testing, production, transportation or storage of chemical weapons prior to 1968 from any non-disclosure restriction.  Servicemembers who participated in such tests after 1968 are permitted to discuss the chemical agents, locations, and circumstances of exposure only, because this limited information has been declassified.

In response to the passage of the Bob Stump Act, DOD began in 2004 to search for Cold War era test information.  In addition, in April 2005, members of Congress on the House Veterans' Affairs Committee requested that the DVA provide written notice to the living veterans who participated in the test programs at Edgewood

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

1  Arsenal and Fort Detrick.  DOD created a database of information
2  about Cold War era test veterans with, among other things,
3  information on the substances they were exposed to, the dose and
4  the route of administration, and where the information was
5  available.  The information came primarily from the test
6  participant files for each person.  DOD provided this information
7  to the DVA for use in making service-connected health care and
8  disabilities determinations.  In December 2005, the DOD began
9  providing DVA with the names of test subjects and continued to do
10  so after that when new information was located.  As of the present
11  time, the DOD has given the DVA the names of 16,645 Cold War era
12  test subjects.  The DVA has sent letters to each veteran in the
13  database for whom it could locate current contact information,
14  which at present totals about 3,300 individuals.

15      Defendants did not include in the letters to Cold War era
16  test subjects the names of the chemical or biological agents to
17  which the participants were exposed or information that was
18  tailored to the individual recipient.  Defendants explain that
19  they did not do so for several reasons, including that it would
20  have taken too long, the information provided by the DOD to the
21  DVA was changing, the DVA did not want to send veterans inaccurate
22  information, alarm them or make them think they would suffer
23  adverse effects if these were unlikely.

24      The letters sent to the Cold War era test subjects by the DVA
25  stated,

26          You may be concerned about releasing classified test
            information to your health care provider when discussing
27          your health concerns.  To former service members who
            have participated in these tests, DoD has stated:
28

16

"You may provide details that affect your health to your health care provider.  For example, you may discuss what you believe your exposure was at the time, reactions, treatment you sought or received, and the general location and time of the tests.  On the other hand, you should not discuss anything that relates to operational information that might reveal chemical or biological warfare vulnerabilities or capabilities."

. . .

If you have questions about chemical or biological agent tests, or concerns about releasing classified information, contact DoD at (800) 497-6261, Monday through Friday, 7:30 a.m. to 4:00 p.m. Eastern Standard time.

The letter also provided information about obtaining a clinical examination from the DVA and contacting the DVA to file a disability claim.  If individuals called DOD's 1-800 number provided in the letter, they could obtain further information about the tests and staff at the hotline would, at least sometimes, refer them to an Army FOIA officer who had the authority to copy and send them their own individual test files; since requests were tracked starting in 2006, the Army has received approximately 114 such requests.  Gardner Decl., Ex. 29, Docket No. 496-37, 16:18-17:4.  The DVA also included a fact sheet from the DOD.  The DVA's expert in chemical agent exposures recognized that this fact sheet "has some significant inaccuracies."

Defendants have also engaged in other types of outreach to past test participants.  The DOD has placed some information on its public website, including general information about the testing conducted, the contents of the Perry memorandum and information about how to contact the DOD's 1-800 hotline for additional information.  DVA's website also contains some substantive information about the WWII and Cold War era testing

17

programs.  The DOD and DVA have also held briefings for some veteran service organizations.

LEGAL STANDARD

Summary judgment is properly granted when no genuine and disputed issues of material fact remain, and when, viewing the evidence most favorably to the non-moving party, the movant is clearly entitled to prevail as a matter of law.  Fed. R. Civ. P. 56; Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Eisenberg v. Ins. Co. of N. Am., 815 F.2d 1285, 1288-89 (9th Cir. 1987).

The moving party bears the burden of showing that there is no material factual dispute.  Therefore, the court must regard as true the opposing party's evidence, if supported by affidavits or other evidentiary material.  Celotex, 477 U.S. at 324; Eisenberg, 815 F.2d at 1289.  The court must draw all reasonable inferences in favor of the party against whom summary judgment is sought. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Intel Corp. v. Hartford Accident & Indem. Co., 952 F.2d 1551, 1558 (9th Cir. 1991).

Material facts which would preclude entry of summary judgment are those which, under applicable substantive law, may affect the outcome of the case.  The substantive law will identify which facts are material.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

Where the moving party does not bear the burden of proof on an issue at trial, the moving party may discharge its burden of production by either of two methods:

United States District Court
For the Northern District of California

> The moving party may produce evidence negating an
> essential element of the nonmoving party's case, or,
> after suitable discovery, the moving party may show that
> the nonmoving party does not have enough evidence of an
> essential element of its claim or defense to carry its
> ultimate burden of persuasion at trial.

Nissan Fire & Marine Ins. Co., Ltd., v. Fritz Cos., Inc., 210 F.3d 1099, 1106 (9th Cir. 2000).

If the moving party discharges its burden by showing an absence of evidence to support an essential element of a claim or defense, it is not required to produce evidence showing the absence of a material fact on such issues, or to support its motion with evidence negating the non-moving party's claim. Id.; see also Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 885 (1990); Bhan v. NME Hosps., Inc., 929 F.2d 1404, 1409 (9th Cir. 1991). If the moving party shows an absence of evidence to support the non-moving party's case, the burden then shifts to the non-moving party to produce "specific evidence, through affidavits or admissible discovery material, to show that the dispute exists." Bhan, 929 F.2d at 1409.

If the moving party discharges its burden by negating an essential element of the non-moving party's claim or defense, it must produce affirmative evidence of such negation. Nissan, 210 F.3d at 1105. If the moving party produces such evidence, the burden then shifts to the non-moving party to produce specific evidence to show that a dispute of material fact exists. Id.

If the moving party does not meet its initial burden of production by either method, the non-moving party is under no obligation to offer any evidence in support of its opposition. Id. This is true even though the non-moving party bears the ultimate burden of persuasion at trial. Id. at 1107.

19

DISCUSSION

Defendants assert that there is no legally enforceable duty under the APA to provide notice to past test subjects.  They also argue that the Court lacks subject matter jurisdiction over Plaintiffs' APA claim for medical care for class members and contend that there is no statutory authority for the DOD or the Army to provide the care requested and no duty to do so created by the various memoranda or regulations.  They further argue that the class members have no constitutional entitlement to notice or health care.  Defendants also seek summary judgment on Plaintiffs' claims against the CIA and DOD regarding secrecy oaths.  Finally, they seek summary judgment on Plaintiffs' "biased adjudicator" claim against the DVA.

I.    APA claims regarding notice and medical care

Title 5 U.S.C. § 702, the judicial review provision of the APA, "permits a citizen suit against an agency when an individual has suffered 'a legal wrong because of agency action' . . . ." Rattlesnake Coalition v. United States EPA, 509 F.3d 1095, 1103 (9th Cir. 2007) (quoting 5 U.S.C. § 702).  For § 702 claims, 5 U.S.C. § 706 "prescribes standards for judicial review and demarcates what relief a court may (or must) order." Rosemere Neighborhood Ass'n v. United States EPA, 581 F.3d 1169, 1172 n.2 (9th Cir. 2009).  When a plaintiff asserts an agency's failure to act, a court can grant relief by compelling "agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1).

Plaintiffs' claims in the Fourth Amended Complaint against the DOD and the Army assert that, under the APA, they are required to provide class members with notice of their exposures and known

United States District Court
For the Northern District of California

health effects, and medical care as set forth in the agencies' own policies.  By notice, Plaintiffs mean "notice to each test participant regarding the substances to which he or she was exposed, the doses to which he or she was exposed, the route of exposure (e.g., inhalation, injection, dermal, etc.) and the known or potential health effects associated with those exposures or with participation in the tests."  Mot. at 1 n.1.

A. Claim for notice

1. Whether the regulations and memoranda have the "force of law"

Defendants contend that the Wilson Directive, CS: 385 and AR 70-25 "lack the force of law."  Defs.' Corrected Reply, Docket No. 513-1, 3.

A "'claim under § 706(1) can proceed only where a plaintiff asserts that an agency failed to take a discrete agency action that it is required to take.'"  Sea Hawk Seafoods, Inc. v. Locke, 568 F.3d 757, 766 (9th Cir. 2009) (quoting Norton v. S. Utah Wilderness Alliance, 542 U.S. 55, 64 (2004)) (emphasis in original).  "Discrete" actions include providing "rules, orders, licenses, sanctions, and relief."  Hells Canyon, 593 F.3d at 932.  A discrete action is legally required when "the agency's legal obligation is so clearly set forth that it could traditionally have been enforced through a writ of mandamus."  Id. (citing Norton, 542 U.S. at 63).  "The limitation to required agency action rules out judicial direction of even discrete agency action that is not demanded by law (which includes, of course, agency regulations that have the force of law)."  Norton, 542 U.S. at 65 (emphasis in original).

21

In its January 19, 2010 and May 31, 2011 orders resolving Defendants' motions to dismiss, the Court recognized that "Army regulations have the force of law."  Docket No. 59, 15; Docket No. 233, 9; see also Kern Copters, Inc. v. Allied Helicopter Serv., Inc., 277 F.2d 308, 310 (9th Cir. 1960) (stating that "Army regulations have the force of law").  Defendants nonetheless contend that "not all regulations possess the force of law" and that AR 70-25 was promulgated pursuant to 10 U.S.C. §§ 3013 and 4503, which are "housekeeping" statutes, merely authorizing day to day internal operations, so this regulation cannot serve as the basis for Plaintiffs' APA claims.  Defs.' Opp. and Cross-Mot., Docket No. 495, 16-17; Defs.' Corrected Reply, Docket No. 513-1, 4-5.  Defendants have previously made similar arguments.  In their motion to dismiss Plaintiffs' third amended complaint, Defendants argued that the 1962 version of AR 70-25 was promulgated pursuant to 5 U.S.C. § 301, which was a housekeeping statute, and thus could not create a benefits entitlement.  The Court rejected this argument, stating "there is nothing in AR 70-25 (1962) or Plaintiffs' complaint to suggest that the regulation was issued pursuant to section 301."  Docket No. 233, 10.

In support of their new argument, Defendants rely primarily on Chrysler Corporation v. Brown, 441 U.S. 281 (1979), in which the Supreme Court considered whether certain regulations promulgated by the Department of Labor's Office of Federal Contract Compliance Programs (OFCCP) had the force of law.  In that case, the Court said, "In order for a regulation to have the 'force and effect of law,' it must have certain substantive characteristics and be the product of certain procedural

requisites." Id. at 302. It distinguished between "substantive rules" that "affect[] individual rights and obligations" and "interpretive rules, general statements of policy, or rules of agency organization, procedure, or practice." Id.; see also Vance v. Hegstrom, 793 F.2d 1018, 1022 (9th Cir. 1986) (explaining that substantive rules "implement existing law, imposing general, extrastatutory obligations pursuant to authority properly delegated by Congress," whereas "[i]nterpretive rules clarify and explain existing law or regulations" and "are issued without delegated legislative power and go more to what the administrative officer thinks the statute or regulation means") (internal quotation marks and citations omitted). The Court stated, "That an agency regulation is substantive, however, does not by itself give it the 'force and effect of law.'" Chrysler, 441 U.S. at 302. Because the "legislative power of the United States is vested in the Congress, . . . the exercise of quasi-legislative authority by governmental departments and agencies must be rooted in a grant of such power by Congress and subject to limitations which that body imposes." Id. The Court rejected the argument that the requisite grant of legislative authority for the regulations at issue in that case could be found in 5 U.S.C. § 301, which the Court labeled a "housekeeping statute." Id. at 309-10. A "housekeeping statute" is "simply a grant of authority to the agency to regulate its own affairs . . . authorizing what the APA terms 'rules of agency organization, procedure or practice' as opposed to 'substantive rules.'" Id.

Defendants concede that "AR 70-25 may appear to contain substantive rules." Defs.' Opp. and Cross-Mot., Docket No. 495,

**United States District Court**
For the Northern District of California

16.  They argue however that, because it was issued under 10

U.S.C. §§ 3013 and 4503, which they contend are housekeeping

statutes, AR 70-25 was not promulgated pursuant to a specific

statutory grant of authority sufficient to create enforceable

rights.

Defendants are correct that AR 70-25 was promulgated under 10

U.S.C. §§ 3013 and 4503.  The 1988, 1989 and 1990 versions state,

in Appendix G under section G-1, titled "Authority,"

> The Secretary of the Army is authorized to conduct
> research and development programs including the
> procurement of services that are needed for these
> programs (10 USC 4503).  The Secretary has the authority
> to "assign detail and prescribe the duties" of the
> members of the Army and civilian personnel (10 USC
> 3013).

Patterson Decl., Ex. 2, Docket No. 491-2, 13 (1990 version);

Gardner Reply Decl., Ex. 88, Docket No. 513-14, 17 (1989 version);

Gardner Reply Decl., Ex. 87, Docket No. 513-13, 17 (1988 version).

Appendices to the 1962 and 1974 versions, which provided "opinions

of The Judge Advocate General" to "furnish specific guidance for

all participants in research using volunteers," made similar

statements.  Gardner Decl., Ex. 47, Docket No. 496-55, 4 (1962

version); Gardner Decl., Ex. 48, Docket No. 496-56, 4 (1974

version).[3]

The former § 4503, which was originally enacted in 1950 as

section 104 of the Army and Air Force Authorization Act of 1949,

64 Stat. 322, 5 U.S.C. § 235a and eventually repealed in 1993,

---

[3]  The Judge Advocate General opined that the authority for the
regulation was 10 U.S.C. §§ 3012(a) and 4503.  Gardner Decl., Ex.
47, Docket No. 496-55, 4 (1962 version); Gardner Decl., Ex. 48,
Docket No. 496-56, 4 (1974 version).  In 1986, Public Law 99-433
redesignated 10 U.S.C. § 3012 as 10 U.S.C. § 3013.

provided in relevant part, "The Secretary of the Army may conduct

and participate in research and development programs relating to

the Army, and may procure or contract for the use of facilities,

supplies, and services that are needed for those programs."  10

U.S.C. § 4503 (1992).  Section 3013 sets forth the

responsibilities and authority of the Secretary of the Army,

including to "assign, detail, and prescribe the duties of members

of the Army and civilian personnel," and to "prescribe regulations

to carry out his functions, powers, and duties under this title."

10 U.S.C. § 3013(g).[4]

In their reply, Defendants represent that, in <u>Schism v.</u>

<u>United States</u>, 316 F.3d 1259 (Fed. Cir. 2002), the Federal Circuit

"expressly" found that 10 U.S.C. § 3013 cannot serve as the

"statutory basis authorizing DoD to provide ongoing medical care

for former service members because it would usurp Congress'

authority to control the purse strings for medical care."  Defs.'

Reply, Docket No. 513-1, 5.

However, the Federal Circuit did not so hold in <u>Schism</u>.  In

that case, the court considered the enforceability of oral

promises of military recruiters, made under the direction of

supervisors, to new recruits that, if they served on active duty

for at least twenty years, they and their dependents would receive

---

[4] A predecessor version of this statute, which was enacted as
section 101 of the Army Organization Act of 1950 and appeared at 5
U.S.C. § 181-4, provided in part that "the Secretary of the Army
may make such assignments and details of members of the Army and
civilian personnel as he thinks proper, and may prescribe the
duties of the members and civilian personnel so assigned; and such
members and civilian personnel shall be responsible for, and shall
have the authority necessary to perform, such duties as may be so
prescribed for them."

United States District Court
For the Northern District of California

free lifetime medical care.  Id. at 1262.  The principal question before the court was whether the oral promises made to the plaintiffs were within the authority of the Air Force Secretary under 5 U.S.C. § 301.  Id. at 1263.  The court held that, pursuant to Chrysler, § 301 "merely authorize[d] housekeeping" and not "the right to make promises of lifetime health care."  Id. at 1279-81.  The court also addressed the plaintiffs' argument that "the Commander-in-Chief's inherent power in combination with 10 U.S.C. §§ 3013, 5013, and 8013--which authorize the positions and enumerate the duties of the Secretaries of the Army, Navy, and Air Force respectively--authorized the recruiters' promises."  Id. at 1287-88.  The court found that the President, as Commander-in-Chief, did not have such inherent authority, because "[u]nder Article I, § 8, only Congress has the power of the purse" and thus such a conclusion would encroach Congress's constitutional powers to appropriate funding.  Id. at 1288.  The court did not apply this reasoning to 10 U.S.C. § 3013, which was not applicable to the plaintiffs in that case, who were Air Force retirees.  Id. at 1289.  The court found that 10 U.S.C. § 8013, the corresponding statute for the Secretary of the Air Force, did not authorize the recruiters' promises because the versions relevant to the plaintiffs there did not include "'recruiting' in the enumerated powers" and, even if they did, "the Secretary's authority to conduct recruiting does not carry with it the broad authority to make promises that bind future Congresses to appropriate funding for free lifetime care."  Id.

     This case is distinguishable from Schism.  Here, at the time that AR 70-25 was promulgated, there was a statutory provision, 10

26

United States District Court
For the Northern District of California

U.S.C. § 4503, that expressly authorized the Secretary of the Army to conduct research and development and to "procure or contract for the use of facilities, supplies, and services that are needed for those programs." 10 U.S.C. § 4503. Title 10 U.S.C. § 3013(g) gave the Secretary the power to prescribe regulations to carry out his functions, powers and duties under that title, including § 4503. Thus, Congress delegated to the Secretary of the Army the authority to contract for services needed to carry out research and to implement regulations to do so. There is no reason that this would exclude adopting a regulation promising to provide volunteers with medical treatment associated with injuries or illnesses that result from participation in testing. Therefore, because AR 70-25 is a substantive rule and was promulgated under 10 U.S.C. §§ 3013 and 4503, statutory grants of authority sufficient to create enforceable rights, it created duties that are enforceable against the Army under the APA.

The parties also dispute whether the Wilson Directive and CS: 385 can create duties that are enforceable under § 706(1) of the APA. The Ninth Circuit has created

> a two-part test for determining when agency pronouncements have the force and effect of law:
>
> "To have the force and effect of law, enforceable against an agency in federal court, the agency pronouncement must (1) prescribe substantive rules--not interpretive rules, general statements of policy or rules of agency organization, procedure or practice--and (2) conform to certain procedural requirements. To satisfy the first requirement the rule must be legislative in nature, affecting individual rights and obligations; to satisfy the second, it must have been promulgated pursuant to a specific statutory grant of authority and in conformance with the procedural requirements imposed by Congress."

27

River Runners for Wilderness v. Martin, 593 F.3d 1064, 1071 (9th Cir. 2010) (quoting United States v. Fifty-Three (53) Eclectus Parrots, 685 F.2d 1131, 1136 (9th Cir. 1982)); see also Rank v. Nimmo, 677 F.2d 692, 698 (9th Cir. 1982) (same).

Defendants argue that these documents do not meet either of the requirements described in River Runners.  First, they contend that there is nothing in these documents that sets forth substantive rules that demonstrate a binding obligation and that they were instead general statements of agency policy and procedure.  Defs.' Opp. and Cross-Mot., Docket No. 495, 14-16.  In response, Plaintiffs point to the language in the memoranda that they say "is indicative of a binding commitment (setting forth what the agency 'will' or 'shall' do)."  Pls.' Reply and Opp., Docket No. 502, 2-3.  Both parties rely on Norton v. Southern Utah Wilderness Alliance, 542 U.S. 55 (2004).  Plaintiffs point out that, in Norton, the Supreme Court suggested that even an agency's "plan," which is less formal than regulations, may "itself create[] a commitment binding on the agency," at least where there is a "clear indication of binding commitment in the terms of the plan."  Id. at 69-70.  Defendants respond that, in Norton, the Court found that the statement in the plan that the agency "'will' take this, that, or the other action" was insufficient to create a binding commitment, absent other supporting evidence.

As Plaintiffs point out, there is clear language in both memoranda that demonstrates that their dictates were intended to be mandatory.  In the Wilson Directive, the Secretary of Defense stated that the participation of human volunteers in testing "shall be subject" to the conditions that he set forth in the

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

memorandum, and authorized the Secretaries of the Army, Navy and Air Force to conduct experiments using such subject only "within the limits" that he had prescribed.  Patterson Decl., Ex. 4, Docket No. 491-4, C-001-3.  He also informed the Secretaries of the Army, Navy and Air Force that they would be required to "insur[e] compliance" with these dictates within their agencies. Id. at C-003.  CS: 385 similarly stated that these requirements "must be observed" and described obtaining of informed consent as a "duty and responsibility."  Patterson Decl., Ex. 5, Docket No. 491-5, VVA 024538.  Unlike in River Runners, the dictates of these policies and the conditions for the use of human subjects contained therein were not waivable and could not be modified on a case-by-case basis.  Cf. River Runners, 593 F.3d at 1071-72. Further, the policies did not simply govern internal procedures. Instead, they proscribed obligations on the part of Defendants toward individuals whom they used to test chemical and biological agents.  As such, they manifestly "affect[] individual rights." Chrysler, 441 U.S. at 302.

        Second, Defendants argue that these memoranda were not promulgated pursuant to any specific grant of authority from Congress.  They state that "at least one court has expressly held that the Wilson Memorandum lacks the force of law because '[t]here simply is no nexus between the [Wilson Memorandum] and a corresponding delegation of legislative authority by the United States Congress."  Defs.' Reply, Docket No. 513-1, 4 (quoting In re Cincinnati Radiation Litig., 874 F. Supp. 796, 827 (S.D. Ohio 1995)) (brackets in original).  In Cincinnati, the plaintiffs cited two bases for the authority of the Wilson Directive: the

inherent authority of the President; and 5 U.S.C. § 301.  874 F. Supp. at 826-27.  The court, citing Chrysler, 441 U.S. at 304, rejected the proffered arguments and found no nexus with a grant of authority from Congress.  Cincinnati, 874 F. Supp. at 826-27. At the hearing on this motion, Defendants argued that, because Plaintiffs had characterized CS: 385 as "a continuation" of the Wilson Directive, it should fail on the same basis.  Docket No. 523, 34:25-35:4.

Plaintiffs have not cited any statutory grant of power from Congress to the Secretary of Defense under which he promulgated the Wilson Directive and none is apparent from the face of the document itself.  Accordingly, they have not met their burden to show that the Wilson Directive has the procedural requisites to have the force and effect of law.

In contrast, CS: 385 clearly identifies its statutory authorization on its face.  Like the 1962 and 1974 versions of AR 70-25, CS: 385 contains an opinion from the Judge Advocate General pointing to 5 U.S.C. §§ 235a and 181-4, the predecessors to 10 U.S.C. §§ 3013(g) and 4503, as granting the Secretary of the Army the authority to conduct research and to make such assignments to Army and civilian personnel as he deems proper.  Patterson Decl., Ex. 5, Docket No. 491-5, VVA 024540.  Accordingly, Plaintiffs have shown that the requirements in River Runners are satisfied as to CS: 385 and therefore it, as well as AR 70-25, can be enforced through the APA.

2. Content and nature of the duty to notify

Defendants contend that, even if they were binding, the Wilson Directive, CS: 385 and all versions of AR 70-25 do not

30

United States District Court
For the Northern District of California

1  compel them to issue the particular form of "notice" that

2  Plaintiffs seek.  They point out that the memoranda and

3  regulations do not mandate disclosure of the particular pieces of

4  information that Plaintiffs identify.  Thus, they argue that no

5  such legal obligation is set forth clearly enough to be legally

6  binding upon them.  They also contend that any ongoing duty to

7  warn created by the most recent iterations of AR 70-25 is not owed

8  to class members who participated in experiments before these

9  versions were issued.

10      Each document, the Wilson Directive, CS: 385 and all versions

11  of AR 70-25, contains similar language providing that informed

12  consent must be obtained from test subjects and that such consent

13  includes being told the "nature, duration, and purpose" of the

14  testing, "the method and means by which it is to be conducted,"

15  "all inconveniences and hazards reasonably to be expected," and

16  the effects upon health or person which may possibly come from

17  participation.  Although Defendants suggest that this does not

18  appear in the most recent versions of AR 70-25, it does appear in

19  Appendix E thereof.  See Gardner Reply Decl., Ex. 87, Docket No.

20  513-13, 15; see also id. at 20 (setting forth definition of

21  informed consent, which "includes, when appropriate, those

22  elements listed in appendix E of this regulation").  Defendants

23  are correct that the wording of the regulations does not support

24  the exact definition of "notice" that Plaintiffs have put forth

25  here.  However, this does not mean that the regulations do not

26  support the duty to provide some notice, specifically that listed

27  in the first sentence of this paragraph.

28

United States District Court
For the Northern District of California

The parties dispute whether Defendants have a "continuing duty to provide updated information as it is acquired." Defendants argue that the regulations, except the most recent versions of AR 70-25, address only the notice that researchers were required to provide to subjects in order to provide informed consent before participating in a test and do not create any ongoing obligation to provide notice to test subjects after testing was completed.  As Defendants contend, the manner in which these documents are written does support that they are directed at the provision of informed consent prior to participation in the experiments.  See First Order on Mot. to Dismiss, Docket No. 59 ("The 1962 version of AR 70-25 mandated the disclosure of information so that volunteers could make informed decisions.").  Further, Plaintiffs do not point to anything in the regulations issued prior to 1988 that compels a contrary conclusion.

The most recent versions of AR 70-25 from 1988 through 1990 do contain a duty to warn that is manifestly and unambiguously forward-looking in nature.  In discussing the 1990 version of AR 70-25 in the order on Plaintiffs' motion for class certification, the Court observed that, "by its terms, the section in the 1990 regulation regarding the duty to warn contemplates an ongoing duty to volunteers who have already completed their participation in research."  Class Cert. Order, Docket No. 485, 40; see also Gardner Reply Decl., Ex. 87, Docket No. 513 13, 5 (1988 version of AR 70-25, with the provision regarding the "duty to warn," which exists "even after the individual volunteer has completed his or her participation in the research").

32

United States District Court
For the Northern District of California

It is less clear whether this ongoing duty is owed to individuals who participated in experiments before 1988 or whether it is limited to only those who might have done so after AR 70-25 was revised in 1988.  Although the provision uses the past tense and addresses the creation of a system that will allow the "identification of volunteers who have participated in research" so that they can be notified of newly acquired information, it does not make clear whether it contemplates that the system would include the volunteers who participated before it was created or if it would include only those who volunteered for research after it was created, to allow them to be provided with additional information in the future, after they had completed their participation.  Gardner Decl., Ex. 49, Docket No. 496-57, 5.  As the Court previously noted, there is nothing in these documents that "limits these forward-looking provisions to those people who became test volunteers after the regulation was created."  Class Cert. Order, Docket No. 485, 39-40.  However, there is also nothing that clearly requires that these provisions apply to those who became test volunteers before they were created.  Although, as the Court also previously observed, "the definition for human subject or experimental subject" contained in the 1988, 1989 and 1990 versions included, with limited exceptions, "a living individual about whom an investigator conducting research obtains data through interaction with the individual, including both physical procedures and manipulations of the subject or the subject's environment," and did not explicitly "exclude individuals who were subjected to testing prior to the date of the

33

regulations," id. at 40, this definition also did not clearly include these individuals.

Defendants argue that, in the face of ambiguous regulations, the Court must defer to their reasonable interpretation of their own regulations. The Rule 30(b)(6) witness for the Department of Defense and the Army testified that "this change in AR 70-25 has an effective date of 1990, and it was not meant to retroactively go back for all Army research conducted prior to that date primarily because the system to effect duty to warn would have to be done at the time of research being conducted." Gardner Decl., Ex. 2, Docket No. 496-4, 151:6-11.[5] He also testified that, in order "[t]o be able to effect a duty to warn at the time a research program is established," the MACOM commander is required "to establish a system to do that, to develop the roster and the location of those individuals." Id. at 139:19-140:1. He further testified that this "has to be part of the informed consent process at the beginning of any research study" and "I do not see how you can retrofit this requirement in completed studies." Id. at 143:1-14. He opined, "If there is no such system in place, I don't see how it's possible for anyone to effect a duty to warn for events that happened when such a system was not established. In other words, prior to 1990." Id. at 140: 8-12.

Generally, "agencies' interpretations of their own regulations are entitled to deference, even when their interpretation of statutes is not." Price v. Stevedoring Servs.

---

[5] As previously noted, neither Plaintiffs nor Defendants were aware of the 1988 and 1989 versions of AR 70-25 until Defendants filed the final brief on the instant cross-motions.

United States District Court
For the Northern District of California

of Am., 697 F.3d 820, 828 (9th Cir. 2012); see also Christopher v. SmithKline Beecham Corp., 132 S. Ct. 2156, 2166 (2012) (noting that, under Auer v. Robbins, 519 U.S. 452 (1997), deference is "ordinarily" given to "an agency's interpretation of its own ambiguous regulation"). However, "this general rule does not apply in all cases." Christopher, 132 S. Ct. at 2166. "Deference is undoubtedly inappropriate, for example, when the agency's interpretation is 'plainly erroneous or inconsistent with the regulation,'" or "when there is reason to suspect that the agency's interpretation 'does not reflect the agency's fair and considered judgment on the matter in question.'" Id. (citations omitted). "This might occur when the agency's interpretation conflicts with a prior interpretation, . . . or when it appears that the interpretation is nothing more than a convenient litigating position, . . . or a post hoc rationalization advanced by an agency seeking to defend past agency action against attack." Id. (internal quotation marks, citations and formatting omitted).

Where a court declines to give an interpretation Auer deference, it accords the agency's "interpretation a measure of deference proportional to the 'thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade.'" Christopher, 132 S. Ct. at 2169 (quoting United States v. Mead Corp., 533 U.S. 218, 228 (2001)). This amount of consideration will "vary with circumstances" and may be "near indifference," such as has been given in some cases when considering an "interpretation advanced for the first time in a

litigation brief." Mead, 533 U.S. at 228 (citing Bowen, 488 U.S. at 212-13).

Plaintiffs argue that the Court should not credit Defendants' explanation and testimony because it is a "post-hoc rationalization" and a "litigation argument." Pls.' Reply and Opp. to Defs.' Cross-Mot., Docket No. 502, 16. Defendants respond that the reason they have advanced this explanation for the first time here is that no one has attempted previously to interpret the regulation in the way that Plaintiffs do. Defendants also argue that the creation of the separate Medical Research Volunteer Registry and Research and Experimental Case Files systems supports their interpretation.

Defendants' arguments are not persuasive. As to their first point, that they have not previously interpreted the regulation does not mean that whatever interpretation they put forward now must be adopted. Instead, this simply means that there is no prior interpretation against which their current understanding can be compared to determine whether they have maintained a consistent position or not. Further, there is substantial reason to suspect that Defendants' current interpretation of AR 70-25 does not reflect the Army's fair and considered judgment on the matter. According to their own briefs and admissions, they have developed this interpretation only in the context of this litigation. See Bowen v. Georgetown Univ. Hosp., 488 U.S. 204, 213 (1988) ("Deference to what appears to be nothing more than an agency's convenient litigating position would be entirely inappropriate."); see also Fed. Labor Relations Auth. v. United States Dep't of Treasury, 884 F.2d 1446, 1455 (D.C. Cir. 1989) (explaining reasons

**United States District Court**
For the Northern District of California

for reluctance to defer to agency counsel's litigating positions, including that "a position established only in litigation may have been developed hastily, or under special pressure, or without an adequate opportunity for presentation of conflicting views"). They did so in a context that suggests that they were under special pressure to take this position to further the defense of this action.  Further, the record also suggests that Defendants' position was developed quickly and without a careful consideration of AR 70-25 (1988) and the context in which it was issued and developed.  Notably, the agency representative upon whose interpretation Defendants rely was mistaken about the date on which the operative parts of the regulation were amended, suggesting that he did not have a clear understanding of the context in which these changes were made.

Further, the explanation put forward by the DOD and Army's Rule 30(b)(6) witness is simply not accurate.  He reasons that the commander must develop the database containing the test subjects information at the beginning of the research study in order to have the necessary information to carry out the duty to notify in the future, if new information is uncovered later about the possible effects of a test.  However, although it may be easier to make such a database at the outset, it is also possible to create one after the fact, using whatever information is available, as the DOD in fact attempted to do when it created the database for the DVA's notice letters.

Finally, Defendants' argument regarding the file systems is flawed.  Their explanation of the development of the Medical Research Volunteer Registry supports that their proffered view is

a post-hoc rationalization of the development of AR 70-25 and its meaning. Defendants contend that "the Army intentionally created the Medical Research Volunteer Registry required by AR 70-25 (1990) to contain information about volunteers participating only in current or future research, not tests completed decades ago." Defs.' Opp. and Cross-Mot., Docket No. 495, 21. They also argue that, in contrast, "in a separate notice published the same day, the Army described" the Research and Experimental Case Files database as including the past volunteers; Defendants suggest that this separate database was not created pursuant to AR 70-25. Id. at 20-21; Defs.' Reply, Docket No. 513-1, 8-9. However, the Medical Research Volunteer Registry predated even the 1988 revision to AR 70-25 and thus was not created solely to fulfill the requirement of that regulation. AR 70-25 also was not cited as among the authorities for that Registry until it was replaced in 2000 by the Medical Scientific Research Data Files system. The description for the new database created in 2000 removed the language that referred to "current and future research" that had appeared in the description for the Medical Research Volunteer Registry. Compare 58 F.R. 10,002, with 65 F.R. 75,250. Further, some stated purposes of the new Medical Scientific Research Data Files system created in 2000 included "[t]o answer inquiries and provide data on health issues of individuals who participated in research conducted or sponsored by" the Army and to "provide individual participants with newly acquired information that may impact their health." This language does not limit those included in the Medical Scientific Research Data Files to those who would be test subjects in the future; instead, the use of the past tense

United States District Court
For the Northern District of California

suggests that it could encompass individuals who participated in research in the past.  In addition, nothing about AR 70-25 mandates that only one record system be created.  A stated purpose of the Research and Experimental Case Files database was "to follow up on individuals who voluntarily participated in Army chemical/biological agent research projects for the purpose of assessing risks/hazards to them," which is consistent with an ongoing duty to notify them of such risks and hazards.

Accordingly, under the circumstances described above, the Court finds that deference to Defendants' position on this issue is not warranted.

Having considered the plain language of AR 70-25, the Court concludes that Plaintiffs' argument--that the duty to warn is properly interpreted as applying on an on-going basis, not just as part of the pre-experiment consent process, and is owed to service members who became test subjects before 1988--is more persuasive. This is consistent with the text itself, including the statement that this duty is owed to individuals who have "participated" in research, not just to those who will participate in such research. This is also supported by the addition to the 1990 version of AR 70-25, which made clear that the regulation applied to research involving "deliberate exposure of human subjects to nuclear weapons effect, to chemical warfare agents, or to biological warfare agents."  The DOD, including the Army, represents that it does not "still conduct human experimentation with chemical and biological warfare agents" and that its research programs "involving human subjects do not involve the exposure of these subjects to chemical or biological warfare agents" any longer.

1   Gardner Reply Decl., Ex. 86, Docket No. 513-12, 2; see also Defs.'
2   Opp. and Cross-Mot., Docket No. 495, 2 (representing that the
3   "Army suspended testing of chemical compounds on human volunteers
4   on July 28, 1976" and that the program involving testing of
5   biological agents on humans ended in 1973).  Because the Army did
6   not--and does not--engage in such ongoing testing, there would
7   have been no reason to add this language to AR 70-25 in 1990 if
8   the regulation did not encompass those who had already become such
9   test subjects.

10      Accordingly, the Court concludes that Defendants' duty to
11  warn test subjects of possible health effects is not limited to
12  the time that these individuals provide consent to participate in
13  the experiments.  Instead, Defendants have an ongoing duty to warn
14  about newly acquired information that may affect the well-being of
15  test subjects after they completed their participation in
16  research.  This ongoing duty is owed to individuals who became
17  test subjects prior to the time that the 1988 revision was issued.

18          3. Sufficiency of action versus failure to act

19      Defendants contend, because "it is undisputed that DoD has
20  engaged in substantial outreach efforts to test participants over
21  the years," both alone and in collaboration with the DVA, it is
22  "clear that Plaintiffs' true complaint is with the sufficiency of
23  action DoD has already taken," which is not cognizable under
24  § 706(1) of the APA.  Defs.' Opp. and Cross-Mot., Docket No. 495,
25  12; Defs.' Reply, Docket No. 513-1, 2.

26      Plaintiffs respond that the Court should not "reverse its
27  ruling that Plaintiffs have stated a cognizable notice claim under
28  APA section 706(1)."  Id. at 16 (citing Order on First Mot. to

United States District Court
For the Northern District of California

Dismiss, Docket No. 59, 14-16).  They also contend that there is no dispute that the outreach actions were not taken "pursuant to the applicable regulations," citing testimony by Defendants' witnesses that the outreach efforts were not conducted in order to comply with AR 70-25.  Pls.' Reply and Opp. to Defs.' Mot., Docket No. 502, 15 n.13.  They further argue that Defendants have made no showing that DVA's efforts can be substituted for those of the Army or DOD, which have their own duty to provide notice. Finally, Plaintiffs contend that they are challenging Defendants' failure to act and not the sufficiency of their outreach efforts.

Although the Court found when ruling on a motion to dismiss that Plaintiffs stated a cognizable claim, Defendants have now made a summary judgment motion on this issue and Plaintiffs must raise a material dispute of fact in support of their claim, not merely state a cognizable claim.  Further, in the order cited by Plaintiffs, the Court did not address the challenge raised by Defendants here.  Plaintiffs' argument that Defendants themselves did not identify AR 70-25 as the legal impetus for past outreach efforts is unavailing.  Under this logic, even if Defendants had taken all of the outreach steps that Plaintiffs maintain that they should have, they could nonetheless be found to have failed to act and be compelled to make redundant efforts.

Plaintiffs are correct that the notice letters were sent by the DVA to veterans for whom addresses could be located, not by the DOD or the Army.  As the Court noted in resolving the motion for class certification, the DOD and the Army acknowledged that the letters were from the DVA and that they could advise the DVA on the content but could not require the DVA to make particular

United States District Court
For the Northern District of California

changes to them.  Class Cert. Order, Docket No. 485, 23, 51.  The
Court concluded that, as a result, the class representatives'
receipt of these letters did not undermine their standing to
challenge the DOD's and the Army's failure to notify.  Id. at 23.
The Court found that this did not make certification under Rule
23(b)(2) inappropriate.  Id. at 51.  However, the Court has not
ruled on the current issue, whether Plaintiffs' challenge is to
the sufficiency of agency action rather than to a lack of agency
action.

The APA limits judicial review to "[a]gency action made
reviewable by statute and final agency action for which there is
no other adequate remedy in a court."  5 U.S.C. § 704.  For an
action to be "final" under the APA, it "must mark the consummation
of an agency's decision-making process" and "must be one by which
rights or obligations have been determined, or from which legal
conclusions will flow."  Bennett v. Spear, 520 U.S. 154, 177
(1997) (internal quotation marks and citations omitted).  Review
of an agency's failure to act may be considered an exception to
the final agency action requirement.  See 5 U.S.C. § 706(1)
(allowing a reviewing court to "compel agency action unlawfully
withheld or unreasonably delayed").  A claim under § 706(1) can be
maintained "only where there has been a genuine failure to act."
Ecology Ctr., Inc. v. United States Forest Serv., 192 F.3d 922,
926 (9th Cir. 1999).  The Ninth Circuit "has refused to allow
plaintiffs to evade the finality requirement with complaints about
the sufficiency of an agency action 'dressed up as an agency's
failure to act.'"  Id. (quoting Nevada v. Watkins, 939 F.2d 710,
714 n.11 (9th Cir. 1991)).

Here, Plaintiffs challenge the decision of the DOD and Army to have the DVA send the notice letters to former servicemen with information about their testing, in addition to arguing that the notice letters themselves were insufficient for a variety of reasons.  It is undisputed that the DOD and Army participated in the preparation of the DVA's letters and accompanying information, although they did not have final say over the content of the letters.  Thus, the challenge here is to <u>how</u> Defendants carried out their duty, not whether they did so at all.  Accordingly, to the extent that Plaintiffs seek to require the DOD and Army to provide notice to each class member which discloses on an individual basis the substances to which he or she was exposed, the doses to which he or she was exposed, the route of exposure and the known effects of the testing, this claim is not brought properly under § 706(1).

However, Plaintiffs also challenge the refusal of the Army to carry out its ongoing duty to warn, that is, after the original notice, and in the future, to provide test subjects with information that is learned subsequently that may affect their well-being.  There is no material dispute of fact that the Army is not doing this on an ongoing basis.  Unlike the other aspects of their claim, here Plaintiffs do not challenge the sufficiency of agency action and properly attack the Army's failure to act.  Defendants have not provided evidence that they have sent any updated information to test subjects since the DVA sent the notice letters and do not acknowledge any intent or duty to do so.

United States District Court
For the Northern District of California

4. Conclusion

For the reasons set forth above, the Court grants in part both Plaintiffs' motion for summary judgment and Defendants' cross-motion in part and denies them in part.  Because the Court dismissed the claim based on the Wilson Directive and found no basis for enforcing CS: 385 and AR 90-75 against the DOD, the Court grants judgment in favor of the DOD on this claim in its entirety.  The Court also grants summary judgment in favor of the Army to the extent that Plaintiffs seek to challenge its original notice efforts.  However, the Court summarily adjudicates in favor of Plaintiffs that the Army has an ongoing duty to warn and orders the Army, through the DVA or otherwise, to provide test subjects with newly acquired information that may affect their well-being that it has learned since its original notification, now and in the future as it becomes available.

B. Claim for medical care

1. Monetary damages

Defendants argue that they are entitled to summary judgment on Plaintiffs' claim for medical care because it is in fact a claim for money damages, not for equitable relief, and thus the APA's waiver of sovereign immunity is inapplicable.  Defendants acknowledge that the Court considered this argument previously and rejected it, but argue that the prior decision should be reconsidered.  They rely on two out-of-circuit cases which they contend held that "claims similar to the medical care claim against DOD are essentially claims for money damages and therefore not cognizable under the APA."  See Defs.' Opp. and Cross-Mot. at 28-29 (citing Schism v. United States, 316 F.3d 1259, 1273 (Fed.

44

Cir. 2002); <u>Jaffee v. United States</u>, 592 F.2d 712, 715 (3d Cir. 1979)).  Defendants raised the same argument in the briefing related to their second motion to dismiss and Plaintiffs' motion for class certification and cited the same cases therein.

As noted above, in <u>Schism</u>, the Federal Circuit held that compensation of members of the military, including claims for benefits that were compensation for services rendered, was governed by statute and not contract.  316 F.3d at 1273.  There, the plaintiffs were seeking comprehensive free lifetime health care coverage premised on an implied-in-fact contract based on oral promises for such coverage made at the time that they were recruited.  The Federal Circuit stated that "full free lifetime medical care is merely a form of pension, a benefit received as deferred compensation upon retirement in lieu of additional cash," and thus there was "no meaningful difference between the retirement benefits that the Supreme Court has identified as beyond the reach of contracts and the full free medical care at issue" in that case.  <u>Id.</u> at 1273.  On that basis, the court concluded that there were no valid contracts.  <u>Id.</u> at 1274.  The present case, however, is not about a benefit as a form of deferred compensation for past military service.  Instead, it is about whether the government has a duty to pay for medical care to address ongoing suffering caused by military testing.

Defendants also renew their argument that this case is "strikingly similar" to the claim brought in <u>Jaffee</u>.  In that case, the plaintiff alleged that, while he was serving in the Army in 1953, he was ordered to stand in a field near the site of an explosion of a nuclear device, without any protection against the

radiation, and without his knowledge of or consent to the risks. Jaffee, 592 F.2d at 714.  On behalf of himself and a putative class of all soldiers who were ordered to be present at the explosion, he sought an order requiring the United States to warn class members of the medical risks that they faced and to provide or subsidize medical care for them.  Id.  The Third Circuit found that "the request for prompt medical examinations and all medical care and necessary treatment, in fact, is a claim for money damages."  Id. at 715.  It noted that the plaintiff "requests a traditional form of damages in tort compensation for medical expenses to be incurred in the future."  Id.  It stated that "his complaint seeks an injunction ordering either the provision of medical services by the Government or payment for the medical services," and that thus "payment of money would fully satisfy Jaffee's 'equitable' claim for medical care."  Id.  The court also found that the payment of money could not satisfy the claim regarding warning of medical risks.  Id.  In another case, United States v. Price, 688 F.2d 204 (3d Cir. 1982), the Third Circuit found appropriate the funding of a diagnostic study to assess the public health threat posed by contamination and abatement because, "though it would require monetary payments," it "would be preventative rather than compensatory" and was intended as "the first step in the remedial process of abating an existing but growing toxic hazard which, if left unchecked, will result in even graver future injury."  Id. at 212.  The Third Circuit subsequently explained the principle derived from Jaffee and Price to be "that an important factor in identifying a proceeding as one to enforce a money judgment is whether the remedy would compensate

for past wrongful acts resulting in injuries already suffered, or protect against potential future harm." Penn Terra, Ltd. v. Dep't of Environmental Resources, 733 F.2d 267, 276-277 (3d Cir. 1984). Here, Plaintiffs have not conceded, as the plaintiff in Jaffe did, that their claim for medical care could be fully remedied by money damages, and Defendants have not shown that it could be. Further, they seek to end purported ongoing rights violations and harm, not compensation for harms that took place completely in the past. Future medical treatment for ills suffered as a result of participation in human experimentation can be seen as preventing future potential harm and suffering.

Accordingly, the Court denies Defendants' motion for summary judgment on this basis.

2. DVA medical care as an adequate alternate remedy

Under the APA, "only 'agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court' are subject to judicial review." Tucson Airport Auth. v. General Dynamics Corp., 136 F.3d 641, 645 (9th Cir. 1998) (quoting 5 U.S.C. § 704).

The DVA, through its Veterans Health Administration, is charged with providing "a complete medical and hospital service for the medical care and treatment of veterans." 38 U.S.C. § 7301(b). Congress has mandated that it provide hospital care and medical services "to any veteran for a service-connected disability." 38 U.S.C. § 1710.[6] Thus, a "veteran who has a service-connected disability will receive VA care provided for in

---

[6] "Disability" is defined as "a disease, injury, or other physical or mental defect." 38 U.S.C. § 1701(1).

47

the 'medical benefits package' . . . for that service-connected disability," even if that veteran is "not enrolled in the VA healthcare system."  38 C.F.R. § 17.37(b).  When receiving care for service-connected disabilities, veterans are not subject to any copayment or income eligibility requirements.  38 C.F.R. §§ 17.108(d)(1),(e)(1), 17.111(f)(1),(3).

If a veteran disagrees with a decision made by the DVA about benefits or service-connection, the veteran may appeal the decision to the Board of Veterans' Appeals.  38 U.S.C. § 7105. Thereafter, decisions of the Board of Veterans' Appeals can be appealed to the Court of Appeals for Veterans Claims.  38 U.S.C. § 7252.

Defendants argue that there is no waiver of sovereign immunity under the APA for the health care claim against the DOD and the Army because there is an adequate remedy for Plaintiffs through the DVA's health care system and the statutory scheme for review of denial of claims made therein.  Defs.' Opp. and Cross-Mot., Docket No. 495, 31-32.  They also assert that Plaintiffs will not be able to establish that they lack an adequate remedy for their health care claims elsewhere.  Id. at 32.

Plaintiffs respond that DVA medical care does not adequately redress their claim because "the DVA system is powerless to grant the equitable relief Plaintiffs seek."  Pls.' Reply and Opp., Docket No. 502, 25.  In the instant case, Plaintiffs seek a declaration that the DOD and the Army have a duty to provide them with medical care and an injunction requiring these agencies to provide examinations, medical care and treatment and to establish policies and procedures governing these.

United States District Court
For the Northern District of California

Defendants reply that Plaintiffs' "alleged injuries can be redressed through" another available and adequate remedy, even if that remedy is not the precise one that they demand.  Defs.' Reply, Docket No. 513-1, 13.

Plaintiffs have not provided evidence of a material dispute of fact that they do not have an adequate remedy to redress their injuries through the DVA health care system.  Although the Board of Veterans' Appeals and Court of Appeals for Veterans Claims cannot direct the DOD and the Army to provide medical care to Plaintiffs, they can provide a remedy to redress the injuries complained of here, by requiring that the DVA provide medical care to Plaintiffs for their service-connected injuries.  See Coker v. Sullivan, 902 F.2d 84, 90 (D.C. Cir. 1990) (noting that federal courts have "interpreted the APA to bar suits where a plaintiff's injury may be remedied in another action, even if that remedy would have no effect upon the challenged agency action") (internal quotation marks omitted).

The cases cited by Plaintiffs, Bowen v. Massachusetts, 487 U.S. 879 (1988), and Tucson Airport Auth. v. General Dynamics Corp., 136 F.3d 641 (9th Cir. 1998), do not counsel otherwise.  In those cases, the courts considered whether an adequate remedy for the parties' claims was available in the Court of Federal Claims and concluded that there was not, because the parties sought equitable relief that could not satisfied by a monetary judgment and the Court of Federal Claims could not hear equitable claims.  Here, an alternate remedy, the provision of medical care by a different government agency, can be ordered by the Board of Veterans' Appeals and Court of Appeals for Veterans Claims.

Plaintiffs assert in their response that the Court has previously noted that Plaintiffs' ability to seek health care from the DVA "does not necessarily relieve the DOD and the Army from being required independently to provide medical care, particularly because Plaintiffs may be able to establish that the scope of their duty may be different than that of the DVA." Pls.' Reply, Docket No. 502, 18 (citing Class Cert. Order, Docket No. 485, 25). However, Plaintiffs have not offered any evidence to support that the duty of DOD and the Army is in fact any broader than that of the DVA. Plaintiffs contend that, even if class members are eligible for medical care from the DVA, "they are not receiving this medical care from the DVA." Pls.' Post-Hearing Resp., Docket No. 519, 1. This, however, does not undermine the fact that class members can challenge the DVA's failure to provide medical care through the statutorily-created appeals scheme. In addition, although Plaintiffs suggest that the quality of medical care provided by the DVA is inferior to that of the DOD and the Army, they have not shown that the care is inadequate or that they are unable to address any inadequacies through the DVA system. To the extent that Plaintiffs argue that the DVA medical care is a "rationing system," apparently referring to the fact that not all veterans may enroll in the DVA's comprehensive medical care program, no such rationing is imposed on the duty of the DVA to provide no-cost care to veterans for service-connected disabilities.[7] Plaintiffs also speculate, "It is possible that

---

[7] In addition to providing veterans with medical care for service-connected disabilities, the DVA offers eligible veterans a "medical benefits package" of basic and preventive care that

United States District Court
For the Northern District of California

many class members are not even eligible for DVA medical care,"
id. (citing 38 U.S.C. § 5303(a); 38 C.F.R. § 3.12), but provide no
evidence that there are any such class members.

To the extent that Plaintiffs argue that the organizational
Plaintiffs are unable to bring their medical care claims through
the DVA system and thus have no adequate alternative remedy, this
argument is unavailing.  Plaintiffs have not shown that either of
these organizations has its own right to medical care.  Further,
to the extent that the organizational Plaintiffs are asserting the
rights of the members of their organizations, those members can
seek care through the DVA for any disabilities, injuries or
illnesses suffered as a result of participation in the
experimentation program.  The organizational Plaintiffs may not
prevail on claims here that their members cannot prevail upon
directly.

---

includes outpatient and inpatient medical, surgical, and mental
health care, prescription drugs coverage, emergency care,
comprehensive rehabilitative care and other services.  38 C.F.R.
§ 1738(a).  To receive the medical benefits package, a veteran
must generally be enrolled in the DVA health-care system.  38
C.F.R. §§ 17.36(a), 17.37.  Veterans who qualify for enrollment
are placed into one of eight priority groups.  38 C.F.R.
§ 17.36(b).  Assignment to a priority group involves a
consideration of factors including income and a percent rating
that attempts to quantify the decrease in veterans' earning
capacity based on their service-connected disability.  38 C.F.R.
§§ 4.1, 17.36(b).  The Secretary determines, based on the
"relevant internal and external factors, e.g., economic changes,
changes in medical practices, and waiting times to obtain an
appointment for care," which priority groups will actually be
eligible for enrollment.  38 C.F.R. § 17.36(b),(c).  Presently,
the DVA enrolls veterans in all priority categories, except those
in subcategories (v) and (vi) of priority category eight, which
consists of "Noncompensable zero percent service-connected
veterans" and "Nonservice-connected veterans" who do not meet
certain income guidelines or moved from a higher priority
category.  38 C.F.R. § 17.26(b)(8), (c)(2).

51

United States District Court
For the Northern District of California

1  Accordingly, the Court concludes that Defendants are entitled
2  to summary adjudication that sovereign immunity has not been
3  waived with regard to this claim because Plaintiffs and the class
4  members can seek medical care through the DVA and challenge any
5  denial of care through the statutory scheme prescribed by
6  Congress.
7  II.  Constitutional claims
8  In their cross-motion, Defendants also seek judgment on
9  Plaintiffs' constitutional claims against the DOD and the Army
10 related to notice and health care.  Plaintiffs have not moved for
11 summary judgment on these claims.
12 Defendants argue that there is no constitutional right for
13 access to government information, so Plaintiffs' constitutional
14 claim for notice fails, and that there is no constitutional right
15 to free health care, so Plaintiffs' claim for health care fails.
16 Defendants further contend that no court has ever granted a
17 request for continuing health care based on a violation of a
18 substantive due process right to bodily integrity.  In a footnote,
19 they also state, "Because Plaintiffs cannot identify any
20 substantive entitlement to Notice or health care under the APA or
21 Constitution, their procedural due process claims regarding the
22 alleged absence of any procedures to challenge the deprivation of
23 Notice and health care should be dismissed."  Defs.' Opp. and
24 Cross-Mot. at 43.
25 Plaintiffs argue that Defendants did not move on their actual
26 Constitutional claims and so the burden of production never
27 shifted to Plaintiffs.  Thus, they contend Defendants should not
28 be granted summary judgment on those claims.

As summarized in the class certification order, Plaintiffs asserted the following constitutional claims against the DOD and the Army in this case:

> (2) under the Fifth Amendment, that these Defendants' failure to provide class members with notice, medical care and a release from secrecy oaths violated their substantive due process liberty rights, including their right to bodily integrity;
>
> (3) under the Fifth Amendment, that these Defendants' failure to provide class members with any procedures whatsoever to challenge this deprivation violated their procedural due process rights;
>
> (4) under the Fifth Amendment, that these Defendants' failure to comply with their own regulations and procedures regarding notice and medical care deprived class members of their due process rights; and
>
> (5) under the First and Fifth Amendment, that the failure to provide a release from secrecy oaths prevented class members from filing claims for benefits with the DVA and thereby violated their right of access to the courts.

Docket No. 485, 10 (numbering in original). Of these claims, the Court certified only one claim, that brought under the Fifth Amendment for Defendants' failure to comply with their own regulations, to proceed on a class-wide basis. The Court denied certification as to the other constitutional claims.

In their motion, Defendants clearly address Plaintiffs' second claim for deprivation of substantive due process rights, including the right to bodily integrity, the third claim for violation of their procedural due process rights by depriving them of their protected interest without providing them with procedures by which to challenge the deprivation, and the fifth claim regarding access to the courts. Defs.' Opp. and Cross-Mot., Docket No. 495, 41-43 & n.42, 49-50. Plaintiffs do not respond substantively to Defendants' challenges to these claims, asserting

United States District Court
For the Northern District of California

53

United States District Court
For the Northern District of California

1  incorrectly that Defendants ignore these claims.  See, e.g., Pls.'
2  Reply and Opp., Docket No. 502, 21, 23 n.22.  Accordingly, the
3  Court grants Defendants' motion for summary judgment on the
4  second, third and fifth claims against the Army and DOD.

5       Plaintiffs also dispute that Defendants properly moved on the
6  fourth claim.  Defendants made clear in the notice of their motion
7  that they moved "on all claims raised and remaining in Plaintiffs'
8  Fourth Amended Complaint."  Defs.' Opp. and Cross-Mot., Docket No.
9  495; see also id. at 1 (arguing that "Plaintiffs' constitutional
10 claims," without any limitation, "are similarly baseless and
11 should be dismissed").  Defendants also argued that "Plaintiffs
12 cannot identify any substantive entitlement to Notice or health
13 care under the APA or the Constitution" and thus "their procedural
14 due process claim regarding the alleged absence of any procedures
15 to challenge the deprivation of Notice and health care should be
16 dismissed."  Defs.' Opp. and Cross-Mot., Docket No. 495, 43 n.42.
17 In their reply, they further explained that not "every violation
18 of a regulation amount[s] to a violation of an individual's due
19 process rights," that Plaintiffs cannot show the agency
20 regulations at issue here have themselves created a constitutional
21 right to those procedures and thus that there is no constitutional
22 claim for violation of those regulations.  Defs.' Reply, Docket
23 No. 513-1, 15.

24      In response, Plaintiffs rely on cases in which courts have
25 held that agencies are bound to follow their own regulations and
26 that failure to do so may violate the due process clause.
27 However, Defendants are correct that such a failure does not
28 always amount to a constitutional violation.  See United States v.

Caceres, 440 U.S. 741, 752-753 (1979) (finding no constitutional violation where the IRS "admittedly" failed to follow its own regulations, on the basis that it was not "a case in which the Due Process Clause is implicated because an individual has reasonably relied on agency regulations promulgated for his guidance or benefit and has suffered substantially because of their violation by the agency"). Plaintiffs have not shown that here.

Accordingly, Defendants' motion for summary judgment on Plaintiffs' constitutional claims is granted.

III. Secrecy oath claims

Defendants move for summary judgment on Plaintiffs' individual claims against the DOD, the Army and the CIA based on secrecy oaths.

A. Claims against the CIA

Defendants argue that the CIA is entitled to summary judgment on Plaintiffs' individual secrecy oath claims against that agency for a number of reasons. First, they contend that Plaintiffs can produce no evidence that the CIA ever administered secrecy oaths to any individual Plaintiff or VVA member. Second, they assert that the claims are moot because the CIA provided a sworn declaration in June 2011 attesting that the individual Plaintiffs and identified VVA members did not give secrecy oaths to the CIA and releasing them from any secrecy oath that they believed that they might have with the CIA. Finally, they argue that the CIA cannot release individuals from a secrecy oath administered by the DOD or the Army.

Plaintiffs do not dispute that they cannot provide any evidence that the CIA administered secrecy oaths or that

United States District Court
For the Northern District of California

1   declaratory relief against the CIA that addressed the validity of

2   DOD or Army secrecy oaths would be ineffective.  They also concede

3   that they have received all relief that they desired on this claim

4   in relation to the individuals released by the CIA through the

5   June 2011 declaration.  They state that this extends to their

6   entire claim against the CIA, "[i]n light of the CIA's statement

7   that the secrecy oath release encompasses all VVA members," and

8   that they "submit that claim to the Court."  Pls.' Reply and Opp.,

9   Docket No. 502, 36.

10      Defendants reply that Plaintiffs mischaracterized their

11   response.  They state that the 2011 declaration encompassed only

12   the VVA members who were identified by name therein and did not

13   encompass an additional twenty-seven VVA members whom Plaintiffs

14   identified as having been test participants for the first time six

15   months after the close of discovery.

16      Irrespective of whether those additional twenty-seven VVA

17   members were released from any possible secrecy oaths through the

18   2011 declaration, the Court grants Defendants' motion for summary

19   judgment on the secrecy oath claim against the CIA.  Plaintiffs

20   have not produced any evidence that any secrecy oaths were

21   administered by the CIA, or are fairly traceable to the CIA,

22   involving any Plaintiff or VVA member, including those twenty-

23   seven individuals who were identified later.

24      B. Claims against the DOD and the Army

25      Defendants also move for summary judgment on the secrecy oath

26   claims against the DOD and Army.  Defendants argue that Plaintiffs

27   have not presented any evidence that they or the VVA members

28   currently feel restrained by any such oath and that Defendants

United States District Court
For the Northern District of California

1  have issued two memoranda releasing them already.  They contend

2  that, as a result, Plaintiffs lack standing to pursue this claim.

3      Plaintiffs respond that the Court already has rejected this

4  argument when it refused to hold that certain Plaintiffs and VVA

5  members lacked standing at the class certification stage.

6  However, as Defendants point out, Plaintiffs presently have the

7  burden to establish that there is at least a genuine issue of

8  material fact as to standing of each Plaintiff.  See Dep't of

9  Commerce v. U.S. House of Representatives, 525 U.S. 316, 329

10  (1999) ("To prevail on a Federal Rule of Civil Procedure 56 motion

11  for summary judgment . . ., mere allegations of injury are

12  insufficient.  Rather, a plaintiff must establish that there

13  exists no genuine issue of material fact as to justiciability or

14  the merits.").

15      Plaintiffs assert that "it is clear that" they "'could

16  benefit from equitable relief that would invalidate the secrecy

17  oaths altogether."  Pls.' Reply and Opp., Docket No. 36.  However,

18  in the instant motion, they have not cited any evidence to support

19  that they or the VVA members still suffer ongoing effects of the

20  oaths, such as fear of prosecution.  At the hearing, Plaintiffs

21  cited the evidence regarding Dufrane relied upon by the Court in

22  the class certification order, but do not address the arguments

23  raised by Defendants regarding the other individuals.

24      In the class certification order, the Court noted that

25  Plaintiffs had offered "evidence that Dufrane testified that he

26  continued to feel bound by the secrecy oath to some extent" and

27  that there was no evidence cited that showed that Defendants had

28  communicated an unconditional release to him.  Class Cert. Order,

Dockett No. 485, 28-29.  Defendants again offer testimony from Dufrane's deposition, in which he stated he did not think that he was allowed to talk about his experiences at Edgewood Arsenal "completely" because he had been told not to talk about some aspects of what happened and that he still felt constrained by the secrecy.  <u>See</u> Docket No. 496-64, 92:1-94:16.  He went on to state, however, that there was nothing in his memory that he could identify that he wants to talk about but is unable to.  <u>Id.</u> at 94:17-23.  In addition, Defendants have now offered evidence that Dufrane had seen the 1993 Perry memorandum prior to his deposition.  As quoted above, that memorandum provided a full and unconditional release from any secrecy oath that had been given.  In light of the facts that a full release was communicated to Dufrane, and that there is nothing in particular that he presently feels that he is prevented from speaking about, although he feels generally constrained, he will not receive a benefit from a further declaration "that Plaintiffs are released from any obligations or penalties under their secrecy oaths."  Fourth Am. Compl. ¶ 183.  Finally, Plaintiffs do not offer any response to Defendants' argument that there can be no showing of future threat of prosecution because there have not been any such enforcement actions in the past.

Accordingly, the Court grants Defendants' motion for summary judgment on the secrecy oath claims against the DOD and the Army.

IV.  Claim that DVA is a biased adjudicator of benefits claims

Defendants seek summary judgment on Plaintiffs' claims against the DVA for biased adjudication of their benefits claims. Defendants argue that 38 U.S.C. § 511 deprives this Court of

United States District Court
For the Northern District of California

jurisdiction over this claim because it bars consideration of the relief that Plaintiffs seek.  They also argue that Plaintiffs cannot establish a genuine issue of material fact as to whether DVA was involved in the testing programs at issue here.  Finally, they contend that Plaintiffs cannot make a sufficient showing that the DVA was an inherently biased adjudicator of their benefits claims.

A. Section 511

Defendants have previously argued on two occasions that § 511 deprives this Court of jurisdiction to hear this claim, and on both occasions, the Court has rejected the argument.  See Docket No. 177, 8-11; Docket No. 485, 31-34.  Defendants contend that they are now making a new argument, which the Court has not addressed: that the relief sought by Plaintiffs cannot be granted under § 511.  Plaintiffs respond simply that the Court's prior decisions were correct and do not address Defendants' purportedly new argument.

Section 511 provides,

> The Secretary shall decide all questions of law and fact necessary to a decision by the Secretary under a law that affects the provision of benefits by the Secretary to veterans or the dependents or survivors of veterans. Subject to subsection (b), the decision of the Secretary as to any such question shall be final and conclusive and may not be reviewed by any other official or by any court, whether by an action in the nature of mandamus or otherwise.

38 U.S.C. § 511(a).

In granting Plaintiffs leave to amend assert this claim against the DVA, the Court acknowledged that § 511 "precludes federal district courts from reviewing challenges to individual benefits determinations, even if they are framed as constitutional

59

challenges." Docket No. 177, 8. At that time, the effect of
§ 511 on claims that "purport not to challenge individual benefits
decisions, but rather the manner in which such decisions are
made," had not been addressed by the Ninth Circuit. Id. Thus,
the Court reviewed several decisions from other circuit courts of
appeals that did address this issue. Id. at 9-11 (discussing in
detail Broudy v. Mather, 460 F.3d 106 (D.C. Cir. 2006); Beamon v.
Brown, 125 F.3d 965, 972 (6th Cir. 1997)). Applying the standards
set forth in Broudy and Beamon, the Court held,

> Section 511 does not bar Plaintiffs' claim under the
> Fifth Amendment. Under this theory, they mount a facial
> attack on the DVA as the decision-maker. They do not
> challenge the DVA's procedures or seek review of an
> individual benefits determination. Nor do they attack
> any particular decision made by the Secretary. The crux
> of their claim is that, because the DVA allegedly was
> involved in the testing programs at issue, the agency is
> incapable of making neutral, unbiased benefits
> determinations for veterans who were test participants.
> This bias, according to Plaintiffs, renders the benefits
> determination process constitutionally defective as to
> them and other class members. Whether the DVA is an
> inherently biased adjudicator does not implicate a
> question of law or fact "necessary to a decision by the
> Secretary" related to the provision of veterans'
> benefits. See Thomas v. Principi, 394 F.3d 970, 975
> (D.C. Cir. 2005).

Docket No. 177, 11.

Defendants later moved for leave to file a motion for
reconsideration of this order, asserting that the Ninth Circuit's
recent decision in Veterans for Common Sense v. Shinseki, 678 F.3d
1013 (2012), compelled a different result. The Court rejected
this argument, finding that "Veterans for Common Sense does not
require reconsideration of the Court's prior conclusion." Docket
No. 485, 33. This Court explained,

> In that case, two nonprofit organizations challenged
> delays in the provision of care and adjudication of

claims by the DVA and the lack of adequate procedures during the claims process. The court found that the challenges to delays were barred by § 511, because to adjudicate those claims, the district court would have to examine the circumstances surrounding the DVA's provisions of benefits to individual veterans and adjudication of individual claims. Id. at 1027-30. However, after discussing the decisions reached by other circuits in Broudy, Beamon and several other cases, the court concluded that it did have jurisdiction over the claims seeking review of the DVA's procedures for handling benefits claims at its regional offices. Id. at 1033-35. In so holding, the court stated that, unlike the other claims, this claim "does not require us to review 'decisions' affecting the provision of benefits to any individual claimants" and noted that the plaintiff "does not challenge decisions at all." Id. at 1034.

In Veterans for Common Sense, the Ninth Circuit explained,

A consideration of the constitutionality of the procedures in place, which frame the system by which a veteran presents his claims to the VA, is different than a consideration of the decisions that emanate through the course of the presentation of those claims. In this respect, VCS does not ask us to review the decisions of the VA in the cases of individual veterans, but to consider, in the "generality of cases," the risk of erroneous deprivation inherent in the existing procedures compared to the probable value of the additional procedures requested by VCS. . . . Evaluating under the Due Process Clause the need for subpoena power, the ability to obtain discovery, or any of the other procedures VCS requests is sufficiently independent of any VA decision as to an individual veteran's claim for benefits that § 511 does not bar our jurisdiction.

678 F.3d at 1034. In its prior order, this Court found that "the Ninth Circuit considered some of the same authority and applied a similar standard as this Court did in its earlier order," and thus concluded that it "would have reached the same conclusion if it had had the benefit of the decision in Veterans for Common Sense at that time." Docket No. 485, 34.

Defendants now argue that the Court's assessment of the "manner in which the VA determines benefits eligibility . . . plainly implicates 'decisions that relate to benefits

61

determination.'"  Defs.' Opp. and Cross-Mot. at 52.  However, like the claim for which the Ninth Circuit found jurisdiction in Veterans for Common Sense, evaluating whether the risk of actual bias is too high to be constitutionally tolerable is "sufficiently independent of any VA decision as to an individual veteran's claim for benefits that § 511 does not bar" this Court's jurisdiction. See 678 F.3d at 1034.

To the extent that Defendants now contend that Veterans for Common Sense does not allow the Court to issue the relief that Plaintiffs seek, the Court rejects this argument.  In that case, in addressing the plaintiff's claim that delays in the provision of mental health care violated the APA and the Constitution, the Ninth Circuit noted that

> in order to provide the relief that VCS seeks, the
> district court would have to prescribe the procedures
> for processing mental health claims and supervise the
> enforcement of its order.  To determine whether its
> order has been followed, the district court would have
> to look at individual processing times. . . . [I]t would
> embroil the district court in the day-to-day operation
> of the VA and, of necessity, require the district court
> to monitor individual benefits determinations.

Id. at 1028.

Here, Plaintiffs seek a declaration that the DVA's decisions regarding entitlement to SCDDC and medical care are "null and void" and an "injunction forbidding defendants from continuing to use biased decision makers to decide their eligibility" for benefits.  Fourth Am. Compl. ¶¶ 233-34; see also id. (seeking "a plan to remedy denials of affected claims for SCDDC and/or eligibility for medical care based upon service connection").  To the extent that Plaintiffs request that the Court reverse the past benefits determinations made by the DVA--or at least the denials--

United States District Court
For the Northern District of California

their claims are not "sufficiently independent" of any VA decision on an individual veteran's claim for benefits.  Accordingly, to the extent that Plaintiffs seek an order vacating all past benefits determinations and requiring that they be re-adjudicated, the Court finds that it lacks jurisdiction to do so.

However, Plaintiffs also ask that the Court issue "an order directing the DVA . . . to devise procedures for resolving such claims that comply with the due process clause, which involve, at a minimum, an independent decision maker, all to be submitted to the Court for advance approval."  Id. at ¶ 234.  Monitoring compliance with such a plan as to adjudications of future claims would not require the Court to look at individual benefits determinations, but rather to consider who will adjudicate the claims.  Plaintiffs' request is similar to that permitted by the Ninth Circuit in Veterans for Common Sense because it involves the "consideration of the constitutionality of the procedures in place, which frame the system by which a veteran presents his claims to the VA," and not the "consideration of the decisions that emanate through the course of the presentation of those claims."  678 F.3d at 1034.  Thus, the Court has jurisdiction to consider Plaintiffs' claim for prospective injunctive and declaratory relief.

B. DVA's purported bias

"The crux of Plaintiffs' claim" against the DVA is that, "'because the DVA allegedly was involved in the testing programs at issue, the agency is incapable of making neutral, unbiased benefits determinations for veterans who were test participants,'" which "'renders the benefits determination process

United States District Court
For the Northern District of California

constitutionally defective.'"  Pls.' Reply and Opp., Docket No.
502, 23 (quoting Class Cert. Order, Docket No. 485, 32).

    "There are two ways in which a plaintiff may establish that
he has been denied his constitutional right to a fair hearing
before an impartial tribunal." Stivers v. Pierce, 71 F.3d 732,
741 (9th Cir. 1995). "In some cases, the proceedings and
surrounding circumstances may demonstrate actual bias on the part
of the adjudicator." Id. "In other cases, the adjudicator's
pecuniary or personal interest in the outcome of the proceedings
may create an appearance of partiality that violates due process,
even without any showing of actual bias." Stivers, 71 F.3d at 741
(citations omitted); see also United States v. Oregon, 44 F.3d
758, 772 (9th Cir. 1994) (stating that the plaintiffs "must show
an unacceptable probability of actual bias on the part of those
who have actual decisionmaking power over their claims"); Exxon
Corp. v. Heinze, 32 F.3d 1399, 1403 (9th Cir. 1994) ("the
Constitution is concerned not only with actual bias but also with
'the appearance of justice'"). "In attempting to make out a claim
of unconstitutional bias, a plaintiff must 'overcome a presumption
of honesty and integrity' on the part of decisionmakers."
Stivers, 71 F.3d at 741. "He must show that the adjudicator 'has
prejudged, or reasonably appears to have prejudged, an issue.'"
Id.; see also Caperton v. A. T. Massey Coal Co., 556 U.S. 868,
883-884 (2009) ("In defining these standards the Court has asked
whether, 'under a realistic appraisal of psychological tendencies
and human weakness,' the interest 'poses such a risk of actual
bias or prejudgment that the practice must be forbidden if the

United States District Court
For the Northern District of California

guarantee of due process is to be adequately implemented.'") (citation omitted).

Plaintiffs argue that the DVA as an agency appears to be biased because it was involved in the testing at issue here. Plaintiffs have offered evidence that a CIA memorandum identified the DVA as among the suppliers of chemicals used for tests, which, when conducted on humans, were carried out jointly with the Army and Edgewood Arsenal.  Plaintiffs also offer evidence, which Defendants do not dispute, that the DVA separately carried out human testing using some of the same substances that were used in the testing programs at issue here, including LSD, mescaline, thorazine, atropine and scopolamine.  However, accepting all of Plaintiffs' evidence as true, this is not sufficient to support a conclusion that the probability of bias or prejudgment on the part of all of the DVA adjudicators was "intolerably high," so as to result in a constitutional violation.  Withrow v. Larkin, 421 U.S. 35, 57 (1975).  Plaintiffs have not offered evidence to show that the substances that the DVA provided to Defendants were actually used at all, much less that they were used on humans who were service members.  In addition, the DVA's involvement did not necessarily mean that its adjudicators would have an interest in deciding claims in an inherently biased fashion.  As Defendants point out, Plaintiffs' evidence shows that, after the DVA began receiving claims for benefits related to LSD testing, it proactively sought to learn more about the long-term effects of the drug in order to adjudicate the claims.  See Patterson Reply Decl., Ex. 22, Docket No. 503-9, DVA135 000062.  This suggests that the DVA sought to resolve such claims properly, not that it

65

United States District Court
For the Northern District of California

sought to avoid responsibility for providing care.  Further, Plaintiffs have not demonstrated that there is any connection between the DVA's participation in the testing and the adjudicators at the agency who actually resolve their disability claims.  As Defendants point out, these claims are adjudicated by the Veterans Benefits Administration, an arm of the DVA separate from the Veterans Health Administration, the arm of the agency which conducted research into the same substances as used in the testing programs at issue.  See United States v. Oregon, 44 F.3d at 772 (characterizing plaintiff's proffered evidence of bias by the Oregon Department of Justice as "fairly weak" where, among other things, plaintiff had not shown that any officials involved in the prior actions it contended showed bias would be involved in the challenged adjudication).  The evidence Plaintiffs offer here is too meager to support the existence of an appearance of bias that permeates the entire agency.

This conclusion is consistent with Ninth Circuit precedent, in which the court rejected claims of institutional bias where there was insufficient evidence to support that the adjudicative body itself, as opposed to an affiliated person or agency, was biased.  In United States v. Oregon, the Klamath Tribe challenged the state of Oregon's administrative procedures for determining water rights.  44 F.3d at 771.  The Tribe argued that the Oregon Department of Justice, which provided legal advice to the Oregon Water Resources Department (OWRD), the agency charged with adjudicating their claims, had previously taken litigating positions against the Tribe's water rights.  Id.  The Ninth Circuit rejected the claim, finding that the Tribe had not shown

that the ODOJ would have "any significant role to play in the adjudication or any impact on its outcome" and thus had failed to show "an unacceptable probability of actual bias by the actual decisionmakers." Id. at 772.  Similarly, in a recent case, the court considered a claim by a landowner who asserted that the hearing procedures employed by the Assessment Appeals Board for Orange County, when considering his challenge to the County Assessor's valuation of his property and assessment of property taxes, violated his due process rights.  William Jefferson & Co. v. Bd. of Assessment & Appeals No. 3 for Orange Cnty., 695 F.3d 960, 961-62 (9th Cir. 2012).  He argued that "the Board's procedures created the appearance of unfairness" because the Board was advised by an attorney who worked in the same office as the attorney representing the Assessor. Id. at 963-65.  The court noted that, even if there were evidence that the Board's attorney advisor "was biased in favor of the Assessor, which there is not," such evidence was not necessarily sufficient by itself to "conclude that the adjudicating body--the Board itself--was biased." Id. at 965.  As in these cases, even if there were some evidence of bias by some departments or individuals at the DVA, there is no evidence of bias by the DVA adjudicators of the claims at issue here.

Plaintiffs also argue that the DVA "manifested its inherent bias."  Pls.' Reply and Opp., Docket No. 502, 27.  Plaintiffs contend that the DVA has disseminated misinformation about the testing, which evidences its inherent bias.  They argue that various documents, including the letter and fact sheet that the DVA sent to veterans about the substances and health effects, a

United States District Court
For the Northern District of California

training letter sent to DVA regional offices specifying rules for adjudicating benefits claims and a letter sent to clinicians examining veterans, all included inaccuracies and misrepresentations, including that a particular study "found no significant long term health effects in Edgewood Arsenal test subjects." They also argue that there is evidence that the DVA deviated from its own normal claim adjudication procedures in deciding these claims, and from the operative regulations, by giving the DOD the sole authority to validate whether an individual participated in any chemical or biological testing, instead of making a decision based on the entirety of the evidence in the record. They contend that this evidences bias. They state that, because the DOD did not provide this verification for many people, many claims for service connection were denied.

Defendants respond that Plaintiffs' purported evidence of bias in the DVA's adjudicatory system is irrelevant because the Court allowed Plaintiffs to bring a claim alleging that the DVA was an inherently biased adjudicator, not a claim of actual bias. They also argue that the evidence Plaintiffs submit cannot be reviewed by the Court under § 511.

Plaintiffs reply that § 511 is not an evidentiary exclusionary rule. However, in Veterans for Common Sense, the court did look at the type of inquiry that the district court would have to carry out in resolving the claims, when deciding if the cause of action itself was barred under that section. For example, in resolving the cause of action regarding delayed processing of mental health claims, the court said that "the district court would have no basis for evaluating [the argument

that the average processing time was too long] without inquiring
into the circumstances of at least a representative sample of the
veterans whom VCS represents; then the district court would have
to decide whether the processing time was reasonable or not as to
each individual case." 678 F.3d at 1027. To the extent that
Plaintiffs invite the Court to examine the reasons that individual
service members' claims were denied or the evidence that was
submitted to show that an injury was service-connected in
particular cases, see e.g., Pls.' Reply and Opp., Docket No. 502,
30, such evidence does fall into the category of which the Ninth
Circuit disapproved.

Further, even if the Court could properly consider all of the
evidence submitted by Plaintiffs, they have not made a sufficient
showing that these materials reveal that there is actual bias or a
substantial appearance of bias on the part of the DVA
adjudicators. Plaintiffs argue that the DOD fact sheet that
accompanied the DVA notice letter showed bias because it included
what a DVA representative believed to be an inaccuracy and because
the letter itself purportedly discouraged veterans from seeking
care. However, although the statement in the fact sheet may have
been mistaken, it was the result of a reasonable difference of
scientific opinion and does not manifestly reveal a bias on behalf
of the DVA, which was not its author, or of the DVA's
adjudicators. Further, the DVA's letter did not discourage
veterans from coming to the DVA for care; instead, it directly
encouraged them to do so. Plaintiffs also argue that certain DVA
training letters to clinicians show bias because they stated that
studies showed no "significant" long-term health or physical

United States District Court
For the Northern District of California

effects from participation in testing. However, as with the DOD fact sheet, these statements reflect a difference of scientific opinion as to what constitutes "significant" effects, a debate that is consistent with the evidence that has been presented to the Court. Finally, to the extent that Plaintiffs contend that the DVA diverged from its normal procedures by depending on the DOD to "to validate whether an individual participated in any chemical or biological test," this argument is also unpersuasive. Defendants have offered evidence that, in other contexts, the DVA does depend on the DOD to provide it with details of veterans' service to be used in adjudicating claims, such as when and in what manner the individual served, and this is sometimes specified in written DVA regulations. It is rational for the DVA to accept the DOD's service records as reliable indicators of whether a person making a claim actually served in the military and in what context. This is not inconsistent with, or an abdication of, the DVA's obligation to consider "all pertinent medical and lay evidence" and to base its determination on "review of the entire evidence of record" when resolving a claim of service-connection. 38 C.F.R. § 3.303(a).

Accordingly, because Plaintiffs have failed to raise a material dispute of fact that there was an appearance of bias or an unconstitutionally high probability of actual bias on the part of the DVA adjudicators, Defendants' motion for summary judgment on this claim is granted.

CONCLUSION

For the reasons set forth above, Plaintiffs' motion for partial summary judgment is GRANTED in part and DENIED in part,

and Defendants' cross-motion for summary judgment is GRANTED in
part and DENIED in part.

     The Court rules as follows:

     (1)     The DOD and the Army are granted summary judgment on:
(a) all APA claims for notice, except to the extent that
Plaintiffs seek to require the Army to warn class members of any
information acquired after the last notice that may affect their
well-being when that information has become available and in the
future; (b) all APA claims for medical care; (c) the claim that,
under the Fifth Amendment, these Defendants' failure to provide
Plaintiffs with notice, medical care and a release from secrecy
oaths violated their substantive due process liberty rights,
including their right to bodily integrity; (d) the claim that,
under the Fifth Amendment, these Defendants' failure to provide
Plaintiffs with any procedures whatsoever to challenge this
deprivation violated their procedural due process rights; (e) the
claim that, under the Fifth Amendment, these Defendants' failure
to comply with their own regulations and procedures regarding
notice and medical care deprived Plaintiffs of their due process
rights; and (f) the claim that, under the First and Fifth
Amendment, the failure to provide a release from secrecy oaths
prevented Plaintiffs from filing claims for benefits with the DVA
and thereby violated their right of access to the courts.

     (2)     The DOD, the Army and the CIA are granted summary
judgment on Plaintiffs' claims seeking a declaration that the
secrecy oaths are invalid and an injunction requiring Defendants
to notify Plaintiffs that they have been released from such oaths.

United States District Court
For the Northern District of California

(3)     Defendants' motion for summary judgment on Plaintiffs' claim against the DVA is granted.

(4)     Plaintiffs' motion for summary judgment on the APA notice claim is granted to the extent that Plaintiffs seek to require the Army to warn class members of any information acquired after the last notice was provided, and in the future, that may affect their well-being, when that information becomes available.

The Court VACATES the final pretrial conference and trial dates.  Within fourteen days of the date of this Order, the parties shall submit a joint proposed injunction and judgment that comply with the terms of this Order.  If the parties are unable to agree to the terms of the injunction and the judgment, they shall file a single form of each that shows the terms to which they were able to agree and their separate proposals for the remaining terms.  Thereafter, an injunction and judgment shall enter.

IT IS SO ORDERED.

Dated:  7/24/2013

CLAUDIA WILKEN
United States District Judge

United States District Court
For the Northern District of California

72