FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| VIETNAM VETERANS OF AMERICA; SWORDS TO PLOWSHARES, Veterans Rights Organization; TIM MICHAEL JOSEPHS; WILLIAM BLAZINSKI; BRUCE PRICE; FRANKLIN D. ROCHELLE; LARRY MEIROW; ERIC P. MUTH; DAVID C. DUFRANE; KATHRYN MCMILLAN-FORREST, *Plaintiffs-Appellants– Cross-Appellees*, <br><br> v. <br><br> CENTRAL INTELLIGENCE AGENCY; JOHN BRENNAN, Director of the Central Intelligence Agency; UNITED STATES DEPARTMENT OF DEFENSE; ASHTON CARTER, Secretary of Defense; UNITED STATES DEPARTMENT OF THE ARMY; JOHN M. MCHUGH, Secretary of the Army; UNITED STATES OF AMERICA; UNITED STATES DEPARTMENT OF VETERAN AFFAIRS; ROBERT A. MCDONALD, Secretary of Veterans Affairs, *Defendants-Appellees– Cross-Appellants*. | Nos.   13-17430 <br> 14-15108 <br><br> D.C. No. <br> 4:09-cv-00037-CW <br><br><br> ORDER AND AMENDED OPINION |

Appeal from the United States District Court
for the Northern District of California
Claudia Wilken, District Judge, Presiding

Argued and Submitted
September 11, 2014—San Francisco, California

Filed June 30, 2015
Amended January 26, 2016

Before: J. Clifford Wallace, Mary M. Schroeder,
and William A. Fletcher, Circuit Judges.

Opinion by Judge W. Fletcher;
Partial Concurrence and Partial Dissent by Judge Wallace

---

## SUMMARY[*]

---

### Veterans Affairs

The panel filed an amended opinion affirming in part and reversing in part the district court's judgment and injunction entered in an action brought by veterans organizations and individuals who were subjects in chemical and biological weapons experiments conducted by the United States military, seeking declaratory and injunctive relief against federal agencies; denied the petition for panel rehearing; and denied on behalf of the court the petition for rehearing en banc.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

The panel agreed with the district court that the U.S. Army had an ongoing duty under Army Regulation 70-25 to provide former test subjects with newly available information relating to their health, and that this duty was judicially enforceable under § 706(1) of the Administrative Procedure Act. The panel held that the district court did not abuse its discretion in entering its injunction to enforce that duty.

The panel also agreed with the district court that the Army had an ongoing duty to provide medical care. The panel disagreed with the district court's denial of relief on the ground that the Department of Veterans Affairs provided medical care that to some degree duplicated the care the Army was obligated to provide. The panel held that the district court may not, in the absence of mootness, categorically deny injunctive relief to former volunteer subjects seeking necessary medical care because some former subjects may be entitled to receive medical care from another government agency. The panel vacated the district court's summary judgment for the government on this claim and remanded to the district court.

Judge Wallace joined the majority in affirming the district court's judgment and injunction compelling the Army to comply with Army Regulation 70-25's clear regulatory mandate, but wrote separately in concurrence because he did not join the majority's analysis of regulatory history to support its textual analysis. Judge Wallace dissented from the majority's conclusion that Army Regulation 70-25 also contained a command that the Army provide medical care to former research volunteers. He would affirm the district court's summary judgment against plaintiffs on their claims for medical care, but on the alternative ground that their claim

was not judicially enforceable under § 706(1) of the Administrative Procedure Act.

---

**COUNSEL**

James Patrick Bennett, Eugene G. Illovsky, Benjamin F. Patterson (argued), and Stacey Michelle Sprenkel, Morrison & Foerster LLP, San Francisco, California, for Plaintiffs-Appellants–Cross-Appellees.

Melinda L. Haag, United States Attorney, Stuart F. Delery, Assistant Attorney General, Charles W. Scarborough (argued), Brigham John Bowen, Anthony Joseph Coppolino, and Mark B. Stern, Appellate Staff, Civil Division, United States Department of Justice, Washington, D.C., for Defendants-Appellees–Cross-Appellants.

---

**ORDER**

The opinion filed on June 30, 2015 and published at 791 F.3d 1122 is hereby amended. The amended opinion is filed concurrently with this order.

With these amendments, Judges Schroeder and W. Fletcher voted to deny the petition for rehearing. Judge Wallace voted to grant the petition for rehearing. Judge W. Fletcher voted to deny the petition for rehearing en banc, and Judge Schroeder so recommended. Judge Wallace recommended granting the petition for rehearing en banc.

The full court was advised of the petition for rehearing en banc. A judge requested a vote on whether to rehear the

matter en banc, and the matter failed to receive a majority of the votes of the nonrecused active judges in favor of en banc consideration. Fed. R. App. P. 35.

The petition for panel rehearing and the petition for rehearing en banc are **DENIED**.

Future petitions for panel rehearing and petitions for rehearing en banc will not be entertained.

---

### OPINION

W. FLETCHER, Circuit Judge:

From the inception of the United States' chemical weapons program during World War I until the mid-1970s, the United States military conducted chemical and biological weapons experiments on human subjects. In these experiments, tens of thousands of members of the United States armed services were intentionally exposed to a range of chemical and biological agents.

Plaintiffs are veterans' organizations and individuals who were subjects in these experiments. They filed an individual and class action complaint seeking declaratory and injunctive relief against the Department of Defense ("DOD"), the Army, the Central Intelligence Agency ("CIA"), and the Department of Veterans Affairs ("VA"). The class comprises "[a]ll current or former members of the armed forces, who, while serving in the armed forces, were test subjects" in these experimentation programs. Two of Plaintiffs' claims, brought under § 706(1) of the Administrative Procedure Act

("APA"), are at issue in this appeal. Plaintiffs claim, first, that the Army has unlawfully failed to notify test subjects of new medical and scientific information relating to their health as it becomes available. They claim, second, that the Army has unlawfully withheld medical care for diseases or conditions proximately caused by their exposures during the experiments.

On cross-motions for summary judgment, the district court held that Army Regulation 70-25 ("AR 70-25") imposes on the Army an ongoing duty to notify former test subjects of relevant new health information as it becomes available. The court issued an injunction requiring the Army to comply with that duty. The court held, further, that AR 70-25 imposes on the Army an ongoing duty to provide medical care, but the court declined to compel the Army to provide such care on the ground that Plaintiffs could seek medical care from the VA.

We affirm in part and reverse in part. We agree with the district court that the Army has an ongoing duty under AR 70-25 to provide former test subjects with newly available information relating to their health, and that this duty is judicially enforceable under § 706(1). We also agree with the district court that the Army has an ongoing duty to provide medical care. However, the district court denied relief on the ground that the VA provides medical care that to some degree duplicates the care the Army is obligated to provide. We disagree with the district court that relief should have been denied on this ground.

## I. Background

As relevant to this suit, beginning in 1942 the War Department (as it was then called) approved the use of human subjects in experiments to test the effects of chemical weapons. Some experiments tested the effectiveness of various chemical agents, while others tested the effectiveness of protective clothing and other defenses. By the end of World War II, more than 60,000 service members had served as experimental subjects in the United States' chemical weapons research program.

During the World War II-era tests, "soldier volunteers" were intentionally exposed to a variety of chemical agents. According to a 1993 report by the National Academy of Sciences, they were exposed to Lewisite (an arsenic-based blister agent) and mustard gas, as well as other "gases such as phosgene (a choking agent), hydrogen cyanide and cyanogen chloride (blood poisoning agents), and chloroacetophenone (tear gas)." A 2006 VA report recounted that these subjects "were exposed commonly to acutely toxic levels . . . of agents via small drops applied to the arm or to clothing, or in gas chambers, sometimes without protective clothing." "Some experiments apparently involved less protected subjects who were reported to have experienced severe burns to the genital areas, including cases of crusted lesions to the scrotum . . . . Documented injuries among experimental subjects . . . [were] initially 'quite high'—one study of accidental injuries identified over 1,000 cases of acute mustard agent toxicity resulting in eye, ear, nose and throat symptoms . . . over a 2-year period."

In the 1950s, DOD conducted a new wave of chemical weapons research and experimentation, focusing on "agents

perceived to pose greater threats than sulfur mustard or Lewisite," such as nerve agents and chemicals with "intense psychoactive properties." These experiments were conducted over the course of about twenty years, from 1955 to 1975. During the course of this research, DOD exposed about 6,700 experimental human subjects to more than 250 different chemical and biological agents.

Beginning in the 1950s, the Army established policies and issued regulations governing the use of human test subjects. On February 26, 1953, Secretary of Defense Charles Wilson sent a memorandum ("the Wilson Directive") to the Secretaries of the Army, Navy, and Air Force. The Wilson Directive set conditions for "the use of human volunteers by the Department of Defense in experimental research in the fields of atomic, biological and/or chemical warfare." It stated that "[t]he voluntary consent of the human subject is absolutely essential," and instructed that a volunteer subject "should have sufficient knowledge and comprehension of the elements of the subject matter involved as to enable him to make an understanding and enlightened decision" about participating.

On June 30, 1953, Brigadier General John Oakes, Secretary of the General Staff of the Army, sent a memorandum ("CS:385") to the Army's Chief Chemical Officer, the Army Surgeon General, and other top Army officials, reiterating the policies articulated in the Wilson Directive. CS:385 provided that "[a]gents used in research must have" several "limiting characteristics," including "[c]ontrollable lethality," "[n]o serious chronicity anticipated," "[e]ffective therapy available," and "[a]dequate background of animal experimentation." The memorandum provided further, that "[a]s added protection for volunteers,

[other] safeguards will be provided," including that "[a]ll apparatus and instruments necessary to deal with any emergency situations must be available," and that "[m]edical treatment and hospitalization will be provided for all casualties of the experimentation as required."

In 1962, the Army promulgated AR 70-25, a regulation prescribing policies and procedures to govern the use of volunteers in Army research involving human subjects. AR 70-25 reiterated the policies in the Wilson Directive, including the requirement of voluntary consent. The regulation provided:

> [The volunteer] will be told as much of the nature, duration, and purpose of the experiment, the method, and means by which it is to be conducted, and the inconveniences and hazards to be expected, as will not invalidate the results. He will be fully informed of the effects upon his health or person which may possibly come from his participation in the experiment.

The regulation also provided, in language similar to CS:385, that "[a]ll apparatus and instruments necessary to deal with likely emergency situations will be available," "[r]equired medical treatment and hospitalization will be provided for all casualties," and "[a] physician approved by The Surgeon General will be responsible for the medical care of volunteers." The Army reissued AR 70-25 in 1974 with the foregoing language unchanged.

In 1975, the Army ceased performing large scale experiments exposing human subjects to chemical agents. In

the late 1970s, against a backdrop of mounting public concern about the long-term effects of such experiments, Army officials exchanged a series of memoranda outlining a program for notifying past subjects about the health consequences of their participation in the experiments. On August 8, 1979, Army General Counsel Jill Wine-Volner wrote a memorandum to a number of high-level Army officials and to the Army Surgeon General. She wrote that the Secretary of the Army

> has concluded that, as a policy matter, some type of notification program is necessary. Moreover, the legal necessity for a notification program is not open to dispute. The Department of Justice has concluded that another Federal agency 'may well be held to have a legal duty to notify those . . . drug-testing subjects whose health [it] has reason to believe may still be adversely affected by their prior involvement in [the] drug-testing program.'

(Omission and alterations in original.)

On September 24, 1979, Wine-Volner wrote another memorandum, this time to the Director of the Army Staff, providing "broad guidance" about "a program to notify participants in Army drug or chemical/biological agent research programs." The memorandum provided, inter alia:

> The Army should review all research programs, regardless of whether conducted by the Army or on behalf of the Army by independent contractors, that were initiated to

study possible military, rather than medical, applications of various drugs and chemical/ biological agents. If there is reason to believe that any participants in such research programs face the risk of continuing injury, those participants should be notified of their participation and the information known today concerning the substance they received. This notification should be [e]ffected regardless of whether the individuals were fully informed volunteers at the time the research was undertaken.

On October 25, 1979, Lieutenant General John McGiffert, Director of the Army Staff, wrote a memorandum to the heads of Army staff agencies, "establish[ing] Army Staff responsibilities for review of past Army research involving possible military applications of drug or chemical/biological agents." He wrote, "The objective of this effort is to identify and notify those research participants who may face the risk of continuing injury." He continued,

Participants in those projects who are considered by medical authority to be subject to the possible risk of a continuing injury are to be notified. In the event that long-term hazards of a substance are not known, The Surgeon General (TSG) should continue to monitor research developments, and if at some future time more information makes it necessary to take some action, TSG should recommend appropriate action, including notification.

In 1981 and 1986, the Army took two actions relevant to the notification program: amending one record system and creating another. The first system, the Research and Experimental Case Files, as amended in 1981, compiled a database about "[v]olunteers (military members, Federal civilian employees, state prisoners) who participated in Army tests of potential chemical agents and/or antidotes from the early 1950's until the program ended in 1975." *Privacy Act of 1974; Amendment to System Notice*, 46 Fed. Reg. 60,639, 60,640 (Dec. 11, 1981). The purposes of the system were "(1) to follow up on individuals who voluntarily participated in Army chemical/biological agent research projects for the purpose of assessing risks/hazards to them, and (2) for retrospective medical/scientific evaluation and future scientific and legal significance." *Id.* The second system, the Medical Research Volunteer Registry, newly created in 1986, was designed to maintain "[r]ecords of military members, civilian employees, and non-DOD civilian volunteers participating in current and future research sponsored by the U.S. Army Medical Research and Development Command." *Privacy Act of 1974; New Record System*, 51 Fed. Reg. 23,576, 23,577 (June 30, 1986). One of the stated purposes of the second system was "[t]o assure that the U.S. Army Medical Research and Development Command (USAMRDC) can contact individuals who participated in research conducted/sponsored by the Command in order to provide them with newly acquired information, which may have an impact on their health." *Id.*

In 1988, the Army reissued AR 70-25. Chapter 2–5(j) of the reissued regulation provided that the Army Surgeon General "will . . . [d]irect medical followup, when appropriate, on research subjects to ensure that any long-range problems are detected and treated." Chapter 2–8(c)

provided that "commanders will . . . [e]nsure that research volunteers are adequately informed concerning the risks associated with their participation, and provide them with any newly acquired information that may affect their well-being when that information becomes available."

Chapter 3–2(h) ("subsection (h)") of the reissued regulation specified:

> *Duty to warn.* Commanders have an obligation to ensure that research volunteers are adequately informed concerning the risks involved with their participation in research, and to provide them with any newly acquired information that may affect their well-being when that information becomes available. The duty to warn exists even after the individual volunteer has completed his or her participation in research. To accomplish this, the MACOM [(Major Army Commands)] or agency conducting or sponsoring research must establish a system which will permit the identification of volunteers who have participated in research conducted or sponsored by that command or agency, and take actions to notify volunteers of newly acquired information.

Chapter 3–1(k) ("subsection (k)") specified, "Volunteers are authorized all necessary medical care for injury or disease that is a proximate result of their participation in research."

Finally, in what the Army later conceded was a "serious" editing error, Appendix F of the reissued regulation provided

that "[r]esearch involving deliberate exposure of human subjects to nuclear weapons effect, to chemical warfare agents, or to biological warfare agents" was "exempt from this regulation."

The Army revised and reissued AR 70-25 two years later. This 1990 revision remains in force today. This revision was, in all relevant respects but one, the same as the 1988 revision. There was, however, one important change — the correction of the erroneous exemption from coverage of human subjects who had been deliberately exposed to "nuclear weapon effect" and to chemical and biological agents. The 1990 "Summary of Change" specified, "This change is published to correct a serious error that occurred during the final editing of the current revision. In attempting to respond to guidance from the Office of The Judge Advocate General that a subparagraph be moved from the text of the regulation to appendix F, the wrong sub-paragraph was moved." Chapter 1–4(d)(4) of AR 70-25 was changed in 1990 to state explicitly, "The guidance in this regulation pertains to . . . [r]esearch involving deliberate exposure of human subjects to nuclear weapons effect, to chemical warfare agents, or to biological warfare agents."

In the decades since the termination of biological and chemical testing on human subjects, Defendants have identified, contacted, and notified some of the former subjects. For example, in 1990 DOD contacted 128 veterans who had participated in World War II mustard gas testing. In 2004, DOD identified 6,387 individuals who had been exposed to mustard gas or other agents during World War II-era experiments. Beginning in March 2005, the VA sent letters to the 319 of those individuals for whom it could find contact information.

In 2009, Plaintiffs filed suit against DOD, the Army, the CIA, the VA, and a number of individuals in their official capacities. The complaint alleged that the Army was required, on an ongoing basis, to (1) provide notice to former test subjects about their exposures to biological and chemical agents and the currently known health effects of those agents, and (2) provide medical care to these test subjects for diseases or conditions proximately caused by their participation in military experiments.

The district court granted in part and denied in part Plaintiffs' motion for partial summary judgment, and granted in part and denied in part Defendants' cross-motion for summary judgment. The court held that the Army has an ongoing duty to notify former test subjects about newly available medical and scientific information relating to their health, and that the Army has not fully complied with that duty. The court issued an injunction requiring the Army to comply. The court also concluded that the Army has an ongoing duty to provide test subjects with medical care, but it declined to issue an injunction enforcing compliance with that duty on the ground that medical care was available from the VA.

The parties cross-appealed.

## II. Standard of Review

We review a district court's summary judgment de novo. *Or. Natural Res. Council v. Allen*, 476 F.3d 1031, 1036 (9th Cir. 2007). A permanent injunction "'involves factual, legal, and discretionary components,'" so we "review a decision to grant such relief under several different standards." *Momot v. Mastro*, 652 F.3d 982, 986 (9th Cir. 2011) (quoting *Walters*

*v. Reno*, 145 F.3d 1032, 1047 (9th Cir. 1998)).  We review legal conclusions underlying the summary judgment de novo, factual findings for clear error, and the scope of the injunction for abuse of discretion.  *Id.*

### III.  Discussion

Section 706(1) of the APA provides that a court "shall compel agency action unlawfully withheld or unreasonably delayed."  5 U.S.C. § 706(1).  A court can compel agency action under this section only if there is "a specific, unequivocal command" placed on the agency to take a "discrete agency action," and the agency has failed to take that action.  *Norton v. S. Utah Wilderness Alliance* (*SUWA*), 542 U.S. 55, 63–64 (2004) (citation omitted).  The agency action must be pursuant to a legal obligation "so clearly set forth that it could traditionally have been enforced through a writ of mandamus."  *Hells Canyon Pres. Council v. U.S. Forest Serv.*, 593 F.3d 923, 932 (9th Cir. 2010).  Plaintiffs argue that AR 70-25 unequivocally commands the Army to provide former test subjects with current information about their health, and to provide medical care for harm and diseases caused by the experiments.  We agree.

### A.  Duty to Warn

We conclude that Chapter 3–2(h) of AR 70-25 ("subsection (h)"), as promulgated in 1988 and again in 1990, requires the Army to provide former test subjects with "newly acquired information" regarding their health as that information becomes available.  We agree with the district court that this "duty to warn" applies not only to future human subjects, but also to test subjects who participated in experiments predating the regulation.  We hold, further, that

the district court did not abuse its discretion in issuing an injunction enforcing this duty.

### 1.  Duty to Warn Under AR 70-25

AR 70-25 requires the Army to warn volunteers of the risks of participating in the experiments, and to provide them with new information "that may affect their well-being" as it becomes available.  Subsection (h) of AR 70-25 provides:

> *Duty to warn.*  Commanders have an obligation to ensure that research volunteers are adequately informed concerning the risks involved with their participation in research, and to provide them with any newly acquired information that may affect their well-being when that information becomes available. The duty to warn exists even after the individual volunteer has completed his or her participation in research.  To accomplish this, the MACOM [(Major Army Commands)] or agency conducting or sponsoring research must establish a system which will permit the identification of volunteers who have participated in research conducted or sponsored by that command or agency, and take actions to notify volunteers of newly acquired information.

Subsection (h) was added to AR 70-25 in 1988.  The Army contends in this litigation that Section (h) has merely prospective effect, applying only to human subjects on whom experiments were performed after 1988.  We disagree.

The text of subsection (h) makes clear that the duty to provide notice applies not only to possible future human test subjects but also to former test subjects. There is nothing in the text that limits the application of subsection (h) to those who volunteered in experiments after the promulgation of the regulation in 1998. Indeed, subsection (h) specifically requires Army commanders to identify the volunteers "who *have participated* in research conducted or sponsored by that command or agency, and take actions to notify volunteers of newly acquired information." (Emphasis added.) Similarly, subsection (h) provides that "[t]he duty to warn exists even after the individual volunteer has completed his or her participation in research."

The Army's revision of AR 70-25 in 1990 makes even more compelling this reading of subsection (h). The 1990 version retains the provision of the 1988 regulation that requires notice to human subjects. But the Army made an important change in 1990 in stating explicitly that the notice requirement under AR 70-25 applies to "[r]esearch involving deliberate exposure of human subjects to nuclear weapons effect, to chemical warfare agents, or to biological warfare agents." Chapter 1–4(d)(4). The 1990 revision would have made little sense if the notice requirement applied only prospectively. The only subjects to whom Chapter 1–4(d)(4) could apply are those who had previously been part of Army experiments. As the district court stated, "Because the Army did not [in 1988 or 1990] — and does not — engage in such ongoing testing, there would have been no reason to add this language to AR 70-25 in 1990 if the regulation did not encompass those who had already become such test subjects."

This reading of AR 70-25 is consistent with the internal agency discussions in the years leading up to the 1988 and

1990 revisions of the regulation. Army memoranda discussing proposed notification programs all recognized an obligation to warn individuals who had been subjects in past research and testing about the potential long-term health risks, as well as to provide additional information about those risks when such information became available. For example, Army General Counsel Jill Wine-Volner wrote in her August 1979 memorandum that "the legal necessity for a notification program is not open to dispute." That led Wine-Volner to write a second memorandum in September 1979 stating that "[i]f there is reason to believe that any participants in [the biological and chemical weapons testing] programs face the risk of continuing injury, those participants should be notified of their participation and the information known today concerning the substance they received." She wrote, further, "This notification should be [e]ffected regardless of whether the individuals were fully informed volunteers at the time the research was undertaken."

This reading of subsection (h) is also consistent with the amending and creating of databases in 1981 and 1986. As we describe above, in 1981 the Army amended a database that included members of the military who had previously volunteered for human testing in order "to follow up on individuals who voluntarily participated in Army chemical/biological agent research projects for the purpose of assessing risks/hazards to them." *Privacy Act of 1974; Amendment to System Notice*, 46 Fed. Reg. 60,639, 60,640 (Dec. 11, 1981). Then, in 1986, the Army created a new database that included members of the military "participating in current and future research" in order to "contact individuals who participated" in such research in order to provide them with "newly acquired information, which may have an impact on their health." *Privacy Act of 1974; New*

*Record System*, 51 Fed. Reg. 23,576, 23,577 (June 30, 1986). The Army clearly anticipated using these databases to provide ongoing medical health information to the volunteers who had participated in the Army's chemical and biological research experiments. Subsection (h) was first promulgated in 1988, seven years after the amendment of the first of the databases and two years after the creation of the other. In other words, subsection (h) was promulgated only after the Army had already concluded it had a duty to provide ongoing medical care notifications, even to *past* participants.

Despite the foregoing, the government contends that subsection (h) applies only to human subjects upon whom experiments were performed after 1988. They contend that subsection (h) is ambiguous and that under *Auer v. Robbins*, 519 U.S. 452 (1997), we must defer to the interpretation that the Army has proposed during this litigation. We find no ambiguity in the text of subsection (h). But even if subsection (h) were ambiguous, *Auer* deference is inappropriate.

Under *Auer*, "[a]n administrative rule may receive substantial deference if it interprets the issuing agency's own ambiguous regulation." *Gonzales v. Oregon*, 546 U.S. 243, 255 (2006). *Auer* deference is not warranted in all circumstances. Deference is not warranted "when there is reason to suspect that the agency's interpretation 'does not reflect the agency's fair and considered judgment on the matter in question.'" *Christopher v. SmithKline Beecham Corp.*, 132 S. Ct. 2156, 2166 (2012) (quoting *Auer*, 519 U.S. at 462). "This might occur when . . . it appears that the interpretation is nothing more than a 'convenient litigating position,'" *id.* (quoting *Bowen v. Georgetown Univ. Hospital*, 488 U.S. 204, 213 (1988)), or a "'*post hoc* rationalizatio[n]'

advanced by an agency seeking to defend past agency action against attack," *id.* (quoting *Auer*, 519 U.S. at 462) (emphasis and alteration in original).

The government's proposed interpretation of subsection (h) is a "convenient litigating position" that does not warrant *Auer* deference. The government acknowledges in its briefing to us that no court has previously had occasion to construe the notice provision of AR 70-25, and it points to no prior interpretation of this provision by the Army, in litigation or otherwise. Indeed, the district court noted that the Army admitted that it "developed [its] interpretation only in the context of this litigation."

We do not believe that the interpretation of the notice provision of AR 70-25 that the government now advances is the "agency's fair and considered judgment on the matter in question." *Auer*, 519 U.S. at 462. In the district court, the government supported its interpretation of AR 70-25 by relying on the testimony of Dr. Michael Kilpatrick, Director of Strategic Communications for the Office of the Under Secretary of Defense for Health Affairs. However, we have reason to doubt Dr. Kilpatrick's analysis. As the district court observed, "Notably, the agency representative upon whose interpretation Defendants rely was mistaken about the date on which the operative parts of the regulation were amended, suggesting that he did not have a clear understanding of the context in which these changes were made."

The text of AR 70-25 requires the Army to provide ongoing notice to volunteers who "have participated" in the Army's testing programs. We conclude that this duty applies to human subjects in the pre-1990 experiments.

2.  Enforceability Under § 706(1)

Even though AR 70-25 imposes a duty on the Army to provide notice to prior test subjects of information regarding their well-being, we can enforce that duty only if the text of the regulation is a "specific, unequivocal command" to take "discrete agency action." *SUWA*, 542 U.S. at 63–64 (citation omitted). The duty to warn contained in subsection (h) is such a command.

We recognize that § 706(1) poses an obstacle for parties seeking to compel agency action. In *SUWA*, the Court explained that parties are entitled to relief under § 706(1) only if the agency "failed to take a *discrete* agency action that it is *required to take*," *id.* at 64, such as "the failure to promulgate a rule or take some decision by a statutory deadline," *id.* at 63. The plaintiff in that case, the Southern Utah Wilderness Alliance, alleged that the Bureau of Land Management ("BLM") had failed to manage wilderness study areas "in a manner so as not to impair the suitability of such areas for preservation as wilderness," *id.* at 65 (quoting 43 U.S.C. § 1782(c)), and that BLM had failed to "manage the public lands . . . in accordance with the land use plans," *id.* at 67 (quoting 43 U.S.C. § 1732(a)). The Court held that the failures to meet these statutory obligations were "[g]eneral deficiencies in compliance" rather than failures to comply with commands to perform discrete actions. *Id.* at 66. Therefore, these obligations "lack[ed] the specificity requisite for agency action." *Id.*

"It is clear that section 706(1) applies to the situation where a federal agency refuses to act in disregard of its legal duty to act." *Equal Employment Opportunity Comm'n v. Liberty Loan Corp.*, 584 F.2d 853, 856 (8th Cir. 1978).

Unlike the plaintiffs in *SUWA*, Plaintiffs have alleged both a legal duty to perform a discrete agency action and a failure to perform that action. They assert that the Army has an ongoing "duty to warn" under subsection (h) of AR 70-25 and that the Army has refused to perform that duty.

The precise efforts the Army must take to identify human subjects in past experiments, and the precise content of the notice to those subjects who have been identified, necessarily entail some discretionary judgment. But discretion in the manner in which the duty may be carried out does not mean that the Army does not have a duty to perform a "discrete action" within the meaning of § 706(a) and *SUWA*. *See SUWA*, 542 U.S. at 65 ("[W]hen an agency is compelled by law to act . . . but the manner of its action is left to the agency's discretion, a court can compel the agency to act, but has no power to specify what the action must be."); *Firebaugh Canal Co. v. United States*, 203 F.3d 568, 578 (9th Cir. 2000) ("Although the district court can compel the Department of Interior to provide drainage service as mandated by the San Luis Act, the district court cannot eliminate agency discretion as to how it satisfies the drainage requirement.").

### 3. The District Court's Injunction

The government argues that the district court's injunction is improper in its scope and duration. We disagree.

Under the district court's injunction, the Army must provide

> individuals who, while serving in the armed forces, were test subjects in any testing

> program in which humans were exposed to a
> chemical or biological substance for the
> purpose of studying or observing the effects
> of such exposure (that was sponsored,
> overseen, directed, funded, and/or conducted
> by the Department of the Army) . . . with
> newly acquired information that may affect
> their well-being that it has learned since its
> original notification, now and in the future as
> it becomes available[.]

Specifically, the injunction directs the Army to provide to members of the class any information that may affect their well-being that has been acquired by the Army and/or its agents since June 30, 2006, or will be acquired in the future. The injunction directs the Army to file with the court a report "describing the efforts it has undertaken to locate the Newly Acquired Information," "confirming whether Newly Acquired Information has been found and describing generally its nature," "explaining the plan it has in its discretion developed for transmitting Newly Acquired Information to the class members entitled to notification," "committing to transmit the Newly Acquired Information" within 120 days of the entry of the injunction, and "outlining the plan and policies it has in its discretion developed for (i) periodically collecting and transmitting Newly Acquired Information that becomes available to it after the Entry Date and (ii) providing any necessary update reports to the Court regarding such future efforts."

We hold that the injunction is appropriately tailored to direct the Army to carry out its duty to warn, and that the district court acted within its discretion. In requiring the Army to tell former test subjects about "newly acquired

information that may affect their well-being," the injunction reiterates the plain language of AR 70-25's duty to warn. As subsection (h) stated, "Commanders have an obligation to ensure that research volunteers are adequately informed concerning the risks involved with their participation in research, and to provide them with any newly acquired information that may affect their well-being when that information becomes available."

The injunction expressly preserves the Army's ability to act "in its discretion" to develop the appropriate policies in order to carry out that duty. It does not prescribe particular policies that the Army should follow. It does not even specify the means by which the Army must give that notice. In this respect, the injunction does not amount to programmatic oversight or "judicial entanglement in abstract policy disagreements which courts lack both expertise and information to solve." *SUWA*, 542 U.S. at 66. The injunction simply directs the Army to fulfill its duty under subsection (h).

### B. Duty to Provide Medical Care

Chapter 3–1(k) of AR 70-25 ("subsection (k)") provides, "Volunteers are authorized all necessary medical care for injury or disease that is a proximate result of their participation in research." Plaintiffs seek an injunction that would require the Army to provide that care. The parties agree that the government does not currently provide medical care to former test subjects "in the absence of those [individuals] being retirees of the military, medical retirees, reservists or active duty military."

We conclude that subsection (k), as promulgated in 1988 and 1990, requires the Army to provide former test subjects with medical care for any injuries or diseases that were proximately caused by Army experiments in which they participated. The fact that the VA provides medical care to some former test subjects, for reasons independent of AR 70-25, does not relieve the Army of its duty under that subsection.

### 1. Duty to Provide Care Under AR 70-25

The text of subsection (k) compels the conclusion that the Army must provide care to former test subjects. It provides that "[v]olunteers are authorized all necessary medical care" for any injuries or diseases that are the proximate result of their participation in Army experiments. In its brief to this court, the government concedes that subsection (k) requires the Army to provide medical care to research volunteers. It contends, however, that the duty to provide medical care is time-limited, such that the duty exists only during the duration of the actual experiment. We disagree that subsection (k) contains this time limitation.

Subsection (k) uses the word "authorized" in describing the duty of the Army — "[v]olunteers are *authorized* all necessary medical care." (Emphasis added.) The natural reading of the word "authorized" is that the volunteers are entitled to receive the "necessary medical care" specified in the subsection. To take a familiar example, when a collective bargaining agreement says that an employee is authorized a certain amount of sick leave, the employee is entitled to that leave. She must show that she is actually sick — just as test subjects must show they suffer from diseases that are a proximate result of their participation in government

experiments — but if she can do so, she is entitled to take time off for sick leave. The meaning of "authorized" is no different here.

The government, agreeing with this reading of the word "authorized," concedes in its brief to us that the Army has a duty under subsection (k) to provide necessary medical care. However, the government contends that the Army's duty to provide medical care ends as soon as the experiment ends. It argues in its brief that "the early versions of AR 70-25 make clear that the only medical care contemplated under that regulation was care during the pendency of the relevant testing program itself. Nothing in any of the later versions of AR 70-25 expands the limited scope of medical care available beyond the period that an individual is participating in a specific experiment." We disagree.

There is nothing in the text of the current version of AR 70-25, first promulgated in 1988, that supports a conclusion that the Army has a duty to provide medical care, but that the duty ceases as soon as the experiment ends. The government's argument is inconsistent with the plain text of subsection (k), which states, "Volunteers are authorized *all* necessary medical care for injury or disease that is a proximate result of their participation in research." (Emphasis added.) There is nothing in this language to suggest that "all" means anything other than "all." Nor is there anything in this language that states or even suggests a temporal restriction on volunteers' entitlement to receive medical care. Not only is the government's argument inconsistent with the text, but it also makes little sense. If the government is right, volunteers were entitled to medical care if they became sick during the actual experiment, but not if

they fell sick as a result of the experiment the day after it ended.

In sum, we agree with the government that subsection (k) requires the Army to provide medical care to all of those authorized to receive it. However, we disagree as to the period during which the care must be provided. The temporal limitation for which the government argues cannot be found in the text of subsection (k). Instead, the text compels the conclusion that the only limitation is causal. We hold, as did the district court, that "AR 70-25 entitles [Plaintiffs] to medical care for disabilities, injuries or illnesses caused by their participation in government experiments," not only during the course of the experiment but also after the experiment has ended.

## 2. Injunction to Provide Medical Care

Section 706(1) of the APA provides that a reviewing court "shall . . . compel agency action unlawfully withheld." The word "shall" requires a court to compel agency action when, as here, there is a "specific, unequivocal command" that the agency must act. *SUWA*, 542 U.S. at 63–64 (citation omitted). "The term 'shall' is usually regarded as making a provision mandatory, and the rules of statutory construction presume that the term is used in its ordinary sense unless there is clear evidence to the contrary." *Firebaugh Canal Co.*, 203 F.3d at 573–74; *cf. United States v. Monsanto*, 491 U.S. 600, 607 (1989) (finding that "Congress could not have chosen stronger words to express its intent that forfeiture be mandatory" than to state that a court "shall" order forfeiture).

We recognize that the operation of § 706(1) is restricted to discrete actions that are unequivocally compelled by statute or regulation. Courts are not permitted under § 706(1) to enter "general orders compelling compliance with broad statutory mandates." *SUWA*, 542 U.S. at 66. In its petition for rehearing and rehearing en banc, the government argues for the first time that an injunction ordering the Army to comply with its duty under subsection (k) is inconsistent with § 706(1) because such an injunction would require a "broad restructuring of Army programs and operations." The government substantially exaggerates the impact of an injunction requiring the Army to provide medical care to human test subjects who were harmed by DOD experiments.

Between 1955 and 1975, DOD exposed about 6,700 human subjects to chemical and biological agents. DOD has since terminated these programs. The group of plaintiffs therefore cannot expand, and some of these 6,700 veterans have undoubtedly died. DOD also exposed numerous human subjects to chemical agents during World War II. We cannot determine from the record in this case how many of these subjects are still living, but the number cannot be large. In fact, as of 2005, the Army had identified contact information for only 319 World War II human test subjects. Requiring the provision of medical care to this limited population would hardly require a "broad restructuring of Army programs and operations." Instead, the Army would be required to provide medical care to a relatively small group of living veterans who were injured as a proximate result of the government's conduct. This is a discrete action specifically mandated by subsection (k) of AR 70-25, for which judicial enforcement pursuant to § 706(1) is required.

The district court concluded that the Army is required under subsection (k) to provide necessary medical care on an ongoing basis, but held that an injunction was unnecessary, given the availability of medical care from the VA. The court explained that it would "not enjoin one government agency to provide health care when another agency has been congressionally mandated to do so." Notably, however, the district court did not hold that the availability of medical care from the VA rendered Plaintiffs' request for an injunction moot. Nor does the government argue to us that the availability of medical care from the VA renders the Plaintiffs' request moot. We can readily see why it does not make such an argument, for there is nothing in the record upon which to base a conclusion that the medical care available from the VA would be equal in scope and quality to the medical care that Plaintiffs claim is owed to them by the Army. Indeed, the government admitted in the district court that it does not provide medical care to former test subjects "in the absence of those [former subjects] being retirees of the military, medical retirees, reservists or active duty military." In the absence of mootness, we cannot agree that the Army's duty to provide care is excused by the availability of medical care from another government agency, even if that care that would overlap to some degree and in some manner with the care that the Army is required to provide.

We hold that the district court may not, in the absence of mootness, categorically deny injunctive relief to former volunteer subjects seeking necessary medical care because some former subjects may be entitled to receive medical care from another government agency. Given the present posture of the case, however, we do not address whether and in what manner the district court might nonetheless take the VA's

provision of medical care into account in formulating an injunction on remand.

Conclusion

We hold that Chapter 3–2(h) of AR 70-25 imposes a duty on the Army to provide all former test subjects with newly acquired information that may affect their well-being, and that this duty is judicially enforceable under § 706(1). We hold that the district court did not abuse its discretion in entering its injunction to enforce that duty. We hold, further, that the district court was right to find that Chapter 3–1(k) imposes a duty to provide medical care. The district court should not, however, have declined to compel the provision of medical care on the ground that another agency was providing similar care to some former test subjects. We therefore vacate the district court's summary judgment for the government on this claim and remand to the district court.

**AFFIRMED** in part, **REVERSED** and **REMANDED** in part.

---

WALLACE, Circuit Judge, concurring in part and dissenting in part:

I agree that the text of AR 70-25 unequivocally commands the Army to provide certain newly acquired information to all former research volunteers when that information becomes available. Because the Army has "unlawfully withheld" agency action by denying that it owes this duty to certain past volunteers, I join the majority in affirming the district court's judgment and injunction

compelling the Army to comply with AR 70-25's clear regulatory mandate. *See* 5 U.S.C. § 706(1). I write separately in concurrence on this point only because I do not join the majority's analysis of regulatory history to support its textual analysis.

I dissent, however, from the majority's conclusion that AR 70-25 also contains a "specific, unequivocal command" that the Army provide medical care to former research volunteers. I would affirm the district court's decision to grant summary judgment against Plaintiffs on their claims for medical care, but on the alternative ground that their claim is not judicially enforceable under section 706(1) of the Administrative Procedure Act (APA).

## I.

"Section 706(1) of the APA . . . serves important interests, but [it] does not give us license to 'compel agency action' whenever the agency is withholding or delaying an action we think it should take." *Hells Canyon Pres. Council v. U.S. Forest Serv.*, 593 F.3d 923, 932 (9th Cir. 2010). Rather, our authority to "compel agency action" is "carefully circumscribed to situations where an agency has ignored a specific . . . command," *id.*, that is located in a federal statute or "agency regulation[] that ha[s] the force of law," *Norton v. S. Utah Wilderness Alliance (SUWA)*, 542 U.S. 55, 65 (2004). Moreover, the "purportedly withheld action must not only be 'discrete,'" *Hells Canyon*, 593 F.3d at 932, meaning that it must be a "precise, definite act," *SUWA*, 542 U.S. at 63, "but also 'legally *required*,'" 593 F.3d at 932, meaning that the text of the statute or regulation contains an "unequivocal command" about which an official has "no discretion whatever," 542 U.S. at 63 (internal quotation marks omitted),

such that the duty "could traditionally have been enforced through a writ of mandamus." *Hells Canyon*, 593 F.3d at 932.

A.

Our analysis must focus exclusively on the text of the relevant statutes or regulations to determine whether this standard is satisfied. This purely textual approach, amounting to a "clear-statement rule," is not unique to the section 706(1) context. It is indispensable whenever a statute requires us to determine whether a particular text obligates agency actors to assume a specific duty or to perform a discrete act.

Like an action brought under section 706(1) of the APA, for example, a citizen suit may be brought under section 505(a)(2) of the Clean Water Act only where plaintiffs "allege[] a failure of the [EPA] Administrator to perform any act or duty under this chapter which is not discretionary with the Administrator." 33 U.S.C. § 1365(a)(2). If plaintiffs are to succeed in their citizen suit against the Administrator, we have held that "the nondiscretionary nature of the duty must be clear-cut—that is, readily ascertainable from the statute allegedly giving rise to the duty." *WildEarth Guardians v. McCarthy*, 772 F.3d 1179, 1182 (9th Cir. 2014). In other words, "[w]e must be able to identify a 'specific, unequivocal command' *from the text of the statute at issue* using traditional tools of statutory interpretation; it's not enough that such a command could be teased out 'from an amalgamation of disputed statutory provisions and legislative history coupled with the [agency's] own earlier interpretation.'" *Id.* (emphasis added), quoting *Our Children's Earth Found. v. E.P.A.*, 527 F.3d 842, 851 (9th Cir. 2008) (stating that plaintiffs must "point to a nondiscretionary duty that is readily-ascertainable and not

only [] the product of a set of inferences based on the overall statutory scheme" (alteration in original) (internal quotation marks omitted)).

## B.

Because our inquiry under section 706(1) is necessarily limited to whether the text of the relevant Army regulations states a specific, unequivocal command to take discrete agency action, I cannot join the majority's perusal of "internal agency discussions in the years leading up to the 1988 and 1990 revisions of [AR 70-25]," nor its discussion of the Army's creation of volunteer databases in 1981 and 1986. The majority includes these historical observations because it believes they support our reading of AR 70-25. They do, of course, but that is irrelevant. Our job is to determine only whether a statute or regulation itself objectively creates a mandatory duty. As we have previously held, it is inappropriate "for us to divine a 'specific, unequivocal command,' from an amalgamation of disputed statutory provisions and legislative history coupled with the [agency's] own earlier interpretation." *Our Children's Earth Found.*, 527 F.3d at 851, quoting *SUWA*, 542 U.S. at 63. To be sure, the majority does not rely exclusively—or even chiefly—on non-textual sources in concluding that the Army has an unequivocal duty to warn. But by including a discussion of regulatory history and historical facts in support of its textual analysis, the majority improperly suggests that these extra-textual sources and observations have some bearing on whether we are authorized to compel unlawfully withheld agency action under section 706(1). I write separately to dispel any doubt: they do not. I thus join in the result but not that part of the majority's analysis.

II.

I dissent from the majority's conclusion that AR 70-25 creates an unequivocal duty for the Army, enforceable under section 706(1), to provide medical care to former research volunteers. As stated above, the Supreme Court's standard under section 706(1) for compelling agency action is demanding. *See SUWA*, 542 U.S. at 63. We ourselves have explained that we can compel agency action only when the legal obligation is "so clearly set forth that it could traditionally have been enforced through a writ of mandamus." *Hells Canyon*, 593 F.3d at 932.

Only two provisions of AR 70-25, as promulgated in 1988, could potentially provide the basis for a judicially enforceable duty to provide medical care. Neither does.

A.

1.

The first is Chapter 3–1(k) (subsection (k)), which provides, "Volunteers are authorized all necessary medical care for injury or disease that is a proximate result of their participation in research." This subsection is not an "unequivocal command" to provide medical care. That is, while the authorization in subsection (k) certainly removes a barrier to volunteers' receipt of medical care—making it clear, at least, that volunteers should not be denied medical care for lack of authorization—it does not clearly require the Army to provide medical care. This is a far cry from the typical mandatory language we usually require in section 706(1) cases. *See Rivas v. Napolitano*, 714 F.3d 1108, 1111 (9th Cir. 2013) (observing that "[t]he mandatory language

used in the regulation makes the act of reconsideration non-discretionary").

The majority, of course, believes the more "natural reading" of the word "authorized" is that "the volunteers are entitled to receive the 'necessary medical care' specified in the subsection." But regardless of how "natural" the majority believes its reading to be, it is not the only plausible reading. The only thing that subsection (k) makes clear is that volunteers are authorized to receive medical care, which is one or two logical steps away from the majority's conclusion that the Army has a legal obligation to provide them with that medical care. Although it is possible to read into the text of subsection (k) the assumption that the authorization is the only thing volunteers need in order to be entitled to medical care, and the assumption that the Army has a duty to provide medical care to anyone who is entitled to it, it is also possible to read the text of subsection (k) without those assumptions. Because the text is reasonably open to interpretation, it does not state an *unequivocal* command.

## 2.

Subsection (k)'s "authorization" for medical care, in addition to not being legally required, also is not *discrete* agency action. Discrete agency action for purposes of section 706(1) is a "precise, definite act," like the promulgating of a rule or the taking of some decision by a statutory deadline. *SUWA*, 542 U.S. at 63. The phrase "[v]olunteers are authorized all necessary medical care for injury or disease that is a proximate result of their participation in research," does not qualify as "the ordering of a 'precise, definite act . . . about which [an official] ha[s] no discretion whatever.'" *Id.* This is most easily demonstrated by comparing subsection (k)

to subsection (h)—the "duty to warn" subsection—which does command discrete agency action.

Subsection (h) unambiguously identifies which agency or officers ("Commanders"; "MACOM") are "legally required" ("have an *obligation*"; "*must* establish") to perform a "discrete action," ("provide [volunteers] with any newly acquired information") which is described "precise[ly]" and "definite[ly]":

- *What*: "information that may affect their well-being";

- *When*: "when [it] becomes available" and "even after the individual volunteer has completed his or her participation in research";

- *To Whom*: "research volunteers"—"[t]o accomplish this, [the Army] must establish a system which will permit identification of volunteers who *have participated* in research . . . and take actions to notify volunteers of newly acquired information."

Subsection (k), in contrast, leaves us to guess at which agency officer is obligated to provide the medical care (assuming, of course, that "authorized" means "required"—it does not), what such medical care would consist of, or when and how long medical care must be provided (only during research? only in "emergency" situations? forever?). As a result, subsection (k) "lack[s] the specificity requisite for agency action." *SUWA*, 542 U.S. at 66.

B.

Only one other provision of AR 70-25 could possibly provide the basis for a judicially enforceable duty to provide medical care: Chapter 2–5(j) (subsection (j)). Subsection (j) provides, "The Surgeon General . . . will . . . [d]irect medical followup, when appropriate, on research subjects to ensure that any long-range problems are detected and treated." Subsection (j), like subsection (k), lacks the usual language of obligation. Subsection (j) contemplates action by the Army Surgeon General only "when appropriate." That grant of discretion prevents us from concluding that this language represents a "specific, unequivocal command" directing the Surgeon General to provide medical care.

C.

For these reasons I would affirm the district court's summary judgment against Plaintiffs on their claims for medical care, but on the alternative ground that their claim is not judicially enforceable under section 706(1) of the APA.

I am not unsympathetic to the notion that those who have served our country—especially those who have risked their health and well-being in that service—should have access to appropriate medical care. However, the Supreme Court has counseled us, and we have recognized, that "[e]ven if a court believes that the agency is withholding or delaying an action the court believes it should take, the 'ability to compel agency action is carefully circumscribed to situations where an agency has ignored a specific legislative command.'" *Gardner v. U.S. Bureau of Land Mgmt.*, 638 F.3d 1217, 1221–22 (9th Cir. 2011), quoting *Hells Canyon*, 593 F.3d at 932. "As much as we as citizens are concerned with the plight

of veterans seeking the prompt provision of the health care and benefits . . . as judges we may not exceed our jurisdiction." *Veterans for Common Sense v. Shinseki*, 678 F.3d 1013, 1016 (9th Cir. 2012) (en banc). I am therefore compelled to dissent from this part of the majority opinion.